# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
## LYNCHBURG DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | CASE NO. 6:13-CR-00022-10 |
| ) | |
| v. ) | **MEMORANDUM OPINION** |
| ) | **and ORDER** |
| ) | |
| LES CHRISTOPHER BURNS ) | |

Defendant filed a motion to suppress any statements or admissions made on March 27, 2013, subsequent to his arrest that morning, asserting that his statements were involuntary because they were obtained by threats to arrest his wife. The government responded to the motion and the parties' arguments have been heard. For the following reasons, Defendant's motion is denied.

## I. BACKGROUND

The record, including testimony presented at the hearing on the suppression motion, discloses the following facts regarding Defendant's arrest and the ensuing interviews.

Federal and local law enforcement officers scheduled March 27, 2013, as the date upon which they would attempt to arrest a number of individuals, including Defendant, who had been indicted by a federal grand jury on drug conspiracy charges. The investigation was referred to as "Operation Pain Train." Pursuant to a separate investigation of Defendant, who was suspected of having fraudulently reported a burglary to obtain an insurance payment, state law enforcement officers obtained a search warrant to search Defendant's residence in Bedford, Virginia. The officers planned to execute the arrest and the search simultaneously.

Around 7:00 o'clock that morning, Defendant's wife, Tara Burns ("Ms. Burns"), departed the marital residence for work. Some distance from the home, several law enforcement officers stopped her car. Ms. Burns was informed that she had done nothing wrong, but that the officers had a warrant to search her home, and they wanted her to call Defendant to convince him to leave his home. One reason for persuading him to leave the house was that law enforcement officers might otherwise break down the door to the residence. Using her cell phone, Ms. Burns contacted Defendant and persuaded him to leave the house, and he was arrested by Bedford County Deputy Juette Renalds pursuant to a federal arrest warrant. Defendant was advised of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). Defendant was taken to the Bedford County Sheriff's Office, where he was again advised of his rights pursuant to *Miranda*, and he was interviewed about the drug conspiracy by Investigator Chris Cook and Assistant United States Attorney ("AUSA") Ashley Neese.

After her husband was arrested, Ms. Burns resumed traveling to work in Lynchburg, first dropping her children off at various places. The trip took about an hour and, right when she arrived at her workplace, she received a call from Investigator Cook, who insisted that she meet that morning with law enforcement officers at the Bedford County Sheriff's Office.

Accompanied by her mother-in-law, Ms. Burns arrived at the Bedford County Sheriff's Office after Defendant's first interview. Ms. Burns was interviewed by Investigator Cook and AUSA Neese. She states that she was never threatened. Ms. Burns was then interviewed a second time by Detective Sara Dryden, who questioned her about a purported burglary that had occurred at the Burns residence, which Detective Dryden was investigating as a potential case of insurance fraud. Detective Dryden told Ms. Burns that if she did not tell the truth she could have her children taken away from her and she could lose her job. After the interview with Dryden, as

she was being escorted from the interview room, Ms. Burns encountered Defendant in the hall and was permitted to speak to him briefly. She states that she informed him of what Detective Dryden had said, and gave him a hug. Defendant was then interviewed again, with Detective Dryden asking the questions and Investigator Cook and AUSA Neese observing. When she concluded her interview, Detective Dryden turned Defendant over to Investigator Cook, and the parties dispute whether Cook and Neese interviewed Defendant again.

## II.  THE MOTION TO SUPPRESS

Defendant alleges that, on the morning of March 27, 2013, Ms. Burns was pulled over a few blocks from home and was "threatened with prosecution for obstruction of justice, among other possible crimes, if she refused" to tell her husband to come to where she was. The motion alleges that, when Ms. Burns was being interviewed at the Bedford County Sheriff's Office,

> [s]he was threatened with prosecution herself by Investigator Cook and Assistant United States Attorney Ashley Neese. The threat was made to her that if she did not tell them that she knew that Defendant had been selling drugs, she would be arrested and held in jail, her children would be taken from her, she would lose custody of them, and she would lose her job and her teaching license.

The motion states that Ms. Burns spoke with Defendant in the hall and relayed this information, and when questioning of Defendant resumed, "[t]he threats that had been made to [Ms. Burns] were repeated to Defendant; he was told by Investigator Cook and by Assistant United States Attorney Ashley Neese that if he didn't tell them what they wanted to hear, his wife would be arrested and locked up also." In Defendant's view, his confession was involuntary because it was obtained by a threat to arrest his wife.

A confession is involuntary if it is not the "product of a rational intellect and a free will." *Mincey v. Arizona*, 437 U.S. 385, 398 (1978); *see also Lynumn v. Illinois*, 372 U.S. 528, 534

(1963) (observing that the test is whether a defendant's "will was overborne at the time he confessed"). "In determining whether a defendant's will was overborne in a particular case," a court must assess "the totality of all the surrounding circumstances – both the characteristics of the accused and the details of the interrogation." *Schneckloth v. Bustamonte,* 412 U.S. 218, 226 (1978). The Supreme Court of the United States has held "that coercive police activity is a *necessary* predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause . . . ." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986) (emphasis added). When a confession is challenged, "[t]he prosecution must prove at least by a preponderance of the evidence that the confession was voluntary." *Lego v. Twomey*, 404 U.S. 477, 489 (1972) (adding that, "[o]f course, the States are free, pursuant to their own law, to adopt a higher standard"). One circumstance that may weigh toward finding a confession involuntary is if threats of legal action are made regarding a defendant's family members. *See, e.g., Lynumn*, 372 U.S. at 534; *see also Harris v .South Carolina*, 338 U.S. 68, 70-71 (1949).[1]

At the suppression hearing on May 20, 2014, the government presented the testimony of Investigator Chris Cook, Ms. Burns, and Detective Dryden. Defendant testified on his own behalf.

---

[1] However, as set forth above, voluntariness is assessed from "the totality of all the surrounding circumstances[,]" and there is no bright-line rule regarding threats to arrest a family member. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 226 (1978). For example, in *Lynumn v. Illinois*, 372 U.S. 528, 534 (1963), a defendant's verbal confession to unlawful possession and sale of marijuana was deemed involuntary when it was made only after the police told her that state financial aid for her infant children would be cut off and her children would be taken from her if she did not cooperate, the threats were made while she was encircled in her apartment by three police officers and a twice convicted felon who had purportedly "set her up," and defendant had no previous experience with the criminal law and had no reason not to believe that the police had ample power to carry out their threats. In *Harris v .South Carolina*, 338 U.S. 68, 70-71 (1949), an illiterate defendant's confession to murder was deemed involuntary because defendant had been held in jail for several days, during which time he was questioned (on one occasion from one-thirty p.m. until past one a.m.), and during his confinement the defendant was not informed of his rights under South Carolina law (including the right to secure a lawyer, the right to request a preliminary hearing, and the right to remain silent), no preliminary hearing was ever held, and the defendant was denied benefit even of consultation with family and friends. These facts, the Court determined, established a denial of due process of the law. That the defendant finally capitulated to the pressure to confess after the sheriff "threatened to arrest petitioner's mother for handling stolen property" was a particular fact, but it was not the basis of the Court's holding.

4

Ms. Burns testified that she was told that she "wasn't in trouble" when she was pulled over on the morning of March 27, 2013. The officers wanted Ms. Burns to tell her husband that she was having car trouble, and that he needed to come to her aid. She testified that, although the officers pressured her to lie to Defendant to get him to leave the house, she was not threatened in any way. She was unwilling to participate in the ruse, but she nonetheless attempted it. She gave the following testimony:

> So I called him and the officer stood by the window. I told Chris that I needed him to come help me and he kept asking why. I said -- I wouldn't lie to him. I just kept saying I need you to come meet me, I need you to come meet me. Whether it was because I wouldn't tell a lie, he figured out that I had been pulled over. He asked if he came if he was going to be arrested. I said probably. I didn't know at the time, but from the way everything was going down, I figured he would be. Then he asked if he didn't come if I was going to be in trouble. Again, I said probably because I was scared.

Investigator Cook testified that Defendant was given a *Miranda* warning and then interviewed by Investigator Cook and AUSA Ashley Neese before Ms. Burns arrived at the station, and that numerous questions were asked about the drug conspiracy. Defendant's testimony acknowledged that he was given his *Miranda* warnings and admitted that he was asked questions about the "Pain Train" investigation during the initial interview.

Although their accounts of the length of the interviews differed, both Investigator Cook and Ms. Burns testified that Ms. Burns was interviewed first by Investigator Cook and AUSA Neese about the drug investigation and then by Detective Sara Dryden about an unrelated insurance fraud investigation. Ms. Burns testified that the only time she spoke to Defendant after the phone call when she had been pulled over was in the hallway after all her interviews were over. Ms Burns testified that she was never threatened in any way during the first interview. She testified that, during the second interview, Detective Dryden threatened to take away "[her] kids and [her] job." She also testified that Detective Dryden never threatened her with arrest.

5

Detective Dryden testified that she told Ms. Burns that "if she was lying about anything as far as to do with the burglary . . . that she could be in a lot of trouble," and Dryden admitted to making the statements about Ms. Burns's children and her job. Investigator Cook and Detective Dryden both testified that, during the second interview of Defendant, Detective Dryden asked the questions, and Investigator Cook and AUSA Neese were present only as witnesses and did not participate in the questioning.

Ms. Burns also testified that, when she spoke to Defendant in the hallway following her interviews, she informed him that Detective Dryden had threatened to take away her children and her job. She testified on cross-examination that, although she told Defendant that she had "been threatened with having the kids taken away" and that she believed she also told Defendant that she had been "threatened with having her job taken away," she did not tell him that she had been threatened "with possible prosecution of any sort." This is consistent with Ms. Burns's statement that she had not been threatened with arrest or prosecution. Defendant corroborated this claim, testifying that, when he spoke to Ms. Burns, she told him "they're going to take the kids" and "I can't lose my job," but nothing about Ms. Burns possibly being arrested or prosecuted. On cross-examination, Defendant agreed that he did not know of any incident where Ms. Burns was threatened by Investigator Cook or AUSA Neese.

Still, Defendant's testimony presented a story quite different from the other witnesses' testimony. He claimed that, after being questioned during the initial interview, he said "it's time for me to have a lawyer,"[2] that AUSA Neese ignored his requests for an attorney, and that the

---

[2] In a related criminal action (dismissed against Defendant after he was indicted in the instant case), Defendant testified on September 3, 2013, that the government had violated his rights in numerous ways, including violating various amendments to the Constitution, committing perjury, and performing acts "shocking to the universal sense of justice" in a way that was "constitutionally grotesque." *See United States v. Reynolds et al*, Criminal Case No. 6:13-cr-00003-18 (W.D. Va.), docket no. 429 (tr. 28-31). In that testimony, he specifically complained that, after the interviews on March 27, 2013, "they allowed us to speak in the hallway. And she was crying. And she told me that the officers had said that 'If you guys don't cooperate, you'll lose your job, your teacher's license, and be

interview "went back and forth for maybe half hour, 45 minutes" after this request was made. Defendant also claimed that, when he went in for the second interview with Detective Dryden, he was told that "if [he] did not cooperate that [his] wife would lose her job, [they] could have the children taken by Social Services and she [could] be arrested." Defendant also described the substance of the second interview as "Dryden at first hammering [him] about the safe," but that Investigator Cook and AUSA Neese interrogated him again about the drug conspiracy after Dryden questioned him. Defendant claimed that all of the relevant information he offered was not given "until after [Cook and Neese] had come in the second time and had started with the hard core interrogation," which Defendant claims occurred after Detective Dryden left.

### III. ANALYSIS

First, I do not find Defendant's testimony credible. In a related criminal case, Defendant testified before me on September 3, 2013, that he had given false testimony to the grand jury and lied during his interviews with law enforcement on March 27, 2013. *See United States v. Reynolds, et al*, Criminal Case No. 6:13-cr-00003-18 (W.D. Va.), docket no. 429 (tr. 15-16, 27). Defendant's testimony on September 3, 2013, repeated the version of his story contained in the motion to suppress, claiming that Ms. Burns was told "you'll lose your job, your teacher's license, and be arrested," and that Investigator Cook and AUSA Neese said that Ms. Burns "can go to jail too." *Id.* (tr. 26-28). However, in his most recent appearance before me on May 20, 2014, Defendant disavowed a number of the statements he gave at the previous hearing, in the

---

arrested, and social services will take your children.'" *Id.* (tr. 26). Yet despite having previously raised claims disputing the adequacy of his due process, it was not until he took the stand at the suppression hearing, held two weeks before trial, that Defendant for the first time raised a claim that the government ignored his request for counsel during the interviews on March 27, 2013. To be sure, Defendant testified on September 3, 2013, that he had not received the assistance of a lawyer when he was called upon to testify before a grand jury (prior to March 27, 2013), but the claim that he was denied counsel on March 27, 2013, is new.

7

motion to suppress, and earlier in his testimony on May 20, 2014, for instance admitting that his wife had "never" stated to him that she had been threatened with arrest or prosecution, and that, on occasions after the date of the arrest but before the hearing on the motion to suppress, she had specifically told him that she had not been. Given that Defendant stated that he had read "part of" the motion, that all of it "was read to [him]," and that he "[p]retty much" knew what it said, the discrepancies between the motion and his testimony damage his credibility. Other contradictions in Defendant's testimony are telling. For example, Defendant stated that "[a]ll of that stuff [about the drug distribution conspiracy] they already knew from testimony from grand jury hearings and from . . . other interviews and all of that stuff," and he acknowledged that "a lot of the stuff in there is true as far as how I met Bryant Reynolds or who I was getting the pills from." However, later on, as Defendant's cross-examination grew heated, he said that he could not give any details because he did not commit any of the acts in question, and he also stated that he "never told [them] in that interview or any other time that [he] sold pills to those people on that list."

Accordingly, I do not believe that Defendant's "will was overborne at the time he confessed" during the first interview, and there is no credible evidence that his "will was overborne at the time" he was interviewed by Dryden. *Lynumn*, 372 U.S. at 534. Indeed, his testimony denying that he confessed at all implies that his will was not overborne, because according to Defendant he did not make many of the statements, or else he repudiated false confessions he had made. Thus, if he maintains that he did not confess at all, it then follows that he was not forced to confess by threats to arrest or prosecute his wife.

Furthermore, Defendant has testified before me on several occasions, and his demeanor is sometimes angry, aggressive, and confrontational, while at other times he is articulate and

controlled. Additionally, he demonstrates some degree of familiarity with the law; he is not ignorant. "In determining whether a defendant's will was overborne in a particular case," a court must assess "the totality of all the surrounding circumstances -- both the characteristics of the accused and the details of the interrogation." *Schneckloth*, 412 U.S. at 226. Considering the totality of the circumstances, it is not plausible to me that Defendant would be easily cowed by law enforcement into a confession (a lengthy, detailed confession, at that).

In any event, the basis for the motion to suppress is that Defendant's confession was extracted under duress because of arrest threats made regarding Ms. Burns. However, the evidence shows that no such threats were expressed to Ms. Burns. Although Detective Dryden admits to making statements regarding Ms. Burns's children and her job, all agree that Dryden made no threat of arrest or prosecution. Ms. Burns and Defendant both testified that, during the brief meeting in the hall of the police station, Ms. Burns relayed to Defendant only Dryden's statements about the children and her job, and said nothing about a threat of arrest or prosecution. Furthermore, the only evidence that Defendant was coerced into a confession at the second interview by a threat that his wife might be arrested or prosecuted is Defendant's own testimony, while other, more credible evidence shows that the prosecution obtained no additional information about the "Pain Train" drug conspiracy at the second interview.

### IV. CONCLUSION AND ORDER

In sum, there is no evidence that Ms. Burns was threatened with arrest, and no credible evidence that Defendant was coerced by such a threat during his second interview. Considering "the totality of all the surrounding circumstances[,]" *Schneckloth,* 412 U.S. at 226, the prosecution has met its burden of showing "by a preponderance of the evidence" that any

statements made by Defendant on March 27, 2013, subsequent to his arrest, were voluntary, *Lego*, 404 U.S. at 489.

Accordingly, Defendant's motion (docket no. 324) is DENIED.

It is so ORDERED.

ENTERED this __27th__ day of May, 2014.

_____
NORMAN K. MOON
UNITED STATES DISTRICT JUDGE