```
 1                    UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF VIRGINIA
 2                         Lynchburg Division

 3

 4   UNITED STATES OF AMERICA,      Criminal No. 6:13cr22

 5              vs.                  Lynchburg, Virginia

 6   LES CHRISTOPHER BURNS,

 7                    Defendant     May  20, 2014

 8              TRANSCRIPT OF SUPPRESSION HEARING
             BEFORE THE HONORABLE NORMAN K MOON
 9                 UNITED STATES DISTRICT JUDGE

10
     APPEARANCES:
11
     For the United States:
12                                   U.S. Attorney's Office
                                     ASHLEY NEESE
13                                   P.O. Box 1709
                                     Roanoke, VA  24008
14

15   For the Defendant:
                                     Snook & Haughey
16                                   JOHN LLOYD SNOOK, III
                                     P.O. Box 2486
17                                   Charlottesville, VA  22902

18   Court Reporter:                 Sonia R. Ferris, RPR
                                     U.S Court Reporter
19                                   116 N Main St  Room 314
                                     Harrisonburg, VA 22802
20                                   540.434.3181 Ext 7

21

22

23

24

25   Proceedings recorded by mechanical stenography;
     transcript produced by computer.
```

```
 1                THE COURT:  Good afternoon.
 2                Call the case, please.
 3                THE CLERK:  United States of America vs.
 4   Les Christopher Burns, case #6:13cr22, defendant #10.
 5                THE COURT:  Government ready?
 6                MS. NEESE:  We are, Your Honor.
 7                THE COURT:  Defendant ready?
 8                MR. SNOOK:  Yes, Your Honor.
 9                THE COURT:  We'll take up the motion to
10   suppress first.
11                MS. NEESE:  Your Honor, prior to taking up
12   the motion to suppress, just briefly, we filed a motion
13   under seal with the Court.  If we want to take that up
14   today, I would like to do it under seal in the courtroom
15   as well. I don't think it's appropriate to take it up
16   today because the Court is already aware of that
17   information and I don't think it would be appropriate
18   for cross-examination either way at that point in time
19   because you're the fact finder in this and know
20   everything that's going on behind that.
21                THE COURT:  We'll take up the motion to
22   suppress.
23                MR. SNOOK:  Judge, I guess I filed the
24   motion.  They've obviously filed their response.
25                THE COURT:  The burden is --
```

1          MR. SNOOK:  Beg your pardon?

2          THE COURT:  The burden's on them.

3          MR. SNOOK: I don't have any sort of reply to

4  their response is all I was going to get at.

5          MS. NEESE:  Your Honor, if defense counsel

6  wants, we will sequester the witnesses then.

7          MR. SNOOK:  Yes, please.

8          MS. NEESE:  We will have a case agent

9  sitting at the table.

10          THE COURT:  Would all the persons here to

11  testify please stay out of the courtroom until you're

12  called into the courtroom?  But remain close by.

13          (Witnesses left courtroom).

14          All right.

15          MS. NEESE:  Your Honor, we would call Chris

16  Cook to the stand.

17  CHRIS COOK, CALLED AS A WITNESS BY THE GOVERNMENT, SWORN

18                    DIRECT EXAMINATION

19  BY MS. NEESE:

20     Q.  Please state your name for the record, sir, and

21  tell us how you're currently employed?

22     A.  Chris Cook, deputy at Bedford County sheriff's

23  office.

24     Q.  How long have you been employed as a law

25  enforcement officer?

1      A.   For approximately 17 years.

2      Q.   Prior -- or are you currently with Bedford

3   County, you stated?

4      A.   That's correct.

5      Q.   Prior to that, you were with Botetourt County?

6      A.   Correct.

7      Q.   How were you employed on March 27, 2013?

8      A.   March 27, 2013, I was an investigator with

9   Bedford County sheriff's office.

10      Q.   In what position?  What type of investigator?

11      A.   Vice unit, narcotics.

12      Q.   Do you know the defendant here today, Les

13   Christopher Burns?

14      A.   I do.

15      Q.   How do you know him?

16      A.   He is a defendant in this case.  Also, he was a

17   confidential informant that worked for me.

18      Q.   What was your role on March 27th of 2013? Just

19   give the Court an overview of what was happening that

20   day.

21      A.   On March 27, 2013, we had in hand a federal

22   indictment for Mr. Burns' arrest.  That morning, myself

23   and Deputy Jouett Reynolds and ATF Special Agent

24   Lockheed travelled to Mr. Burns' residence to effect

25   that arrest.

1     Q.  Did y'all have anything else in your hand at the

2   time?

3     A.  We also had a state search warrant from Bedford

4   City Police Department to be executed as well, which was

5   in reference to an insurance fraud that was being

6   investigated.

7     Q.  Where was that search warrant supposed to take

8   place?

9     A.  At 414 Franklin Street, Bedford City.

10    Q.  Whose residence was that?

11    A.  Mr. Les Burns'.

12    Q.  Did anyone else live there at the time?

13    A.  Tara Burns as well and their two children.

14    Q.  What time, approximately, did you go to the

15  residence?

16    A.  It was approximately -- it was probably a little

17  before 7:00 a.m. that morning.

18    Q.  Explain to the Court what happened; from your

19  perspective.

20    Q.  That morning, Ms. Burns left the residence and

21  was later stopped by several law enforcement officers;

22  sergeant John Wilkes, Bedford County sheriff's office;

23  ATF Special Agent Davidson, Russell Davidson; and the

24  Rack, Tom Gallagher, ATF.  They stopped and made contact

25  with Ms. Burns.  At that time, they advised Ms. Burns

1    that a federal indictment for Mr. Burns' arrest was in

2    hand and as well, a search warrant for the residence.

3       Q.   Where were you during this stop?

4       A.   At this point, I was just up the street in a

5    vehicle from Mr. Burns' residence, watching the

6    residence.

7       Q.   What happened next, in your view?

8       A.   The agents out with Mrs. Burns requested that she

9    call Mr. Burns and respond to that location.  That was

10   done solely for the purpose of safely effecting the

11   arrest of Mr. Burns.

12      Q.   Then what happened?

13      A.   Well, she eventually called Mr. Burns and from my

14   understanding, he asked her questions, if she had been

15   pulled over and if he was going to be arrested.  Shortly

16   after that, he did exit the residence and Deputy

17   Reynolds affected the arrest, took him into custody.

18      Q.   Did you watch that?

19      A.   I did.  Myself and Special Agent Lockheed were

20   the cover officers during the arrest.

21      Q.   What happened with Mr. Burns once he was

22   arrested?

23      A.   Once Mr. Burns was arrested, he was taken to

24   Deputy Patrick Schrader's patrol vehicle.  At that time,

25   I advised him of his Miranda warnings.  He said he

1   understood his rights.  I left along with Deputy

2   Schrader and returned back to the Bedford County

3   sheriff's office.

4       Q.   Did you ride in the same vehicle with Mr. Burns?

5       A.   No, I did not.

6       Q.   Where were you heading at that time?

7       A.   At that time, I travelled back to the Bedford

8   County sheriff's office to interview Mr. Burns.

9       Q.   Did Mr. Burns state anything to you once he was

10  advised of his rights at that point in time?

11      A.   Nothing more than he understood his rights.

12      Q.   Once you got back to the Bedford County sheriff's

13  office, what happened?

14      A.   Once back at the Bedford County sheriff's office,

15  we went to the conference room located to the front of

16  the sheriff's office and at that point, an interview

17  ensued after I again advised Mr. Burns of his Miranda

18  warnings.

19      Q.   Be explanatory to the Court.  Who went to the

20  conference room?

21      A.   It was myself, AUSA Neese, and Mr. Burns was in

22  the conference room.

23      Q.   Approximately what time was this?

24      A.   Approximately 7:30, 7:40 a.m.

25      Q.   Then what happened -- did Mr. Burns come into the

1  room?

2      A.   Yes.

3      Q.   Who brought him in there?

4      A.   I'm assuming Deputy Schrader brought him into the

5  room.   I met up with Deputy Schrader somewhere and

6  brought Mr. Burns into the conference room.

7      Q.   What happened when you first sat down?

8      A.   When we first sat down, I advised Mr. Burns of

9  his Miranda warnings and he stated that he understood

10 his rights and stated that he was willing to talk.

11     Q.   Explain to the Court what the conference room

12 set-up is.   Is that typically where you all interview

13 people who are arrested?

14     A.   No.   There's an interrogation room located within

15 the investigations unit, but that morning, we used the

16 conference room.

17     Q.   Were there other things going on that day?

18     A.   Yes.   There were other indictments being served

19 and so --

20     Q.   What type of indictments?

21     A.   Federal indictments, for the Pain Train drug

22 conspiracy.

23     Q.   So, more people were going to be arrested that

24 day?

25     A.   That's correct.

1    Q.   Was Mr. Burns the first one arrested that day?

2    A.   I believe so.

3    Q.   Why was that?

4    A.   I don't know why Mr. Burns was the first one we

5    arrested, but --

6    Q.   Did y'all have a search warrant for any other

7    place?

8    A.   No, there was no other search warrants.

9    Q.   Now, going back to the actual interview, once you

10   advised him of his Miranda rights and he agreed to talk,

11   what happened?

12   A.   We -- well, we questioned Mr. Burns in reference

13   to the Pain Train and an interview ensued at that point.

14        He started off the interview by stating that he

15   had abused drugs for approximately ten years, different

16   types of illegal narcotics.  He abused different types

17   of pain medications -- Dilaudid, oxycodone, methadone,

18   Suboxone, Ecstasy.

19   Q.   What was your role in the Pain Train

20   investigation? Were you investigating a drug conspiracy?

21   A.   That's correct.

22   Q.   Were you the lead agent assigned to Mr. Burns?

23   A.   Yes.

24   Q.   Okay.  Keep going.

25   A.   Okay.  So, he also stated that starting in 2010,

1    he began to distribute various types of drugs.  He named

2    ten different people approximately that he was

3    distributing the drugs to.

4       Q.  Did he name other people he got involved with in

5    this conspiracy?

6       A.  He did.

7       Q.  Tell us about that, sir.

8       A.  All right.  He named -- he stated that in

9    approximately 2010, he game involved with Bryant

10   Reynolds, who was also indicted in Pain Train.  Prior to

11   that, he was involved with Scottie Andrews.  Scottie

12   Andrews was purchasing Oxycontin, oxycodone pills from

13   Bryant Reynolds and then redistributing them to Mr.

14   Burns.  Later on, Mr. Burns developed a relationship

15   with Mr. Reynolds.  I believe it started off that Mr.

16   Burns sold a vehicle to Mr. Reynolds and in payment, he

17   received, I believe, $1800 and ten, 80-milligram

18   Oxycontin tablets.

19      Q.  Where did you get that information?

20      A.  From Mr. Burns, during the interview.

21      Q.  Now, let me ask you.  Is Scottie Andrews also

22   charged in this?

23      A.  He is.

24      Q.  Tell us what happened next during the interview,

25   sir.

1     A.   After we got through the different people that he

2     was distributing drugs to, different people that had

3     distributed drugs to him since 2010, he stated that he

4     knowingly injected a minor female approximately five

5     times, a year-and-a-half prior to the interview.

6     Injected her with Dilaudid tablets.

7     Q.   Are you just giving a brief overview of what

8     happened during this interview?

9     A.   I am.

10     Q.   Explain to the Court how long this interview took

11     place.

12     A.   The interview took place approximately 45 minutes

13     to an hour.

14     Q.   What was the demeanor of Mr. Burns throughout

15     this time period?

16     A.   He was forthcoming, cooperative.

17     Q.   Did you have any problems with him whatsoever?

18     A.   None.

19     Q.   Did you ever threaten him in any way?

20     A.   No.

21     Q.   Did you ever ask him if he was lying?

22     A.   Absolutely.

23     Q.   Tell us about that, sir.  Tell us about your

24     investigative experience with drug users and people that

25     you've arrested and how they usually cooperate once

1    they're Mirandized.

2        A.   In my experience in interviewing people who abuse

3    drugs, once they're being questioned in reference to how

4    much of a drug they abuse, they tend to minimize.  I

5    just thought a few times during the interview that he

6    possibly was minimizing.  I asked him if he was lying

7    and we went on with the interview.

8        Q.   Did he ever see anybody else during the course of

9    this part of the interview?

10       A.   No.

11       Q.   Ever see his wife?

12       A.   Not during the interview, no.

13       Q.   Had you talked to his wife at any point in time

14   prior to this interview?

15       A.   No.

16       Q.   At the end of the interview, what did you all

17   discuss?

18       A.   I'm sorry.  I don't know what you're asking.

19       Q.   Did you have any communications with Mr. Burns

20   prior to March 27th of 2013?

21       A.   Yes.

22       Q.   Did you ever ask him if he had done anything

23   wrong?

24       A.   Yes.  We suspected Mr. Burns of stealing a

25   storage device card from us during a controlled purchase

1    when he was working for us.  Prior to the interview, we

2    had met him, questioned him about it and he had denied

3    it.  During this interview, he did admit to stealing the

4    storage device card from the device.  Stated that he did

5    that because he had used during the controlled purchase.

6        Q.  At a point in time -- did you talk about anything

7    else with him?

8        A.  Yeah.  He stated in 2011, in the summer of 2011,

9    he had met up with a Jonathan Bohon and at that time,

10   Mr. Bohon was purchasing Dilaudid tablets from a Tony

11   Abey.  Mr. Burns had provided Mr. Bohon with currency in

12   order to purchase some of the Dilaudids. Later on that

13   day, Mr. Burns and Mr. Bohon met up.  Mr. Burns injected

14   himself.  He injected Mr. Bohon and Amanda McKinney.

15   Mr. Burns and Amanda McKinney left that location and

16   travelled back to Mr. Burns' residence where Mr. Burns

17   injected himself and Amanda McKinney again.

18        The following day, Mr. Burns attempted to make

19   contact with Mr. Bohon.  However, a person by the first

20   name of Butch, last name unknown, answered Bohon's phone

21   and attempted to wake Mr. Bohon up.  He didn't wake up.

22   I think Mr. Burns stated he called several times that

23   day trying to make contact with Mr. Bohon, Butch, last

24   name unknown.  Was unable to wake him.  Later on that

25   evening, Mr. Burns was informed that Mr. Bohon had

1    overdosed and died.

2        Q.   Did you ever ask Mr. Burns about a firearm?

3        A.   Asked Mr. Burns about a firearm that -- he stated

4    he had a Walther .22 caliber that he kept in a safe that

5    he had reported stolen from his residence.  He stated

6    that he had discharged the firearm on several occasions,

7    after being a convicted felon and knowing that he was a

8    convicted felon.

9        Q.   What happened once you concluded the interview?

10       A.   Once the interview was concluded, I, at that

11   time, I believe I made contact with Mrs. Burns and

12   requested that she travel to the sheriff's office to be

13   interviewed.

14       Q.   Tell us what happened next once Mrs. Burns was

15   interviewed.  Or did she come to the sheriff's office?

16       A.   She did.

17       Q.   Tell us what happened.

18       A.   Once Mrs. Burns came to the sheriff's office, she

19   was interviewed in reference to Mr. Burns' drug abuse,

20   distribution.  She was questioned about her knowledge of

21   that.  She stated that she knew --

22       Q.   I'm going to interrupt you for just a second,

23   sir.  How many times was Mrs. Burns interviewed on that

24   day?

25       A.   She was interviewed twice.

1    Q.  Tell the Court who interviewed her the first

2    time.

3    A.  The first time, myself and AUSA Ashley Neese

4    interviewed Ms. Burns.

5    Q.  Where did the interview take place?

6    A.  It took place in the conference room, at the

7    sheriff's office.

8    Q.  How long, approximately, was the interview?

9    A.  It was approximately --

10   Q.  Was it a long interview?

11   A.  No, maybe 15, 20 minutes, I believe was how long

12   it lasted.  It wasn't very long.

13   Q.  Tell us about that.

14   A.  During the interview, Ms. Burns stated that she

15   knew that her husband had illegally used drugs in the

16   past.  She knew that he had injected himself with drugs

17   before, but that she had no knowledge of him

18   distributing drugs.  She had no knowledge of his recent

19   usage of drugs.

20   Q.  Were any threats made to Ms. Burns during this

21   time period?

22   A.  No, ma'am.

23   Q.  Tell us what else the interview was about.

24   A.  She was questioned about the SD card, as well,

25   and she stated that she did have knowledge about the SD

card.  She stated that her husband, Mr. Burns, told her

that he had taken the SD card during the controlled

purchase.  Well, at first he told her there were

controlled purchases on the SD card and that he had

stolen the SD card because he had second thoughts about

working for the sheriff's office.

Q.  How did that interview end?

A.  (No response).

Q.  Did you arrest her, sir?

A.  No.

Q.  Did you tell her she was free to leave at any

point in time?

A.  Yes.

Q.  Was she under arrest at any point in time?

A.  She was never detained.

Q.  Was she ever threatened in any way?

A.  No.

Q.  Did she get interviewed again?

A.  She was.

Q.  Was that right after the first interview?

A.  Yes, I believe she, right after that, she was

interviewed by Detective Dryden.

Q.  Sir, tell us about that.  Did you stay in there?

A.  I did stay in.  Myself and AUSA Neese stayed in

basically as witnesses to the interview.  At that time,

1    Detective Dryden conducted an interview in reference to

2    the insurance fraud that she was investigating.

3        Q.   Who's Detective Dryden?

4        A.   At that time, Detective Sarah Dryden was a

5    detective with Bedford Police Department.

6        Q.   Did she have knowledge of who Mr. Burns was

7    before that day?

8        A.   She did.

9        Q.   How did she have knowledge of him?

10       A.   I believe prior to being a detective, she had

11   conducted a traffic stop of Mr. Burns in Bedford City

12   and during that traffic stop found Mr. Burns to be in

13   possession of illegal narcotics.

14       Q.   Is that how Mr. Burns became a confidential

15   informant working for you?

16       A.   It is.

17       Q.   Two days after he was stopped by her?

18       A.   It is.

19       Q.   Keep going on what happened during the interview,

20   the second interview with Ms. Burns.

21       A.   During the second interview, Ms. Dryden just

22   basically asked Ms. Burns questions in reference to the

23   safe being stolen from their residence, which Mr. Burns

24   had reported to the police department.  Ms. Burns stated

25   that there was $1,800 U.S. currency in the safe; the

1    .22-caliber Walther handgun, and different documents

2    that were in the safe.  She was asked -- she stated that

3    she did not believe the safe was actually stolen from

4    the house and stated that she had questioned her husband

5    on several different occasions if he, in fact, had

6    knowledge of the safe being stolen from the house, which

7    she stated that he denied.

8        Q.   During this second interview, at any point in

9    time, was she threatened?

10       A.   No.

11       Q.   What did Detective Dryden tell her?

12       A.   Detective Dryden stated that if she had knowledge

13   about any of the illegal activity going on in the

14   household that there would be -- that she could

15   potentially have her children taken away and she could

16   potentially possibly lose her job if she was not being

17   forthcoming and truthful about the circumstances.

18       Q.   Did you ever talk to Ms. Burns that way?

19       A.   No.

20       Q.   Did you ever state anything like that to her?

21       A.   No.

22       Q.   Tell me this, sir.  Did Ms. Burns leave the

23   conference room between the first interview and the

24   second interview?

25       A.   No.

1    Q.  Did she ever see Mr. Burns between the first

2  interview and the second interview?

3    A.  No.

4    Q.  What happened after the second interview, sir?

5  Wait.  Was she arrested?

6    A.  No, she was not.

7    Q.  Was she free to leave?

8    A.  She was.

9    Q.  After the second interview, was she escorted out

10  of the sheriff's office?

11    A.  Yes.

12    Q.  What happened during that time period?

13    A.  Mrs. Burns and Mr. Burns saw one another in the

14  hallway and she requested to speak with Mr. Burns, which

15  she did, for approximately one minute.

16    Q.  What happened after that?

17    A.  At that time, she left and Mr. Burns entered the

18  conference room again and was interviewed by Detective

19  Dryden.

20    Q.  Tell us about that interview, sir.  Were you

21  present during that interview?

22    A.  I was present during the interview.

23    Q.  Did you engage in that interview?

24    A.  No, I did not.

25    Q.  Tell us about it, sir.

1    A.  During the interview, Detective Dryden asked

2    Burns questions about the safe, knowledge of who may

3    have stolen the safe, if he had any type of -- if he

4    participated in the safe being taken in order to collect

5    money from the insurance, illegally, and during the

6    interview, Mr. Burns denied any knowledge of any of

7    that.

8    Q.  Was he ever threatened in any way?

9    A.  No.

10   Q.  Did he ever ask for counsel in either the first

11   or second interview?

12   A.  He did not.

13   Q.  Let me ask you this, sir.  Was Detective Dryden

14   part of the federal drug investigation whatsoever?

15   A.  She was not.

16   Q.  Did you ever ask him any questions after the

17   first interview regarding his involvement in the drug

18   conspiracy?

19   A.  I didn't.

20   Q.  Did you record that interview on that day?

21   A.  I did not.

22   Q.  Either of the two interviews?

23   A.  No.

24   Q.  Did Detective Dryden record either of them?

25   A.  No.

1          MS. NEESE:  No further questions at this

2    time, Your Honor.

3                    CROSS-EXAMINATION

4    BY MR. SNOOK:

5      Q.  Mr. Cook, I'm just curious.  I assume in the

6    interview room, you would be recording the interview;

7    correct?

8      A.  No.

9      Q.  I'm not talking about in the conference room, but

10   if you had done the interview in your designated

11   interview room, those are set up to record; correct?

12     A.  There are recording devices in those interview

13   rooms where we could potentially record.

14     Q.  Is there a reason why you didn't record the

15   interview with Mr. Burns?

16     A.  It's just normal procedure.

17     Q.  Normal procedure is to not record any interviews

18   with defendants.

19     A.  That's correct.

20     Q.  In all cases or just in drug cases?

21     A.  In federal cases.

22     Q.  Okay.  So this is pursuant to the federal

23   Department of Justice policy that you don't record

24   interviews.

25     A.  That's correct.

1    Q.  You're aware that the federal Department of

2  Justice policy says that if you believed it to be

3  important, you can ask for permission to interview;

4  right?

5    A.  I don't know that.

6    Q.  Okay.  Who made the decision not to interview?

7  I'm sorry.  Who made the decision not to record?

8    A.  I don't recall at any point that we told one

9  another that we weren't going to record it. We just

10 didn't.

11   Q.  Okay.  Because it's sort of your standard

12 practice not to record federal interviews.

13   A.  That's my understanding, yes.

14   Q.  This was even though you knew -- at that time,

15 you already had very clear suspicions that the defendant

16 here was somebody who had been trying to trick law

17 enforcement; isn't that right?

18   A.  Yes, he had.

19   Q.  And reasonably anticipating, therefore, if

20 there's anybody who's going to give you problems later

21 on, it would be somebody like him, you didn't think it

22 was important to record it?

23   A.  No.

24   Q.  Now, let me get a sense of the timing of all of

25 this.  The original arrest was shortly after seven

1    o'clock; is that right?

2        A.   That's correct.

3        Q.   By what time did you get him back to the Bedford

4    County sheriff's office?

5        A.   The interview started approximately 7:30, 7:40

6    a.m.

7        Q.   Do you recall about what time that first

8    interview concluded?

9        A.   Approximately 8:30, 8:40 a.m.

10       Q.   Do you recall approximately what time it was that

11   Tara Burns arrived?

12       A.   It began at approximately 8:45, 9:00 a.m.

13       Q.   Meaning, the interview with her.

14       A.   Correct.

15       Q.   Do you recall about what time it was that you

16   called Tara and asked her to come to the Bedford County

17   sheriff's office?

18       A.   From what I recall, it was after the interview,

19   the first interview with Mr. Burns.

20       Q.   Okay.  So that would be somewhere about 8:30,

21   8:45?

22       A.   It could have been before the interview.  I just

23   don't recall at what point I talked to her on the phone.

24       Q.   You were pretty insistent that Ms. Burns had to

25   come to the sheriff's office that morning. You didn't

1    want to talk to her that evening when she suggested.

2        A.   That's correct.

3        Q.   And why was that?

4        A.   At that point in time, we were conducting our

5    interviews and I wanted her to come to the office at

6    that time to be interviewed.

7        Q.   In fact, you told her if she didn't come, you

8    would go get her, is that right?

9        A.   I told her we could come pick her up, right.

10       Q.   It wasn't just that if her car wasn't working,

11   you would go pick her up.  It was, you were going to get

12   her.  Either she was going to get herself there or you

13   were going to get her there.

14       A.   I told her I could respond to her location and

15   give her a ride to the sheriff's office.

16       Q.   Okay.  And you knew she worked at a school.

17       A.   Right.

18       Q.   So, your plan was either she drives herself in or

19   you go to the elementary school where she's working, you

20   present yourself there and you bring her from there to

21   the sheriff's office.  That was your plan.  That's what

22   you told her; right?

23       A.   I at no point had a warrant for Ms. Burns.

24       Q.   I understand that.  That's not my question.

25       A.   No, I was not going to detain Ms. Burns and bring

1    her to the sheriff's office.

2       Q.   Did you tell her that either she had to come

3    there on her own or you would go get her?

4       A.   I told her if she wanted me to, I could respond

5    to her location and pick her up.

6       Q.   Those were the only two choices.  Either she

7    drives herself or, quote, if she wants to, you will go

8    pick her up at her place of employment.

9       A.   We were negotiating.  She stated that she did not

10   want to come to the sheriff's office at the time because

11   she had to work.  I told her that myself and Ms. Neese

12   were at the office at that time and wanted to conduct

13   the interview.

14      Q.   You told her basically that Ms. Neese was

15   breathing down your neck to get her there.

16      A.   Which she probably was, yes.

17      Q.   Okay.  And she said -- she finally said, okay,

18   I'll come, let me go talk to my principal.

19      A.   That's correct.

20      Q.   So when she got there -- when she got to the

21   Bedford County sheriff's office, you say that was

22   9 o'clock? Did I get that from you? I'm trying to

23   remember.  I'm not trying to put words in your mouth.

24      A.   I believe the interview started at approximately

25   8:45, 9:00 a.m.

 1    Q.  You say that interview lasted about 45 -- 15 to
 2  20 minutes.
 3    A.  Probably about, yeah, 15 to 20 minutes or so.
 4    Q.  Do you have any of these times noted or are you
 5  sort of reconstructing as we go here?
 6    A.  Pretty much reconstructing.  These are all
 7  approximates.
 8    Q.  Now we're up to somewhere shortly after 9 o'clock
 9  that this first interview was over and then Ms. Dryden
10  came in; is that right?
11    A.  That's correct.
12    Q.  Then Ms. Dryden and you and Ms. Neese talked with
13  her about the insurance fraud claim and about how long
14  did that last?
15    A.  Detective Dryden questioned her at that time.
16  Ms. Neese and I were just there basically as witnesses.
17  It lasted, not long, maybe 15 minutes or so.
18    Q.  So now we're up, getting close to 9:30.  Is that
19  fair to say?
20    A.  9:30, 9:45, maybe close to 10, something like
21  that.
22    Q.  Then Ms. Burns is leaving and as she's leaving,
23  she saw Chris Burns, asked to speak to him, they did for
24  a minute.  You weren't there when they interacted?
25    A.  I believe I probably was still in the conference

1    room at that time.  I'm not sure.

2       Q.   Where was Mr. Burns during the time Mrs. Burns

3    was being questioned?

4       A.   I believe he was downstairs being processed by

5    the agents there.  I don't know.

6       Q.   Then after that brief encounter, Mr. Burns, Chris

7    Burns was brought back into the conference room and at

8    that point, interviewed again by Detective Dryden with

9    you and Ms. Neese present.

10      A.   Correct.

11      Q.   I'm just curious.  Did you at any time get a

12   written Miranda waiver from Ms. Burns?

13      A.   I did not.

14      Q.   Now, during the first interview you had with Tara

15   Burns, you say that she said that she had known that

16   Chris Burns had been illegally using drugs and had been

17   illegally, obviously illegally, injecting himself with

18   drugs.

19      A.   She said she had knowledge of him doing that in

20   the past.

21      Q.   And you asked her about what she knew about any

22   sales and she denied knowing anything about any sales.

23      A.   That's correct.

24      Q.   In fact, you pressed her on that, didn't you, and

25   asked her, basically, you seemed to have a hard time

1    believing that she wouldn't have known what he was up

2    to.

3        A.  I may have, yes.

4        Q.  And in the course of that discussion, you told

5    her basically that if she was -- if she had knowledge of

6    and was participating in any way in his illegal

7    activities, she could also be charged.

8        A.  I don't recall saying that.

9        Q.  Do you recall discussing with her in that

10   interview the fact that if she knew of what he was doing

11   and knew of his illegal -- actually, let me ask you

12   this.  Did you ask her about specific people that you

13   believe Chris Burns had been involved with?

14       A.  She named a couple people in Pain Train that she

15   had seen her husband with.

16       Q.  Some of those are people who have been charged

17   either state or federally.

18       A.  Correct.

19       Q.  When she mentioned that, mentioned those names,

20   you pressed her on what exactly she knew and what she

21   was aware of that Mr. Burns and they had been doing.

22       A.  Sure.  I asked if she had any knowledge of any

23   sales between them, if she had witnessed anything.  She

24   said that she had no knowledge of anything.

25       Q.  And at any time during that discussion, was there

1   -- during that interview, that first interview with Tara

2   Burns, was there any mention about losing her job,

3   losing her children, anything like that?

4       A.  No, never.

5       Q.  Was there any mention -- back up.  Were you

6   present for any conversation with Tara Burns at the time

7   that she was pulled over at 7:00 in the morning?

8       A.  I was not.

9       Q.  You were basically -- you could see them in the

10  distance; is that right?

11      A.  No.

12      Q.  Did I misunderstand? I thought you said you could

13  see something in the distance. Maybe I was

14  misunderstanding. Seeing Mr. Burns' house in the

15  distance?

16      A.  That's right.

17      Q.  I gotcha.

18          Now, you said when you began the interview with

19  Mr. Burns, he was forthcoming, he was cooperative.

20  Those are adjectives that you used?

21      A.  Yes.

22      Q.  You mentioned that in your experience, it is

23  common for people in Mr. Burns' situation to lie or to

24  minimize.

25      A.  That is correct.

1    Q.   Did Mr. Burns lie or minimize to you?

2    A.   He didn't retract what he said, so.

3    Q.   Is that a yes or a no?

4    A.   I don't know if he was lying or not.  He didn't

5    retract his statements.

6    Q.   I guess I'm -- is it your testimony that Mr.

7    Burns basically gave one consistent thread for the

8    entire 45 minutes to an hour and didn't change anything,

9    didn't backtrack, didn't add anything later on, didn't

10   have to be confronted to say, you're lying, you're

11   minimizing.

12   A.   I don't recall him changing his statement at any

13   time, no.

14   Q.   So maybe I'm misunderstanding the import of why

15   Ms. Neese was asking the question when she was asking

16   about your experience about how drug users and people

17   you're interviewing are often minimizing and you have to

18   confront them with the minimization.

19   A.   Sure.

20   Q.   But you didn't have to with him; is that what

21   you're saying?

22   A.   He was confronted numerous times during this

23   interview about amounts of pills he was purchasing,

24   amounts he was using, but he never retracted his

25   statements.

1      Q.   Okay. Was there anything that Mr. Burns said, and

2    I'm directing your attention -- I'm sure you have a copy

3    of the report of investigation that was done.  I've got

4    discovery page numbers.

5          Are you familiar with this? Let me show it to

6    you.

7          (Document shown to witness).

8          Discovery 2142 and following.

9      A.   That's correct.

10     Q.   Although this doesn't seem to have your signature

11   on it anywhere, have you read this before?

12     A.   I have.

13     Q.   Does it accurately reflect the discussions that

14   were being held?

15     A.   Yes.

16     Q.   Is there anything that Mr. Burns ever said that

17   is in any way inconsistent with what is written down

18   here?

19     A.   No.

20     Q.   So, there would not -- if he was consistent about

21   quantities, for example, there was never a time when he

22   said, oh, instead of, let's say, receiving 100, 120

23   pills, he never said, oh, I only got 50 or 60 pills.  It

24   was always that number used.

25     A.   That's correct.

 1     Q.   Just a second, Judge.

 2          (Counsel conferred with the defendant).

 3          One other question, I guess.

 4          The missing SD card we've heard a lot about, was

 5     that supposedly for a particular transaction or a number

 6     of transactions or what?

 7     A.   For one particular transaction, yes.

 8     Q.   What was the date of that transaction? Do you

 9     know?

10     A.   I don't have that in front of me.

11     Q.   Do you know who the target was?

12     A.   I do.

13     Q.   Who was that?

14     A.   The target that day was Tim Goodman and a

15     Samantha Hogan and Ms. Hogan's boyfriend, and I don't

16     recall his name at this time.  Samantha Hogan was the

17     target who was going to supply Mr. Burns with the

18     heroin.

19     Q.   And was that a transaction that was supposed to

20     have taken place December 28th?

21     A.   I don't recall the day.

22               MR. SNOOK:  Thank you.

23                    REDIRECT EXAMINATION

24     BY MS. NEESE:

25     Q.   Let's start with the SD card. Could there have

1    been more than one transaction on that card?

2       A.   To my knowledge, there was not.  What's proper

3    procedure for us to do is to transfer the controlled

4    purchase on to a disc.  Sometimes there would be several

5    purchases that would build up and that was not

6    necessarily always done.

7       Q.   Okay.  So could there have been more than one?

8       A.   There could have been.

9       Q.   Did you charge anybody after that day?

10      A.   No.

11      Q.   Why not?

12      A.   I don't --

13      Q.   Did you have the evidence you needed?

14      A.   I did.

15      Q.   So you had the SD card then.

16      A.   No, we never recovered the SD card.

17      Q.   Does that maintain the controls in place, the

18   recordings?

19      A.   I'm sorry.  I thought you asked if I charged him

20   with the SD card.  No, no one was charged with the

21   controlled purchases from that day.

22      Q.   Do you have the recordings from that day?

23      A.   I believe so.

24      Q.   You do have the recordings?

25      A.   There was other recording devices that Mr. Burns

1    had from that controlled purchase.  Now, that purchase

2    was never -- he had a digital recorder as well, along

3    with another device.

4         Q.   So you have recordings, including this SD card.

5         A.   He did have a recording on a digital recorder.

6    Now whether those recordings were kept, I doubt because

7    no one was ever charged.

8         Q.   All right.  Let's move on.

9              Going back to March 27th of 2013, how many people

10   were arrested? More than one?

11        A.   Yes.

12        Q.   Were any of those post Miranda arrests recorded?

13        A.   No.

14        Q.   Are you sure it's federal policy to not record

15   any interview?

16        A.   I just know it's normal procedure.

17        Q.   Do you work with the FBI consistently?

18        A.   No.

19        Q.   Were you working with ATF?

20        A.   Yes.

21        Q.   Were you following what ATF was telling you?

22        A.   I was.

23        Q.   Now let's go back to the written Miranda waiver.

24   Anybody else sign a written Miranda waiver that day?

25        A.   Not that I'm aware of.

```
 1        Q.   Did you all get other confessions that day?
 2        A.   Yes.
 3        Q.   You have your notes from that day, sir?
 4        A.   No.
 5        Q.   Tell the Court why not?
 6        A.   Everything that's on my notes went directly into
 7   my report.  Therefore, there was no use to keep my
 8   notes.
 9        Q.   Do you do that as a standard practice?
10        A.   Yes.
11        Q.   I do want to ask you a few questions.  Did you
12   keep this report?
13        A.   No, I don't have it.
14        Q.   Just following up on what Mr. Snook was stating
15   and what you stated on direct.  Did he minimize at
16   certain points in time?
17        A.   In my opinion, I thought he did minimize.
18        Q.   Did you write down every time he minimized what
19   the pills were or did you write it down after he came
20   with what you thought to be clean?
21        A.   What he -- his final statement is what I wrote
22   down.
23             MS. NEESE:  No further questions, Your
24   Honor.
25                   RECROSS-EXAMINATION
```

BY MR. SNOOK:

Q.  So there were inconsistent statements.

A.  I thought that he minimized.

Q.  That wasn't my question.  There were inconsistent statements; yes or no?

A.  I thought that I stated that there were, that I thought he was minimizing.

Q.  And you didn't write down in your report, the earlier versions of what he said.

A.  No, because we weren't done with that line of questioning.

Q.  So what y'all wrote down is a synthesis.  It's not a chronological sequence of what he said; correct?

A.  That's correct.

Q.  And there are things that he said -- you're telling us now there are things that he said that were inconsistent with what you wrote down in the report; yes?

A.  Yeah.  At certain points during the interview, I thought he was minimizing.  We would stay on that topic and he would give a final answer and that's what I would put in my notes.

Q.  Okay.  So no one would ever know, because you destroyed the notes and you made no recording, no one would ever know about any inconsistent versions of

1    anything that he ever said; right?

2        A.   I don't know what you're -- what's the question?

3        Q.   I'm trying to figure out whether there's any

4    possible way that it would ever be known to anybody that

5    he had ever given an inconsistent version.

6             You testified, I thought, in my cross-examination

7    of you, that everything he said in that document -- that

8    everything you had written down in that document was

9    completely consistent, that he had not said anything

10   inconsistent with that document.  Am I right? Did I

11   fairly characterize my question and your answer?

12       A.   During an interview, we don't write down every

13   word that the person we're interviewing says.  We'll get

14   on a topic and we'll ask him questions.  If we don't

15   think that he's being forthcoming or he's being honest

16   or if he's minimizing, then we'll stay on topic until we

17   get to a point where it's his final answer.

18       Q.   Okay.  And nobody is going to know because you

19   don't record and you don't write down the intermediate

20   steps and you destroy your notes.  Nobody is ever going

21   to know that he ever gave an answer less than what

22   you've got written down; correct?

23       A.   There's just no way to conduct an interview that

24   way and write down notes about everything that anybody

25   says.  It's just not possible.  I wouldn't even be able

1    to read my own notes.

2       Q.   And because you didn't ask for permission to

3    record, of course, we don't have any way of knowing what

4    actually happened along the way.

5       A.   What actually happened is in my report.

6       Q.   Except for the parts you didn't write down.

7       A.   Except for the parts I thought Mr. Burns was

8    minimizing.

9       Q.   So when you finally got to the answer that you

10   were happy with or that you were willing to accept, then

11   you wrote it down and that's what this report shows.

12      A.   That's correct.

13              MR. SNOOK:  That's all.

14                 FURTHER REDIRECT EXAMINATION

15   BY MS. NEESE:

16      Q.   I might have missed it, but where in the report

17   does it say he was threatened?

18      A.   He was never threatened.

19      Q.   At any point in time?

20              MR. SNOOK:  Judge, this is beyond the scope

21   of my recross.

22              MS. NEESE:  He's talking about the report,

23   Your Honor. He opened it up.

24              THE COURT:  He didn't say anything about

25   threatened.

1          MS. NEESE:  No further questions.

2          THE COURT:  Is that all?

3          Thank you.

4          Any other witness?

5          MS. NEESE:  Yes, Your Honor.  We have Ms.

6    Tara Burns coming in and then we'll call Detective Sarah

7    Dryden.

8    TARA BURNS, CALLED AS A WITNESS BY THE GOVERNMENT, SWORN

9                    DIRECT EXAMINATION

10   BY MS. NEESE:

11     Q.  Good morning or good afternoon.  Please state

12   your name for the record.

13     A.  Tara Dawn Burns.

14     Q.  Ms. Burns, are you the wife of Les Christopher

15   Burns, the defendant here today?

16     A.  Yes.

17     Q.  Do you have an attorney, ma'am?

18     A.  Yes.

19     Q.  What is her name?

20     A.  Rhonda Overstreet.

21     Q.  How long has she been representing you?

22     A.  Half a year.

23     Q.  Approximately six months or so?

24     A.  (Indicating yes).

25     Q.  Is that a yes?

 1    A.   Yes.

 2    Q.   Please say yes or no because the court reporter

 3 is taking everything down.

 4         Is it hard for you to be here today?

 5    A.   Yes.

 6    Q.   Do you want to be testifying?

 7    A.   No.

 8    Q.   Have you expressed that to myself, federal law

 9 enforcement, your attorney and the defendant?

10    A.   Yes.

11    Q.   Have you been placed in this situation?

12    A.   Yes.

13    Q.   I'm going to ask you some questions, ma'am.

14         Were you contacted by the defense counsel?

15    A.   Yes.

16    Q.   Did you talk to your attorney first?

17    A.   He said he had talked to her.

18    Q.   Have you talked to her since then?

19    A.   Yes.

20    Q.   Would you tell us what was said? Did she know you

21 were meeting with him?

22    A.   No, she did not.

23    Q.   When was that, approximately?

24    A.   That I met with him?

25    Q.   Mr. Snook, yes.

1     A.   May 3rd.

2     Q.   A few days before this motion was filed?

3     A.   Yes.

4     Q.   Did he ever advise you he was going to file this

5   motion?

6     A.   He said he was looking into a defense.

7     Q.   Did you know about this motion before the United

8   States contacted you?

9     A.   No.

10     Q.   Do you remember March 27th of 2013?

11     A.   Yes.

12     Q.   If you would, please, let's talk about what

13   happened that morning.  Did you get pulled over by law

14   enforcement?

15     A.   Yes, I did.

16     Q.   At approximately what time, ma'am?

17     A.   It was probably 7, 7:15.  It was shortly after 7

18   in the morning.

19     Q.   Where did you get pulled over?

20     A.   Right on the Bedford City, Bedford County line,

21   before it turns to 55, on 221, coming out of Bedford.

22     Q.   How far away were you from your house?

23     A.   Five miles, maybe.

24     Q.   Not within distance, seeing distance of it.

25     A.   No.

1    Q.  Did you have anybody else in the car?

2    A.  My two daughters.

3    Q.  Tell us what happened when you were pulled over,

4  ma'am.

5    A.  It was a big black four-by-four truck.  An

6  officer came to the window and introduced himself.  Said

7  that I wasn't in trouble, but they had a warrant to

8  search the house and needed me to call Chris and to tell

9  him that my car was broken down and I needed him to come

10 help me fix it.  I said that I didn't want to lie and

11 they said that I needed to call him.  So I called him.

12   Q.  Did they tell you why you needed to call him

13 though, ma'am? What was the consequence if you didn't

14 call?

15   A.  They were going to knock down the door.

16   Q.  Because they had a state search warrant?

17   A.  Uh-huh.

18   Q.  Go ahead.  I'm sorry.

19   A.  So I called him and the officer stood by the

20 window.  I told Chris that I needed him to come help me

21 and he kept asking why.  I said -- I wouldn't lie to

22 him.  I just kept saying I need you to come meet me, I

23 need you to come meet me.  When I wouldn't tell a lie,

24 he figured out that I had been pulled over.  He asked if

25 he came if he was going to be arrested.  I said

1    probably.  I didn't know at the time, but from the way
2    everything was going down, I figured he would be.  Then
3    he asked if he didn't come if I was going to be in
4    trouble.  Again, I said probably, because I was scared.
5        Q.  Didn't you just testify that they told you, you
6    weren't in trouble?
7        A.  Yes.
8        Q.  Explain that to the judge, what you mean.
9        A.  They were pressing me to call him and lie to him,
10   to get him to come out.  Never being in trouble before,
11   being pulled, it --
12       Q.  Did it make you uncomfortable?
13       A.  Yes.
14       Q.  Have you ever been in trouble?
15       A.  No.
16       Q.  Was this an uncomfortable position all day?
17       A.  Yes.
18       Q.  Tell us what happened next, ma'am.
19       A.  He stood by the window a little bit and
20   throughout the course of being on the phone with Chris,
21   he kept telling me to hurry up and get him out of the
22   house.  Finally, I hung up the phone and said he was on
23   his way.  He stood there for a little bit.  I don't know
24   how long, but a few minutes probably.  He said he was
25   going to find out what was going on. Went back to the

1    truck.  Probably two or three minutes later, he came and

2    said that he had been arrested and if I wanted to know

3    what was going on, they would tell me.

4        Q.  Let me just stop you there.  Who came back to the

5    truck?

6        A.  The officer who had --

7        Q.  And who had been arrested?

8        A.  Chris.

9        Q.  So you didn't actually speak to Mr. Burns.

10       A.  Huh-uh, not after I hung up the phone.

11       Q.  Did you talk to him at any point in time during

12   the course of the period he was being arrested?

13       A.  From the time I called and told him to come help

14   me?

15       Q.  Right.

16       A.  No.

17       Q.  Keep going.

18       A.  So then I stepped out of my car because again, my

19   two kids were in the back seat.  I didn't want them to

20   hear what was going on because obviously, this was not a

21   good situation that a four and five-year old needed to

22   be listening to, or four and six.  She had just turned

23   six.  So I go to in between the truck and my car and

24   they told me that they had arrested him and that he had

25   been shooting up or he had shot up a 16-year old girl

 1   and that he was playing both sides of the field, that he

 2   was going back and forth between law enforcement and the

 3   other people and he was in trouble and they were

 4   searching the house.

 5        After that, I got back in my car -- or they told

 6   me that he would be going to Roanoke and he could call

 7   me later when he got there.  One of the officers gave me

 8   his card in case I had any questions so that I could

 9   call him and find out what was going on.  I left there

10   and --

11   Q.  Were you free to leave?

12   A.  Yes.

13   Q.  Did anybody ever say you were going to be

14   arrested?

15   A.  No.

16   Q.  For obstruction of justice?

17   A.  No.

18   Q.  Keep going, ma'am.

19   A.  I left.  I took my youngest daughter to my

20   grandparents' house.  They watched her during the day

21   for me to go to school and do my student teaching and

22   then to work.  Then I took the oldest to school.  She

23   was in kindergarten.  About the time I was pulling into

24   the parking lot at my work, I got a call from Officer

25   Cook saying I needed to come in because they needed to

1    question me.

2        Q.  How long, approximately, after you were free to

3    leave the scene?

4        A.  About an hour.

5        Q.  So do you know approximately what time you left

6    the scene?

7        A.  Probably 7:20 to 7:30.

8        Q.  Approximately 7:20 to 7:30?

9        A.  Uh-huh.

10       Q.  You were able to leave?

11       A.  Uh-huh.

12       Q.  About an hour later, you get the call,

13   approximately?

14       A.  Approximately.

15       Q.  Okay.

16       A.  Saying that I need to come in because they had

17   questions. I asked if I was in trouble.  He said it

18   depends on how I answer the questions.  I said can we do

19   this after I get off work, I just pulled into the

20   parking lot.  He said no, I have the Assistant U.S.

21   Attorney breathing down my neck, I need you to come in.

22   I said, can you meet me in Lynchburg, I just left

23   Bedford and I'm here in Lynchburg.  No, I need you to

24   come here to Bedford.

25           We went back and forth. He told me several times

1    I could drive myself or he would send someone for me,

2    someone to pick me up and drive me.  I told him I was

3    responsible for the kids in my class, I couldn't just

4    get back in my car and drive off and what was I to tell

5    my boss?  He said, well, tell her it's a family

6    emergency because that's what it is.

7          So I go inside.  He told me to call when I was on

8    the way.

9    Q.  Did you consider it a family emergency at that

10   point in time?

11   A.  Yes.

12   Q.  Was your husband arrested?

13   A.  Yes.

14   Q.  Were you allowed to talk to him while you were on

15   the phone with Investigator Cook?

16   A.  No.

17   Q.  Did you have any communication with him during

18   this time period?

19   A.  No.

20   Q.  Keep going, ma'am.

21   A.  So I go into work and I go to the assistant

22   principal's office and when I got there, I started to

23   try and tell her I needed to leave for a family

24   emergency and I just started crying.  Once I calmed

25   down, I explained to her what was going on so that if

1   something should happen, someone at the school would be

2   aware of what was going on.  She told me I could take

3   the whole day off.  I said no, I want to come back.  I

4   just need a half a day.  I need to go, but I'm going to

5   come back.  She said, well, if I need to take the whole

6   day just to let her know and they would have my class

7   covered.

8           So on the way out to Bedford, I called my

9   mother-in-law and I told her what had happened and --

10      Q.  Your mother-in-law is who?

11      A.  Gina Smith.

12      Q.  Is that Mr. Burns' mother?

13      A.  Yes.

14      Q.  Okay.

15      A.  She asked if I wanted her to meet me out there

16  and I said yes because I was scared.  I didn't want to

17  go in by myself.  She met me out there at the police

18  station and we sat in the waiting room together.  Then

19  when I was called back, she was not allowed to go with

20  me.

21          I went into the conference room and I was asked

22  about Chris, about his drug habits.

23      Q.  Let me stop you there.  When you first came back,

24  who was in the conference room?

25      A.  You and Detective Cook.

1    Q.  Anyone else?

2    A.  There might have been one other.  I don't

3  remember.

4    Q.  Was Detective Dryden there yet?

5    A.  No.

6    Q.  Before you came in that conference room, were you

7  allowed to talk to Mr. Burns?

8    A.  No.

9    Q.  Go ahead.

10    A.  I was questioned about the break-in at our house

11  where the safe was stolen.

12    Q.  You were first questioned about his drug use and

13  abuse?

14    A.  Yes.

15    Q.  Will you tell us about that, what you were

16  questioned about?

17    A.  What did I know he had done; did I know he was

18  selling; did I know he was using.

19    Q.  Were you advised of anything during this time

20  period?

21    A.  Not to lie.

22    Q.  Were you ever threatened in any way?

23    A.  No.

24    Q.  Did anybody ever say you were in trouble, ma'am?

25    A.  No.

1    Q.  Keep going.  I'm sorry.  Was the interview about

2    you or was it about Mr. Burns?

3    A.  Mr. Burns.

4    Q.  Keep going.

5    A.  The questioning went back and forth between his

6    drug use and people he knew and the break-in at our

7    house with the safe.

8    Q.  Let me ask you this real quick.  The people he

9    knew, were you asked about specific people?

10   A.  I believe so.

11   Q.  Do you remember any names?

12   A.  No.

13   Q.  Let me ask you this.  Were you friends with his

14   friends?

15   A.  No.

16   Q.  Did you know everything that was going on?

17   A.  No.

18   Q.  Did you tell us that?

19   A.  Yes.

20   Q.  Keep going.

21   A.  I was repeatedly told not to lie.  Then I guess

22   it lasted for about an hour and I was allowed to leave.

23   Q.  Let me ask you.  The whole thing lasted an hour

24   or just the first part of the interview?

25   A.  I think around the first part of the interview.

1    Q.  Did you have a second interview with Detective

2  Dryden?

3    A.  Yes.

4    Q.  Do you consider that all one event?

5    A.  I consider the whole thing one event, but it was

6  two separate interviews.

7    Q.  Did you ever leave the conference room?

8    A.  Yes.

9    Q.  Okay.

10    A.  I left and I went back out to the waiting room.

11  My mother-in-law had went out to her car and we sat in

12  her car for a few minutes.  While I was in her car, I

13  got a call saying I needed to come back in, they had a

14  few more questions.  So I come back in and I get called

15  to the conference room and Officer Dryden was in there

16  at that point.  She immediately started off that she was

17  going to take my kids and my job.

18    Q.  I'm going to stop you before we get to that

19  point.  Between that time period, did you ever talk to

20  Mr. Burns?

21    A.  No.

22    Q.  Keep going.  So what happened as soon as you come

23  in the room?

24    A.  She started off with that, my kids and my job

25  would be taken.

1      Q.   What was that in reference to?

2      A.   I asked her why, and she said because there had

3 been needles and drugs at the house.

4      Q.   Did you know about that stuff?

5      A.   No.

6      Q.   Did she ask you then later about that?

7      A.   Yes.

8      Q.   Did it calm down at that point in time?

9      A.   Yes.  To start off with that, it shook me up.

10     Q.   Were you arrested?

11     A.   No.

12     Q.   Were you ever threatened to be arrested?

13     A.   No.

14     Q.   Were you ever threatened by Detective Dryden,

15 Investigator Cook or myself in any way?

16     A.   Just that one, starting off with the kids and my

17 job.

18     Q.   By Detective Dryden.

19     A.   Uh-huh.

20     Q.   And you felt that was threatening because you

21 didn't know what was going on; is that correct?

22     A.   Yes.

23     Q.   Keep going.

24     A.   Most of her questioning was centered around the

25 break-in because she was investigating the safe being

1    stolen.

2         When that interview was over, I stepped out and

3    Chris was coming up the hall and being brought into the

4    conference room.  We were allowed a minute, couple

5    minutes to talk.  As soon as I started saying he was in

6    a lot of trouble and things were going on, I was told I

7    needed to leave and I was allowed to give him a hug.

8    Then I left.

9        Q.  Detective Dryden say anything to you while you

10   gave him a hug?

11       A.  She said, oh, come on, but --

12       Q.  Okay.  Did you ever tell him you were threatened

13   in any way?

14       A.  I believe I told him the threat Dryden made.

15       Q.  That's how you perceived it; correct?

16       A.  Yes, that's how I perceived it.

17        I left there.  I believe that I went by the house

18   and saw the house was torn apart.  From there, I went

19   back to work and finished the rest of the day there.  I

20   got there right at half a day.  I got there right around

21   12 or a little after and finished up the rest of the day

22   and went and got the kids.

23       Q.  Were you ever contacted by law enforcement after

24   that?

25       A.  Not for a while.

1    Q.  When was the first time you were contacted by law

2    enforcement?

3    A.  After, when I got the subpoena to come in as a

4    witness.

5    Q.  Is that for the November trial that was

6    originally scheduled?

7    A.  I think so, yes.

8         MS. NEESE:  No further questions at this

9    time.

10        THE COURT:  All right.

11                    CROSS-EXAMINATION

12   BY MR. SNOOK:

13   Q.  Ms. Burns, do you remember talking with me

14   shortly after I was appointed to represent Chris, by

15   phone?

16   A.  Yes.

17   Q.  You told me at that point that you were

18   represented by Ms. Overstreet.

19   A.  Yes.

20   Q.  I told you I would call Ms. Overstreet before we

21   did anything further.

22   A.  Yes.

23   Q.  Did you ever talk with Ms. Overstreet after I had

24   talked with her?

25   A.  I believe so.

1      Q.   Okay.  Then at various points over the next few

2  months, I called you some other times and you called me

3  a few times and I was trying to get together to meet

4  with you just to talk about the case; right?

5      A.   I believe we talked two, maybe three times.

6      Q.   There were calls in particular around the weekend

7  of March 14, 15, when I was trying to see if I could

8  work things out when I was going to be down in the

9  Roanoke area for various reasons and it didn't work out;

10  is that right?

11      A.   I guess.

12      Q.   You're shaking your head.  Is that yes or no?

13      A.   I don't remember.

14      Q.   Then shortly before May 3rd, which was a

15  Saturday, and May 3rd was the day we actually met,

16  shortly before that, a few days before that, I called

17  you because I told you I was going to be down in the

18  Lynchburg area, over that weekend and I'd be meeting

19  with Chris and trying to meet with various other

20  witnesses, including some clients on unrelated matters.

21      A.   Yes.

22      Q.   I asked if we could get together and in

23  particular, there were some questions -- I don't

24  remember now, but I had questions for you, you had

25  questions for me or both ways, about some pictures;

1    right?

2        A.   Yes.

3        Q.   You wanted me in particular to bring the pictures

4    to you so you could see what was being discussed.

5        A.   Yes.

6        Q.   Then we had a couple of phone calls and

7    eventually it worked out and I think we met at 2 o'clock

8    in the afternoon in a restaurant parking lot or parking

9    lot adjacent to a restaurant in Bedford?

10       A.   Yes; it was 3 o'clock.

11       Q.   That could well be, okay.

12            After that or as we got there, eventually, you

13   came and you sat in my car while we talked for half an

14   hour or so.

15       A.   Yes.

16       Q.   In the course of that interview, we discussed --

17   you asked me about the pictures and at one point, I did,

18   in fact, show you some pictures.  But then we also -- I

19   had asked you just generally why it was that you were

20   being involved as a witness.

21       A.   Yes.

22       Q.   And part of what came out of that, we were

23   talking about the substance of what you had said in your

24   interview in November with the law enforcement folks and

25   Ms. Neese and others and using that as the basis for the

1    questioning.  Do you remember that we were talking along

2    those same lines?

3       A.   Yes.

4       Q.   And in the course of that interview, that

5    conversation you and I were having, I asked you

6    specifically about the events of the arrest; right?

7       A.   Yes.

8       Q.   And you told me at that point that you had been

9    pulled over a few blocks from your home, that you were

10   directed to call the defendant, directed to tell him you

11   had car trouble, he needed to come.  You told them you

12   weren't going to do that, you weren't going to lie to

13   your husband.

14      A.   Yes.

15      Q.   You told me that day, on Saturday, May 3rd, that

16   you had been threatened with prosecution for obstruction

17   of justice, among other possible crimes, if you refused.

18   Do you remember telling me that?

19      A.   No.

20      Q.   You did not tell me that.

21      A.   I don't remember telling you that, no.

22      Q.   Faced with those threats, you called your husband

23   and just told him he needed to come where you were and

24   as soon as he stepped out of the house, he was arrested?

25            MS. NEESE:  I object to the questioning.

 1    He's assuming something she didn't answer to.  She just

 2    said she wasn't threatened.

 3                THE COURT:  Sustained.

 4                MR. SNOOK:  I'll retract the question.

 5    BY MR. SNOOK:

 6      Q.  As a consequence of the conversation you had --

 7    let me ask you this.  When you were were talked to by

 8    the officers at the scene, were you -- did you feel,

 9    regardless of what they might have said, did you feel as

10    though you were under some threat?

11      A.  Yes.

12      Q.  And in particular, you felt as though you were

13    under a threat if you didn't do what they wanted you to

14    do.

15      A.  Yes.

16      Q.  And that, you communicated to me, did you not?

17      A.  Yes.

18      Q.  And when you called Chris and you didn't lie to

19    him, you just asked him to come, he asked you, am I

20    going to get arrested?

21      A.  Yes.

22      Q.  And you said probably or something like that.

23      A.  Yes.

24      Q.  And he asked you, if I don't come, are you going

25    to be arrested, and you said probably.

1    A.  Yes.  He said, are you going to be in trouble,

2  not arrested.  He asked if I was going to be in trouble.

3    Q.  Okay.

4       Then you went on dropping children off and going

5  to your job as a teacher.

6       When you got to the school, you got a call -- for

7  your job, you got a call from the sheriff's office, told

8  to come down to the sheriff's office right away.

9    A.  Yes.

10   Q.  And when you said basically, can we do this in

11 the afternoon, they said no, it's got to be right now.

12 I've got the U.S. Attorney breathing down my neck.

13   A.  Yes.

14   Q.  At that point, you were offered a choice.  Either

15 you go on your own or they were going to come get you.

16   A.  Yes.

17   Q.  There was no third option.

18   A.  No.

19   Q.  It wasn't a negotiation?

20   A.  Yeah, it was two options.

21   Q.  You recall about what time it was that you had

22 gotten to the school and about what time you got that

23 call?

24   A.  It was probably around 8:15, 8:25, because I was,

25 with being pulled over, I was a little bit late.  So it

 1    was about an hour.  It took an hour to drop both kids

 2    off and get to work when I left.

 3        Q.  So if everything had gone normally, you would

 4    have expected to have been at work by 8:15?

 5        A.  Yes.

 6        Q.  And you were delayed roughly ten minutes.

 7        A.  Yes.

 8        Q.  By 8:25 or so, you're getting this call from the

 9    sheriff's office saying come on down?

10        A.  Yes.

11        Q.  You go inside, talk to the principal and explain

12    the situation to the principal.

13        A.  Yes.

14        Q.  You say okay, I'm driving to Bedford County

15    sheriff's office.  How long did it take you to get to

16    the sheriff's office from your school?

17        A.  Probably took 30, 45 minutes.

18        Q.  So now we're talking about 9:15, 9:30.

19        A.  Probably.

20        Q.  Is that about the time you remember having gotten

21    to the sheriff's office?

22        A.  I don't remember the time I got there.

23        Q.  You don't remember specifically.

24        A.  No.

25        Q.  How long do you think you had to sit and wait

1    before you went and talked to the officers?

2        A.  Probably about five, ten minutes.

3        Q.  So -- I say officers. You actually talked with

4    Officer Cook and with Ms. Neese.

5        A.  Yes.

6        Q.  Then the conversation -- if we have you there --

7    I'm trying to keep up with my chronology of things.  We

8    have you there about 9:30, maybe talking to them about

9    9:40 or so.  Does that sound about right?

10       A.  I suppose.

11       Q.  About how long did that conversation last? I'm

12   talking about the first piece before you went out to the

13   car.

14       A.  Probably about 45 minutes to an hour.

15       Q.  Then that conversation was over.  You go out to

16   the car with Gina Smith.

17       A.  Yes.

18       Q.  You're sitting there in the car.  The phone rings

19   and they say I want to talk to you again.

20       A.  Yes.

21       Q.  How long had you been sitting in the car?

22       A.  About five minutes or so.  Not very long.

23       Q.  Had you been told at that point we're done with

24   you, go on about your business?  Or had they told you to

25   stand by, we might want to ask you more questions?

1    A.  They said that I was free to go.  I just hadn't

2    left the parking lot.  We were still just sitting there,

3    talking.

4    Q.  So it was really just by happenstance you were

5    still there.

6    A.  Yes.

7    Q.  They call you back and say come back, we want to

8    talk to you some more, and you have another conversation

9    with Detective Dryden as well as with Ms. Neese and

10   Officer Cook.

11   A.  Yes.

12   Q.  How long did that second conversation last? Do

13   you recall?

14   A.  I don't recall.  After the opening comments, I

15   wasn't focusing very well on the rest of the interview.

16   Q.  So after the opening comments of the second part

17   of the interview about possibly taking away your kids

18   and possibly losing your teaching certificate and

19   everything else, the rest is a little blurry?

20   A.  Yes.

21   Q.  Now, when you got to the opportunity finally to

22   talk to Chris, you say you were both in the hallway sort

23   of at the same time, almost by accident apparently.

24   A.  Yes.

25   Q.  Tell us about that conversation.

1      A.   It was a short conversation.   I asked if I could

2  speak with him.   I was told to make it quick.   As soon

3  as I started saying they threatened to take the kids, I

4  was cut off and told -- telling him he was in a lot of

5  trouble and I didn't know what was going on.   Then I was

6  told that I need to go. I asked if I could give him a

7  hug and Officer Dryden wasn't too happy about it, but

8  she let me give him a hug and then said, oh, come on,

9  and I had to leave and that's when I left.

10     Q.   During the quick conversation there, you were

11 able to tell Chris that you had been threatened with

12 having the kids taken away; right?

13     A.   Yes.

14     Q.   Did you tell him that you were being threatened

15 with having your job taken away?

16     A.   I believe so.

17     Q.   Did you tell him they were threatening you with

18 possible prosecution of any sort?

19     A.   No.

20     Q.   Now, when you were asked -- I guess -- when you

21 talked to the officer -- was it Officer Cook who had

22 called you and asked you to come back to the sheriff's

23 office?

24     A.   The second time?

25     Q.   No; when you were at the school.

1      A.   Yes, it was Officer Cook.

2      Q.   At that point, you asked him whether you were in

3  trouble and his answer was, it depends on your answers.

4      A.   Yes.

5      Q.   What did you take that to mean?

6      A.   That if I gave answers that they didn't like that

7  I could be in trouble.  Or if they found out that I knew

8  something, I could be in trouble.

9      Q.   So in the course of the conversation that you had

10  with him, they were asking what did you know about

11  selling, in particular, and you said you didn't know

12  anything about any selling activities.  You knew about

13  some drug use in the past.

14      A.   Yes.

15      Q.   Is it fair to say that they didn't believe you

16  when you said you didn't know about any selling

17  activities?

18      A.   That was my impression.  I was told not to lie,

19  repeatedly.  That was my impression.

20      Q.   When you were asked about specific people and

21  whether you knew about Chris's activities with those

22  specific people, you said you didn't know.

23      A.   Yes.

24      Q.   And they didn't seem to want to believe that

25  either, did they?

1    A.  No.

2    Q.  And they challenged you and basically said, don't

3  lie to us when you gave those answers.

4    A.  Yes.

5    Q.  Given what was -- what had been said to you about

6  how it would depend on what your answers were and

7  whether they thought you were lying, how did that whole

8  thing make you feel about whether you were free from

9  prosecution?

10    A.  I was scared, not being believed when I'm telling

11  the truth and being told not to lie.  I was scared.

12    Q.  During the brief minute or so that you had with

13  Chris, were you able to tell him anything about that?

14    A.  Just the beginning.  Like I said, about the kids

15  and my job.  I wasn't able to tell him anymore about

16  them not believing me.  I think those came later on in

17  visits and phone calls.

18    Q.  One other thing.  Also on the day we met on

19  May 3rd, you gave me Chris' wedding ring and asked that

20  I give it to him?

21    A.  No.  He asked me to give it to you and I gave it

22  to you.

23    Q.  Right.  And you didn't give it to me with the

24  expectation I would try to give it to him?

25    A.  It was with the expectation.  I didn't think you

 1   would keep it.

 2      Q.   This is it; right?

 3      A.   As far as I can see.

 4           (Said ring shown to witness).

 5           Yes.

 6                MR. SNOOK:  I'll state for the record,

 7   Judge, the jail wouldn't let me give it to him.

 8                Thank you.  That's all I have.

 9                     REDIRECT EXAMINATION

10   BY MS. NEESE:

11      Q.   I just want to clarify some things.  When you

12   were stopped by law enforcement, was Investigator Cook

13   there?

14      A.   I don't believe so.

15      Q.   Was I there?

16      A.   No.

17      Q.   Did you ever tell him that you were threatened by

18   us on May 3rd of 2014, when you talked to him?

19      A.   No.

20      Q.   Either Investigator Cook or myself?

21      A.   No.

22      Q.   Did you have the opportunity to read this motion

23   that he filed?

24      A.   Yes.

25      Q.   What did you state about it?

1    A.  That he took a lot of things that I said out of

2    context.  He added a lot of things to them and twisted

3    part of what I said.

4    Q.  Let me ask you this, ma'am.  When you were

5    stopped by law enforcement in the black truck and the

6    three officers you were talking about, you just talked

7    on cross-examination about the phone call you made to

8    Chris and that he was probably going to be arrested; is

9    that correct?

10   A.  Yes.

11   Q.  And he said, if I don't come, are you going to be

12   in trouble, and you said probably; is that correct?

13   A.  Yes.

14   Q.  Did you ever say anything about losing your job

15   then?

16   A.  No.

17   Q.  Did you ever say anything about losing your kids?

18   A.  No.

19   Q.  Did anybody even tell you that then?

20   A.  No.

21   Q.  Did you have conversation with him about that

22   before you saw him in the hall?

23   A.  No.

24   Q.  You kept talking about the opening comments of

25   that second interview.  You said "they."  Who stated

1    that?

2        A.   Officer Dryden.

3        Q.   Did Investigator Cook ever say anything like

4    that?

5        A.   No.

6        Q.   Did I ever say anything about that?

7        A.   No.

8               MS. NEESE:  No further questions, Your

9    Honor.

10              THE COURT:  We'll take about a five-minute

11   recess before we call the next witness.

12              (Recess at 2:50 p.m. until 2:55 p.m.)

13              MS. NEESE:  Your Honor, I'll wait for the

14   defendant and then we have a matter to address briefly

15   just to see if Ms. Burns can be excused at this point in

16   time because she was going to leave.

17              THE COURT:  Does anyone need her back?

18              MR. SNOOK:  I don't.

19              MS. NEESE:  Your Honor, just briefly.

20              Ms. Overstreet is still here with her

21   client. She's free from our point.

22              MR. SNOOK:  We have no further questions.

23              THE COURT:  She's free to leave then.

24              Thank you, Ms. Overstreet.

25              MS. NEESE:  We'll call Detective Sarah

1    Dryden to the stand.

2       SARAH DRYDEN, CALLED AS A WITNESS BY THE GOVERNMENT,

3                              SWORN

4                        DIRECT EXAMINATION

5    BY MS. NEESE:

6       Q.  Good afternoon, ma'am.  Thank you for being here.

7           Please state your name for the record.

8       A.  Sarah Dryden.

9       Q.  How are you currently employed?

10      A.  B&W Police Department.

11      Q.  You're still in law enforcement?

12      A.  Yes.

13      Q.  On March 27th of 2013, ma'am, how were you

14   employed?

15      A.  Bedford City Police Department.

16      Q.  Were you a detective there?

17      A.  Investigator detective; same thing.

18      Q.  What kind of employment duties did you have being

19   an investigator and detective?

20      A.  I was assigned cases that the road couldn't

21   handle.  I would look into different cases as far as

22   burglaries, drug investigations, different things like

23   that.

24      Q.  If you would, did you receive a phone call that

25   morning?

1      A.  Yes, I did.

2      Q.  Did you already -- do you know the defendant

3  here?

4      A.  I do.

5      Q.  Have you dealt with him on numerous occasions?

6      A.  Yes, I have.

7      Q.  If you would, please, tell us at that point in

8  time, did you have an open investigation regarding an

9  alleged breaking and entering that happened at Mr.

10  Burns' residence?

11      A.  Yes, I did.

12      Q.  Tell us about that, if you don't mind, just

13  briefly.

14      A.  Mr. Burns had advised Bedford City Police

15  Department that his house had been broken into and

16  several -- I believe a gun and money and a safe had been

17  stolen.

18          I had information from a confidential informant

19  that he was bragging that he had staged that break-in.

20      Q.  So what happened when you received the call on

21  March 27, 2013?

22      A.  I was advised by my lieutenant that Bedford

23  County was doing a search warrant at his house.  He

24  asked me to respond and assist with Bedford County.  I

25  did that in reference to my open case in the city.

1     Q.  Do you remember approximately what time you got

2  there, ma'am?

3     A.  It would have been a little bit after eight,

4  probably.

5     Q.  Did you -- you weren't the lead agent at that

6  point in time.  You weren't seizing items from the

7  house, were you?

8     A.  No, ma'am.

9     Q.  Was Mr. Burns there at the time?

10     A.  No, ma'am.

11     Q.  Do you know where he was?

12     A.  I believe he was at the sheriff's office.

13     Q.  Now, how long did you stay at the scene,

14  approximately, if you can remember?

15     A.  Probably about an hour.

16     Q.  Then after 9 or so, what happened, 9, 9:15?

17     A.  I responded to the sheriff's office.

18     Q.  What was your duties in responding there?

19     A.  The reason I wanted to go there was to interview

20  Ms. Tara Burns and Mr. Burns in reference to my open

21  case.

22     Q.  I'll ask you just briefly.  At any point in time,

23  were you part of the federal drug investigation?

24     A.  No.

25     Q.  Did you know all the facts of it?

1     A.   No.

2     Q.   Now, what happens when you first get to the

3  Bedford County sheriff's office?

4     A.   Ms. Burns was in a conference room, along with

5  Mr. Cook and yourself, and I proceeded to interview her

6  in reference to the burglary at Mr. Burns' house.

7     Q.   You had just been at the house, right?

8     A.   Yes, ma'am.

9     Q.   Did you see items that were being retrieved or

10  seized from the house?

11     A.   Yes, ma'am.

12     Q.   What all types of items did you see?

13     A.   Phones.  I believe there were narcotics that were

14  seized.  Maybe a computer.

15     Q.   When you first came in the room, did you talk to

16  Ms. Burns about what all was being taken from the

17  residence?

18     A.   I did.

19     Q.   Will you tell us about that?

20     A.   I advised Ms. Burns if she had any involvement in

21  my open case that she needed to be truthful.  The house

22  was in complete disarray.  She has two small children.

23  I advised her if she was lying about anything as far as

24  to do with the burglary that Mr. Burns had supposedly

25  falsely reported that she could be in a lot of trouble.

1    Q.   Did you tell her anything about her kids and her

2  job?

3    A.   Yes.

4    Q.   Was that -- did you ever say you were going to be

5  arresting her that day?

6    A.   No.

7    Q.   Were you just trying to interview her?

8    A.   Yes.

9    Q.   Did you ever tell her she was under arrest?

10    A.   No.

11    Q.   What else happened in the interview?

12    A.   We talked about basically the burglary.  It maybe

13  lasted 15 minutes.

14    Q.   Was that your portion of the interview?

15    A.   That was.

16    Q.   Was that basically a conversation between you and

17  Ms. Burns?

18    A.   Yes.

19    Q.   Was Investigator Cook in there?

20    A.   Yes.

21    Q.   Was myself in there?

22    A.   Yes.

23    Q.   What happened following that interview, ma'am?

24    A.   I was fairly confident she didn't have anything

25  to do with it and I didn't need to speak with her any

1    longer.  We walked out of the interview room and Mr.

2    Burns was in the hallway.  Ms. Burns asked to speak with

3    him briefly and they did.  Then I interviewed Mr. Burns

4    after that.

5        Q.  Tell us about that.  What happened next? Does he

6    come into the conference room?

7        A.  Yes.

8        Q.  Did you record that interview?

9        A.  No.

10       Q.  Did you conduct that interview?

11       A.  Yes.

12       Q.  What was that interview about?

13       A.  That interview was about the burglary that he had

14   reported.

15       Q.  Did you ever talk to him about the drug

16   investigation?

17       A.  No.

18       Q.  Did you ever threaten him in any way?

19       A.  No.

20       Q.  Did you ever say he was under arrest for anything

21   regarding his activities in Bedford City?

22       A.  No.

23       Q.  How long did you state that lasted?

24       A.  Maybe 15, 20 minutes.

25               MS. NEESE:  No further questions, Your

1    Honor, at this time.

2                      CROSS-EXAMINATION

3    BY MR. SNOOK:

4       Q.  Officer Dryden, your current employment is with

5    who?

6       A.  B&W Police Department.

7       Q.  So, were you doing the primary investigating on

8    the breaking and entering allegation?

9       A.  Yes.

10      Q.  Did you get the search warrant for the Burns'

11   house?

12      A.  No.

13      Q.  Who did get the search warrant?  Do you know?

14      A.  Bedford County.

15      Q.  Was the search warrant specifically looking for

16   things pertaining to the breaking and entering?

17      A.  No.

18      Q.  Was it looking for things -- was it looking for

19   things pertaining to drugs, as far as you know?

20      A.  I don't know what the search warrant was for, as

21   far as itemized.

22      Q.  Who was the lead agent getting -- doing the

23   search warrant?

24      A.  I'm not for sure.

25      Q.  Who was the lead agent doing the search?

    A.  I believe it was federal agents.  I don't know.

There were several of them there.

    Q.  You were there 45 minutes or an hour?

    A.  Yes, sir.

    Q.  Who seemed to be in charge?

    A.  There was a Deputy Reynolds.  I can't think of

the other gentleman's name that was there.

    Q.  So when you saw Tara Burns at the sheriff's

office -- first of all, your testimony was you respond

to the sheriff's office at 9:15.  Was that the time you

got there or was that the time you left the residence?

    A.  It was around 9, 9:15, something like that.  It's

been a year.  I'm not for sure.

    Q.  About how long does it take to get from where you

were to the sheriff's office?  Just a few minutes?

    A.  Probably about five, ten minutes.

    Q.  You got there and when you got there, Tara Burns

was already in the conference room?

    A.  Yes.

    Q.  Already meeting with Ms. Neese and with Chris

Cook?

    A.  Yes.

    Q.  Seemingly in the middle of a conversation with

them?

    A.  No, they were done with her when I walked in.

1    Q.  But they were still in the room with her?

2    A.  Yeah.

3    Q.  So you began the interview basically by telling

4    her if she was lying about the burglary, she could be in

5    a lot of trouble; she could lose her job, she could lose

6    her kids.

7    A.  No.

8    Q.  When did you say anything to the effect of if

9    you're lying about the burglary or you could be in a lot

10   of trouble or whatever?  If I'm miss --

11   A.  I'm sure it was during the conversation as far as

12   the burglary that her husband had reported to the city

13   that I picked up.  During that conversation, I did tell

14   her if she was caught lying, she could be charged, which

15   would have an effect on her job and she could possibly

16   lose her kids if she didn't clean up her act, clean up

17   her house and not have her kids around the types of

18   drugs that were found when we were there.

19   Q.  Okay.  That portion of the interview lasted about

20   15 minutes.

21   A.  Approximately.

22   Q.  And during that time, did Ms. Neese or Mr. Cook

23   jump into the conversation at all or was it just between

24   you and her?

25   A.  Just between me and her.

1    Q.  When you walked out of the room, did you walk out

2  with Ms. Burns?

3    A.  Yes, sir.

4    Q.  When you walked out with Ms. Burns and she saw

5  Chris, did she ask you if we can talk for just a second?

6    A.  She did.

7    Q.  Did you hear any of their conversation?

8    A.  Not that I recall.

9    Q.  At some point, they hugged and then you took --

10   A.  Then he went into the conference room and then I

11 did his interview.

12   Q.  When you -- after Tara left, you then went in and

13 were sitting in on the interview with Mr. Burns or

14 conducting an interview with Mr. Burns?

15   A.  Yes, sir.

16   Q.  How did that interview end?

17   A.  I left.  I don't know.

18   Q.  Don't know what happened after you left.

19   A.  No.

20   Q.  During your interview, that second interview with

21 Mr. Burns, were Ms. Neese and Mr. Cook still there?

22   A.  Yes.

23   Q.  Did they participate?

24   A.  No.

25   Q.  And your questions were basically directed to the

1    burglary?

2        A.   Yes, sir.

3        Q.   Were the questions dealing with, for example, a

4    missing SD card?

5        A.   Yes.

6        Q.   What do you recall about that?

7        A.   Mr. Burns had reported that he had a stolen SD

8    card during the burglary.

9        Q.   That one of the things that was stolen was an SD

10   card.

11       A.   Yes.

12       Q.   And did you understand that the allegation was

13   that the -- at least some folks in the sheriff's office

14   thought that the SD card was a sheriff's office SD card?

15       A.   That's what Mr. Burns told me.

16       Q.   During the portion of the interview that day.

17       A.   During a previous interview, he stated that he

18   had stolen it.

19       Q.   And when was that interview?

20       A.   I've interviewed him so many times, I can't tell

21   you.

22            MR. SNOOK:  That's all I have.  Thank you,

23   Judge.

24            MS. NEESE:  No further questions.

25            THE COURT:  Any other evidence?

1              MS. NEESE:  That's our evidence, Your Honor.

2              THE COURT:  Mr. Snook?

3              MR. SNOOK:  Could I have just a minute, Your

4    Honor?

5              (Mr. Snook conferred with the defendant).

6              MR. SNOOK:  Call Mr. Burns, Your Honor.

7      LES CHRISTOPHER BURNS, CALLED AS A WITNESS, SWORN

8                     DIRECT EXAMINATION

9    BY MR. SNOOK:

10     Q.  State your name for the record, please.

11     A.  Les Christopher Burns.

12     Q.  Keep your voice up and point towards the

13   microphone.

14     A.  Yes.

15     Q.  Mr. Burns, I'm going to direct your attention

16   specifically to the incident on March 27th of 2013, a

17   year ago.  Let me ask you.  When you got up that

18   morning, what happened?  Just start from when you got up

19   that morning.

20     A.  I got up, got the kids ready and the wife ready

21   for work and sent them on their way and I was getting

22   ready for work myself.

23     Q.  Do you remember roughly what time this was?

24     A.  We got up right around six o'clock.  Through the

25   course of an hour, fixing breakfast, taking showers and

1    whatnot.  She left the house right around seven-ish,

2    somewhere in there.  It's hard to be specific from a

3    year ago.

4       Q.  Okay.

5       A.  She left.  I was finishing getting ready for

6    work.

7       Q.  What was your work at that point?

8       A.  Construction.  I had a truck full of replacement

9    windows to put in and some vinyl siding to do.

10           I got a phone call about 10, 15 minutes after she

11   left.  Said she had -- was having trouble.  She didn't

12   specify what trouble.  Just said I'm having trouble, I

13   need you to come to me.  I asked her where and she told

14   me, DMV.  I asked her what's wrong, what's wrong, what's

15   wrong.  She wouldn't tell me, wouldn't tell me and she

16   was acting real weird.  So, I assumed that she had been

17   pulled over. I asked her and she kind of confirmed it,

18   yes.  I asked her was I in trouble because obviously,

19   she was trying to get me there. I assumed I was. She

20   said she didn't really know what was going on.  She just

21   kind of hinted at, look, something's not right, you need

22   to come here. She was obviously scared.

23           I told her all right.

24       Q.  You said she was obviously scared.   What makes

25   you say she was scared?

 1    A.   Nervous, out of her element.

 2    Q.   Just in terms of tone of voice?

 3    A.   Her tone of voice, her demeanor, the way she was

 4   talking to me, the things that she said.   She was

 5   circling around my questions.   Wouldn't answer them.

 6   Are you with the police? What's wrong? She wouldn't tell

 7   me what is wrong. She wouldn't be specific. She usually

 8   is.

 9    Q.   Did you have any -- did she say anything that

10   suggested that she was in trouble?

11    A.   She didn't say anything, no. She sounded like it.

12   She sounded like she was scared.

13    Q.   So what happened then?

14    A.   I told her I was on my way. I hung up the phone

15   and walked out the door. As I walked out, I got in my

16   truck.   I started the truck. I saw the vehicles coming

17   up the end of the road. They stopped. The officers got

18   out. They came up my driveway yelling at me to get on

19   the ground. I got on my knees with my hands behind my

20   head. I was handcuffed, put in the back of a car, after

21   they showed me my search warrant. They put me in the

22   back of a car. I think it was a county cop that was

23   driving the car.   Said the Miranda stuff.   You have the

24   right to remain silent, whatever.

25    Q.   Did anybody ever give you a Miranda form to sign?

1    A.   No.

2    Q.   But you acknowledge they verbally told you the

3   Miranda rights.

4    A.   Right.

5    Q.   So were you taken some place?

6    A.   I was taken to the sheriff's office in Bedford

7   County.

8    Q.   Which is roughly how far away from where you

9   live?

10   A.   Five, ten minutes. It's just a couple miles away.

11   Q.   When you first got the call from your wife, 7:10,

12   something like that, 7:15, maybe?

13   A.   Right around, yeah.

14   Q.   About how long was it before you got transported

15   from that location to the sheriff's office?

16   A.   Maybe a half hour or so.

17   Q.   That was a sloppy question.  How long were you

18   there at your house before you left in the car? Is that

19   the half hour?

20   A.   From the time that my wife called and I hung up

21   the phone and went to get in my truck until the time I

22   arrived at the sheriff's office was, I'm assuming, about

23   a half hour.

24   Q.   So now we're there 7:45 or somewhere around

25   there.  Is that about right?

1      A.   Roughly, yeah.

2      Q.   So what happened when you got to the sheriff's

3  office?

4      A.   I was took in and sat down in a room. I had to

5  wait for everybody else to get there, I guess, because

6  they were busy running around at the house or doing -- I

7  don't know what they were doing.

8      Q.   How long did you wait before somebody joined you

9  in the room?

10     A.   I don't know.  At this point, I really --

11     Q.   Short time, long time?

12     A.   It wasn't too long.

13     Q.   Who then joined you in the room?

14     A.   Investigator Cook and Ashley Neese.

15     Q.   And for how long -- so what was that discussion

16  like?  Tell us how that went.

17     A.   Basically, a series of questions, you know.

18  What are we going to find at your house? What have you

19  been doing? Have you been playing both sides of the

20  field? This and that about, do you know these people?

21  Have you been messing with these people? That's pretty

22  much -- I told them it's time for me to have a lawyer.

23  At that point, Ashley Neese said you didn't hire a

24  lawyer. I know because I just talked to him the other

25  day and you didn't have the money to hire him.

1    Q.   Had you, in fact, been talking to a lawyer?

2    A.   Yeah.

3    Q.   And that lawyer had said that the lawyer wanted

4    to talk to Ms. Neese first before he quoted you a fee?

5    A.   Oh, yeah.

6    Q.   Did you, in fact, have a lawyer hired at that

7    time?

8    A.   No, I didn't.

9    Q.   But you expressed a desire to have a lawyer.

10   A.   Yeah.

11   Q.   What happened then?

12   A.   Well, Cook went on with some more questions and

13   said this and that had been happening.  They went into

14   some stuff about McKinney and the whole pop her cherry

15   thing.  Asking me about injecting minors with drugs and

16   all kinds of stuff.

17   Q.   What was your answer?

18   A.   I hadn't had anything to do with any of that.

19   That's not what I was doing.

20   Q.   All right.

21   A.   That went back and forth for maybe half hour,

22   45 minutes. I don't really know how long it was. I went

23   downstairs in a room to be asked a bunch of questions by

24   these other people with computers. They started bringing

25   other people downstairs that had been arrested.

1    Q.  So after some conversation that you had with

2   Chris Cook and Ashley Neese, you were taken to a

3   different room?

4    A.  Yeah, downstairs in a big, kind of like a meeting

5   room, I guess.  It had a couple white boards and some

6   big, long picnic tables with some chairs and a row of

7   laptops set up across them.

8    Q.  When you went downstairs to that room, who were

9   you speaking with?

10    A.  I don't know if it was a probation officer.  I

11   don't know what they call that person.

12    Q.  Did it seem to be somebody associated with the

13   federal court or somebody who was a state sheriff's

14   officer or what?

15    A.  I really don't know.

16    Q.  So you talked to somebody and what was that

17   discussion all about?

18    A.  They were asking questions like about my past,

19   about what kind of drugs I've used throughout my life or

20   did I have a history of this or a history of that, did I

21   have a criminal record, did I have a driver's license,

22   how many kids did I have, how long had I lived where I

23   was; stuff of that nature.

24    Q.  More background stuff than anything pertaining to

25   the indictment.

1    A.   Right.

2    Q.   So what happened then?

3    A.   I was down there for a while.  I went, was

4  brought back up and as I was brought back up, I saw my

5  wife in the hallway.  We happened to cross paths. She

6  came over and talked to me.  When she came and talked to

7  me, she was crying.  She was telling me, they're saying

8  they're going to take the kids, don't let them take the

9  kids, I can't lose my job, you better not let me go

10  through this.

11    Q.   Did she say they were going to take the kids if

12  something happened?

13    A.   She said, they said they're going to take the

14  kids, don't let them take my kids, is what she was

15  telling me. She was hysterical. She was crying. We

16  didn't have much time at all together and we were

17  separated.

18    Q.   What happened then?

19    A.   I was taken into the interview room again with

20  Investigator Cook, Ashley Neese and Investigator Dryden.

21    Q.   What happened then?

22    A.   I was told if I did not cooperate that my wife

23  would lose her job, we could have the children taken by

24  social services and she could be arrested.

25    Q.   Did they say what she might be arrested for?

1     A.  No.

2     Q.  So what happened after the threat of arresting

3  your wife, taking the kids, her losing the job? What

4  happened after that?

5     A.  Dryden started in with the whole burglary in the

6  house and asking questions about where we were on

7  vacation and what really happened to the safe and this

8  and that.  I insisted I don't know who broke into the

9  house, I don't know where the safe went and they kept

10 saying, if you don't cooperate, this is not going to be

11 good. I kept asking, what do you want me to tell you,

12 what do you want me to tell you? They said, we want you

13 to tell us the truth. I said I'm telling you the truth

14 they kept telling me, no, you're not, you're lying,

15 you're lying.

16    Q.  How long did this second interview go on for?

17    A.  I don't know.  This was longer than the first

18 one. It was Dryden at first hammering me about the safe.

19 I just finally told them, look, I took the safe and

20 threw it off a bridge. I was fed up.  I said, I threw it

21 off a bridge.  They said, what bridge?  I said, I don't

22 know, I don't know what the name of the bridge was.  She

23 got mad and she left.

24    Q.  Who's the "she"?

25    A.  Ms. Dryden.

1    Q.  So at that point, the interview continues with

2    Neese and Cook?

3    A.  Yes.

4    Q.  And what happens then?

5    A.  Cook was asking me specifically about the tape

6    recorder, the chip in the recorder.  I had told him

7    before, him and Investigator Young, that I was willing

8    to take a lie detector test. They told me no, you'd

9    probably just go and do drugs so you'll pass anyway.  I

10   said, you can lock me up for a week, I don't care. I'll

11   take the lie detector test.  He was asking me

12   specifically about when did this happen, when did you

13   take the chip, what day did you take the chip, who were

14   you buying from when you took the chip? I didn't know

15   anything about this stuff. He kept insisting and

16   insisting and insisting they told me if you don't

17   cooperate, this is going to get worse, it's going to get

18   worse so I told them --

19   Q.  Let me stop you a second.  You had done some buys

20   for the Bedford County sheriff's office.

21   A.  Yes.

22   Q.  Most of them, as I recall looking at the record,

23   seemed to have been in December of 2012?

24   A.  Around that time, yes.

25   Q.  You heard Officer Cook saying something about

 1   attempts to buy from Tim Goodman and Samantha Hogan and

 2   somebody else?

 3       A.   Yes.

 4       Q.   Do you know when that supposedly happened?

 5       A.   Around the end of December.

 6       Q.   You had made reference in an earlier hearing in

 7   some testimony of yours around December 28th.  Does that

 8   sound about right?

 9       A.   I think that's the date.  I don't know exactly.

10       Q.   Had you made any buys from anybody after

11   December 28th?

12       A.   I don't recall.

13       Q.   Did you ever hear -- did you have other

14   conversations with law enforcement folks between

15   December 28th and this date where --

16            MS NEESE:  Your Honor, I'll object to this

17   line of questioning.  He's going well outside of what

18   he's filed a motion here on and what's been presented.

19   If he wants to go into that, I need additional witnesses

20   to come in before we get there.

21            MR SNOOK:  I'll move on, Judge.  That

22   probably is far afield at this point.

23   BY MR SNOOK:

24       Q.   So you're being asked about all this stuff and

25   about the SD card and things like that.  Did the topic

1    of conversation come back to drugs at some point?

2       A.   Yes.

3       Q.   How did that happen? Let me back up a second.

4            You've heard the testimony of Officer Cook.  I

5    know you've seen the write-up of the testimony. Does

6    that write-up and the testimony you heard today, does

7    that accurately describe how the interview went with you

8    that day?

9       A.   No.

10      Q.   You started off -- was there a point where you

11   changed the overall nature of the conversation?

12      A.   It went from the safe to the chip to the drugs

13   back to the chip.  It kept going back to this microchip.

14      Q.   Did your first -- I'll say the conversation that

15   you had at first.  Was that the sort of confession that

16   you see memorialized in the writing from Officer Cook?

17      A.   I'm sorry. Can you repeat that?

18      Q.   Yeah. I know I've shown you before the document

19   that I had showed to Cook while he was on the stand

20   again.

21           This is the discovery Bates number 2142 and so

22   on.

23           You've seen that before?

24      A.   Today.  I've seen it today.  Okay

25      Q.   Rather than ask you about the document, let me

1    ask you just about the testimony that you heard today.

2        When you first began the discussion with Cook and

3    with Ms. Neese, did you first tell them all about

4    meeting Bryant Reynolds through Scottie Andrews,

5    distributing pills to all these different people, all

6    the discussion you heard from the witness stand today?

7        A.  All of that stuff, they already knew from

8    testimony from grand jury hearings and from

9    pre-interviews and other interviews and all of that

10   stuff.

11       Q.  So then there are other things that are

12   discussed.  Later on, for example, they're discussing

13   about giving drugs to a minor, injecting a minor and so

14   on. Was that stuff that you had ever said before?

15       A.  No.

16       Q.  Did you say that that day?

17       A.  I didn't until after they had come in the second

18   time and had started with the hard core interrogation.

19   My wife had been threatened and all this.  Then they

20   come in saying, well, this girl said this, this and

21   this. I told them it's not true, that never happened.

22   They said -- they made the reference to "pop her

23   cherry."  I guess I didn't understand it because I told

24   them I've never had any sexual activities or encounters

25   with that girl, ever.

1    Q.  To you, what does the phrase "pop her cherry"

2 mean?

3    A.  Cherry is a referral to a hymen.

4    Q.  So to pop a girl's cherry refers to having sex

5 with her for the first time?

6    A.  For the first time.

7    Q.  And that's what you thought you were being

8 questioned about?

9    A.  Yes, at first.

10    Q.  And so later on, was there some other discussion

11 of that? Did you change the answer?

12    A.  Well, they pointed out that we don't mean that

13 way.  We mean as far as injecting with drugs. I told

14 them no, I've never injected her with drugs. That's

15 Mandy's girlfriend.  That's her thing.  That's what they

16 do.  I'm not a part of what they do.  They kept saying

17 she's already told us this and we have witnesses to say

18 this and if you don't tell us what we want to hear, this

19 is what is going to happen.  You're going to end up in a

20 lot of trouble.  We already told you.

21    Q.  Okay.  So was there other discussion what you

22 heard from the witness stand today that you did not, in

23 fact, say until after you had been threatened?

24    A.  I had finally, in the end, I had admitted to

25 taking this microchip and he asked what case, who I was

1    buying from when it was taken, when I took it, why I

2    took it. I didn't have the answer as to when I had taken

3    it. I didn't know when it was taken because I didn't

4    take it. At that time, he said, well, why are you

5    telling me this if you didn't do it? I said, because you

6    made me.  That's when he grabbed me by the arm and ended

7    the interview.  He took me to the stairs.  He told me,

8    don't tense up.  He grabbed me by the shoulders. Don't

9    tense up, and started walking me down the stairs

10   Q.  So now let me -- there's some extended discussion

11   in this report about various people you had bought from,

12   sold to, so on. Are there parts of this interview that

13   are, in fact, true, what you heard the officer testify

14   to today?

15   A.  A lot of the stuff in there is truth as far as

16   how I met Bryant Reynolds or who I was getting pills

17   from. Then a lot of it, there's no way I could have said

18   that stuff at all. For instance, there's a name in

19   there, Camber Stump.  I've never heard the name, Camber

20   Stump. I've given the name Camber Carter. There was

21   questions asked about purchase of heroin from a girl

22   named Holly. I don't know Holly's last name.  But it

23   says in there I said her name is Holly Eckert.  I've

24   never met a Holly Eckert.

25   Q.  Just to be clear, I'm referring -- what I have in

1    my hand is something from, again, discovery number 2142

2    and so on.

3           Is this the document you're referring to or are

4    you referring to something else?

5       A.   Yeah, this is the document.

6       Q.   Okay.  What are the specific parts of that

7    document that you say are not true?

8       A.   Number 20.  Burns purchased heroin from Holly

9    Eckert through Amanda McKinney.

10          I've never known Holly's last name.  I've never

11   even met her face to face.

12      Q.   So somebody else would have had to have provided

13   that last name in that report.

14      A.   That's right.

15      Q.   Okay. Is there anything else in that version that

16   is incorrect?

17      A.   Line 18.  Burns sold pills to this whole list of

18   people, and I bought heroin and pills from Deede and

19   Decanter, in Vinton?  No.

20      Q.   Is that simply not what was even discussed that

21   day or is that something that you eventually

22   acknowledged under pressure?

23      A.   No, that was not said.

24      Q.   Period.

25      A.   Right.

1          I'd have to read through all of this.

2          Burns sold Suboxone pills to Gretchen Staton a

3     couple days ago.  I never said I sold anything to

4     Gretchen Staton.  I was questioned about did I sell her

5     the night before I was arrested and I said no, I never

6     left the house that night. I never met her anywhere and

7     sold her that. No, I never said that.

8     Q.  So that again is a statement, you did not say it

9     at all in the interview.

10    A.  No, I didn't.

11    Q.  I want to distinguish for the purposes of this

12    hearing between things that you eventually said, you

13    agree that you eventually said it on that day, but you

14    said it only because you had been pressured to say it.

15    I'm trying to get at what qualifies as things you said

16    only because you had been pressured to say them.

17    A.  About the storage device, it says that I had used

18    drugs while making the controlled purchase and that was

19    why I stole it. I never said that.

20    Q.  Okay.  Did you agree with something that --

21    A.  I did eventually agree, yes, that I had stolen

22    it, in the middle.  Then at the end of the conversation,

23    I told them I didn't know the specific details because

24    it didn't actually happen.  The only reason I had

25    admitted it was because I had just been threatened into

1    it.

2        Q.   So you've mentioned the bit about the SD cards.

3    You've mentioned the bit about popping her cherry.  Is

4    that also something that you eventually admitted to, but

5    it was not, in fact, correct?

6        A.   Yes.

7        Q.   And the reason why you, quoting, admitted that,

8    was what?

9        A.   Because I had been threatened, the same as with

10   the distribution.  I never said I distributed to all

11   these people here.  These people, I never said that.  I

12   never said I sold to all those people.

13       Q.   So again, I want to keep -- whether the officer

14   is making it up is a different question from the

15   question I'm asking. The question I'm asking are about

16   things you agree that you said, but you said them only

17   because you were being threatened or because your wife

18   was being threatened.

19            What things did you say that you agreed to

20   because you or your wife had been threatened? The part

21   about the SD card; yes?

22       A.   Yes.

23       Q.   The part about popping her cherry?

24       A.   Yes.

25       Q.   Anything else?

1    A.  What we talked about with the safe.

2    Q.  Okay.  Anything else?

3    A.  I'd have to read through it all to be sure, but

4  you want to know about things I said, but then retracted

5  because I had been threatened.

6    Q.  Yes.

7         THE COURT:  I have a schedule today that I

8  have to meet.  I can't keep going.  If he's not

9  prepared, we can go another day.

10         THE WITNESS:  I think that's all.

11  BY MR SNOOK:

12    Q.  How did things end in your conversation?

13    A.  I was asked why I couldn't give details to

14  specific incidences.  I told them because I didn't

15  commit those incidents, those events.  Mr Cook asked why

16  I had said something that wasn't true and I said because

17  you made me. That's when the interview was ended and I

18  was taken out of the room.

19         MR SNOOK:  That's all the questions I have.

20              CROSS-EXAMINATION

21  BY MS NEESE:

22    Q.  Mr Burns, you've read this, correct?  You've read

23  the motion to suppress that your counsel filed?

24    A.  Part of it, yes.

25    Q.  You didn't read the whole thing?

1    A.  It was read to me though.

2    Q.  So you know what it says?

3    A.  Pretty much.

4    Q.  This is completely different than what's said in

5  here, correct?

6    A.  I don't know.

7    Q.  You've been in here this entire time, right?

8    A.  Yes.

9    Q.  You've heard Investigator Cook testify?

10   A.  Uh-huh.

11   Q.  You have to say yes or no on the record.

12   A.  Yes, I have.

13   Q.  You've heard your wife testify.

14   A.  Yes.

15   Q.  And you've heard Detective Dryden testify?

16   A.  Yes.

17   Q.  And now you're testifying directly in conflict

18  with all three of those?

19            MR SNOOK:  Object to the conclusion.

20            THE COURT:  Sustained.

21  BY MS NEESE:

22   Q.  You understand what obstruction of justice is,

23  sir?

24   A.  I think so.

25   Q.  Do you understand what perjury is?

1    A.  I think so.

2    Q.  Did you talk to your wife on Sunday night?

3    A.  Yeah.

4    Q.  She tell you she was going to be testifying?

5    A.  Testifying where? Here?

6    Q.  Yes.

7    A.  Yeah, I think so.

8    Q.  You told her, you're going to throw me under the

9    bus, aren't you?

10   A.  I don't know if I told her she was going to or

11   asked her if she was going to.  I don't remember exactly

12   how that conversation went.

13   Q.  Your wife is a pretty truthful person, isn't she?

14   A.  Yeah.

15   Q.  Talked to her last night, too, didn't you?

16   A.  Yes.

17   Q.  Told her she was brutally honest, after you

18   talked to Mr Snook, didn't you?

19   A.  She is.

20   Q.  But you read this motion?

21   A.  I read part of it.  I had part of it read to me.

22   Q.  She's brutally honest.

23   A.  She is.

24   Q.  She testified that she was never threatened by

25   myself or Investigator Cook; right?

1     A.  Yeah.

2     Q.  She never told you that in the hall, did she?

3  She's never once told you that.  Not any time that you

4  ever talked to her did she ever tell you she was

5  threatened by us.

6     A.  She never said you and she never said

7  Investigator Cook.  She said "they."

8     Q.  That wasn't my question though.  She never has

9  told you that she was threatened by me.

10    A.  No.

11    Q.  She's never told you that she was threatened by

12  Investigator Cook.

13    A.  Okay.

14    Q.  Is that a yes or a no, sir?

15    A.  As far as I know, she hasn't.

16    Q.  You've engaged in a lot of phone conversations,

17  haven't you? You've thought about this case for a long

18  time; right?

19    A.  In a way.  In a way, I try not to.

20    Q.  One of your theories is to make me a witness to

21  this case, isn't it? You've talked about that numerous

22  times on the phone calls?

23    A.  I've thought about it, yes

24    Q.  But there's nothing in this motion about how you

25  allegedly tell us you want counsel on that day?

1      A.   I'm sorry?

2      Q.   Nothing is in the motion and you never brought up

3  in the last year and two months that you allegedly told

4  us you wanted counsel that day; right?

5              MR SNOOK:  Objection.  It was said in the

6  third hearing before the Court

7              MS NEESE:  Your Honor, I think I actually

8  brought that up.  We'll get to that.

9              THE COURT: Answer the questions

10             THE WITNESS:  What's the question?

11 BY MS NEESE:

12     Q.   You never have brought up that you asked for

13 counsel that day. It's not brought up in your motion

14 here today, is it?

15     A.   I think I brought it up at our motion to dismiss.

16 I may be mistaken, but I thought I did.

17     Q.   Let me ask you this. Did you read the response

18 from the United States in the motion to dismiss?

19     A.   I don't recall.

20     Q.   Did you get a line of questioning on

21 cross-examination when I asked you if you had contacted

22 an attorney?

23     A.   Yes, I believe.

24     Q.   You didn't bring it up on your own though, did

25 you, sir?

1    A.  Yes, I did, actually.

2    Q.  Okay.  Let me ask you this.  Who was that

3  attorney?

4    A.  Mr. Potter, I believe.

5    Q.  You believe or do you know?

6    A.  I'm pretty sure.

7    Q.  You never asked us for counsel that day, did you?

8    A.  Yeah, I did.

9    Q.  But it's not in your motion, right? It's suddenly

10  brought up here in the middle of your testimony,

11  correct, first time?

12    A.  It was brought up in November as well.

13    Q.  November, sir? We didn't have a hearing in

14  November.

15    A.  I'm sorry, September.

16    Q.  Let's go back to the witness thing.  You've

17  admitted that on numerous occasions on the phone that as

18  long as I'm a witness, I can't prosecute your case;

19  right?

20    A.  That was my understanding

21    Q.  And that's what you wanted; right?

22    A.  I don't know.

23    Q.  You've had plenty of discussions on the phone

24  regarding my involvement in this case and what your

25  thoughts are and what your mom's thoughts are, back and

1    forth?

2        A.   Are you asking my opinion?

3        Q.   No.  I'm asking, you've had these plenty of phone

4    calls, haven't you?

5        A.   I've said something about it, you being a

6    witness, yes.

7        Q.   You've called me many names on the phone, right?

8        A.   I'm sure I've expressed my opinion about you,

9    yes.

10       Q.   You don't want me prosecuting this case, do you?

11       A.   Are you asking my opinion?

12       Q.   Exactly, sir.  You don't want me prosecuting this

13   case, do you?

14            MR SNOOK:  Objection as to relevance.

15            THE COURT:  This is getting argumentative.

16            MS NEESE:  Your Honor, may he answer that

17   question though? I think it's relevant to the fact of

18   what's been filed here today and what he's alleging

19            THE COURT:  Answer the question yes or no.

20            THE WITNESS:  I don't have an opinion, solid

21   opinion developed at this time.

22            MS NEESE:  Your Honor, at this point in

23   time, we're going to request additional time at this

24   point to set forth additional evidence regarding the

25   jail recordings in this case.

1                    THE COURT:  Okay.

2                    MR SNOOK:  On a matter that is highly

3       collateral, if relevant at all.  I don't think it's

4       appropriate, Judge.

5                    THE COURT:  Okay.

6       BY MS NEESE:

7          Q.  Sir, are you accusing me of threatening you on

8       that day?

9          A.  Me?  I didn't say you said anything.  I never

10      accused you.

11         Q.  Sir, have you read your motion?

12                   MR SNOOK:  Judge, I will freely acknowledge

13      that my motion, which he did not write, mentions Ms.

14      Neese and if I had known exactly what the facts were, I

15      would have mentioned Ms. Dryden as well.

16                   MS NEESE:  Your Honor, he's freely admitting

17      he didn't know the facts of the case and has filed

18      something that's not accurate.

19                   THE COURT:  Let's move on.

20                   MR SNOOK:  I stand corrected.  Every now and

21      then, I learn new facts.

22      BY MS NEESE:

23         Q.  So I'm asking you, sir, did I ever threaten you

24      in any way?

25         A.  You were in the room with me when I was

1    threatened. You didn't stand up and prevent it.  You

2    didn't leave the room. You allowed it to happen.  You

3    were there.  You are the overseer of this case.

4         Did I take it as you threatening me? Yes.  You

5    were the higher authority. You allowed it to happen. You

6    sat back and watched it happen. So yes, that is how I

7    perceived it.  If my perception is incorrect, I

8    apologize for the misunderstanding, but I don't see how

9    it is.

10   Q.  We're two weeks away from trial, correct?

11   A.  Yes.

12   Q.  A year and two months into this and this is the

13   first time this has ever been brought up, right?

14   A.  No.

15   Q.  Never?

16   A.  No, this was brought up in September.

17   Q.  That was a motion to dismiss the indictment, sir?

18        MR SNOOK:  Judge, now we're arguing about

19   legal strategies with a lawyer who was not even in the

20   case.

21        THE COURT:  Let's go.

22   BY MS NEESE:

23   Q.  You understand the investigative side and the

24   prosecutive side are two different sides of things?

25   A.  Yes.

1              MR SNOOK:  Objection as to relevancy, Your

2     Honor.

3              MS NEESE:  He's classifying me as an

4     overseer.  There's two separate sides

5              THE COURT:  He said that was his perception.

6     BY MS NEESE:

7        Q.  You were never asked about having popped

8     anybody's cherry, on March 27th, were you? You were just

9     asked if you injected anyone.

10       A.  No, that is not true.

11       Q.  Really?

12       A.  The statement was made, pop her cherry, exactly,

13    expressly.  I remember that very vividly because my

14    return reply was I have never had sexual relations with

15    that girl, ever.

16       Q.  No one ever accused you of having sexual

17    relations with a minor ever, have they?

18       A.  No, they haven't, and it was clarified it didn't

19    mean a sexual relation.  It meant shoot up for the first

20    time.

21       Q.  Let me ask you this, sir.  Regarding popping her

22    cherry, that didn't come out until discovery came out,

23    did it, well after you were indicted and charged,

24    arrested and appeared before the Court?

25       A.  It came out on the 27th when I was questioned in

1    the interview room.

2       Q.   But that's not in the report, is it? You didn't

3    say -- what you did say just a minute ago, but that was

4    in the report, but the injection? Is that what you're

5    saying? I'm sorry

6       A.   A lot of things that were said are not in the

7    report. That report is not an accurate depiction of what

8    actually happened.

9       Q.   You've convinced yourself of a lot of things in

10   jail, haven't you?

11      A.   I've not convinced myself of anything.

12      Q.   Convinced yourself your wife was going to stand

13   by you through this hearing, didn't you?

14      A.   I'm not convinced of anything.

15      Q.   Amanda McKinney does know a girl named Holly,

16   correct?

17      A.   Yes.

18      Q.   And you've gotten heroin through Amanda McKinney

19   through Holly before; correct?

20      A.   I don't know if it came from her or not. She said

21   it did.

22      Q.   That's what you informed us on that day.

23      A.   That it came from a girl named Holly.

24      Q.   Paragraph 18.  You said you never sold pills to

25   any of these people.  Is that what you said?

1     A.   That's not what I said.

2     Q.   You said you never told us you distributed pills

3    to those people?

4     A.   I said I never told you that I distributed pills

5    to all the people on this list.

6     Q.   Okay.   Then clarify, sir.   What do you mean by

7    that?

8     A.   I mean exactly what I said.   I never told you in

9    that interview or any other time that I sold pills to

10   those people on that list.

11    Q.   So Investigator Cook was lying when he wrote this

12   list?

13    A.   I can't say that he was lying.   I don't know that

14   he wrote that list. But that list is incorrect.   That is

15   not a statement that I made directly. I never said that.

16    Q.   We don't have it here today, but have you been

17   able to review all the discovery, sir?   There are two

18   reports in the discovery of March 27th.   There's

19   Investigator Cook's report and the report your attorney

20   has filed with the Court; is that correct?

21    A.   Okay.

22    Q.   This is signed by Russell Davidson with ATF?

23    A.   Okay.

24    Q.   You also just said a minute ago that you never

25   bought heroin from Deede and Decanter, but in fact, the

1    report never says that. It says instead -- in the Vinton

2    area -- it says they live in the Vinton area; is that

3    right?

4       A.  The way I understood, what that said was I had

5    admitted buying heroin from Erin Deede and Ashley

6    Decanter. That's the way that I understood it.

7       Q.  So you're clarifying your last statement?

8                MR SNOOK:  Judge, for the record, I would

9    note I've tried in my questioning of the defendant to

10   limit the issue to things that he said, not to things he

11   disagrees with or says the officer got wrong, but

12   rather, as to things that he says the officer put down

13   that he had changed because of intimidation.  I think we

14   got down to only about three paragraphs and I don't

15   think that was one of them.

16               MS NEESE:  Your Honor, I'm pretty sure

17   paragraph 18 that I'm talking about was one of them.

18               THE COURT:  Go ahead with paragraph 18.

19   BY MS NEESE:

20      Q.  Paragraph 18 is the one talking about who you

21   distributed pills to and that's the one talking about

22   the heroin you were just talking about; is that correct?

23   Do you have a copy in front of you?

24           (Said document handed to the witness).

25      A.  What is the question?

1    Q.  You just testified a minute ago that you had

2    never bought heroin from them in Vinton, but that's not

3    what that paragraph says, is it?

4    A.  It says, Deede and Decanter have sold heroin and

5    pills to Burns in the past.

6    Q.  It doesn't say in Vinton, does it? People get

7    confused sometimes, don't they? They testify to

8    something --

9            MR SNOOK:  Objection.  I'd like to have him

10   answer one question at a time.

11           THE COURT:  Sustained.

12   BY MS NEESE:

13   Q.  Is that correct, sir?

14   A.  It says earlier in here, Deede and Decanter from

15   Vinton.

16   Q.  It doesn't even say from Vinton, sir.

17   A.  I can read back through it and find it if I need

18   to, where it says from Vinton.

19   Q.  No.  The proceeding two sentences, one of them

20   says they live in the Vinton area, but it never says you

21   bought heroin from the Vinton area. So what you're doing

22   is confusing what you said and what you read.  That

23   happens, right? Just like you're confusing the fact you

24   never were interviewed by Investigator Cook and me after

25   Dryden left that day.

1    A.  No, I'm not.

2              MS NEESE:  No further questions, Your Honor.

3              MR SNOOK:  I have nothing further, Judge

4              THE COURT:  Step down, please.

5              MS NEESE:  Briefly, we'd like to call

6    Investigator Cook as a rebuttal witness to what Mr.

7    Burns has testified to.

8       CHRISTOPHER COOK, PREVIOUSLY SWORN, RECALLED AS A

9                    WITNESS BY THE GOVERNMENT

10                      DIRECT EXAMINATION

11   BY MS NEESE:

12   Q.  You're still under oath.  Do you understand that?

13   A.  Yes, ma'am.

14   Q.  Have you heard Mr. Burns testify here today?

15   A.  I have.

16   Q.  After Detective Dryden interviewed Mr. Burns, did

17   you ever conduct another interview of Mr. Burns?

18   A.  I did not.

19   Q.  Did I ever conduct another interview of Mr.

20   Burns?

21   A.  No, ma'am.

22   Q.  Did you take him downstairs?

23   A.  Yes, ma'am.

24   Q.  Did you ever grab him by the arm?

25   A.  No, ma'am.

 1      Q.   Would you please explain that to the Court?

 2      A.   Upon leaving the conference room, I escorted Mr.

 3  Burns to the downstairs area. Once we got to the top of

 4  the steps, Mr. Burns did tense up.  I told him not to

 5  tense up. At that time, Deputy Nash came to my location

 6  and the two of us escorted him downstairs to the area

 7  the probation people were at.

 8      Q.   Did you ever threaten Mr. Burns at any point in

 9  time?

10      A.   No, ma'am.

11               MS NEESE:  No further questions, Your Honor

12                    CROSS-EXAMINATION

13  BY MR SNOOK:

14      Q.   You had the ability to be taping these

15  conversations, but you chose not to.

16               THE COURT:  I think we heard enough about

17  that already.

18               MR SNOOK: Judge, there's one question I want

19  to ask relating to that.

20               THE COURT:  All right.

21               MS NEESE:  Your Honor, I didn't ask anything

22  about that.

23               THE COURT:  Let's go on.  I've got to leave.

24  We'll have to come back.

25  BY MR SNOOK:

1    Q.  The interview room that has the ability to do a

2    video interview was not in use at the time you were

3    talking to him; is that correct?

4    A.  I don't know if it was in use or not.  We chose

5    to use the conference room.

6    Q.  At 7:45 in the morning, you don't know whether

7    there was anybody else being interviewed at the time?

8    A.  We chose to use the conference room at the

9    sheriff's office to use for the interview.

10                  MR SNOOK:  That's all.

11                  THE COURT:  Thank you.  You may step down.

12                  Is there any other evidence on any of the

13   other motions?

14                  MS NEESE:  Your Honor, at this point in time

15   regarding the motion in limine, I have a jury trial next

16   week and I haven't been able to respond to be in

17   compliance with the joint discovery order.  We have to

18   respond within seven days.  However, I'm saying in

19   response orally that there is no federal rule of

20   evidence that governs inextricably intertwined evidence.

21   We've provided notice throughout discovery.  He has

22   notice obviously because he's filed a motion in limine

23   to restrict some of these things and our argument would

24   be portions of this motion in limine will be

25   inextricably intertwined and intrinsic evidence to the

1    case and not 404(b) evidence.

2             MR SNOOK:  Your Honor, I'm not sure how

3    exactly I can respond and it may be we have to wait and

4    see how trial goes, but obviously, I'm concerned about a

5    couple of things. One is there's extremely inflammatory

6    allegations even in the evidence the Court heard today

7    that don't effectively prove any point or make it

8    anymore likely that the government has proven a

9    conspiracy. I think the Court can rule, frankly, on the

10   basis of our representations. I don't know if the Court

11   wishes us to present evidence or present the evidence we

12   wish the Court to not consider.  We can do that if the

13   Court directs. I don't know exactly how you want us to

14   proceed though.  I'm mindful of the Court's schedule. I

15   will take whatever direction the Court would offer.

16            THE COURT:  I'm looking at things like these

17   pictures and things like that.

18            MS NEESE:  Your Honor, regarding number

19   one -- and I do want to respond in writing because it

20   will give my full argument.

21            Regarding the photos from defendant's cell

22   phone, specifically at least as to number one, the

23   photographs from 2007 would not be used.  There are some

24   photographs on there that he hasn't -- he just said nude

25   selfies. However, there are some photographs on the cell

phone that could potentially be used.  I'm not saying
we're definitely going to be using them, but there are
specific witnesses to be testifying that he had specific
pictures on his cell phone.  In fact, there's at least
one picture of him actually shooting someone up in the
arm. We don't know if it's himself or not.  We're going
to do some further testing on that one, but we do have
an injection shot on there as well.

As to #2, I will write all this up.  There
are numerous witnesses who could potentially testify
during this jury trial that he was getting pills from
other people to then distribute to them, for them to
engage in certain activities with him. That's clearly a
conspiracy, Your Honor, in our point of view.  And there
are also people that were trading back and forth with
him and selling to him.  We're going to indicate that
that is intrinsic and it is inextricably intertwined to
this case.

Regarding the forged prescription, the
evidence you don't have before you is one of his
co-defendants, Jennifer Hershey, is the one helping him
get that prescription and they were getting it not only
for their own use, but for the distribution to each
other and other people.  Additionally, Aliesha Dixon has
already provided a statement he was going to try to have

```
1    her go pick up the statement. She's another person not

2    charged in this conspiracy, but was getting pills from

3    Burns, not just prescription pills and we'll also argue

4    that's inextricably intertwined evidence

5              Regarding the death of Jonathan Bohon, we

6    will brief that to you because that's much more than

7    what is in the motion here.

8              Evidence of use of other drugs, if it's

9    during the course of the conspiracy, Your Honor, it's

10   definitely going to be inextricably intertwined

11   evidence.  Plus, the bags that came up from the search

12   warrant that was executed at his home did determine to

13   test positive for heroin and there's also allegations

14   made by numerous witnesses that he was a distributor of

15   heroin during the course of this conspiracy to the same

16   people he was distributing pills.  They're both opiate

17   based drugs and we'll be arguing it's in inextricably

18   intertwined.

19             MR SNOOK:  I guess we'll have to see the

20   government's response before I can make a more detailed

21   response.

22             THE COURT:  Do y'all want to be heard

23   further on this motion today or do you want to write?

24             MR SNOOK:  Judge, we haven't even had a

25   chance to discuss law.  The facts are the first issue.
```

```
1   The Court has heard the facts.  I don't know that we
2   need to spend much more time with the Court on that. If
3   the Court wishes, I'd be happy to take up your time.
4              THE COURT:  No.
5              MS NEESE:  We'll rest on the facts and
6   indicate that this was a voluntary statement.
7              THE COURT:  I'll let you know something
8   about this pretty quickly.
9              We'll recess now.
10
11
12  "I certify that the foregoing is a correct transcript
13  from the record of proceedings in the above-entitled
14  matter.
15
16
17  /s/ Sonia Ferris                May 28, 2014"
18
19
20
21
22
23
24
25
```

1                              **INDEX**

2    **WITNESS FOR GOVT.**

3    Chris Cook
      Direct Examination by Ms. Neese......................3
4    Cross-Examination by Mr. Snook......................21
      Redirect Examination...............................32
5    Recross-Examination................................35
      Further Redirect Examination.......................38
6
7    Tara Burns
      Direct Examination by Ms. Neese.....................39
      Cross-Examination by Mr. Snook......................54
8    Redirect Examination...............................66

9    Sarah Dryden
      Direct Examination by Ms. Neese.....................69
10   Cross-Examination by Mr. Snook......................75

11   **WITNESS FOR DEFENSE**

12   Les Christopher Burns
      Direct Examination by Mr. Snook.....................80
13   Cross-Examination by Ms. Neese.....................98

14   **REBUTTAL WITNESS FOR GOVT**

15   Chris Cook
      Direct Examination by Ms. Neese....................112
16   Cross-Examination by Mr. Snook.....................113

17

18

19

20

21

22

23

24

25