1          UNITED STATES DISTRICT COURT
           WESTERN DISTRICT OF VIRGINIA
2               LYNCHBURG DIVISION

3  **UNITED STATES OF AMERICA,**

4                    Plaintiff,
                                        **No. 6:13-CR-22-10**
5       vs.                            Lynchburg, Virginia
                                        **June 2, 2014**
6  **LES CHRISTOPHER BURNS,**

7                    Defendant.

8       **TRANSCRIPT OF JURY TRIAL PROCEEDINGS - DAY 1**
              BEFORE THE HONORABLE NORMAN K. MOON
9          UNITED STATES DISTRICT JUDGE, and a jury

10  **APPEARANCES:**

11  **For the Government:**

12  **ASHLEY BROOKE NEESE**
    **DREW JOSEPH MICHAEL BRADYLYONS**
13  United States Attorneys Office
    BB&T Building
14  301 First Street, S.W., Room 906
    Roanoke, VA 24008
15  540-857-2250

16  **For the Defendant:**

17  **JOHN LLOYD SNOOK, III**
    Snook & Haughey, P.C.
18  408 East Market Street, Suite 107
    Charlottesville, VA 22902
19  434-293-8185

20

21  Court Reporter:    Carol Jacobs, Official Court Reporter
                        Registered Diplomate, Realtime Reporter
22                      U.S. District Court
                        1101 Court Street
23                      Lynchburg, VA 24504
                        434-847-5722, ext. 3
24
        Proceedings recorded by mechanical stenography;
25  computer-assisted transcription.

1          (Proceedings were had in the aforestyled case, JURY

2     SELECTION, OPENING STATEMENTS, said proceedings not being

3     designated to be transcribed.  Proceedings were then had as

4     follows:)

5          (Jury in at 1:42 p.m.)

6               THE COURT:  All right.  Call the first witness,

7     please.

8               MR. BRADYLYONS:  Your Honor, the United States

9     calls Sarah Dryden.

10               THE CLERK:  Please raise your right hand.

11                SARAH DRYDEN, GOVERNMENT'S WITNESS, SWORN

12               THE CLERK:  You may have a seat on the witness

13     stand.

14                         DIRECT EXAMINATION

15     BY MR. BRADYLYONS:

16     Q.   Good afternoon.

17     A.   Good afternoon.

18     Q.   Could you please introduce yourself to the jury.

19     A.   Sarah Dryden.

20     Q.   And where do you work?

21     A.   B&W.

22     Q.   Where were you employed in October of 2012?

23     A.   Bedford City Police Department.

24     Q.   Where were you working on October 26th of 2012?

25     A.   I was working on the road that night, patrol.

1   Q.   Can you please tell us what happened.

2   A.   I stopped a Dodge -- dark-colored Dodge vehicle, 460

3   westbound --

4            THE COURT:  Can the jury hear?  You have got to

5   move that microphone up and speak up.

6            THE WITNESS:  Hear me now?

7   BY MR. BRADYLYONS:

8   A.   I had stopped a Dodge vehicle, on 460, on suspicion of

9   drunk driving.

10  Q.   And what happened next?

11  A.   I made contact with the driver.  He stated that his

12  name was Jonathan Burns Kara.  I asked him for his LO, which

13  was his license.  He said that he did not have it with him.

14  And he gave me his Social Security number.

15  Q.   What did you do with that information?

16  A.   I ran that Social through dispatch.  Dispatch came back

17  and stated that the subject was licensed and that he had a

18  concealed weapons permit.  I asked the subject driving the

19  vehicle if he had the weapon with him in the vehicle.  He

20  stated no.  The subject seemed very nervous, shaking; his

21  voice was shaking.  I asked him for permission to search the

22  vehicle, which he gave me.

23  Q.   What did you find?

24  A.   I located several Q-tips on the floor and also under

25  the driver's seat, which gave me suspicions that there were

1 probably needles or drugs in the vehicle.  I continued to

2 search.  And underneath the gearshift of the vehicle I found

3 an empty prescription bottle for oxycodone with the name of

4 Les Burns on the prescription bottle.

5     I asked the subject why he had -- or who was Les Burns.

6 And he said that it was his brother.  I asked him why he had

7 the prescription bottle.  He said he did not know that it

8 was in the vehicle.

9     Upon searching further, I found a white box containing

10 multiple needles, also five white pills, and a spoon with

11 white residue on it.  I asked the subject why he was using

12 his brother's medication.  He stated that in fact his name

13 was Les Burns and then he gave me his Social, which I ran

14 through dispatch.  Dispatch came back and stated that he was

15 not licensed and that he had been arrested prior for giving

16 law enforcement false information.

17 Q.  What happened next?

18 A.  I placed Mr. Burns under arrest and I read him *Miranda*

19 warnings.  And I asked him if he wished to speak with me

20 further.  He stated that he did.  Mr. Burns stated that he

21 had just bought pills from a David Cyrlin for $35 apiece.

22 He stated that they were Dilaudid; I believe they were eight

23 milligrams.  Mr. Burns stated that he does have a

24 prescription for oxycodone, he takes that twice daily for

25 his neck pain, but the oxycodone is not enough, so he

1  purchases the Dilaudid from Mr. Cyrlin and injects that, I

2  believe half of a pill a day.

3  Q.  Do you see Mr. Burns here today?

4  A.  Yes, I do.

5  Q.  Could you please point him out and describe what he's

6  wearing.

7  A.  He's right there, wearing a tan suit.

8         MR. BRADLYLYONS:  Your Honor, may the record reflect

9  that the witness has identified the defendant?

10        THE COURT:  It will.

11  BY MR. BRADLYLYONS:

12  Q.  And what did you do with the information that he

13  provided you?

14  A.  Like I said, I had placed him under arrest and read him

15  *Miranda*, spoke with him further.  And I asked him if he

16  wanted to cooperate in a police investigation since he

17  stated that he was buying the pills illegally from

18  Mr. Cyrlin.  He stated that he would.  I contacted the

19  sergeant over investigations for Bedford City Police

20  Department.  He stated that we could not do anything with

21  Mr. Burns that night.  So then I contacted Investigator Cook

22  with Bedford County Sheriff's Office, who agreed that he

23  would work with Mr. Burns when he signed up to work with

24  him.

25  Q.  When was the next time you saw Mr. Burns?

1   A.   December 15th of 2012.

2   Q.   And how did that contact come about?

3   A.   I was working patrol again.  And I was assigned a call.

4   It was for prescription fraud on East Main Street, the CVS.

5   The complainant was the pharmacist at CVS.  She stated that

6   a male --

7           MR. SNOOK:  Objection to hearsay.

8   BY MR. BRADYLYONS:

9   Q.   Without saying what someone else told you.

10  A.   Okay.  A subject had brought in a --

11          MR. SNOOK:  Objection to hearsay.

12  BY MR. BRADYLYONS:

13  Q.   Again, without saying what anyone else told you.

14  A.   Okay.  Upon reviewing the security footage, I had

15  viewed a subject that had brought in a prescription for

16  oxycodone.  The prescription was for a female subject --

17          MR. SNOOK:  Objection.  The security footage cannot

18  possibly disclose those details.

19          THE COURT:  Sustained.

20  BY MR. BRADYLYONS:

21  Q.   Did you review security footage?

22  A.   Yes.

23  Q.   What did you see in the security footage?

24  A.   I recognized Mr. Les Burns -- well, back up.  He had

25  dropped off a prescription for oxycodone.  He later --

1          MR. SNOOK:  Objection.  That probably is not on the

2    security footage either.  I ask that she be directed to give

3    a foundation --

4          THE COURT:  Just tell us what you actually saw on

5    the --

6          THE WITNESS:  Okay.

7    BY MR. BRADLYONS:

8    A.   Mr. Burns came in to pick up the prescription for

9    oxycodone, which he was not allowed to pick up at that

10   time --

11         MR. SNOOK:  Objection.  That's --

12         THE COURT:  Sustained.

13         How do you know it was oxycodone?

14         THE WITNESS:  That's what the prescription was

15   written for.

16         THE COURT:  Well, how did you have --

17         THE WITNESS:  When I went to the call, the

18   pharmacist gave me the actual prescription.

19         THE COURT:  You went to the call?

20         THE WITNESS:  Yes, sir.  CVS.  The pharmacist was

21   the complainant.

22         THE COURT:  Okay.  And you saw a prescription?

23         THE WITNESS:  Yes, sir.

24         THE COURT:  Okay.

25         MR. SNOOK:  Judge, I -- the only way she knows that

1    it is -- the prescription is basically somebody else has

2    told her.  It is the same --

3            THE COURT:  Well, she said she saw it.  So -- I

4    mean --

5            THE WITNESS:  I saw the prescription pad that it

6    -- that was filled out for oxycodone, that he -- that

7    Mr. Burns passed.

8            THE COURT:  Well, the part that Mr. Burns passed is

9    hearsay.  She can say that she saw a prescription for

10   oxycodone.

11           In the drugstore; correct?

12           THE WITNESS:  Yes, sir.

13           THE COURT:  And whose name was on it?

14           THE WITNESS:  It was written out for a Robin

15   Sexton.

16           THE COURT:  A what?

17           THE WITNESS:  Robin Sexton.

18           THE COURT:  All right.

19   BY MR. BRADYLYONS:

20   Q.  And what did you do next after you left the CVS?

21   A.  After I had viewed the security footage and I had

22   recognized Mr. Burns, I went to speak with Mr. Burns.

23   Q.  And what did Mr. Burns tell you?

24   A.  Mr. Burns stated that a Heather Overstreet had the

25   filled-out prescription pad from Carilion Hospital.  The pad

1    was signed Dr. Adams.  Mr. Burns stated that he took the

2    prescription to CVS.  And he was going to pass it, in order

3    to get a cut of the pills, and share it with Ms. Overstreet.

4    Q.   Did you contact Ms. Overstreet?

5    A.   I attempted to and learned that she had been

6    incarcerated the whole time.

7    Q.   And what did you do next?

8    A.   I went back to speak with Mr. Burns.  Mr. Burns stated

9    that he had lied; that he had actually obtained a blank

10   prescription pad from a Camber Carter in Roanoke.  Mr. Burns

11   stated that he himself filled out the prescription and

12   signed the name of Dr. Scott Adams.  He stated that

13   Mr. Adams was his prior physician, who works in Goode.

14   Q.   And what else -- what did he do next?

15   A.   Mr. Burns stated that he had taken the prescription pad

16   to CVS and dropped it off.  He stated that the pharmacist

17   had called the number that he left for the pharmacist, and

18   Jennifer Kirsche answered the phone, acting to be Robin

19   Sexton, in which she gave the date of birth to the

20   pharmacist, because the pharmacist stated she needed more

21   information.  Mr. Burns stated that after the pharmacist had

22   called and said that she needed more information, he got

23   spooked and did not go to pick up the prescription.

24   Q.   What did Mr. Burns tell you he intended to do with the

25   pills?

1   A.   He stated he was going to split the pills with

2   Ms. Kirsche.

3   Q.   Anyone else?

4   A.   Camber Carter.

5        MR. BRADYLYONS:  One moment, Your Honor.

6   (Pause.)

7        MR. BRADYLYONS:  No further questions at this time,

8   Your Honor.

9        THE COURT:  All right.  Mr. Snook?

10       What was the date that you were in the drugstore?

11       THE WITNESS:  December 15th, 2012 -- 2013.

12       THE COURT:  2012?

13       THE WITNESS:  It would have been 2013, I believe

14   -- no, it would have been 2012.  I'm sorry.

15       THE COURT:  All right.

16       MR. SNOOK:  I have no questions, Judge.

17       THE COURT:  Okay.

18       MS. NEESE:  No further questions.

19       THE COURT:  All right.  Thank you.  You may step

20   down.

21       THE WITNESS:  Thank you.

22       (Thereupon, further proceedings were had, TESTIMONY

23   of CHRIS COOK, JUETTE RENALDS, and DIANE CATLEY, said

24   proceedings not being designated to be transcribed.

25   Proceedings were then had in the presence of the jury as

1   follows:)

2           THE COURT:  Who is your next?

3           MS. NEESE:  Jennifer Kirsche.

4           THE CLERK:  Please raise your right hand.

5           If you could stand.  Please stand.  Raise your

6   right hand.  Raise your right hand.

7       JENNIFER KIRSCHE, GOVERNMENT'S WITNESS, SWORN

8           THE CLERK:  You may have a seat on the witness

9   stand.

10                    DIRECT EXAMINATION

11  BY MS. NEESE:

12  Q.  Good afternoon.  Please state your name for the record

13  and tell the court reporter how to spell your last name.

14  A.  It is Jennifer Kirsche.  And it is K-I-R-S-C-H-E.

15  Q.  Do you mind speaking just a little bit closer to the

16  microphone, ma'am.

17  A.  Sorry.

18  Q.  Are you presently charged with anything in this court?

19  A.  Yes.

20  Q.  Have you entered a guilty plea?

21  A.  Yes, ma'am.

22  Q.  What was that to?

23  A.  Conspiracy to distribute Schedule II narcotics.  I

24  signed a plea agreement for seven to nine years.

25  Q.  What kind of -- what kind of narcotics are you talking

1    about?  What's Schedule II?

2    A.    Pain pills mostly, Opanas, methadone, OxyContin, or

3    OxyContin hydromorphone.

4    Q.    Is hydromorphone also known as Dilaudid?

5    A.    Yes.

6    Q.    Now, have you been made any promises for testifying

7    here today?

8    A.    No.

9    Q.    Are you hoping for anything, ma'am?

10   A.    Substantial assistance.

11   Q.    Is that part of your plea agreement?

12   A.    Yes.

13   Q.    Is substantial assistance -- what is substantial

14   assistance?

15   A.    A sentence reduction.

16   Q.    Now, let's talk about your criminal history, if you

17   could.  Tell us, were you convicted in 2008 of giving false

18   information to a criminal investigator?

19   A.    Yes.

20   Q.    Tell us about that, please.

21   A.    I was using drugs, using heroin.  And we had stole some

22   stuff from Wal-Mart.  I had gotten pulled over and lied to

23   the police about the guy that was with me.  And I gave them

24   a false name.

25   Q.    False name for yourself or for someone else?

1   A.   For him.

2   Q.   Okay.  Did you later admit to it?

3   A.   Yes.

4   Q.   Did you admit to it on that day?

5   A.   Yeah, later on that day.  They arrested me and took me

6   into the jail, and I confessed then.

7   Q.   Did you plead guilty to it?

8   A.   Yes.

9   Q.   Do you also have a felony conviction for grand larceny?

10  A.   Yes.

11  Q.   And will you tell us about that, ma'am.

12  A.   Well, that was involved with the same thing.  We were

13  stealing from Wal-Mart.  So it was computers and stuff, over

14  $250.

15  Q.   Same incident?

16  A.   Yes.

17  Q.   Okay.  Tell us about it.

18  A.   Well, we had stole computers from Wal-Mart.  And that

19  day we had made it to the door, but we didn't get out the

20  door.  It's the same thing.  And I got charged with grand

21  larceny for having my hand in stealing the computers.  And

22  so it was all in the same day.

23  Q.   Why were you stealing computers, ma'am?

24  A.   For my drug habit.

25  Q.   What were you going to do with the computers?

1    A.    Resell it and get the money to buy drugs.

2    Q.    And then in 2012 were you convicted of shoplifting?

3    A.    Yes.

4    Q.    What was that for?

5    A.    Same -- same thing, pretty much.  I went in and stole a

6    few things and was going to later return them and get a gift

7    card to turn around and use for drugs.

8    Q.    Trade the gift card for drugs?

9    A.    Yes, ma'am.

10   Q.    Did you plead guilty to that?

11   A.    Yep.

12   Q.    Did you plead guilty to the grand larceny?

13   A.    Yes, ma'am.

14   Q.    Is it fair to say you have been a drug user for a long

15   time?

16   A.    Yes, ma'am.

17   Q.    What types of drugs?

18   A.    All kinds.  Heroin, opiates, pain pills, crack cocaine,

19   meth, ecstasy, acid, marijuana.

20   Q.    What do you mean "heroin" and "opiates"?  What is

21   "opiate," based on your knowledge?

22   A.    Pain pills.  Heroin is an opiate.  So pain pills are

23   like a derivative of heroin.  It is basically the same

24   thing.

25   Q.    How long have you used pills, ma'am?

1    A.    For probably about six years.

2    Q.    How did you get started?

3    A.    Heroin.  I started using heroin when I was 18; found

4    out that there were certain pills that you could use and do

5    the same way and get the same effects as heroin.  It was

6    cheaper; you knew what you were getting; it couldn't be cut

7    and stepped on by other people that you were getting it

8    from.

9    Q.    What types of pills gave you the same effects as

10   heroin?

11   A.    Dilaudids, OxyContins, roxycontins *(sic)*.

12   Q.    And when you say "OxyContin," are you talking about a

13   certain milligram?

14   A.    Well, you could -- they come in different milligrams.

15   I mean, some people use 80s.  But you could take two or

16   three 20s and put them together, and it would be basically

17   the same thing.

18   Q.    And what types of milligrams are the Roxys?

19   A.    They come in 10 milligram, 5 milligrams, I think.  30

20   milligram is the most common.

21   Q.    When were you arrested, ma'am?

22   A.    August of 2013.

23   Q.    Were you a pill user until then?

24   A.    Yep.

25   Q.    Do you know the defendant here today, Mr. Burns?

1   A.   I do.

2   Q.   Will you identify him for the jury.

3   A.   Right there.

4   Q.   And what is he wearing?

5   A.   A gray suit.

6           MS. NEESE:  Your Honor, please let the record

7   reflect that the witness has identified the defendant.

8           THE COURT:  It will.

9   BY MS. NEESE:

10  Q.   How do you know Mr. Burns?

11  A.   We had been friends for about 14 years.

12  Q.   Do you remember when you first met him or where you

13  were?

14  A.   Not right off.  That is a long time ago.

15  Q.   Did you ever get involved in using any types of illegal

16  substances with him?

17  A.   Yes, ma'am.

18  Q.   How long have you been doing that?

19  A.   On and off for the last 14 years, throughout our whole

20  friendship.

21  Q.   Specifically regarding pills, have you ever used pills

22  with him?

23  A.   Yes.

24  Q.   Tell us about it, please.

25  A.   I have sold him pills.  I have purchased pills from

1  him.  We have used pills together.

2  Q.  Okay.  Let's talk about specifically when exactly did

3  you-all start dealing in pills together?

4  A.  I would say probably 2008.  I was renting a house from

5  him.  I had purchased some heroin from him from time to

6  time --

7  Q.  Let me just stop you for just a second.  You said you

8  were renting a house from him?

9  A.  From his mother, yes.

10  Q.  Okay.  Where was that house located?

11  A.  In Montvale.

12  Q.  Do you know where Mr. Burns was living at that point in

13  time?

14  A.  At his mother's house.

15  Q.  How far away was that?

16  A.  Up the hill.  Walking distance.

17  Q.  Did you walk there sometimes?

18  A.  A few times.

19  Q.  Who were you living with?

20  A.  My fiance at the time, Mark Hite.

21  Q.  And who was he living with?  Mr. Burns?

22  A.  Oh.  He was living with his mother.

23  Q.  Anyone else?

24  A.  My sister was living there with them.

25  Q.  Who is your sister, ma'am?

1    A.    Jessica Kirsche.

2    Q.    Now, if you would, please, tell us how you got involved

3    with pills with him.

4    A.    I was using methadone at the time. And when people

5    can't find heroin and they become boat sick, they turn to

6    other forms of opiates, being the pain pills. And I had

7    sold him methadones a few times then. And that was like the

8    beginning of my heavy pill addiction. And things just

9    escalated from there throughout time.

10    Q.    What do you mean "escalated"?

11    A.    Well, then he got, you know, hooked on the pills. I

12    was hooked on pills. Other people around where we are from

13    were hooked on pills. And it just become a

14    buy-trade-give-take game between everybody.

15    Q.    Who are the other people you are talking about?

16    A.    Other codefendants that are involved in the same

17    conspiracy that I'm involved in.

18    Q.    Could you name some people?

19    A.    Scottie Andrews, Kevin Jessee, Bryant Reynolds.

20    Q.    Did you ever deal with Scottie Andrews?

21    A.    I have.

22    Q.    Did you ever deal with Tim Goodman?

23    A.    I have.

24    Q.    Did you ever deal with Kevin Jessee?

25    A.    No.

1  Q.   Why not?

2  A.   We knew each other, but we just didn't -- didn't

3  associate with each other like that.  I imagine that through

4  other people that they were probably bought from me for him

5  or I bought pills that come from him, but it was never

6  direct.

7  Q.   Did anyone ever tell you that you got pills from them

8  that came from Kevin Jessee?

9  A.   No.

10  Q.   Did you ever know that anybody was taking Kevin Jessee

11  pills?

12  A.   No, not directly.

13  Q.   Okay.  Well, tell us who else.

14       Was your sister involved?

15  A.   Yes, she was.

16  Q.   Were other people involved?

17  A.   Yeah, other people.

18  Q.   What was Mr. Burns's relationship like with

19  Mr. Andrews?

20  A.   They worked together.  I don't really know how much

21  they hung out outside of that.  But I know that they had a

22  work relationship.  And they probably traded pills, bought

23  and traded pills --

24            MR. SNOOK:  Objection to speculation.

25            THE COURT:  Sustained.

1  BY MS. NEESE:

2  Q.  Did you ever see them trade any pills?

3  A.  Not directly, no.

4  Q.  Did either of them ever talk to you about how they

5  purchased pills from each other?

6  A.  Yes.  All of the time.

7  Q.  Tell us what they told you, ma'am.

8  A.  I mean, Scottie would tell me that he called --

9       MR. SNOOK:  Objection.  Hearsay at this point.  We

10  don't have the predicate laid.

11       MS. NEESE:  Your Honor, she stated that he was

12  involved in dealing pills.  And he's a coconspirator to this

13  conspiracy.  She can testify to what Mr. Andrews told her

14  about purchasing pills --

15       THE COURT:  You have to lay the framework that

16  there was a conspiracy between the two of them before the --

17  BY MS. NEESE:

18  Q.  Did you have a pill relationship with Mr. Andrews?

19  A.  Yes.

20  Q.  Did Mr. Burns have a pill relationship with

21  Mr. Andrews?

22  A.  Yes.

23  Q.  Did you have a pill relationship with Mr. Burns?

24  A.  Yes.

25  Q.  What was that pill relationship like?

1    A.   He would come to me and purchase pills.  I would go to

2    him and purchase pills.  There were times that we would

3    trade pills, for better pills, with each other.  There were

4    times that there was no money involved and I would give him

5    pills, to keep him from being dope sick.  In return, there

6    was times that I didn't have pills and I needed something, I

7    would call on him and rely on him to help me out, in return,

8    because I was dope sick.

9    Q.   Did you ever get pills from him to give to anybody

10   else?

11   A.   Yes.

12           THE COURT:  When you say "him," who are you talking

13   about?

14           THE WITNESS:  Chris Burns.

15           THE COURT:  Okay.

16   BY MS. NEESE:

17   Q.   Did you ever get pills from Mr. Burns to distribute to

18   other people?

19   A.   Yes, ma'am.

20   Q.   Did he know that?

21   A.   I assumed he did.

22   Q.   Did -- did you-all ever talk about your relationship

23   with Scottie Andrews?

24   A.   Not really, no.

25   Q.   Did you ever get pills from Mr. Burns for Scottie

1    Andrews?

2    A.   Yes.

3    Q.   Okay.   If you would, please, tell us what Mr. Andrews

4    stated --

5         MR. SNOOK:   Judge, objection.   That may indicate

6    intent on her part, but it doesn't indicate a meeting of the

7    minds.   She already said she assumed, but she didn't know

8    anything about any agreement.

9         MS. NEESE:   Your Honor, this is the Fourth Circuit.

10   We follow the *Pinkerton* law.   He is bound to know that

11   there's a reasonable foreseeability that other people are

12   involved.   They know each other.   She said that she was

13   buying pills -- or getting pills from him for Mr. Andrews.

14   She can testify what Mr. Andrews said --

15        THE COURT:   Well, she said she got them, but she

16   has -- she needs to explain why -- I mean, what does Burns

17   know?   When she says "I got pills from Burns for Andrews,"

18   what was the -- did she go to Andrews -- how did it come

19   about?   I mean, there must have been --

20        MS. NEESE:   He is held reasonably foreseeable to

21   anybody else that was involved in the conspiracy, Your

22   Honor, under *Pinkerton*.   And --

23        THE COURT:   Yeah, but I'm talking about this case.

24   I'm not talking about some other case.   What happened in

25   this transaction?

1    BY MS. NEESE:

2    Q.   Did Mr. Burns ever come to your house when Scottie

3    Andrews was there --

4            THE COURT:   No, there was just a transaction -- she

5    talked about she got pills from Burns for Andrews.   Now, how

6    did it happen?

7    BY MS. NEESE:

8    Q.   How many times did you get pills from Mr. Burns,

9    approximately, throughout the course of the conspiracy?

10           MR. SNOOK:   Judge, object to the form of the

11   question.

12   BY MS. NEESE:

13   A.   Hundreds of times.

14           THE COURT:   Overruled.

15   BY MS. NEESE:

16   Q.   Hundreds of times?

17   A.   Throughout the conspiracy, yes.

18   Q.   What types of pills were they?

19   A.   All kinds.   Fentanyl patches, which those aren't a

20   pill, but it is opiate-based.   Roxys, Dilaudid --

21   Q.   Roxy, what milligrams?

22   A.   10-milligrams?   I believe they were the pink ones.

23   Q.   Were those the only ones?   Did you ever get the 30s as

24   well?

25   A.   Yes.

1    Q.   Where were the 30s coming from?

2    A.   From Bryant Reynolds.

3    Q.   How do you know that?

4    A.   Because Chris Burns would be at Bryant's house and he

5    would get them from him and bring them to me.

6    Q.   Did you pay Mr. Burns to get them for you?

7    A.   Yes.

8    Q.   Now, going back to Mr. Andrews, was Mr. Andrews ever at

9    your house when Mr. Burns was there?

10   A.   Yes.

11   Q.   Did you-all ever talk about pill dealings together?

12   A.   We done pills together.

13   Q.   Did all three of you have a conversation about pill

14   dealings together?

15   A.   Yes.

16   Q.   Would that be numerous times, just one time?

17   A.   Numerous times.

18   Q.   Were you-all involved in this together?

19   A.   Yes, ma'am.

20   Q.   Will you please tell us what Mr. Andrews told you about

21   Mr. Burns -- him and Mr. Burns's dealings?

22   A.   They were working together.  Mr. Andrews would come buy

23   pills from me and say that he was going to take them back to

24   the job or wherever Chris Burns may have been.  And he would

25   come and say, you know, that he was picking him up and going

1  to take them by his house or --

2  Q.  So you knew that Scottie was taking pills to Mr. Burns?

3  A.  Yes, ma'am.

4  Q.  Did you ever give -- give or sell pills to Mr. Burns

5  and you knew he was going to take them to Scottie?

6  A.  No.

7  Q.  Okay.  Now, going back to the pills that you got from

8  Mr. Burns, what other kinds of pills -- you said the Roxy

9  10s, the Roxy 30s.  What other kinds of pills were you

10  getting from him?

11  A.  8-milligram Dilaudids, methadone sometimes.  Anything

12  that really could be found.

13  Q.  Did he ever talk to you about whether or not he had a

14  prescription?

15  A.  I knew he had a prescription for Roxy 10s, I believe,

16  the pink ones.

17  Q.  Did he tell you that?

18  A.  Yes.

19  Q.  Did you ever take him to go get them?

20  A.  No.

21  Q.  Did anybody else that you know of?

22  A.  No, not that I know of.

23  Q.  Okay.  Did you ever get any of the Roxy 10s?

24  A.  Yes, ma'am.

25  Q.  Did you have to pay for them?

1  A.  Yes.

2  Q.  Did you ever get them for free?

3  A.  A few times, yes.

4  Q.  Did you ever give any to anybody else once you got

5  them?

6  A.  No.  They were for my personal use.

7  Q.  Just for your personal use?

8  A.  Right.

9  Q.  Are you aware of any other prescriptions that he had?

10  A.  No.

11  Q.  You said you had gotten Dilaudids from him.  Do you

12  know -- did he tell you where he got the Dilaudids from?

13  A.  No.

14  Q.  Did you pay him ahead of time to get them for you?

15  A.  Sometimes I would give him the money up front to go get

16  them because he didn't have enough to purchase extra ones

17  for me.  Sometimes he would have extra ones and I would

18  purchase them later on.

19  Q.  Did you ever purchase Opanas from him?

20  A.  Yes.

21  Q.  Do you know where he got the Opanas?

22  A.  I do not.

23  Q.  Did Mr. Burns ever tell you any other sources that he

24  had besides Mr. Reynolds?

25  A.  No.  Those were things that we kind of kept to

1    ourselves.

2    Q.   Why is that?

3    A.   Well, because you didn't want somebody else going and

4    stepping on your toes to go to who you were going to,

5    because it was -- it was a hustle, it was a money thing to

6    where, you know, you made a few bucks here and there, you

7    got a few extra pills here and there, you didn't want

8    somebody stepping in and taking over that.  So we kind of

9    kept our sources to ourselves.

10   Q.   What do you mean you made a few extra bucks, you get a

11   few pills?

12   A.   Well, some people would sell, say, a Roxy 30 for 20

13   bucks.  You could buy that from that person A, turn around

14   and sell it to person B for 30 bucks.  That's a $10

15   difference that would go in your pocket that you could use.

16   After you bought, you know, four or five pills, that's 40 or

17   $50 that you could use for your own personal use or whatever

18   you may have needed it for.

19   Q.   Let's go back to your distributions.  What type of

20   pills did you distribute to Mr. Burns?

21   A.   Methadone, Opanas, Roxys, Dilaudids.

22   Q.   Okay.  Do you -- were you getting those prescribed to

23   you?

24   A.   No, ma'am.

25   Q.   Who were you getting those from?

```
 1   A.   I was getting them from a man that I look up to as my

 2   father.

 3   Q.   Was his name Jimmy Seaman?

 4   A.   Yes, ma'am.

 5   Q.   Did Mr. Burns know where you were getting your pills?

 6   A.   Yes.

 7   Q.   How many times would you say you have distributed to

 8   him?

 9   A.   Hundreds of times.

10   Q.   Throughout the course of the years?

11   A.   Uh-huh.

12   Q.   Is that a yes?

13   A.   Yes, ma'am.

14   Q.   Did you ever talk to him about what he was going to do

15   with the pills?

16   A.   I -- no.  I mean, use them.

17   Q.   Did you ever see him use?

18   A.   Yes.

19   Q.   Okay.  How did he use pills?

20   A.   Intravenously.

21   Q.   Is that how you used them?

22   A.   Yes.

23   Q.   Is that always how you used them?

24   A.   Yes.

25   Q.   Tell the jury what happens once you start using pills
```

1  intravenously by injecting them.

2  A.   It becomes pretty much you have to have it.  You are

3  dependent on it, just as you are the air you breathe.  You

4  get up in the morning; you can't function without having

5  something -- you have to have something to do just to feel

6  normal.  It becomes where you are not even getting high; it

7  is just a way of life.

8  Q.   Did it take over your life?

9  A.   Yes, ma'am.

10 Q.   Did you sell to a lot of different people?

11 A.   I had about 10 or 15 different people I sold to on a

12 regular basis.

13 Q.   Was your sister also someone who was involved in this?

14 A.   Yes, ma'am.

15 Q.   What was her relationship with Mr. Burns?

16 A.   They had a relationship at one point in time, back in

17 2008, 2009, I believe.

18 Q.   Did they deal pills together?

19 A.   Not back then.

20 Q.   During the course of -- from at least 2009 to 2013,

21 ma'am, were they dealing pills together?

22 A.   Yes.

23 Q.   Did she get pills from him?

24 A.   Yes.

25 Q.   Did he get pills from her?

1  A.   Yes.

2  Q.   So she's another supplier too?

3  A.   Yeah.

4  Q.   Did you know about that?

5  A.   I mean, she would normally get the pills from me to

6  take to him or vice versa.  If I was sick and she could run

7  to his house and get them or something and bring them back

8  home to me, then that's the way it went.

9  Q.   When you say "vice versa," she would go get pills from

10 Mr. Burns?

11 A.   Right.

12 Q.   Did you know they were coming from Mr. Burns?

13 A.   Yes.

14 Q.   Did he know they were going to you?

15 A.   I would assume so.

16 Q.   Did you talk to Jessie Kirsche about it?

17 A.   I mean, she was my sister.  She lived with me.  We were

18 both addicts.  So it was kind of an unspoken-type thing, you

19 know.  She would make a phone call, say she could get

20 something from somebody.  She would go to town and get it

21 and bring it home.

22 Q.   What about Tim Goodman, were you friends with him?

23 A.   Yes, ma'am.

24 Q.   Did you sell pills to him?

25 A.   I did a few times, yes.

1  Q.  Did you ever hang out with him and Mr. Burns together?

2  A.  Not really together, no.

3  Q.  Did you know if they had any type of relationship?

4  A.  I had been told.

5  Q.  By who?

6  A.  By Tim Goodman.

7  Q.  Tell us what Tim Goodman told you about their

8  relationship.

9  A.  They worked together; that he was getting pills from

10  Chris; that Chris was getting pills from him, from other

11  people.

12  Q.  Did Tim Goodman have his own prescription?

13  A.  Not that I'm aware of, no.

14  Q.  Do you know a Heather Overstreet?

15  A.  I do.

16  Q.  Are you good friends with her or were you?

17  A.  I was, yes.

18  Q.  Was she someone you distributed pills to?

19  A.  Uh-huh.  Over a time, yes.

20  Q.  Is that a yes?

21  A.  Yes.

22  Q.  Okay.  Do you know if her and Mr. Burns had any type of

23  relationship?

24  A.  There was something said about it from her part, that

25  she had met up with him a few times.  But I don't think -- I

1    mean, I don't think there was ever anything to it.  I didn't

2    speak to her much later on after that.

3    Q.   What do you mean?  Did you-all have a falling-out?

4    A.   You could say that.

5    Q.   Did you ever get pills from her?

6    A.   Yes.

7    Q.   I'm going to direct you to December 2012.  Do you

8    remember an issue with a prescription that was turned in to

9    CVS?

10   A.   I recall that, yes.

11   Q.   Will you please tell us about that.

12   A.   It was a prescription written for Roxys.

13   Q.   And I'm going to stop you for just a second.

14        Roxicodone?

15   A.   Yes.

16   Q.   And will you tell the jury what kind of milligrams it

17   was?

18   A.   30-milligrams, I believe.

19   Q.   And who told you that?

20   A.   Mr. Burns.

21   Q.   And what did he tell you about that prescription?

22   A.   It was turned in to CVS.  They needed to verify the

23   prescription.  It had been written in a female's name.

24   Q.   Do you know the female's name?

25   A.   Robin Sexton.

1  Q.  Did you know her?

2  A.  No.

3  Q.  Did Mr. Burns know her?

4  A.  As far as I knew, she was made up.

5  Q.  Keep going.

6  A.  So the pharmacy had to verify the prescription.  He

7  gave them my number, asked if they could call me, and I

8  would verify the name and address and date of birth on it.

9  Q.  Let me ask you this:  Did you get an address?

10  A.  I don't remember what it was.

11  Q.  Did you get a -- no, I'm not asking if you know the

12  address.  Did he give you an address to use?

13  A.  Yes.

14  Q.  Did he give you a date of birth to use?

15  A.  Yes.

16  Q.  Did the pharmacist call you?

17  A.  Yes.

18  Q.  Did you provide that information?

19  A.  I did.

20  Q.  And what were you doing this for, ma'am?

21  A.  To get pills.

22  Q.  Okay.  Were you-all going to split the pills?

23  A.  I was going to get some of them.  I wouldn't say split

24  it.  But I would have gotten some off of it, yeah.

25  Q.  Do you know how many the prescription was for?

1   A.   60 or 90, I believe.

2   Q.   Do you know if anyone else besides you two were

3   involved in this?

4   A.   No.

5   Q.   Were you around Mr. Burns every single day?

6   A.   Not every single day, but two or three times a week.

7   Q.   Was he dealing with other people that you don't know

8   about it or that you heard names but you don't know them

9   personally?

10  A.   Yes.

11  Q.   Is that what he told you?

12  A.   Yes.

13  Q.   Did he ever talk to you about going to Roanoke?

14  A.   I know he made trips to Roanoke.

15  Q.   Did he tell you that?

16  A.   Yes.

17  Q.   And that's how you knew?

18  A.   Yes.

19  Q.   Why was he going to Roanoke?

20  A.   To pick up things; pills, heroin sometimes.

21  Q.   Okay.  When you say "things," you have got to explain

22  to the jury --

23  A.   Pills.

24  Q.   What kind of pills was he getting from the Roanoke

25  area?

1    A.    I believe Dilaudids, Roxys.

2    Q.    And you said heroin as well?

3    A.    A few times, yes.

4    Q.    Did you ever get any of the pills that he went to

5    Roanoke to get?

6    A.    I'm sure I probably did.

7    Q.    The pills that you received from Mr. Burns, did you

8    always pay for them?

9    A.    Not always.

10   Q.    Did he give them to you sometimes?

11   A.    Sometimes.

12   Q.    Did you pay for them sometimes?

13   A.    Sometimes, yes.

14   Q.    Now, did you use those pills?

15   A.    Yes.

16   Q.    Did they have the effect on you that they are supposed

17   to have?

18   A.    After a while, no.  It is --

19   Q.    Well, I meant are they actual controlled substances?

20   A.    Oh.  Oh, yes.

21   Q.    So at first did they make you high?

22   A.    Yes.

23   Q.    Once you got used to them, does it just make you

24   function normally?

25   A.    Yes, ma'am.

1    Q.   Tell the jury about that.

2    A.   Well, like I said, you have to have it in order to get

3    up and be able to eat or go to work or be able to play with

4    your kids like a normal functioning person could do.  If you

5    didn't have it, you would be in withdrawal.  And that's not

6    -- that's not a good thing to be.

7                MS. NEESE:  No further questions at this time, Your

8    Honor.

9                THE COURT:  Okay.

10               Mr. Snook, we'll take about just a five-to-ten-

11   minute break.

12               You can go back to the jury room.  And as soon as

13   everyone is ready to come back, we'll start back.  So don't

14   be gone more than ten minutes.  Okay?

15        (Jury out.)

16        (Recess at 4:15 p.m.)

17        (Call to Order of the Court at 4:20 p.m.)

18               THE COURT:  All right.  If they are all there,

19   bring them in.

20        (Jury in.)

21                           CROSS-EXAMINATION

22   BY MR. SNOOK:

23   Q.   Ms. Kirsche, let me ask you a few things.

24        Do I understand that you got started using opiates

25   something like 14 years ago?

1   A.   Yes, sir.

2   Q.   And at that time was Chris using opiates also?

3   A.   Not that I'm aware of at that time, no.

4   Q.   Had he been using ecstasy at some point or the other?

5   A.   Yes.

6   Q.   So the time that he really began using opiates was

7   after you had given him some pills?

8   A.   He was using heroin.  And I had bought heroin from him

9   a few times.  And I had sold him methadones a few times

10  around the same time.  That's when I became aware that he

11  was using.

12  Q.   Okay.  And that would have been not 14 years ago, but

13  -- you say you started dealing with him in about 2008; is

14  that right?

15  A.   On the pain pills, yes.

16  Q.   Okay.  And so you were -- so you were renting a house

17  from his mother basically down the hill from where he was

18  living with your sister with his mother?

19  A.   Yes, sir.

20  Q.   Okay.  And during a significant portion of this time

21  -- you were talking about him -- about Chris Burns and

22  Scottie Andrews working together.  You mean that literally,

23  that Scottie was an employee of Chris's business?

24  A.   Yes, sir.

25  Q.   And, in fact, at a different point in time Tim Goodman

1   was an employee of Chris's business?

2   A.  Yes, sir.

3   Q.  And that Chris worked -- I mean, he -- he had them

4   doing jobs; and they were manual laborer folks, doing real

5   work and getting real pay?

6   A.  Yes, sir.

7   Q.  Okay.  You -- you described a process that you would go

8   through of perhaps -- or maybe I'm jumping to a conclusion

9   here, of selling -- of buying a Roxy 30, say, for $20 and

10   reselling it for $30.  Did I understand -- you had said at

11   one point that you made about 5 to $10 a pill when you sold

12   the pills?

13   A.  Depending on which pills they were, yes, sir.

14   Q.  And also kind of what the market was going for at the

15   time?

16   A.  Right.  Right.

17   Q.  And that was pretty much -- I mean, there might be

18   times when you, as a matter of friendship, might give Chris

19   a pill if he was in a pretty bad way with being pill sick?

20   A.  Of course.

21   Q.  And, similarly, he might sometimes give you something

22   under the same circumstances?

23   A.  Yes, sir.

24   Q.  And it wasn't "Do this for me, so I'll do it for you"

25   as much as it was a friendship thing?

1   A.   Right.

2   Q.   Okay.  And that, in fact, when you would be selling

3   pills and you might sell pills to him, you would sell it at

4   a price that would allow you to recoup and make a little

5   profit yourself; right?

6   A.   Of course.

7   Q.   And you say that you were not -- I mean, you

8   maintained -- for example, you didn't want to let each other

9   know what your sources were?

10  A.   Right.

11  Q.   It would be fair to say that there was rather -- I

12  mean, it wasn't cooperation in that sense.  It was almost a

13  little competition?

14  A.   Pretty much, yes.

15  Q.   Yeah.  Okay.

16       You knew that Chris had a pretty bad pill addiction of

17  his own?

18  A.   Yes, sir.

19  Q.   And that when you would give him or sell him one or two

20  pills, that was pretty much going to get used up right away?

21  A.   Yes, sir.

22  Q.   Okay.  You didn't buy from him and he didn't buy from

23  you in quantities where you would go out and resell it.  You

24  are just talking about personal "get me past being pill

25  sick"?

1    A.    There was times it could be -- 10, 15 would be the

2    quantity.

3    Q.    Okay.  But 10 or 15 sounds like a lot, but that's

4    actually a daily dose for many people, isn't it?

5    A.    Sometimes.  Not necessarily.  If you are broke and you

6    have no money and no way to get any money, selling ten pills

7    to make two pills, it would keep you from being sick.  It

8    would knock the edge off.  And that's what we had to do

9    sometimes.

10   Q.    But if Chris had a prescription, let's say, for 300

11   pills a month --

12   A.    Right.

13   Q.    -- that would be ten pills a day?

14   A.    Yeah.

15   Q.    Okay.  And so if he got ten pills, that's a day's use

16   for him; right?

17   A.    Yes.

18   Q.    Okay.  And the kinds of quantities that you dealt with

19   when you were dealing with Chris, you would sell them most

20   of the time one or two at a time; right?

21   A.    Most of the time.  But there was -- there was times it

22   was a few more than that.

23   Q.    Okay.

24   A.    There was some types of pills, like Dilaudid 8, you can

25   buy one and split between two people and feel better.  So

1  sometimes buying one pill doesn't necessarily mean anything.

2  Q.  Right.  So -- and I guess my point would simply be that

3  the -- you knew pretty well that when you were selling stuff

4  to him, it was pretty much going to go into his arm?

5  A.  For the most part.

6  Q.  Yeah.

7  A.  But, like I said, there's other times that sometimes

8  you have to do what you have to do to get yours -- to be

9  able to afford it to get it.

10  Q.  Okay.  You never said to him, "Okay.  I'm going to give

11  you" -- "I'm going to sell you 50 pills," which you would

12  know would be much too much for a day's use?

13  A.  Yeah.

14  Q.  Or you were going to give him 50 pills, knowing that

15  he's going to go out and resell them, that never happened?

16  A.  Not to that extent, no.

17  Q.  Okay.  And that the largest quantity you have mentioned

18  ever selling to him at one time was perhaps ten?

19  A.  Ten, fifteen.

20  Q.  Okay.  Again, given the prescription that he had, the

21  legal prescription he had, that could be basically a day's,

22  maybe a day-and-a-half's use?

23  A.  Right.

24  Q.  Okay.  So -- and I take it that there was never a time

25  when you and Chris would sort of say, "Okay, you know, you

1  sell stuff down here and I'll sell stuff over there"?

2  A.   No.

3  Q.   Okay.  There was never a time when you told him what to

4  do?

5  A.   No.

6  Q.   There was never a time when he told you what to do?

7  A.   No.

8  Q.   And, in fact, there was never a time when you saw

9  anybody telling Chris what to do?

10 A.   No.

11 Q.   Or when you ever saw Chris telling anybody else what to

12 do in terms of selling drugs?

13 A.   No.

14 Q.   He was pretty much a lone wolf, wasn't he?

15 A.   We pretty much all were.

16 Q.   Yeah.  Now, Chris was locked up in March of 2013?

17 A.   Uh-huh.

18 Q.   Okay.  And you have got to say "yes" so we can get --

19 A.   I'm sorry.  Yes, sir.

20 Q.   Okay.  And you had gotten arrested in June of 2013 on

21 state charges?

22 A.   Yes, sir.

23 Q.   Were you locked up pending trial at that point or were

24 you -- I know you were arrested on federal charges in

25 August.

1  A.   At that time I got arrested and I got out on bond.

2  Q.   On the state charges?

3  A.   On the state charges.

4  Q.   Was one of the state charges -- was there more than one

5  state charge that you were arrested on?

6  A.   It was a conspiracy to obtain drugs through false

7  pretenses, and I think there was a distribution charge.

8  Q.   And was that a distribution charge -- a distribution

9  where you had actually sold to Chris on a controlled buy?

10  A.   I sold to an undercover confidential informant.  I'm

11  not sure who it was.

12  Q.   Okay.  Do you remember what the date was on that?

13  A.   I know it was March of 2012.

14  Q.   Okay.  March --

15  A.   Or '13.  I'm sorry, 2013.

16  Q.   I apologize.  I was getting off memory.

17       So March of 2013, were there actually a couple of

18  controlled purchases of methadone from you at that point?

19  A.   Two of them, yes, sir.

20  Q.   And was that -- never -- now, during this time, let's

21  say over the last year or so before you were locked up, were

22  you selling to Scott Jennings?

23  A.   No.

24  Q.   Okay.  When were you selling with Scott Jennings?

25  A.   I didn't sell to Scott Jennings.

1    MS. NEESE:  Your Honor, I object.  Outside the

2  scope right now.  We didn't ask about Scott Jennings.  We

3  haven't talked about him.

4    MR. SNOOK:  Well, she mentioned an awful lot of

5  people, Judge.

6    THE COURT:  Well, maybe one of the people unknown.

7    Go ahead.

8  BY MR. SNOOK:

9  Q.  I'm sorry.  I didn't hear your answer.

10  A.  I didn't sell to Scott Jennings.  I purchased from

11  Scott Jennings.

12  Q.  Oh, okay.  I'm sorry.  So you purchased from Scott

13  Jennings.  And tell us a little bit about that.  What

14  -- what were you purchasing, what quantities?

15  A.  Dilaudid 8s.  I would purchase sometimes morphine 15s

16  and 5-milligram methadones.

17  Q.  And when, roughly, were you buying from Scott Jennings?

18  A.  Early 2013.

19  Q.  Okay.  Now, you -- in early 2013 was Tim Goodman

20  -- were you and Tim Goodman in a relationship?

21  A.  We were.

22  Q.  Okay.  And on the day that he was arrested on a federal

23  indictment, January 29th, was he up at your house?

24  A.  He was.

25  Q.  Who else, other than the two of you, knew that he was

1  there?

2  A.  Mr. Burns knew he was there.

3  Q.  Okay.  Because Chris was actually supposed to be coming

4  to pick Tim up, to go to work together?

5  A.  Right.

6  Q.  And so -- but is it fair to say that, as far as you

7  knew, nobody else was aware that Tim would have been there?

8  A.  No, not that I knew of.

9  Q.  Okay.  So at that point did it become apparent to you

10  and to Tim that Chris must have been a source of information

11  for the cops?

12  A.  We -- we wondered about that.

13  Q.  Okay.  Had there been other indications before that,

14  let's say over the month or so before that, that you and

15  your friends had been wondering about Chris?

16  A.  There was a couple times he mentioned about being on

17  the phone with Investigator Cook while we had been around.

18  There had been some talk of him wearing a wire and being, I

19  guess, a confidential informant on other people --

20  Q.  By "some talk," you and your friends were wondering

21  whether that was what was going on?

22  A.  Right.  Yeah.

23  Q.  In terms of actual, what I'll call, you know, a smoking

24  gun, or proof, so to speak, in your mind that he was -- he

25  must be working with the cops, did that basically come when

1    Tim got arrested?

2    A.   Yes.

3    Q.   And that was January 29th?

4    A.   Yes.

5         MR. SNOOK:  That's all I have.  Thank you, Judge.

6         THE COURT:  Okay.

7                     REDIRECT EXAMINATION

8    BY MS. NEESE:

9    Q.   Were you arrested on August 27th, 2013?

10   A.   Yes, ma'am.

11   Q.   Did you ever provide a statement prior to August 27th

12   of 2013?

13   A.   No.

14   Q.   To law enforcement about Chris Burns or anyone else?

15   A.   No, ma'am.

16   Q.   Did you ever know that he was a confidential informant

17   on you?

18   A.   No, I did not.

19   Q.   Is today the first day you are finding that out?

20   A.   It is.

21   Q.   You said just a little bit ago that ten pills is a

22   daily use.  Ten Dilaudids 8s is a daily use, ma'am?

23   A.   Not ten Dilaudids 8s, no.

24   Q.   Were you talking about his prescription?

25   A.   His prescription.

1  Q.  Much different?

2  A.  Much different.

3  Q.  So if he was getting 10 or 15 pills from you that are

4  Dilaudids 8s, is that a daily use?

5  A.  Very serious heavy use.  I mean, most people do maybe

6  four Dilaudids 8s a day, on average.

7  Q.  Is his prescription even for 300 pills, though?

8  A.  Not that I'm aware of.  I don't know.

9  Q.  It is not even close to that, is it?

10 A.  I don't know how many he got.

11 Q.  Now, going back to the Dilaudids 8s.  If he got 15

12 pills from you -- if you got 15 pills from someone, would

13 you use all of those 15 in one day?

14 A.  No, ma'am.

15 Q.  If you got 15 pills from someone, does that typically

16 mean that you were going to go sell it to someone else and

17 make some money to get your own?

18        MR. SNOOK:  Objection to speculation -- I think --

19 it is not speculation.  It is not relevant, because what she

20 would do doesn't tell us anything about what Mr. Burns would

21 do.

22        MS. NEESE:  It is relevant.

23        THE COURT:  It is what she was doing to do -- I'll

24 overrule the objection.  Go ahead.

25 BY MS. NEESE:

1  Q.   If you received 15 pills, would you have gone and sold

2  some to make some money in order --

3  A.   To cover the ones that I was going to keep; yes, ma'am.

4  Q.   You said something about being a lone wolf.  Ma'am, you

5  pled guilty to a conspiracy, didn't you?

6  A.   I did.

7  Q.   Why did you plead guilty to a conspiracy if you were a

8  lone wolf?

9  A.   Well, in the terms of -- okay, the conspiracy, yes, I

10  sold pills to numerous people; I bought pills from numerous

11  people.  Conspiracy is when two or more people are involved

12  in breaking the law.  That's what --

13         MR. SNOOK:  Objection.  That's not a correct

14  statement of the law, Judge.

15         THE COURT:  She's not asking her about the law.

16  She's asking her why she pled guilty to a conspiracy.  She

17  can answer the question.

18         MR. SNOOK:  Judge, I would suggest her answer is

19  not responsive at that point.

20         THE COURT:  Well, she asked the question.  It is

21  not -- go ahead.

22         THE WITNESS:  But when --

23         MR. SNOOK:  Judge, I don't mean to interrupt --

24         THE COURT:  I understand your objection.

25         MR. SNOOK:  Well, she's on redirect.  She's not on

1    cross.

2            THE COURT:  Don't lead.

3            MS. NEESE:  I didn't ask her -- I asked her why --

4            THE COURT:  Don't argue with me.  I sustained the

5    objection -- I mean, overruled the objection.  Go ahead.

6    BY MS. NEESE:

7    Q.   Why did you plead guilty to the conspiracy, ma'am?

8    A.   Because I was involved in the conspiracy.  But as far

9    as being a lone wolf statement, each of us, when it come to

10   getting high, we wanted to keep our pills for ourselves.  We

11   didn't want to have other people around that we would have

12   had to share with or turn on to, especially if it was a

13   small quantity.  So if I got two or three pills, I wouldn't

14   want nobody around me to where I could do them myself

15   instead of have friends hanging over at my house and stuff

16   to where I would have had to share with somebody.

17   Q.   Were you involved in a conspiracy, ma'am?

18   A.   Yes, ma'am.

19   Q.   Were you sharing with people?

20   A.   Yes.

21   Q.   Were you trading with people?

22   A.   Yes, ma'am.

23   Q.   Were you giving to other people?

24   A.   Yes, ma'am.

25   Q.   Were you selling to other people?

1    A.   Yes, ma'am.

2    Q.   Did all of these people know that you had that

3    intention?

4    A.   Yes, ma'am.

5    Q.   Was Mr. Burns one of those people?

6    A.   Yes, ma'am.

7    Q.   Did you buy from him a lot of times?

8    A.   Yes, ma'am.

9    Q.   How many pills would you estimate overall?

10   A.   Over the years, probably thousands.

11   Q.   Did you ever give any to your sister after you got any

12   from him?

13   A.   I'm sure I did, yes, ma'am.

14   Q.   Did you ever give to anybody else, sell to anybody

15   else?  Scottie Andrews?  Tim Goodman?

16   A.   Yeah.  Yes, ma'am.

17            MS. NEESE:  No further questions.

18            MR. SNOOK:  Judge, just one thing I wanted to ask.

19                      RECROSS-EXAMINATION

20   BY MR. SNOOK:

21   Q.   Ma'am, in your statement -- well, let me ask -- the

22   pills that -- at least one of the sources of the pills that

23   you were selling was your father's?

24   A.   Yes, sir.

25   Q.   Your father had prescriptions for 480 Dilaudid pills --

1    A.   Yes, sir.

2    Q.   -- monthly?

3    A.   Yes.

4    Q.   16 a day?

5    A.   Yes.

6    Q.   He had a prescription for 300 methadone pills?

7    A.   Yes, sir.

8    Q.   Ten a day.

9         120 oxycodone?

10   A.   Yes.

11   Q.   Four a day.

12        And 60 Opana pills; that's two a day?

13   A.   Yes, sir.

14        He's also a cancer patient, has liver tumors, several

15   back surgeries, hip surgeries.

16   Q.   So if you were selling Chris Burns 15 Dilaudids at a

17   time, that was one day of your father's Dilaudids?

18   A.   Yes.

19   Q.   Thank you.

20                    REDIRECT EXAMINATION

21   BY MS. NEESE:

22   Q.   Is there a difference between -- well, let me ask you

23   something.  Was his prescriptions for orally taking pills or

24   injecting them?

25   A.   Orally.

1  Q.  Please explain to the jury what is the difference

2  between injecting a pill and orally taking a pill and how it

3  can affect you.

4  A.  Well --

5          MR. SNOOK:  Beyond the scope of my exam, Judge.

6          THE COURT:  Overruled.  Overruled.

7          Go ahead.

8  BY MS. NEESE:

9  A.  Okay.  Orally you take it.  Some of them have a blocker

10 in it, like time-released, so it is not hitting you all at

11 once.  It has to digest through your system and so forth and

12 so on.  When you do it intravenously, it is immediate.  It

13 is -- within five seconds you are getting the full effect of

14 the pill.

15 Q.  Is that how it is prescribed to be taken?

16 A.  Intravenously?

17 Q.  Right.

18 A.  No, ma'am.

19 Q.  Were you selling some of those pills from Mr. Seaman's

20 prescription?

21 A.  Yes, ma'am.

22 Q.  Was he taking all of those pills that Mr. Snook just

23 asked you about?

24 A.  No.

25 Q.  Not even close; right?

1  A.   No, ma'am.

2          THE COURT:  Did he have one doctor prescribing all

3  of those pills?

4          THE WITNESS:  Yes, sir.

5          THE COURT:  Where was he?

6          THE WITNESS:  In Moneta.

7          THE COURT:  The doctor was?

8          THE WITNESS:  Uh-huh.

9          THE COURT:  All right.  Anything else?

10          Okay --

11          MS. NEESE:  Not from this witness.

12          THE COURT:  All right.  Do you have a short

13  witness?  Well, we'll start on one --

14          MS. NEESE:  The marshals have asked me to put

15  Bryant Reynolds next, if I can put him next.

16          THE COURT:  All right.  But I told you we're

17  stopping by five o'clock now.

18          I mean, that's -- you know, that's the rule now.

19  We don't go -- Congress --

20          MS. NEESE:  I can't gauge how long he's going to be

21  cross-examined.  I don't think he's a long witness --

22          THE COURT:  Well, put him on.  We'll start with him

23  and then we'll stop and bring him back tomorrow.

24          Since the government is running out of money, we

25  can't pay people overtime.  As much as these people would

1    like to stay here and keep you-all here at night to work, we

2    can't -- we can't do it.

3              THE CLERK:  Please raise your right hand.

4          BRYANT REYNOLDS, GOVERNMENT'S WITNESS, SWORN

5              THE CLERK:  You may have a seat on the witness

6    stand.

7                        DIRECT EXAMINATION

8    BY MS. NEESE:

9    Q.  Good afternoon, sir.  Please state your name for the

10   record.

11   A.  Bryant Reynolds.

12   Q.  Are you currently charged in this court, sir?

13   A.  Yes.

14   Q.  Have you entered your guilty plea?

15   A.  Yes.

16   Q.  Is that with a plea agreement?

17   A.  Yes.

18   Q.  Do you remember what it was for?

19   A.  180 months.

20   Q.  I'm not asking you timewise, sir.  I'm asking you what

21   you pled guilty to.

22   A.  Conspiracy to distribute Schedule II.

23   Q.  What kind of Schedule II controlled substances?

24   A.  Pharmaceutical pills and methadone.

25   Q.  Will you tell us what kind of pharmaceutical pills,

1   sir?

2   A.   Oxycodone, OxyContin, Adderall.

3   Q.   Methadone?

4   A.   Yeah, methadone.

5   Q.   Opana?

6   A.   Yeah, that was on there.  That was -- I never had that

7   for a prescription, I don't think, but my wife had it.

8   Q.   Is your wife also charged in this conspiracy?

9   A.   Yes, she is.

10  Q.   Let me ask you this, sir:  Have you been promised

11  anything to testify here?

12  A.   No.

13  Q.   Why are you testifying?

14  A.   Hopefully I can get some time taken off my sentence.

15  Q.   Were you involved in a drug conspiracy?

16  A.   Yes.

17  Q.   Will you tell us about that, sir, your involvement.

18  A.   Just found out from a guy in Botetourt that a doctor in

19  DC was giving out a lot of pills, so naturally I went to

20  there.

21  Q.   What doctor was it?

22  A.   Dr. Alen Salerian.

23  Q.   When approximately did you start going to see

24  Dr. Salerian?

25  A.   February 2010.

1    Q.   Okay.   And what kind of pills were you being

2    prescribed, sir?

3    A.   At first?

4    Q.   Yes, at first.

5    A.   The OxyContin 80-milligram and Adderall 30-milligram.

6    Q.   Methadone as well?

7    A.   Yes.

8    Q.   At some point in time did it change from the OxyContin

9    80s to the Roxicodone 30s?

10   A.   June 2010.

11   Q.   Why did it change, sir?

12   A.   OxyContin made a time-release pill.  It was an OP that

13   you couldn't break down -- you couldn't snort it.  You

14   couldn't -- they couldn't break it down or put it in needles

15   or anything.  So they changed it to 30s, because it was more

16   in demand.

17   Q.   When you say "more in demand," more -- for abuse

18   purposes, breaking them down?

19   A.   Yes.

20   Q.   Using them in different ways than prescribed?

21   A.   Yes.

22   Q.   Is that what people were doing on the street?

23   A.   I'm sure.  That's what I did.

24   Q.   And other people too; is that correct?

25   A.   Yeah.  Apparently a bunch of people.

1    Q.   Let me ask you something:  Did you become an addict to

2    pills?

3    A.   Yes.

4    Q.   Is that hard to say here?

5    A.   Not really, not now that I have faced it; it ain't that

6    bad.  But, yeah, I was definitely an addict.

7    Q.   What did you do to support your addiction?

8    A.   I would sell part of my pills so I could pay for what I

9    had.  And then when I got shot, I couldn't -- I couldn't

10   work, so I had to get rid of more pills to make my bills.

11   Q.   Do you know the defendant, Chris Burns?

12   A.   Yes, I do.

13   Q.   Will you please tell the jury where he's seated and

14   what he's wearing.

15   A.   He's sitting beside me on my left, with a -- I guess a

16   gray sports jacket on.

17           MS. NEESE:  Your Honor, please let the record

18   reflect that the witness has identified the defendant.

19           THE COURT:  It will.

20   BY MS. NEESE:

21   Q.   How do you know Mr. Burns?

22   A.   I met Mr. Burns through Scottie Andrews.  He -- Scottie

23   asked me did I want to buy a car, a Camaro, a '96, '97 model

24   car, for OxyContins.  And I told him sure.  I had plenty of

25   OxyContins; I didn't have a lot of cars.

1  Q.  Is that the OxyContin 80s?

2  A.  OxyContin 80s, yes.

3  Q.  Were you being prescribed those?

4  A.  Uh-huh.  Yes.

5  Q.  Okay.  So was that between February 2010 and June 2010?

6  A.  Yeah.  I think I got them for, like, five months.

7  Q.  If you would, please, tell what the agreement was.

8  A.  I -- I -- it was an odd number.  It was like 17 or 27

9  OxyContin 80s for the car.  I really can't remember.  I just

10  know it was an odd number.

11  Q.  Did you get the car?

12  A.  Yes.

13  Q.  What color was it?

14  A.  Red, bright red.

15  Q.  Did you talk to Mr. Burns about it?

16  A.  Yes.

17  Q.  Did you exchange with him?

18  A.  Yes.

19  Q.  What happened once you-all made this exchange, with

20  your relationship with Mr. Burns?

21  A.  He -- Chris started coming up, working for my wife

22  some, doing something with little computers.  I don't know.

23  I was pretty much bedridden.  And he was working on her car,

24  trying to put a motor in a little Mitsubishi Eclipse, I

25  think.

1  Q.  Did you have dealings with him when he would come up to

2  your house?

3  A.  Yeah, sometimes.  I mean, I would -- Chris knew a lot

4  of people.  And, like I said, I was bedridden and hurt.  I

5  would get him, you know, to get rid of some pills for me;

6  you know, he'd make some calls, I would give him 10, 20

7  pills, and, you know, he would bring me money for it.

8  Q.  Tell us about that, sir.  What was the relationship?

9  How did you set it up with him?  What did you-all talk

10  about?

11  A.  I was -- I'm in a bed; I got shot; I don't really

12  remember talking.  I just know he could get rid of them.  He

13  knew people that needed them or wanted them, and I needed

14  the cash, so -- to keep my lights on or stuff.  I couldn't

15  do anything else.  My wife was handicapped or -- or

16  disabled.

17  Q.  Did you front pills to him?

18  A.  I would -- I guess you would call it fronting.  Pretty

19  much he already had them gone.  I would just give them to

20  him and he would bring me the money back.

21  Q.  So you gave them to him first?

22  A.  Yes.

23  Q.  And then he took them somewhere?

24  A.  Yes, ma'am.

25  Q.  Did he tell you where he was taking them?

1   A.   I never really asked.

2   Q.   Did he tell you if he was using them or if he was going

3   to pay for them -- or if he was selling them to someone?

4   A.   He was getting rid of them for me.  He was selling

5   them.

6   Q.   Did he tell you that?

7   A.   Yeah.  I mean -- yeah.  He would make calls and have to

8   go meet people, so...

9   Q.   Did he also tell you -- did he ever come up there with

10  anybody else?

11  A.   Yeah.  Several items he'd come up with Ms. Kirsche,

12  Jessie Kirsche.  He'd come up with Scottie, John Bohon.  He

13  would bring his kids up.  I mean --

14  Q.   Going back just a second to the times -- how many times

15  do you think you fronted him pills and then he sold them or

16  distributed them for you?

17  A.   Lord, I wouldn't know.  I mean, I really don't know.

18  Q.   More than once?

19  A.   Oh, yeah; more than once.

20  Q.   Did you also give him pills sometimes in exchange for

21  work?

22  A.   Sure.

23  Q.   Did you sell him pills?

24  A.   I don't really know if I ever sold him any or not.  I

25  know it came close to he just worked it off, you know,

REYNOLDS - DIRECT

```
1   without having to really pay for it.
2   Q.  Did you ever use pills with him?
3   A.  We didn't -- we didn't do -- we didn't use pills the
4   same way.  No.
5   Q.  That's not what I'm asking you.  Did you ever see him
6   use pills or do you know how he used pills?
7   A.  Yes.
8   Q.  Tell the jury about how he used pills and what you mean
9   you didn't use pills the same way.
10  A.  He used -- he would inject pills.  And I never
11  injected.  I would snort pills.  It is just -- I guess it is
12  a preference, but -- it is completely different.  You know
13  most -- anyone that -- most people that inject pills will go
14  almost like hide somewhere and do it.  It is not as open as
15  it is.  So, no, I mean I never did go in the bathroom with
16  him to do it.  Just --
17  Q.  Did you ever get pills from Mr. Burns?
18  A.  He brought me pills twice.
19  Q.  Tell me about that.
20  A.  It was just a gesture.  The reason I know -- the reason
21  I remember it is because nobody ever brought pills to my
22  house.  But he came in and offered me, like, five or seven.
23  He had a doctor that was giving him 5-milligram oxycodones.
24  And he came in and offered me -- it was like five or seven.
25  I did them all at one time.  And then I think it was like
```

1   two -- maybe two or three days later he came in and gave me

2   two or three more.

3   Q.   When you say "five to seven" 5-milligram pills, five to

4   seven equals between 25 and 35 milligrams; is that correct?

5   A.   Yeah.   That's real low, because at the end I was doing

6   -- I was doing anywhere from 260 to 300 milligrams at a

7   time.

8   Q.   You could do that in a day?

9   A.   No, no, at a time.   I could do that --

10  Q.   You built up your tolerance?

11  A.   I did it four or five times a day.   I was taking eight

12  to ten 30-milligram pills three or four, five times a day.

13  Q.   Were you shooting those up?

14  A.   Never have.

15  Q.   Now, going back to who-all Mr. Burns hung out with up

16  there, who-all did he hang out with or bring to your house?

17  A.   He had the little boy, John Bohon.   I know Scottie

18  -- well, Scottie came up there with him at first.   Mandy

19  -- Mandy McKinney.   And a little girl named Samantha would

20  come up sometimes.   Mostly just with John.   I mean, John was

21  helping him work on the cars.

22  Q.   Let's talk about -- you said Jessica Kirsche earlier.

23  A.   Yeah.   Jessie came up with him.   That was the day that

24  -- the day I got the car Jessie was with him.

25  Q.   Did you ever talk to Mr. Burns about who he hung out

1  with or what he did with his pills?

2  A.   Not exactly.  I mean, it is -- we knew the same people.

3  You know, it is just like nothing that you really discuss.

4  Q.   Did you ever see him trade any pills or give any pills

5  to Scottie, Jessie, anybody else he was up there with?

6  A.   Yeah, I have seen -- I have seen him give pills to

7  Jessie.  I have given him and Scottie pills together.

8        MS. NEESE:  I don't think I have any further

9  questions of this witness at this time.

10        THE COURT:  All right.  Mr. Snook?  We'll give it a

11  try.

12                    CROSS-EXAMINATION

13  BY MR. SNOOK:

14  Q.   Mr. Reynolds, the time period that we're talking about

15  here is kind of a long time period, starting back in 2010.

16  And, say, 2010 was when this car-for-pills trade was done?

17  A.   Yes, sir.

18  Q.   Do you remember when in 2010?

19  A.   No, I don't, not exactly.  It would have been in the

20  spring, between February and June.

21  Q.   Okay.  And was it at that point that you were basically

22  bedridden?

23  A.   I got shot in -- no.  I got shot in 2010, in November;

24  that's when I got shot.  So I was a year off.  My bad.

25  Q.   All right.  So a year off in what way?  Tell me what is

1  right.

2  A.   Well, in -- I got the car from Chris -- it was in the

3  spring of 2010.  That's when I was getting the 80s.  Then I

4  got shot in November.  And then I was bedridden for several

5  months after that.  And that's when he kind of quit, you

6  know, coming around.

7  Q.   So he quit coming around when you got bedridden?

8  A.   Yeah.  Pretty much, yeah.

9  Q.   So he quit coming around, then, in about November of

10  2010?

11  A.   Oh, no, no, no.  It would have been the spring of 2011.

12  Q.   Spring of 2011?

13  A.   Right.

14  Q.   Okay.  And then when he was coming up there, you say he

15  was coming with Jonathan Bohon, with Scottie, with Mandy

16  McKinney, with Samantha, with Jessie Kirsche; those are the

17  names you mentioned?

18  A.   Yes.

19  Q.   Okay.  And do you have any sense in your own mind of

20  -- let's say during the time when you were so bedridden, was

21  there somebody in particular he was typically coming up

22  with?

23  A.   He was dealing with my wife at the time.

24  Q.   Okay.  And your wife's name is?

25  A.   Danielle.

1  Q.   And so you don't actually know what Chris was doing
2  during the time that you were in that kind of bad shape?
3  A.   Yeah, he was working on the car out in the garage.
4  Q.   Okay.  But as far as keeping tabs on drug activity and
5  so on, you weren't really able to keep tabs on him much,
6  were you?
7  A.   Pretty much had to come in there, because they were in
8  the safe right beside me.  So if I was awake, I would know
9  when she came in and got whatever she got.
10  Q.   Okay.  And what you would actually see is Danielle
11  coming in?
12  A.   No.  Chris would come in, because he ruined my carpet.
13  He had grease on his feet and I had new carpet in the
14  bedroom.
15  Q.   Okay.  Now, why did Chris bring you pills on those two
16  occasions?  Did you need them for some reason?
17  A.   No.  I guess it was just a gesture of being friendly.
18  I mean, he would come up; I would give him a pill, you know,
19  if he was coming to work on the car.  You know, pretty much,
20  if you do pills, you do pills, and you can't stop.  It is
21  not -- it is not nothing -- you can want to quit, but you
22  can't.
23  Q.   Now, when you were initially arrested, you were
24  arrested on January 29th, weren't you?
25  A.   January 29th?  No.  I was arrested on September 7th.

1  Q.   Let me show you a copy of the indictment dated January

2  17th.

3  A.   I was already in jail when I was indicted on this, yes.

4  Q.   Okay.  So on January 29th was when the other folks were

5  arrested?  And on December -- pardon me, February 1st you

6  gave a proffer; correct?

7  A.   Yes, I guess.

8  Q.   And you met with Ms. Neese and with your attorney and

9  various other people about the idea that you would cooperate

10  and get a better deal as a result?

11  A.   Possibly, yes.

12  Q.   Okay.  And in that interview there are four pages of

13  notes -- have you seen the notes from the interview?

14  A.   No, I haven't.

15  Q.   Okay.  You describe your drug activity going back to

16  2005?

17  A.   Correct.

18  Q.   And the only place that you mention Mr. Burns' name is

19  when you say, "B. Reynolds stated that ELMO sold pills on a

20  regular basis to Matt Chiles, Matt Barlow, Tim Goodman,

21  Jonathan Bohon, Chris Burns, David Cyrlin, and Mandy"?

22  That's the only time you mentioned him in that entire

23  interview; isn't that true?

24  A.   Under my -- what I was thinking was I was supposed to

25  tell what I did wrong.  And I -- I mean, three years, I did

1  a lot.

2  Q.  Well -- you know, the next paragraph, "Bryant Reynolds

3  was then asked about David Cyrlin"?

4  A.  Uh-huh.

5  Q.  That kind of sounds like you are being asked about what

6  other people did wrong, isn't it?

7  A.  David stayed up at my house for a couple of days --

8         THE COURT:  They are not his notes, I don't

9  believe.

10         MR. SNOOK:  I understand, but I can --

11         THE COURT:  Well -- okay.  It is five o'clock.  I

12  said we would stop at 5:00.  So we will resume tomorrow

13  morning at 9:30.

14         Members of the jury, tonight do not discuss the

15  case with anyone.  Do not allow anyone to discuss the case

16  with you.  Do not read, listen to anything about the case.

17  I don't expect there will probably be any news about it,

18  anyway.  But avoid any information about the case.

19         And be back tomorrow morning at 9:30.  Report to

20  the same room downstairs that you reported to this morning.

21         Okay.  Leave your notes in the jury room.

22         Recess.

23     (Jury out.)

24     (Thereupon, at 5:02 p.m. these proceedings were

25  recessed, to be reconvened on June 3, 2014, at 9:30 a.m.)

```
 1                      EXAMINATION INDEX

 2

   SARAH DRYDEN, GOVERNMENT'S WITNESS
 3        DIRECT BY MR. BRADYLYONS                        2

 4 CHRIS COOK, JUETTE RENALDS,
   DIANE CATLEY......not transcribed                     10

 5

 6 JENNIFER KIRSCHE, GOVERNMENT'S WITNESS
          DIRECT BY MS. NEESE                           11
 7        CROSS BY MR. SNOOK                             36
          REDIRECT BY MS. NEESE                         46
 8        RECROSS BY MR. SNOOK                           50
          REDIRECT BY MS. NEESE                         51
 9
   BRYANT REYNOLDS, GOVERNMENT'S WITNESS
10        DIRECT BY MS. NEESE                           54
          CROSS BY MR. SNOOK                            63
11

12

13

        I certify that the foregoing is a correct transcript
14
   from the record of proceedings in the above-entitled matter.
15

16     ____/s/ Carol Jacobs____          September 25, 2014
       Official Court Reporter                  Date
17

18

19

20

21

22

23

24

25
```