```
1                  UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF VIRGINIA
2                       LYNCHBURG DIVISION

3    UNITED STATES OF AMERICA,

4                        Plaintiff,
                                         No. 6:13-CR-22-10
5        vs.                             Lynchburg, Virginia
                                         June 3, 2014
6    LES CHRISTOPHER BURNS,

7                        Defendant.

8           TRANSCRIPT OF JURY TRIAL PROCEEDINGS - DAY 2
                   BEFORE THE HONORABLE NORMAN K. MOON
9             UNITED STATES DISTRICT JUDGE, and a jury

10   APPEARANCES:

11   For the Government:

12   ASHLEY BROOKE NEESE
     DREW JOSEPH MICHAEL BRADYLYONS
13   United States Attorneys Office
     BB&T Building
14   301 First Street, S.W., Room 906
     Roanoke, VA 24008
15   540-857-2250

16   For the Defendant:

17   JOHN LLOYD SNOOK, III
     Snook & Haughey, P.C.
18   408 East Market Street, Suite 107
     Charlottesville, VA 22902
19   434-293-8185

20

21   Court Reporter:    Carol Jacobs, Official Court Reporter
                        Registered Diplomate, Realtime Reporter
22                      U.S. District Court
                        1101 Court Street
23                      Lynchburg, VA 24504
                        434-847-5722, ext. 3
24
          Proceedings recorded by mechanical stenography;
25   computer-assisted transcription.
```

1        (Call to Order of the Court at 10:10 a.m.)

2            THE COURT:  Good morning.  Are we ready to re-call

3   the jury?

4            MS. NEESE:  Yes, Your Honor.

5            MR. SNOOK:  Yes, sir.

6            THE COURT:  Okay.  Is the witness available?

7            THE MARSHAL:  Yes, Your Honor.

8            THE COURT:  Call the jury back.

9        (Jury in.)

10           THE COURT:  All right.  Good morning, ladies and

11  gentlemen.  Sorry we had to hold you up, but it was

12  unavoidable.

13           And we're going to resume with the witness who was

14  on the stand yesterday.  He is still under oath from

15  yesterday.

16     BRYANT REYNOLDS, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN

17           THE COURT:  Have a seat.

18           Sit down.  You are -- you took the oath yesterday,

19  so you are still under oath.

20           THE WITNESS:  Yes, sir.

21                   CROSS-EXAMINATION CONTINUED

22  BY MR. SNOOK:

23  Q.  Mr. Reynolds, when we broke off yesterday, you and I

24  were talking about the proffer that you had made on February

25  1st of 2003.  And I thought I -- before we resume with that,

1    I thought I would just see if we can kind of bring the jury

2    up to speed on some chronology issues.

3        First of all, you were initially arrested -- was it

4    September 8th of 2012?

5    A.   Yes, I think it was.

6    Q.   And you were arrested on what is called a complaint at

7    that point, and it got converted into an indictment a month

8    later?

9    A.   Yes.

10   Q.   Okay.  And that indictment charged you with

11   distribution of drugs and also with some -- with guns?

12   A.   I don't -- I don't really remember.  I know I was

13   indicted -- I think it was attempted -- or manufacturing or

14   something.

15   Q.   Okay.  And then -- then came this indictment.  And this

16   indictment was issued in January.  And you had a detention

17   hearing in January -- on January 30th.  And you were denied

18   bond at that point?

19   A.   Yes.

20   Q.   Okay.  And so on February 1st of 2013 you gave this

21   proffer?

22   A.   Yes.

23   Q.   Okay.  And just so the jury will understand, the

24   purpose of a proffer, particularly after you have already

25   been arrested, is really twofold.  One purpose of it might

1   be that you are told that if you tell information about what

2   you've done, it can have some benefit for you in your own

3   sentencing?

4   A.   Yes.

5   Q.   And it can also amount to -- if you have given

6   information --

7           THE COURT:  Well, let's -- ask him what his

8   understanding was; not your testimony, but his understanding

9   of what the proffer was.

10          MR. SNOOK:  All right.

11  BY MR. SNOOK:

12  Q.   And you testified yesterday that you were there -- you

13  thought you were there for your own benefit, primarily;

14  right?

15  A.   Yes.

16  Q.   Is it also true that when you go into a proffer session

17  that one of the things you are trying to do to help with

18  your own sentencing is to give information about other

19  people?

20  A.   Yes.

21  Q.   Okay.  And you know that if you are going to make a

22  -- if you are going to receive a motion for a reduction in

23  your sentence at some point down the road, that motion,

24  sometimes called a 5K motion, will be made by the government

25  based upon cooperation that you have given in making cases

1  against other people?

2  A.  Yes.

3  Q.  Okay.  And so the purpose of this proffer session right

4  away was to -- was really twofold.  Not only to help

5  yourself in terms of explaining your own conduct, but also

6  to help yourself in terms of identifying other people who

7  -- or talking about other people as well; right?

8  A.  Yeah.  Initially I was under the impression that I had

9  to tell everything I had done.

10  Q.  Right.

11  A.  I didn't -- I didn't realize it was on other people,

12  until basically I got more into it.

13  Q.  During the session itself?

14  A.  Right before.  Right before.

15  Q.  Right before --

16  A.  Yes.

17  Q.  Okay.  Now, I'm going to offer -- I'm going to give you

18  a copy of the notes that the -- Officer Wilks had taken and

19  ask -- I guess you said yesterday that you had not seen

20  those before; is that correct?

21  A.  Yes, sir.  I haven't seen the notes.  And I can't see

22  them right now.

23  Q.  Okay.  Have you got a problem with vision?

24  A.  Yes.

25  Q.  Okay.  Let me just kind of -- you know, I was going to

1    offer that in hopes that it might refresh your recollection

2    a little bit.  But if it won't refresh your recollection

3    because of vision issues, then we have got a problem.

4         Now, first of all, that was a meeting that was

5    basically you and Officer Wilks and your attorney, Tom

6    Blaylock, out of Roanoke?

7    A.   Yes.

8    Q.   And Ms. Neese?

9    A.   Yes.

10   Q.   And part -- the first thing that you mentioned was you

11   were talking about Dr. Salerian, who was the doctor up in

12   the DC area who was prescribing the drugs for you?

13   A.   Yes.

14   Q.   And just to understand this situation as well,

15   Dr. Salerian is himself facing criminal charges, isn't he?

16   A.   Yes.

17   Q.   Okay.  Is it your expectation that you could be a

18   witness against Dr. Salerian?

19   A.   If he's found competent, yeah, I think so.

20   Q.   Okay.  If he's found competent?  Is there some mental

21   health issue with --

22        MS. NEESE:  Your Honor, I would object.  This is

23   now going outside the scope of this conspiracy charge.

24        THE COURT:  We are not trying Dr. Salerian.  Let's

25   stick pretty close to this case.

1           MR. SNOOK:  Okay.

2    BY MR. SNOOK:

3    Q.   One of the -- so you were talking -- the first thing

4    you talked about was Dr. Salerian.  The second thing,

5    Mr. Wilks asked you about your involvement with Mark

6    Campbell, and you talked about Mark Campbell?

7    A.   Uh-huh.

8    Q.   Then that gets us through the next couple of

9    paragraphs.  He then asked you about trips to West Virginia.

10   And you described going to West Virginia with Mark Campbell?

11   A.   Yes.

12   Q.   Okay.  Then he asked you about your wife's involvement?

13   A.   Yes.

14   Q.   Okay.  I'm sorry.  Beth is not your wife?

15   A.   No.

16   Q.   Okay.  You have a brother, Jeff?

17   A.   Yes.

18   Q.   And Beth is Jeff's wife?

19   A.   Yes.

20   Q.   Okay.  So you were asked about Beth's involvement in

21   the distribution network?

22   A.   Yes.

23   Q.   And talked about that.

24        Then you were asked about Tony Smith?

25   A.   Yes.

1  Q.   Okay.  And you talked about Tony Smith?

2  A.   (Nods head affirmatively.)

3  Q.   Yes?  You have to have a yes or no.

4  A.   Yes.  Okay.

5  Q.   Then you were asked about Matt Barlow, and you talked

6  about Matt Barlow?

7  A.   Yes.

8  Q.   Then you were asked about Eric Nichols; you talked

9  about Eric Nichols?

10  A.   Yes.

11  Q.   You were asked about Andy Dooley; you talked about Andy

12  Dooley?

13  A.   Yes.

14  Q.   You were asked about George Lynch and Dana Parker; you

15  talked about them?

16  A.   Yes.

17  Q.   You were asked about Emily Clark, and you talked about

18  Emily Clark?

19          MS. NEESE:  Your Honor, I would object at this

20  point in time.  A potential witness just walked into the

21  courtroom.  He's not supposed to be in here.

22          MR. SNOOK:  Oh, okay.

23  BY MR. SNOOK:

24  Q.   Okay.  So you were asked about Emily Clark; you talked

25  about Emily Clark?

1    A.   Yes.

2    Q.   Then you were asked about Tony Abee, otherwise known as

3    Elmo?

4    A.   Yes.

5    Q.   And you talked about him?  You said that you didn't

6    deal with him, but you knew a number of people who did?

7    A.   Right.  Yes.

8    Q.   And you said that Elmo sold pills on a regular basis to

9    Matt Giles, Matt Barlow, Tim Goodman, Jonathan Bohon, Chris

10   Burns, David Cyrlin, and Mandy?

11   A.   Yes.

12   Q.   Okay.  You were then asked about David Cyrlin.  You

13   talked a little bit about David Cyrlin; right?

14   A.   Yes.

15   Q.   You were then asked about Phillip Helms.  You talked a

16   little bit about Phillip Helms?

17   A.   Yes.

18   Q.   You were then asked about Edgar Rawlings, spelled

19   various ways in various discovery materials, but you know

20   who I'm talking about?

21   A.   Yes, I do.

22   Q.   And you talked some about him?

23   A.   Yes.

24   Q.   You were asked about Timmy and Reva White.  You talked

25   about them?

1    A.    Yes.

2    Q.    You were asked about Lewis Lynch, otherwise known as

3    Smoky.  You talked about him?

4    A.    Yes.

5    Q.    You were asked about Josh Surprenaut, however you

6    pronounce his name; you talked about him?

7    A.    Yes.

8    Q.    Finally, you were asked about other people that you

9    knew who were getting pills from Dr. Salerian.  You talked

10   about them?

11   A.    Yes.

12   Q.    Okay.  Chris Burns wasn't getting pills from

13   Dr. Salerian, as far as you know?

14   A.    No.

15   Q.    Okay.  So is it fair to say that the only time in this

16   February 1st session that you talked about Chris Burns was

17   you mentioned that he got drugs from Elmo?

18   A.    Yes, I guess.  Yes, I did.

19   Q.    Now, that was at a time when -- this February 1st, you

20   had just been arrested on the January -- on the indictments

21   that got served on everybody on January 30th?

22   A.    Yes.

23   Q.    Okay.  You had not yet had a chance to receive any

24   discovery package, any information from the government about

25   what kind of a case they had, what kind of evidence they

1   had?

2   A.   No, I had not.

3   Q.   Over the next couple of months your attorney did get

4   discovery from the government and then you wound up entering

5   a plea agreement; correct?

6   A.   Yes.

7   Q.   Okay.  And in that information that was given to you

8   between February 1st and the plea agreement that was entered

9   into in May, you received this discovery information.  And

10  some of the discovery information included information from

11  Mr. Burns, didn't it?

12  A.   I'm assuming.  I couldn't -- they wouldn't let me have

13  -- I was in segregation, so I could just glance at it.  I

14  didn't really get to see much of it.

15  Q.   Okay.  So when you pled guilty in May, you had an

16  agreement that called for a specific sentence of 180 months?

17  A.   Yes.

18          MS. NEESE:  Object, we are talking about -- I would

19  object.  We're talking about sentencing issues now.

20          THE COURT:  Overruled.

21  BY MR. SNOOK:

22  Q.   And -- but you were not immediately sentenced?

23  A.   No.

24  Q.   Okay.  And one of the reasons you were not immediately

25  sentenced was that, although there was an agreement for this

1  set time of 180 months, you also knew that you still had the

2  ability to get a further motion from the government that

3  might reduce that; correct?

4  A.  I was hoping I would, yes.

5  Q.  Sure.  And the way that this works is that you have to

6  convince the government that you have got some ability to

7  help them make a case; right?

8  A.  Yes.

9  Q.  And if you eventually do end up rendering what is

10  called "substantial assistance," then the government will

11  make a motion -- or can make a motion to the judge, asking

12  the judge to consider reducing the sentence below what you

13  were otherwise expecting?

14  A.  Yes, sir.

15  Q.  Okay.  And so between May of 2013, when you entered

16  into the plea agreement -- between May and -- I guess the

17  next proffer that you gave was December 17th of 2013?

18  A.  Yeah.

19  Q.  Okay.  Between that seven-month period, your sentencing

20  got continued and continued and continued until after

21  -- until now you are expected to be sentenced, what, later

22  on this month?

23  A.  Yes.

24  Q.  And that may still get continued; right?

25  A.  Very possibly.

1  Q.   Okay.  And, again, it is getting continued to see

2  whether you are able to help the government make a case that

3  they couldn't otherwise make; right?

4           MS. NEESE:  Your Honor, I would object.  I mean,

5  the way he phrased that question, "the way we otherwise

6  couldn't have made," that's assuming facts that are not in

7  evidence and making a statement here; it is testifying.

8           MR. SNOOK:  I'm actually just quoting from the --

9           THE COURT:  Well, you are not quoting anything, are

10  you?

11           MR. SNOOK:  I'm using words, Judge, that is often

12  used in the U.S. Attorney's plea agreements.

13           THE COURT:  Well, it's one thing -- when you are

14  sentenced -- you know, nobody is sentenced immediately upon

15  a guilty plea.  It is more than -- usually always more than

16  75 days before they are sentenced.

17           MR. SNOOK:  Well, okay.

18  BY MR. SNOOK:

19  Q.   Originally you were scheduled to have been sentenced

20  -- you pled guilty in May.  You would have been sentenced in

21  August, was the date that was scheduled; correct?

22  A.   Yes, I believe so.

23  Q.   And it has been continued a number of times since then

24  --

25           MS. NEESE:  Your Honor, I would object to this line

1    of questioning.  We understand that his sentencing is not

2    until later this month.  And he has already asked him and he

3    has answered these questions.

4              THE COURT:  Okay.  Let's --

5              MR. SNOOK:  He has given the answer.  I just wanted

6    to clarify the point you raised, Your Honor.

7    BY MR. SNOOK:

8    Q.   So then when you gave -- when you gave the proffer

9    December 17th of 2013, at that point you were expecting to

10   be testifying in a case that was coming to trial -- that was

11   at that point scheduled for trial in January, wasn't it,

12   against Mr. Burns, Mr. Cupp, some other people?

13   A.   Yeah, I believe so.

14   Q.   Okay.  And in that hearing -- in that proffer that you

15   gave, December 17th was the first time that you had told

16   anybody from the government about Chris Burns supposedly

17   selling for you; isn't that true?

18   A.   Yes.

19   Q.   Now, the time period that -- I want to make sure that I

20   understood from your testimony yesterday.  You testified

21   that it was sometime in the summer of 2010 that Mr. Burns

22   began coming up to your house.  And that was around the time

23   that he -- that he did this deal with the car?

24   A.   Yeah, it was --

25             MS. NEESE:  Your Honor, objection.  That is

1  misquoting the testimony.  I think he said the spring of

2  2010.  He was getting Oxy 80s, he testified, between

3  February and June of 2010.  He's misstating the witness's

4  testimony from yesterday.

5       MR. SNOOK:  I -- I think there was some confusion

6  in his testimony, but we'll back up.

7       THE COURT:  Well, ask him what his testimony is

8  about the subject, not what you wrote down.

9  BY MR. SNOOK:

10 Q.  When was it that you first met Mr. Burns?

11 A.  The spring of 2010.

12 Q.  Okay.  And that was when you did the

13 car-for-drugs-and-cash swap?

14 A.  Yes.

15 Q.  Okay.  And so starting in the spring of 2010 -- do you

16 recall when in the spring of 2010?

17 A.  No, not really.

18 Q.  Okay.  Whether it was March, April, May, June --

19 A.  It was one of those.

20 Q.  Okay.  And then you had -- so the next point that you

21 had mentioned was something about when you started getting

22 drugs from Dr. Salerian, and when was that?

23 A.  February 2010.

24 Q.  2010.  Okay.  February of 2010.

25      And the time -- you said there was a time -- when you

1    first started, you were getting OxyContin 80-milligram

2    pills.  And then do I understand that the formulation of

3    those changed so they could no longer be snorted or shot up

4    or whatever?

5    A.    Exactly.

6    Q.    And about when did that happen?

7    A.    June, July, somewhere right in --

8    Q.    2010?

9    A.    Yes.

10   Q.    Okay.  And do you know whether you observed Mr. Burns

11   shooting up or whatever with these OxyContin 80s between the

12   time that he started coming up there and the time that they

13   stopped making those pills that way?

14   A.    I don't know that I paid that much attention to it.  I

15   mean, I know he used them, but I didn't know --

16   Q.    All right.  And then do I -- there was -- the next

17   point in time I think was when you yourself got shot; is

18   that right?

19   A.    Yes.

20   Q.    And when was that?

21   A.    November 19th, I believe, 2010.

22   Q.    2010?

23   A.    Yes.

24   Q.    Okay.  And then it was about in spring of 2011 that you

25   basically stopped having contact with Mr. Burns because you

1  and he had a falling-out over a truck?

2  A.  Yes.  He -- he got a -- he got a guy's truck from my

3  house and got in trouble over that.

4  Q.  Okay.  And after that he didn't come up there anymore?

5  A.  I saw him one time after that.

6  Q.  Okay.

7  A.  But -- no, not really.

8  Q.  Okay.  So the time period we're talking about, when he

9  was up there with some frequency, would have been sometime

10 spring or summer of 2010 until about spring of 2011?

11 A.  Yeah.

12 Q.  Okay.  But not after that?

13 A.  Uh-uh.

14 Q.  During the time between 2010 and 2011 that you would

15 see Chris up there, I gather the main purpose for him being

16 there was to be working on cars?

17 A.  Yeah, he was up there to put a motor in my wife's car

18 or fix a motor or something.

19 Q.  Okay.  And when he would come up there, it would

20 basically be on a weekend or something like that?

21 A.  Evenings -- weekend, evenings.

22 Q.  I mean, did he come up every day?

23 A.  For a while he did.

24 Q.  Okay.

25 A.  But then, you know, he would go three or four days and

1  I wouldn't see him.

2  Q.  Maybe a week or more?

3  A.  Could -- possibly, yeah.

4  Q.  And so the every three or four days was during

5  -- pardon me.  Every day for a while would have been when he

6  was really hot and heavy working on the car?

7  A.  Yeah.

8  Q.  Okay.

9       MR. SNOOK:  That's all I have.  Thank you, Judge.

10       THE COURT:  All right.

11                    REDIRECT EXAMINATION

12  BY MS. NEESE:

13  Q.  Good morning, Mr. Reynolds.

14  A.  Good morning, Ms. Neese.

15  Q.  A lot of people charged in this conspiracy?

16  A.  A lot of people.

17  Q.  Did you have knowledge about a lot of people?

18  A.  Quite a few people.

19  Q.  Did you talk about a lot of people throughout this

20  course of this conspiracy in your proffer sessions?

21  A.  Yes, I have.

22  Q.  You were just going through that proffer session.  Did

23  you ever -- did Mr. Snook ask you if you talked about Scotty

24  Andrews in that proffer session?

25  A.  I don't think he did, no.

1   Q.   Have you talked about Scotty now?

2   A.   I'm sure I have.

3   Q.   You have been asked about it now; right?

4   A.   Yeah.

5   Q.   Were you asked about Mr. Burns' specific activity in

6   February of 2013?

7   A.   No.

8   Q.   Did you talk about Jennifer Kirsche?

9   A.   I have now, but --

10  Q.   Did you talk about her back in February, though?

11  A.   No.

12  Q.   Were you asked about her in February?

13  A.   No.

14  Q.   Would you have told us about Mr. Burns in February if

15  we would have asked you?

16  A.   Sure, I would have.

17  Q.   Did you talk about Cory Moles in February?

18  A.   That I don't remember.

19  Q.   Have you talked about him now?

20  A.   Yeah, I don't think I talked about Cory at first,

21  because this -- it was just basically talking about

22  Dr. Salerian at first.

23  Q.   Have you talked about Cory now?

24  A.   Sure have.

25  Q.   Did you have knowledge then, though?

1    A.    Yeah.

2    Q.    Did you ever get out of jail between September 8th of

3    2012 until now?

4    A.    No -- yes.  On a -- when my sister was --

5    Q.    What was that?

6    A.    When my sister died in December.

7    Q.    How long were you out?

8    A.    Ten days.

9    Q.    Have you been charged with any additional charges

10   because of anything that happened during that time period?

11   A.    No.

12   Q.    So besides that short 10-day break, have you ever been

13   out of jail between September 8th of 2012 and now?

14   A.    No, I haven't.

15   Q.    Did Mr. Burns ever make any purchases off of you,

16   working for law enforcement?

17   A.    I don't know.  Not that I know of.

18   Q.    And you were talking about the discovery.  You didn't

19   get to read each and every page of the discovery, did you?

20   A.    No.  I just glanced at a very, very little bit of it,

21   actually.

22   Q.    Pretty voluminous?

23   A.    Yes.

24   Q.    Large amount?

25         Did you get to keep it with you in the jail?

1    A.   No, they wouldn't let me do that.

2    Q.   Did you get to analyze what everybody else said about

3    you?

4    A.   No, I didn't get to see much of nothing.

5    Q.   Did you see each and every statement that Chris Burns

6    made throughout the course of this conspiracy?

7    A.   I did not really know Chris had made any.  That was

8    -- just a few I went through; I didn't get to see many at

9    all.

10   Q.   Just a minute ago you testified that the main purpose

11   he was up at your house was working on cars.  Was that the

12   main purpose he was up there?

13   A.   I don't think so.

14   Q.   Well, then, what was it, sir?

15   A.   I think it was a combination of getting medication and

16   -- I think it was getting medication, actually.  But he was

17   working on the car, but --

18   Q.   Did he ever fix that car?

19   A.   Uh-uh.

20   Q.   Well, tell the jury about it, sir.

21   A.   I ended up getting rid of the car.  A guy come to get

22   it.  And it took him about three days to finish putting the

23   motor in and try to find bolts and stuff.  Stuff was missing

24   out from under it.  I'm not sure if they ever finally got it

25   running or not.

1  Q.  You were asked about a truck.  Tell us about that.

2          MR. SNOOK:  Objection as to the relevance, Judge.

3  Why -- what exactly the problem might have been isn't

4  relevant.  The problem is simply that there was a problem,

5  is all I was getting at, and that's why they stopped doing

6  business with one another.

7          MS. NEESE:  Your Honor, it is relevant to the case.

8  It is about Chris Burns.  And he has already asked him about

9  it.  And I think I should be able to let him explain.

10         THE COURT:  Overruled.  Go ahead.

11  BY MS. NEESE:

12  Q.  Please tell us what happened with the truck and why he

13  was no longer allowed up there.

14  A.  David Cyrlin was -- had a truck -- he had his vehicles

15  parked up at my house.  I think to keep them from getting

16  repossessed; I'm not exactly sure.  But one of -- his truck

17  had a real nice -- it was a big diesel truck, four-wheel

18  drive, he had up there.  And Chris come up -- he -- somehow

19  Chris got a title -- got the title --

20         MR. SNOOK:  Objection to speculation.

21         THE WITNESS:  No, actually, I saw it.

22         THE COURT:  Wait.  Wait.

23         THE WITNESS:  But I think it was a salvage title.

24  And then he come and got it.  And I think the wheel fell off

25  it at Thaxton market.  He just come and took the truck.

1   BY MS. NEESE:

2   Q.   Okay.   Why did you quit talking to him after that?

3   A.   Well, I mean, just -- he -- he come and stole a truck

4   out of my yard.   And he stole my jack.

5           MR. SNOOK:   Judge, my objection is that this is

6   basically an attempt to get in character assassination.

7           THE COURT:   Well, wait a minute.   Didn't you ask if

8   they stopped having -- associating with one another or

9   something?

10          MR. SNOOK:   Yes.

11          THE COURT:   And he's explaining why.

12          MR. SNOOK:   But my point is that the why --

13          THE COURT:   Well, the trouble is, when you bring it

14  up, people tend to speculate about the why, whether it had

15  to do with drugs or something else.   This is an explanation

16  of why -- at least, I gather, I don't -- if it be true, what

17  it -- it explains other testimony in the case.

18          MR. SNOOK:   I would suggest, Your Honor, that

19  simply to say it wasn't over drugs gets to the heart of what

20  the Court's concern would be, without getting into a lot of

21  other accusations.

22          THE COURT:   Well, you brought it up.   And I -- this

23  -- just shorten it as much as you can.   We don't want to get

24  into another trial about this.

25          MS. NEESE:   Thank you, Your Honor.

1   BY MS. NEESE:

2   Q.   You were asked about the last -- when that incident

3   happened and the last time you dealt with him or saw him up

4   at your house, you said it was spring of 2011.  Sir, do you

5   know the direct -- exact date?

6   A.   I don't.  No, I don't.

7   Q.   Could it have been later?

8   A.   It possibly could have been.  I know once -- once the

9   vehicle was taken and I was out in the garage and I found

10  -- I found two needles and a burnt spoon, and then that's

11  when I shut the garage down completely.  So that was near

12  the summer, you know.

13  Q.   That's what I'm asking you, sir.  Could it have been

14  later than spring of 2011?

15  A.   It could have been, yeah.

16          MS. NEESE:  No further questions, Your Honor.

17                      RECROSS-EXAMINATION

18  BY MR. SNOOK:

19  Q.   Wasn't it, in fact, June 11th, 2011?

20  A.   It very possibly was.

21          MR. SNOOK:  Thank you.

22          THE COURT:  Is that all?  Is that all of this

23  witness?

24          MS. NEESE:  Thank you, Your Honor.

25          THE COURT:  Is that all of this witness?

1      MS. NEESE:  Of this witness, yes, that's all.

2      THE COURT:  All right.  You may be excused, then.

3      Next witness?

4      MR. BRADLYLYONS:  The United States calls Scott

5  Andrews.

6      THE CLERK:  Will you please raise your right hand

7  to be sworn.

8      SCOTT MICHAEL ANDREWS, GOVERNMENT'S WITNESS, SWORN

9      THE CLERK:  Thank you.  Please have a seat, sir.

10                  DIRECT EXAMINATION

11  BY MR. BRADLYLYONS:

12  Q.  Good morning, sir.

13  A.  Good morning.

14  Q.  Can you please state your name for the record?

15  A.  Scott Michael Andrews.

16  Q.  Have you entered a guilty plea?

17  A.  Yes, sir.

18  Q.  And what was that plea for?

19  A.  Five to 20 years, for possession to distribute and

20  distribute oxycodone, oxymorphone, hydromorphone, Adderall,

21  Suboxone.

22  Q.  Have you been sentenced?

23  A.  No, sir.

24  Q.  Have you met with counsel for the United States?

25  A.  Yes.

1   Q.   Have you been promised anything by the United States?

2   A.   No, sir.

3   Q.   Are you hoping for something --

4   A.   I'm only hoping for the substantial assistance, but I

5   haven't been promised that either, so...

6   Q.   Have you been convicted of petty larceny?

7   A.   Yes, sir.

8   Q.   Can you please explain what happened.

9   A.   I put on a pair of sandals in Wal-Mart and went to the

10  register with them.  And the security surrounded me and

11  charged me for petty larceny.  And I pled guilty because

12  -- even though I hadn't left the store yet, I was planning

13  to, so I pled guilty.

14  Q.   When did you begin using prescription pills illegally?

15  A.   Probably 2009; 2008, 2009.

16  Q.   When did you meet Chris Burns?

17  A.   Around that time.

18  Q.   Do you see him in the courtroom today?

19  A.   Yes, sir.

20  Q.   Can you please point him out and describe what he's

21  wearing.

22  A.   The young fellow there.  Tan suit, gold tie.

23          MR. BRADLYLYONS:  May the record reflect that the

24  witness has identified the defendant?

25          THE COURT:  It will.

1    BY MR. BRADYLYONS:

2    Q.   Where was Mr. Burns getting his pills from?

3    A.   It was several different sources.  Back in 2009 one of

4    the sources was myself.  I had a pretty good connection in

5    Goode.  And he purchased maybe several times a week, I would

6    say.

7    Q.   And after that?

8    A.   He had his own sources.  We had one source of Jennifer

9    Kirsche that we went to, Bryant Reynolds and Jeff Reynolds.

10   Q.   And who were your sources at that time?

11   A.   The same people, except for Jennie.  I couldn't go to

12   Jennie at that time, because we had a falling-out prior,

13   years prior.

14   Q.   Did you have any of your own sources?

15   A.   Yes.

16   Q.   Who was that?

17   A.   Alfred Dunnigan -- or Donathan, I think, in Goode.  He

18   lives in Goode, Virginia.  And Bryant Reynolds.

19   Q.   Who was Mr. Burns distributing pills to?

20        MR. SNOOK:  Judge, I ask that he be limited to

21   things he saw or that Mr. Burns said or --

22        THE COURT:  You have to lay some foundation that he

23   knows -- that he sensed in some way what he's about to

24   testify to; not that other people might have told him.

25        MR. BRADYLYONS:  Thank you, Your Honor.

1   BY MR. BRADYLYONS:

2   Q.   Did Mr. Burns ever tell you who he was distributing to?

3   A.   Only the two young girls that I actually seen him

4   distribute to, and that was Mandy -- I don't know her last

5   name -- and Samantha Blankenship.

6   Q.   Okay.  Did you observe him distributing to anyone else?

7   A.   Yes.  Jennifer Kirsche, Jessie Kirsche, this guy Mark

8   Hites.

9   Q.   Were you distributing pills at this time?

10  A.   Yes, sir.

11  Q.   Who were you distributing pills to?

12  A.   The same people.  And I had my own little circle, as

13  well as he had his little circle off to the side too.

14  Q.   Were you receiving pills from Mr. Burns?

15  A.   Yes, through Jennie.

16  Q.   How many times did you get pills from Mr. Burns?

17  A.   Over the years, probably several hundred times.

18  Q.   And how many pills?

19  A.   It is hard to really put a number on how many pills.

20  Q.   And you said through Jennie Kirsche.  Can you please

21  explain what you meant by that.

22  A.   Yeah.  Me and Jennie had a falling-out, me and her dad.

23  So I couldn't purchase the pills.  So I used to get Chris to

24  go purchase the pills for me until I finally got back in.

25  And I could go myself, right there at the end.

1    Q.   And how did you get back in?

2    A.   Through mutual -- through going out there and sitting

3    in his truck with him.  And finally Jennie came out there

4    one day and talked to me and we worked things out.

5    Q.   Do you know why she came out to talk to you that time?

6    A.   We hadn't seen each other in years.  We was pretty good

7    friends.

8    Q.   You mentioned Bryant Reynolds a few moments ago.

9    A.   Yes.

10   Q.   Who is he?

11   A.   I used to work for him.  He owned Reynolds

12   Construction; him and his dad and his brother owned the

13   company.  I used to work for him.

14   Q.   Was he a distributor of pills?

15   A.   Yes, sir.

16   Q.   At some point did you introduce Mr. Burns to Bryant

17   Reynolds?

18   A.   Yes, through negotiation on a car that he was supposed

19   to be trading pills for, a Camaro.

20   Q.   And can you tell me about that transaction.  Can you

21   please describe it.

22   A.   Chris was just looking to get rid of the car.  And I

23   told Bryant about it.  And so Bryant told me to bring him up

24   there.  And they discussed it and ended up trading the pills

25   for the car.

1    Q.   So you brokered this deal.  What did you get out of it?

2    A.   Chris gave me some pills for setting the deal up.

3    Q.   Have you ever had a discussion with Jennie Kirsche

4    about a prescription pad?

5    A.   Yes.  She just told me that Chris had stole one, which

6    Chris later on verified, telling me he had stolen a

7    prescription pad and was trying to get Jennie to verify once

8    the doctor or the pharmacy or whatever called up.

9    Q.   Did he tell you anything else about it?

10   A.   No, that was it.

11   Q.   During that period you knew Mr. Burns, what was he

12   doing for a living?

13   A.   He was doing replacement windows, vinyl siding.

14   Q.   Did he tell you if he was making much money doing that?

15   A.   He never really did say.

16   Q.   Okay.  Did he tell you if he was making enough money to

17   fund his prescription drug consumption?

18   A.   Yeah.

19   Q.   Was he making enough money?

20   A.   Oh, no, not to do -- to support his habit.

21   Q.   Did he tell you how he was supporting his habit?

22   A.   The same way everybody else did:  distribute, like

23   being a middleman.

24   Q.   At some point did you learn that Mr. Burns was working

25   for the police?

1   A.   Yes.  He called me one time and told me that if he

2   called and asked for anything, to play stupid; that he was

3   going to be an informant, confidential informant.

4   Q.   Okay.  Did he then call you, asking, as a confidential

5   informant?

6   A.   Yes.  Several hours later he did call and ask to

7   purchase pills.

8   Q.   And what did you do?

9   A.   I did what he told me to; I played stupid.

10  Q.   Do you recall the first time -- I'm sorry.  How many

11  times did that happen?

12  A.   It was several.  I'd say two to three times within a

13  week's time.

14  Q.   Okay.  Did he say anything about it, working for the

15  police?

16  A.   He just said that pretty much he was untouchable; they

17  wouldn't mess with him, as far as getting pulled over,

18  because he was working for them.

19  Q.   Do you recall testifying in grand jury?

20  A.   Yes, sir.

21  Q.   When you testified in grand jury, were you getting

22  pills from Mr. Burns?

23  A.   Yes, sir.

24  Q.   Did you mention Mr. Burns in your grand jury testimony?

25  A.   No, sir.  I never was asked about him.

1    Q.    You were never asked about him?

2    A.    No.

3    Q.    Would you -- if you had been asked, would you have

4    asked him about him?

5    A.    Yes.

6    Q.    And what date was that; do you remember?

7    A.    I think it was March 2013, maybe.

8    Q.    Okay.  Did you testify a subsequent --

9    A.    Or January 2013.  It was the beginning of the year.

10   Q.    Did you testify again after that?

11   A.    Yes.

12   Q.    And did you talk about Mr. Burns that time?

13   A.    No.  I never was asked.

14   Q.    Okay.  Hold on one moment.

15         (Off-the-record discussion between government counsel.)

16   BY MR. BRADYLYONS:

17   Q.    You testified in grand jury twice; is that correct?

18   A.    Yes, sir.

19   Q.    The first time was in January of 2013?

20   A.    2013, yes.

21   Q.    You testified again in grand jury after that?

22   A.    Yes.

23   Q.    You said a moment ago that you did not speak about

24   Mr. Burns that first time because you weren't asked?

25   A.    The first time, yeah, I didn't.

1    Q.    Is that right?

2    A.    Yes.

3    Q.    The second time, were you asked about Mr. Burns?

4    A.    Yes.  He was mentioned, yes.

5    Q.    Did you testify about him?

6    A.    Yes.

7    Q.    Do you remember what you said?

8    A.    Just about the prescription fraud, about the --

9          MR. SNOOK:  Judge, objection.  He hasn't been

10   impeached yet.

11         THE COURT:  Sustained.

12   BY MR. BRADYLYONS:

13   Q.    You said a moment ago that you didn't testify about

14   Mr. Burns; is that right?

15   A.    Yes.  The first time, yes.

16   Q.    Okay.  The second time you also said you didn't testify

17   about Mr. Burns; is that right?

18   A.    I have been to the -- as far as the Poff building to

19   testify; I have been to the sheriff's department several

20   times.  I can't recall which time it was asked, but I had

21   talked to him.  I can't remember if it was at the sheriff's

22   department when we had talked about him or if it was at the

23   Poff building.

24         MR. BRADYLYONS:  Your Honor, I have a prior

25   consistent statement.  Can I review it with the witness?

```
 1            THE COURT:  Sir?
 2            MR. BRADYLYONS:  I have a prior consistent
 3   statement.  May I review it with the witness, as to the
 4   second time he testified in grand jury?
 5            THE COURT:  Any objection?
 6            Just say yes or no.  I don't --
 7            MR. SNOOK:  Yes.
 8            THE COURT:  Okay.  Wait until he's impeached, then.
 9            MR. BRADYLYONS:  One moment, Your Honor.
10       (Off-the-record discussion between government counsel.)
11   BY MR. BRADYLYONS:
12   Q.  Do you recall in March of 2013 being asked if Mr. Burns
13   had told you he was playing both sides?
14   A.  Yes.
15            MR. SNOOK:  Judge, I -- A, it is direct
16   examination; B, this is a leading question.  I object.
17            THE COURT:  Well, I don't think it necessarily
18   suggests the answer.
19            MR. BRADYLYONS:  I have no further questions at
20   this time.
21            THE COURT:  All right.
22                          CROSS-EXAMINATION
23   BY MR. SNOOK:
24   Q.  Mr. Andrews, let me ask you sort of a little -- some
25   historical questions.
```

1    You had said that you had first met up with Chris Burns

2  sometime around -- was it 2008 or 2009; is that right?

3  A.   Yes, sir.

4  Q.   And somewhere around there you began selling pills to

5  him?

6  A.   Yes, sir.

7  Q.   Okay.  And was that the -- that was the first way you

8  made contact with him; you were selling to him?

9  A.   Yes.

10 Q.   Okay.  And do I understand that at that point you knew

11 that Chris was going and getting -- he would get drugs not

12 only from you, but also from Jennie Kirsche and also from

13 Bryant Reynolds?

14 A.   Yes, sir.

15 Q.   And you also would get them from Bryant Reynolds, but

16 at that point you weren't able to deal with Jennie Kirsche?

17 A.   Yes, sir.

18 Q.   And you also had another source, this Alfred person?

19 A.   Yes, sir.

20 Q.   And so we're into 2009.  Did you ever go with him up to

21 Bryant Reynolds?

22 A.   That first initial take him up there, yes, I did.

23 Q.   Okay.  And that was for this deal with the car?

24 A.   The car, yes.

25 Q.   And am I right that the deal wound up -- there was some

1    cash involved, but there was also some pills involved?

2    A.   Mainly pills involved.

3    Q.   Okay.  And your involvement with it, for sort of

4    brokering the deal, was you got some pills?

5    A.   Yes, sir.

6    Q.   And then -- and that was, what, 2010 sometime?

7    A.   Yes.

8    Q.   During that time were you going to Bryant fairly

9    regularly to get drugs?

10   A.   No, I wasn't; no, sir.

11   Q.   So did you -- during the, say, 2010 into 2011, did you

12   see Chris up there with any regularity or did you --

13   A.   Yeah, I used to go to his brother's, which is right

14   next door; and, yeah, I used to see him up there regularly.

15   He worked on a few vehicles and he hung out up there.

16   Q.   Okay.  So you were dealing more with Jeff than with

17   Bryant?

18   A.   Yes.

19   Q.   So Jeff was another source of yours, but apparently not

20   a source for Chris; am I right?

21   A.   Chris could go to Jeff too at one point.

22   Q.   But not as often?

23   A.   Yeah; not as often, no.

24   Q.   And I take it that when you were distributing drugs to

25   make a profit, you weren't sharing the profits with Chris?

1  A.   Yes, we -- we looked out for each other.  When he could

2  get them from Jennie, he looked out for me; when I would get

3  them from Alfred and Jeff, I looked out for him.  It was a

4  mutual agreement.

5  Q.   Okay.  I'm trying to figure out what you mean by "look

6  out for"?

7  A.   As far as if I didn't have any money, then he would

8  supply me some pills until I got some cash; and if he didn't

9  have any money or cash, I would look out for him, supply him

10  some pills.

11  Q.   Okay.  I asked you a very specific question.  Let me

12  ask it again.  When you made a profit, did you share the

13  profit with Chris?  Did you -- if you made a $5 profit on

14  selling a pill, did you give him 2.50 of it?

15  A.   No, sir.

16  Q.   Okay.  And, likewise, he didn't with you; right?

17  A.   No, sir.

18  Q.   Okay.  And there was never a time when he told you what

19  to do as far as selling drugs?

20  A.   No, sir.

21  Q.   There was never a time when you told him what to do as

22  far as selling drugs?

23  A.   No, sir.

24  Q.   In fact, you never saw anybody tell Chris, "Go sell

25  this, go sell that," did you?

1    A.   He did it on his own.  Nobody had to tell him.

2    Q.   And you were doing your thing on your own too; right?

3    A.   Yes.  And we did it together, too.

4    Q.   Now, when you -- there was a time -- do you know about

5    how many times -- you say you think you made maybe a hundred

6    -- several hundred different buys or -- buys from Chris; is

7    that right?

8    A.   Over the years, yes, sir.

9    Q.   Okay.  And over what years?

10   A.   From 2009 to 2013.

11   Q.   And how often would that be?

12   A.   Several times a week.

13   Q.   Okay.  And that's -- so several times a week.  We're

14   talking over, what, a period of about four years?

15   A.   Yes, sir.

16   Q.   So 52 weeks a year, we're talking about potentially 800

17   different buys?

18   A.   Approximately, probably, yes.  It is hard to really put

19   a number on it.

20   Q.   Okay.  During that time you were in jail for a fair

21   amount, weren't you?

22   A.   2013?

23   Q.   Well --

24   A.   I got locked up in August.

25   Q.   Beg your pardon?

1    A.    I got locked up in August.

2    Q.    Were you locked up in 2011-2012 over child support

3    issues?

4    A.    That was 2010-2011, for six months, yes.

5    Q.    Okay.  And also wasn't there an escape charge coming

6    out of that --

7    A.    I left work release.

8    Q.    So you got more time in jail --

9    A.    I just had to pull my initial time.  I never did get

10   more time.

11          MR. BRADYLYONS:  Objection, Your Honor.

12   BY MR. SNOOK:

13   Q.    So you had six months in jail?

14   A.    Yes.

15   Q.    I assume he wasn't selling drugs to you then?

16   A.    No, sir.  I was on work release.

17   Q.    Then you went down to -- was it Louisiana?

18   A.    Yes.

19   Q.    How long were you in Louisiana?

20   A.    Three months.

21   Q.    I assume he wasn't selling drugs to you in Louisiana?

22   A.    No, sir.  I had got clean when I was in Louisiana.

23   Q.    Now, January 17th, 2013, your first appearance before

24   the grand jury, had you already been arrested at that point

25   on something else?

1    MR. BRADYLYONS:  Objection, Your Honor.  He hadn't

2  been arrested in this case.  It is not relevant.

3    THE COURT:  Overruled.  Answer the question.

4  BY MR. SNOOK:

5  A.  Yes, sir.

6  Q.  Okay.  So you were in custody at the time?

7  A.  For one day, yes.

8  Q.  Okay.  And had you just been arrested on something

9  dealing with drugs?

10  A.  This initial charge, yes.

11  Q.  Okay.  I'm talking about on January 17th.  You were in

12  custody on January 17th for a drug charge; correct?

13  A.  No, sir.

14  Q.  Okay.  What was it that you had been arrested for?

15  A.  For destruction of property.

16  Q.  Okay.  So you were arrested on, say, the 16th, and then

17  you are brought to the grand jury the very next day?

18  A.  I really can't recall the date exactly.

19  Q.  Okay.  Within a few days anyway?

20  A.  Yes.

21  Q.  Right?

22    Did you talk with somebody involved in the

23  investigation to say, "Hey, I want to talk about drug use"?

24  A.  No, sir.

25  Q.  Did they have any idea why they should call you to the

1  grand jury?  Had you talked to anybody at all?

2          MS. NEESE:  Your Honor, objection.  He's

3  speculating to the answer.  He has no idea what the

4  investigators thought.  He's asking him a question he

5  doesn't know the answer to.

6          MR. SNOOK:  That's cross-examination.

7          Let me rephrase the question.

8  BY MR. SNOOK:

9  Q.  When you were arrested on something having nothing to

10  do with drugs --

11  A.  Yes.

12  Q.  -- and then a few days later, whether one day, a week

13  later, whatever, you end up in front of a federal grand jury

14  investigating drugs, what happened between that first day

15  and the grand jury appearance in terms of talking to

16  somebody?  Did you tell your attorney?  Did you tell the

17  U.S. Attorney --

18  A.  No, it never was spoken of.

19  Q.  So you just got called in front of the federal grand

20  jury, and nobody knew why?

21  A.  Yes.  I didn't know why.  At the time I did not know

22  why.

23  Q.  And so when you got called there the very first time,

24  on January 17th, nobody had talked to you at all before you

25  walked in the door, about drugs or anything else?

1   A.   No.

2   Q.   Okay.  And on that day you answered questions about

3   -- I mean, did anybody -- first of all, did anybody explain

4   to you what possible benefit there would be to your talking?

5   A.   No.  There was no benefit involved, period.

6   Q.   So you walked in and you were asked all of these

7   questions about all of these people, and nobody -- I mean,

8   there literally were probably 15 or 20 people you were asked

9   about and you -- yes?

10  A.   I don't know if there was that many.

11  Q.   Well -- okay.  And you -- did you mention Bryant

12  Reynolds?

13  A.   Yes.  I was asked about Bryant, yes.

14  Q.   Okay.  And in talking about Bryant Reynolds, you never

15  talked about Chris, did you?

16  A.   He never was asked about, no.

17  Q.   Well, when -- I repeat my question:  When you were

18  asked about Bryant Reynolds, you never talked about Chris;

19  correct?

20  A.   No, because his name never was mentioned.

21  Q.   Okay.  So, then, after you got charged -- let's see.

22  There was a time, March 8th of 2013, would it be fair to say

23  that was an interview --

24          MS. NEESE:  Your Honor, I'm going to object to

25  this.  He keeps saying after he was charged.  He wasn't

1  charged at that time.  Mr. Andrews wasn't charged until

2  August of 2013.

3       MR. SNOOK:  I'll rephrase the question.

4  BY MR. SNOOK:

5  Q.  On March 8th, 2013, you met with folks in the sheriff's

6  office?

7  A.  Yes.

8  Q.  And at that point, that was the first time that you had

9  mentioned that Mr. Burns was involved in any drug

10 activities?

11 A.  Yes.

12 Q.  And at that point you had been with him, involved in,

13 for example, selling a refrigerator and a dishwasher to

14 Timmy and Reva White and -- at the end of January?

15 A.  Yes.

16 Q.  And selling it for drugs, basically?

17 A.  That was the money to get some pills, yes.

18 Q.  And then you knew that folks -- let's see, that -- hold

19 on a second.

20      All right.  No -- were you friends with Jennifer

21 Kirsche and Tim Goodman at that point?

22 A.  No, sir.  Not at that time, no.

23 Q.  Is it fair to say, though, that you became aware in the

24 month of February and into the beginning of March that the

25 feeling was very strong among the people that you were

1    dealing drugs with that Chris Burns was a snitch?

2    A.   Yes.

3    Q.   Okay.  And so by the time you made your first

4    statement, the first time you mentioned Chris, March 8th, at

5    that point you were already aware of all of the rumors about

6    him being a snitch?

7    A.   Not at first, no, I wasn't.

8    Q.   Well, by March 8th were you?

9    A.   I really don't recall the dates, sir.

10   Q.   Okay.  That was the date after there had been a federal

11   indictment come down, a whole bunch of people got

12   arrested --

13            MS. NEESE:  Your Honor, I would object.  March

14   8th -- we didn't have a federal indictment that came down on

15   March 7th.  We didn't have a federal indictment that came

16   down until March 21st.  He's testifying to facts that are

17   not in the record, that are not accurate.

18            MR. SNOOK:  Judge, there was testimony from other

19   witnesses --

20            THE COURT:  Well, wait a minute.  When did you say

21   he told you that he was working?

22            THE WITNESS:  I really don't recall the dates, sir.

23            THE COURT:  Was that before March or after March?

24            THE WITNESS:  It was after March.

25   BY MR. SNOOK:

1    Q.   Are you sure it wasn't the beginning of February?

2    A.   I really don't recall the date, sir.

3           MR. SNOOK:   And, Judge, just to correct one thing

4    that Ms. Neese said, there was a federal indictment that

5    came down January 17th and people were arrested January

6    29th.   And there was testimony about that yesterday.   It may

7    not have been this indictment, but these people --

8           THE COURT:   Well, there are indictments handed down

9    every day involving other people.

10          MR. SNOOK:   Involving the people within this group

11   and people who have testified from this witness box.

12          THE COURT:   Okay.   Quit testifying and let

13   -- yourself, and ask him questions that he might know the

14   answer to.

15          MR. SNOOK:   Okay.

16   BY MR. SNOOK:

17   Q.   The time that you claim that Chris called you up and

18   said, "Hey, when I talk to you" -- "when I call you later

19   on, play stupid" --

20   A.   Yes.

21   Q.   -- you don't know when that was?

22   A.   Not the exact date, no, sir.

23   Q.   Is it possible that it was February 8th?

24   A.   I really don't recall the date, sir.

25   Q.   Okay.   I just wanted to put that together -- well, we

1   have.  Yeah.  Right.

2       You said that you had been interviewed many times --

3   A.  Yes.

4   Q.  -- in the sheriff's office and attorneys' offices,

5   various places --

6   A.  Yes.

7   Q.  -- including jails?  How many times have you been

8   interviewed, all told, about this case?

9   A.  It has been several.  I don't recall the number.  It

10  has been several; probably three or four times.

11  Q.  Three or four times plus a couple grand jury

12  appearances?

13  A.  That's including grand jury.

14  Q.  Okay.  Now, Mr. Andrews, you have testified that you

15  have a plea agreement in this case; correct?

16  A.  Yes, sir.

17  Q.  And the plea agreement, although it is not for a

18  specific amount of time, it sets forth some factors from

19  which, if nothing else happened, there's some sentencing

20  guidelines that apply that would tell you what you might

21  expect?

22  A.  Yes.

23  Q.  Okay.  And without getting into the details of that,

24  you understand that basically the best way for you to get a

25  sentence below what the guidelines would call for is to have

1    the government make a motion on your behalf for a reduction?

2    A.   I haven't been promised anything.

3    Q.   I understand that.

4         Answer my question, please.  You understand the best

5    way for you to get a result lower than what the sentencing

6    guidelines would already be is for the government to make a

7    motion on your behalf?

8    A.   I was only told about substantial assistance.  I didn't

9    know the exact definition of it as far as my guidelines

10   being lowered; I did not know that.

11   Q.   Okay.  You understand that the purpose of a substantial

12   assistance motion is that if the government makes the

13   motion, the judge reduces your sentence?

14   A.   I understand that now.

15        MS. NEESE:  Your Honor, I would object.  It is up

16   to the court to make the determination as to sentencing.

17   And we're getting outside of the scope --

18        THE COURT:  Right.  Don't misquote --

19        MR. SNOOK:  I'm sorry.

20   BY MR. SNOOK:

21   Q.   So you understand that the purpose is for the -- if you

22   satisfy the U.S. Attorney, and the U.S. Attorney makes the

23   motion to the court, the court can give you a lower

24   sentence?

25   A.   By my understanding, yes.

1  Q.  Okay.  And that was your understanding when you made

2  the plea agreement?

3  A.  No, sir.  My plea agreement --

4  Q.  You didn't understand that?

5  A.  -- was for my guidelines, as far as my points and the

6  criminal history.  That's what I pled to.

7  Q.  Right.  And the plea agreement doesn't specify that you

8  will get this substantial assistance.  But you understand

9  that it leaves the door open for it?

10 A.  Yes.

11 Q.  Okay.  And this is a plea agreement you entered just

12 about three months ago?

13 A.  Yes, sir.

14 Q.  Okay.  At a time when, basically, you knew that the

15 only person you could really testify about would be

16 Mr. Burns?

17 A.  No.  At the time it was -- nobody had been -- as far

18 as -- went to their sentencing, so, I mean, I could have

19 went to -- as far as Jeff or Bryant or anybody.

20 Q.  Of course, Bryant already had an agreement as to his

21 sentence --

22 A.  I did not -- I did not know that.

23 Q.  There was one other person named in this indictment, a

24 Ronnie Cupp.  Did you testify against him?

25 A.  No, sir, I did not know Ronnie.

1   Q.   Okay.  So, effectively, the only person in this

2   indictment that you would be testifying against would be

3   Mr. Burns?

4   A.   Yes, sir.

5   Q.   That's all.  Thank you, Judge.

6           THE COURT:  Any redirect --

7           MR. SNOOK:  Oh, excuse me a minute, Your Honor.

8   BY MR. SNOOK:

9   Q.   Did you tell Mr. Burns about working -- the fact that

10  he was working for the police before or after his house had

11  been robbed -- had been burglarized?  Do you remember?

12  A.   I don't recall that, no, sir.

13  Q.   Do you remember there was a time when you became aware

14  that there had been a break-in --

15  A.   Yeah, I remember when Burns told me that he had took on

16  homeowners insurance and then called and reported stuff

17  stolen, to claim the money.

18  Q.   Okay.  Do you remember whether that happened before or

19  after he told you that he had been working with the police?

20  A.   As far as exact date, I don't remember, but it was

21  around that time.

22  Q.   Okay.  Thank you.

23           THE COURT:  Any redirect?

24           MR. BRADLYONS:  Yes.

25                   REDIRECT EXAMINATION

1    BY MR. BRADYLYONS:

2    Q.   What kind of pills were you getting from Bryant?

3    A.   Oxycontins and oxycodones, methadones, Adderall.

4    Q.   A few moments ago you were asked if you were doing your

5    own thing.  And you said that "we did it together."  Can you

6    explain what you meant by that.

7    A.   We was -- had our little circle.  It was me, Burns,

8    Jennie, this guy Mark Hites.  I mean, it was several of us.

9    When one didn't have pills, the other one looked out for the

10   other one.

11   Q.   You said at one point you got clean in Louisiana?

12   A.   Yes.

13   Q.   At some point did you come back to Virginia?

14   A.   Yes.  I come back to Virginia, for this girl, and

15   started dating her, and then met up through Burns, and then

16   Burns offered me a job, which I was -- would have been

17   making pretty much the same amount as I was in Louisiana, so

18   I went to work with him.  And that's when I got back on my

19   addiction, became addicted again to the opiates, yeah.

20          THE COURT:  You say you went to work for him.  Like

21   what was the job?

22          THE WITNESS:  Installing replacement windows and

23   vinyl siding.

24          THE COURT:  Okay.

25          THE WITNESS:  I think he was subbing for -- Owens

1    Corning is where he was subbing.

2    BY MR. BRADYLYONS:

3    Q.   How many transactions total were there between you and

4    Mr. Burns?

5    A.   Over the years?  Several hundred.

6    Q.   Do you remember the date of each of those?

7    A.   No, sir, I do not.

8    Q.   Sir --

9    A.   When you are addicted to opiates, you do what you can

10   do to not be sick for that day.

11   Q.   You began cooperating with the police on January 17th

12   of 2013.  Who have you provided information about since

13   then?

14   A.   It has been several people.

15   Q.   Do you remember who else?

16   A.   Bryant Reynolds, Jeff, Jennifer Kirsche.  It is a

17   bunch.

18   Q.   Would you testify --

19       (Off-the-record discussion between government counsel.)

20   BY MR. BRADYLYONS:

21   Q.   Was that before they were indicted?

22   A.   Yes.  Yes.

23   Q.   Would you have helped the police, if you were asked to,

24   in a trial?

25   A.   Yes.

1   Q.   Did Mr. Burns tell you about what happened when his

2   house was broken?

3   A.   He just said that he had just taken homeowners

4   insurance, and he was going to call and report stuff stolen,

5   to collect some insurance money.

6   Q.   Did he tell you what actually happened?

7   A.   No, sir, he didn't.

8   Q.   Did he tell you anything else about it?

9   A.   No, sir, just that I think he ended up getting

10  insurance money, homeowners insurance.

11          MR. BRADYLYONS:  No further questions.

12          MR. SNOOK:  Judge, just one point.

13                      RECROSS-EXAMINATION

14  BY MR. SNOOK:

15  Q.   Isn't it true that you actually -- when you came back

16  from Louisiana, you actually met back up with Mr. Burns in

17  about January of 2013 at Jennie Kirsche's house?

18  A.   Yes.

19  Q.   Okay.  And so you hadn't seen him -- hadn't dealt with

20  him in any way through most of 2012; isn't that right?

21  A.   Yes.

22  Q.   Thank you.

23          THE COURT:  All right.  Thank you.

24          THE WITNESS:  Actually it was like three months,

25  maybe, out of 2012, when I was in Louisiana.

1  BY MR. SNOOK:

2  Q.   The three months you were in Louisiana, and you had

3  been locked up for six months before that?

4  A.   Yes, but it was a gap between then and when I was out.

5  Q.   Okay.  So six months you were locked up, during which

6  you weren't using drugs; then you go back to using drugs;

7  then you go to Louisiana, you get clean again; you come back

8  and get back to using drugs?

9  A.   Yes.

10  Q.   Okay.  Thank you.

11          THE COURT:  All right.  Is that all of this

12  witness?

13                     REDIRECT EXAMINATION

14  BY MR. BRADYLYONS:

15  Q.   When did you start using drugs again?

16  A.   When I come back from Louisiana?  It was the end of

17  2012, like December.

18  Q.   Okay.  Who got you started up again?

19  A.   Huh?

20  Q.   Who got you started up again?

21  A.   Burns, Chris Burns.

22          THE COURT:  All right.  Members of the jury, we'll

23  take about a 15-minute recess now.  You may retire to the

24  jury room.

25          Recess for about 15 minutes.

```
 1        (Jury out.)

 2        (Recess at 11:10 a.m.)

 3        (Call to Order of the Court at 11:25 a.m.)

 4            THE COURT:  All right.  Are we ready to call the

 5   jury back and call your next witness?

 6            MS. NEESE:  Yes, Your Honor, we are.

 7            THE COURT:  All right.  Send somebody for the

 8   witness.

 9            If the jury is all together -- be sure they are all

10   together.

11            Who is your next witness?

12            MR. BRADLYONS:  Jessica Kirsche.

13        (Jury in.)

14            THE CLERK:  Would you please raise your right hand.

15            JESSICA KIRSCHE, GOVERNMENT'S WITNESS, SWORN

16            THE CLERK:  Thank you.  Please have a seat.

17                        DIRECT EXAMINATION

18   BY MR. BRADLYONS:

19   Q.   Good morning.

20   A.   Good morning.

21   Q.   Can you please state your name for the record.

22   A.   Jessica Kirsche.

23   Q.   Have you ever been convicted of petty larceny?

24   A.   Yes, sir.

25   Q.   Can you tell me what happened?
```

1  A.   An ex-boyfriend of mine and I were at Wal-Mart and --

2         THE COURT:  You know, I don't think it is necessary

3  or proper to get into this, I mean, unless she is saying she

4  was innocent.  She hasn't been impeached, so I don't think

5  at this point that is proper.  So let's cut that and move

6  on.  I mean, you can ask if she has been convicted, but

7  that's enough.

8  BY MR. BRADYLYONS:

9  Q.   Have you ever used prescription pills?

10 A.   Yes, sir.

11 Q.   What pills have you used?

12 A.   The majority of opiates:  Dilaudids, Roxys, Oxycontins.

13 Q.   Please describe your usage.

14 A.   I have used for years now.  It has been an

15 on-and-off-again thing.  Just the majority of prescription

16 drugs.

17 Q.   And when did you start?

18 A.   Probably about '05.

19 Q.   I would like to ask you a few questions about your

20 relationship with Chris Burns.  When did you meet him?

21 A.   Probably about '08.

22 Q.   Do you see him in the courtroom here today?

23 A.   Yes, sir.  Right there.

24 Q.   Can you point him out and --

25 A.   Right there.

```
1              MR. BRADYLYONS:  May the record reflect that the

2      witness has identified the defendant?

3              THE COURT:  It will.

4      BY MR. BRADYLYONS:

5      Q.   Had you ever met him before then?

6      A.   No.

7      Q.   Was he a user of prescription pills?

8      A.   Yes.

9      Q.   Did you see him use?

10     A.   Yes.

11     Q.   Did he tell you he used?

12     A.   Yes.

13     Q.   What did he use?

14     A.   Opiates:  Dilaudid, Roxys; heroin.

15     Q.   And how did he use?

16     A.   IV.

17     Q.   How did you use?

18     A.   IV.

19     Q.   Did he ever tell you where he was getting pills from?

20     A.   Every now and then he would tell me Bryant Reynolds,

21     somebody behind Hop Inn, are the two that I know of.

22     Q.   Did you ever get pills from him?

23     A.   Yes.

24     Q.   Did you ever give him pills?

25     A.   Yes.
```

1   Q.   Did you buy pills from him?

2   A.   Yes.

3   Q.   Did you trade pills with him?

4   A.   Yes.

5   Q.   Did you loan him pills?

6   A.   Yes.

7   Q.   Can you describe the arrangement you had?

8   A.   If he was sick, he would call me.  And if I had

9   something, I would give it to him.  If I was sick, I would

10  call him.  If he had something, he would give it to me.

11  Just watched out for each other.

12  Q.   During the time period you have known him, how many

13  times did you exchange pills?

14  A.   A good 30 times, if not more.

15  Q.   And let me clarify.  So that's times you got from him

16  and he got from you --

17  A.   Yes.

18  Q.   -- or one or the other, both?

19  A.   Yes.

20  Q.   Who is Tim Goodman?

21  A.   It is a mutual friend.

22  Q.   Did Tim Goodman ever tell you he got pills from

23  Mr. Burns?

24  A.   Yes.

25  Q.   Who is Scotty Reynolds?

1   A.   Scotty Reynolds?

2   Q.   I'm sorry.  Scotty Andrews?

3   A.   A mutual friend.

4   Q.   Okay.  Did Mr. Andrews ever tell you he got pills from

5   Mr. Burns?

6   A.   Yes.

7   Q.   Okay.  And who is Jennie Kirsche?

8   A.   My sister.

9   Q.   Did she ever tell you she got pills from Mr. Burns?

10  A.   Yes.

11  Q.   So that's -- you have just mentioned -- or I just

12  mentioned a group of people.  Can you describe the

13  prescription pill relationship you-all had?

14  A.   We all used together.  When -- I mean, we all looked

15  out for each other.  When one of us didn't have, if the

16  other one did, it was just sort of a back-and-forth, all

17  helped each other out when we could.

18  Q.   And why would you do that?

19  A.   To be looked out for the next time, I guess was the

20  best reason.

21        MR. BRADYLYONS:  One moment, Your Honor.

22    (Off-the-record discussion between government counsel.)

23  BY MR. BRADYLYONS:

24  Q.   When you were getting pills from Mr. Burns, where did

25  that happen?

1  A.   All different places.   There's times that -- out at

2  Bryant Reynolds' house; there was times it was at my house;

3  there was times we met different places and would exchange.

4  Q.   And what state and county are those places in?

5  A.   Bedford County.

6  Q.   In Virginia?

7  A.   Yes.

8  Q.   Did Mr. Burns ever tell you what kind of pills he was

9  getting from Bryant Reynolds?

10  A.   Roxy 30s.

11  Q.   Did he ever mention any other kind?

12  A.   No.

13  Q.   Did you ever get any of those from Mr. Burns?

14  A.   Yes.

15  Q.   Did you get any other type of pill from Mr. Burns?

16  A.   Dilaudids and Roxy 10s.

17  Q.   Did you buy some of those pills?

18  A.   Yes.

19       MR. BRADYLYONS:   No further questions at this time.

20       THE COURT:   All right.   Mr. Snook.

21                    CROSS-EXAMINATION

22  BY MR. SNOOK:

23  Q.   Ms. Kirsche, when you first met Chris, you say that was

24  about 2008?

25  A.   Yes.

1  Q.   Okay.  And at that point -- you said you had been using
2  drugs since about 2005?
3  A.   Yes.  Off and on, yes, sir.
4  Q.   And was Chris clean at that time?
5  A.   As far as I know, he was, yes.
6  Q.   Okay.  And then he had -- meaning he wasn't using
7  drugs, as far as you know?
8  A.   I don't think he was using IV drugs, no.
9  Q.   Okay.  And then you are aware that sometime about 2009
10  or so he got in a pretty serious accident?
11  A.   Yes.
12  Q.   Okay.  And that he began using drugs for pain-killing
13  purposes at that point?  Were you even a friend with him
14  during that time?
15  A.   Yes.  Yes.
16  Q.   Am I right in that, that he was --
17  A.   Yes.
18  Q.   Okay.  And he had a legitimate prescription as a result
19  of that?
20  A.   Yes.
21  Q.   Now, you were asked a series of questions about whether
22  Tim Goodman said that he bought from Chris Burns.  When did
23  you have that conversation with Tim Goodman?
24  A.   There was a few times I have had conversation with Tim
25  Goodman.  He used to date my sister.

1    Q.   Okay.  And do you remember a time last -- I guess it

2    would be January of 2013, when Tim Goodman was arrested?

3    A.   Yes.

4    Q.   Okay.  And at that point he was dating your sister?

5    A.   Yes.

6    Q.   Okay.  And is it fair -- did you have conversations

7    with Tim and with your sister, around the time of Tim's

8    arrest, concerning the fact that Tim and your sister

9    believed that Chris Burns was working for the police?

10   A.   No, sir.

11   Q.   When was that -- did you ever have a conversation like

12   that with them?

13   A.   Yes.  Probably about a month after that happened.

14   Q.   Okay.  So if -- we're saying about a month or so after

15   Tim's arrest?

16   A.   Yes, sir.

17   Q.   Okay.  Sometime in February, perhaps?

18   A.   Yes.

19   Q.   Okay.  Did you have a conversation with Scotty Andrews

20   around that time about what they knew about Tim -- about

21   Chris?

22   A.   No.

23   Q.   You were asked when -- actually, you were asked, first

24   of all, whether Tim Goodman had ever said that he had bought

25   from Chris Burns.  And I forgot -- I asked sort of the wrong

1    question.  Let me go back to that.  Do you recall when you

2    had that conversation with Tim Goodman?

3    A.   It was before the arrest.

4    Q.   Okay.  And do you recall when you had a conversation

5    with Scotty Andrews when he said he had bought some drugs

6    from Chris Burns?

7    A.   I'm not for sure when that was, no, sir.

8    Q.   Okay.  And do you recall when you had a conversation

9    with Jennie Kirsche about when she -- where she said that

10   she had bought from Chris Burns?

11   A.   All different times.

12   Q.   Okay.  When you -- you talked about this group and you

13   said that "We all looked out for each other."  I take it you

14   were all addicts?

15   A.   Yes.

16   Q.   And you-all would have times when you needed some

17   opiates and you didn't have some?

18   A.   Yes.

19   Q.   And so you would sometimes buy a pill from somebody

20   -- from one of the other members of your little group?

21   A.   Yes.

22   Q.   Did you have a prescription of your own?

23   A.   No, sir.

24   Q.   Okay.  Do you know whether any of the others had

25   prescriptions of their own?

1   A.   No, sir.

2   Q.   So during this time when you were all looking out for

3   each other, you weren't specifically selling drugs for the

4   other person, were you?

5   A.   No.

6   Q.   Okay.  And you weren't specifically, for example,

7   sharing profits from any drug activity?

8   A.   No.

9   Q.   And you weren't dividing up turf, to where somebody

10  would say, "Well, I'm going to go sell drugs over here and

11  you go sell drugs over there"?

12  A.   No.

13  Q.   And, in fact, there really wasn't anybody sort of

14  controlling things.  Chris wasn't telling anybody what to

15  do; right?

16  A.   No.

17  Q.   You weren't telling anybody what to do?

18  A.   No.

19  Q.   Jennie and Tim and Scotty weren't telling anybody what

20  to do?

21  A.   No.

22  Q.   Everybody was kind of doing their own thing?

23  A.   Yes.

24  Q.   That's all I have.  Thank you, Judge.

25          THE COURT:  All right.

REDIRECT EXAMINATION

BY MR. BRADYLYONS:

Q.   Hi.

     Do you know what Mr. Burns's prescription was for?

A.   The only prescription I know that he was getting was

Roxy 10s.

Q.   Did he have an earlier prescription?

A.   Not that I'm aware of.

Q.   What would be the difference between that and a Roxy

30?

A.   Just a smaller milligram.

Q.   Did -- the pills you got from Mr. Burns, did they make

you high?

A.   Yes.

Q.   How did those pills affect your life?

A.   Ruined my life.

Q.   Tell me a little more.

     MR. SNOOK:  Judge, objection to relevance.  Also

objection as it goes beyond the scope of my cross.

     THE COURT:  Sustained.

BY MR. BRADYLYONS:

Q.   Where did Mr. Burns get Dilaudids?

A.   I'm not for sure.

Q.   You mentioned a moment ago that Mr. Burns got a

prescription for oxycodone for pain; is that right?

1  A.  Yes.

2  Q.  Was he also taking pills recreationally?

3  A.  Yes.

4  Q.  Did he ever give you pills from his prescription?

5  A.  Yes.

6  Q.  You also said that you didn't know if people were

7  sharing profits.  Did you know what other people were doing

8  when they weren't at your house?

9  A.  No.

10  Q.  Would they have told you if they were out making

11  transactions --

12          MR. SNOOK:  Objection.  Speculation.

13          THE COURT:  Sustained.

14          MR. BRADLYLYONS:  No further questions, Your Honor.

15          MR. SNOOK:  Nothing further.

16          THE COURT:  All right.  Thank you.  You may be

17  excused, then.

18          MR. SNOOK:  Your Honor, there is a possibility that

19  we may wish to have her --

20          THE COURT:  All right.  Well, remain -- you are not

21  excused as a witness.  Remain available.

22          MR. SNOOK:  Does the marshal service know how to

23  contact you?

24          THE WITNESS:  Yes.

25          MR. SNOOK:  Okay.  Thank you.

1    THE COURT:  Next witness.

2    MS. NEESE:  Tim Goodman.

3    THE CLERK:  Would you please raise your right hand.

4    TIMOTHY GOODMAN, GOVERNMENT'S WITNESS, SWORN

5    THE CLERK:  Thank you, sir.  Please have a seat.

6    DIRECT EXAMINATION

7  BY MS. NEESE:

8  Q.   Please state your name for the record.

9  A.   Timothy Goodman.

10  Q.   And, Mr. Goodman, where are you from?

11  A.   Thaxton.

12  Q.   Is that in Bedford County?

13  A.   Yes, ma'am.

14  Q.   Are you presently charged in this court?

15  A.   Yes, ma'am.

16  Q.   Have you entered into a guilty plea?

17  A.   I have.

18  Q.   What charge did you enter into a guilty plea?

19  A.   For the charge of conspiracy.

20  Q.   Conspiracy to --

21  A.   To distribute a number of things.

22  Q.   What types of things?

23  A.   Pills.

24  Q.   Okay.  Will you please tell the jury what types of

25  pills?

1   A.   I believe on the -- I believe it is listed as

2   oxycodone, Dilaudid, oxymorphone, Adderall.  I'm sure I'm

3   leaving out a couple.

4   Q.   Is it fair to say that you know quite a bit about

5   pills?

6   A.   Yes, ma'am, unfortunately.

7   Q.   Have you abused pills before?

8   A.   I have.  I used to be an addict.

9   Q.   And were you also a pill distributor?

10  A.   Yes, ma'am.

11  Q.   Now, going back to your charge, sir, have you ever been

12  promised anything?

13  A.   To appear in this court?  No.

14  Q.   Have you ever been promised anything for your testimony

15  here today?

16  A.   No, ma'am.

17  Q.   Are you hoping for anything?

18  A.   If the government sees fit to give me substantial

19  assistance, that's its prerogative.  I'm just here to tell

20  the truth.

21  Q.   Is the substantial assistance portion within your plea

22  agreement?

23  A.   I believe so, yes, ma'am.

24  Q.   Now, do you know the defendant here today?

25  A.   I do.  Chris Burns.

1  Q.  All right.  And if you would, please, just point him

2  out for the jury and tell us what he's wearing.

3  A.  Strikingly brown suit -- tan suit.

4         MS. NEESE:  Your Honor, please let the record

5  reflect the witness has identified the defendant?

6         THE COURT:  It will.

7  BY MS. NEESE:

8  Q.  When were you first interviewed about this case?

9  A.  Towards the end of 2012.  I want to say August, maybe

10  September.

11  Q.  Do you remember the specific day?

12  A.  I don't.

13  Q.  Were you cooperating at that point in time?

14  A.  No, ma'am, I wasn't.

15  Q.  Did you ever provide any information regarding

16  Mr. Burns at that point in time?

17  A.  No, ma'am, not at that point.

18  Q.  And why not?

19  A.  I don't -- I wasn't asked about Chris Burns.

20  Q.  When did you start using pills, sir?

21  A.  It actually started with -- I had a lung collapse 2010,

22  2011, somewhere in there.  And it kind of snowballed after

23  that.  And we are on the cusp of a year sober now.

24  Q.  Congratulations.

25  A.  It's quite a change.

1  Q.   When you started using pills, what types of pills were

2  you using?

3  A.   It started with Lortabs and Percocets, which I got from

4  my doctor, just to help with the pain for my lung.  And then

5  gradually I graduated to stronger pills, like the ones in

6  the indictment:  the oxycodone and oxymorphone and all of

7  those.

8  Q.   And Dilaudid as well?

9  A.   Dilaudid, yes, ma'am.

10  Q.   How did you start abusing pills?  What ways would you

11  use them?

12  A.   Just taking them, originally; and then snorting them;

13  and then by the end of it, I was actually an IV user.

14  Q.   Let's go through each of those.  So "taking them," is

15  that orally?

16  A.   Yes, ma'am.

17  Q.   Is that how they were prescribed?

18  A.   Yes, ma'am.

19  Q.   Were you ever prescribed oxycodone?

20  A.   No.  It was Lortab.

21  Q.   Were you ever prescribed Dilaudid?

22  A.   No, ma'am.

23  Q.   Were you ever prescribed hydromorphone -- or, excuse

24  me, oxymorphone, which is also known as Opana?

25  A.   No, ma'am.

1  Q.   Where did you get those pills?

2  A.   From a number of different people, most of them are

3  named in the indictment; and, yeah, I got some from the

4  defendant as well.

5  Q.   Okay.  When did you meet the defendant?

6  A.   I met him through a mutual acquaintance, Kevin Jessee.

7  And he and Chris wanted me to find some Roxicodone pills.

8  And that was 2012.  And they actually -- Kevin offered to

9  drive me to a job interview I had in Lynchburg.  And Chris

10  just so happened to be the driver of the vehicle.  And we

11  met and kind of hit it off and started hanging out from

12  there.

13  Q.   Tell us about the conversation that you had with

14  Mr. Burns and Mr. Jessee.

15  A.   Well, it was -- they wanted me to see if I could, you

16  know, find anything.  And I -- at that point I couldn't.

17  And, you know, I told them I didn't really have time, you

18  know, due to the job interview.  So they agreed, you know,

19  to drive me there, in hopes that, you know, us just being

20  around each other for longer, you know, I would have a

21  better chance of finding something, which --

22  Q.   Did you ever find anything?

23  A.   Yeah, I ended up finding Roxicodone.

24  Q.   Well, tell us about that.

25  A.   I believe we got -- I can't remember the exact number.

1    It wasn't -- it wasn't very many.  And I -- I got something
2    for finding it, which was --
3    Q.   Okay.  You are being vague, sir.
4    A.   Yes, ma'am.
5    Q.   You have got to tell the jury -- explain to the jury
6    exactly what happened.
7    A.   Okay.  Well, I think -- after the job interview I ended
8    up finding Roxicodone.  And Kevin Jessee --
9    Q.   Roxicodone, what milligrams?
10   A.   30 milligrams.
11   Q.   Okay.  Did you find more than one?
12   A.   Yes, ma'am.
13   Q.   Did you go to that source?
14   A.   We did.  Myself and Kevin Jessee and Chris, we went and
15   got them from my friend, Matt Barlow --
16   Q.   Okay.
17   A.   -- who is also named in the indictment.
18   Q.   And did you actually get pills that day?
19   A.   Yes, ma'am, we did.
20   Q.   Who paid for the pills?
21   A.   It was actually -- I believe it was Chris's money,
22   because Kevin had called me.  He was, you know, in on it.
23   So Chris gave him something for calling me and me finding
24   something.  So, basically, to get Chris's fix, he had to,
25   you know, help Kevin and myself out.

1    Q.    Did he give you pills after he got them?

2    A.    Yeah, I got something for the deal.

3    Q.    What did you get, sir?

4    A.    One Roxicodone 30.

5    Q.    What did Kevin get?

6    A.    I couldn't swear to it.  I'm not sure.

7    Q.    Okay.  Now, moving on, did you establish a relationship

8    with Mr. Burns?

9    A.    I did.

10   Q.    What was that relationship?

11   A.    We -- well, initially we were just friends.  And, you

12   know, it was just coincidence that we hadn't met until that

13   point, because he actually grew up in the same area.  So we,

14   you know, started talking.  And we were both addicts; so

15   that was, you know, the common ground we had.

16        And then actually Chris and myself -- Chris started a

17   company.  And he was looking for a contract for installing

18   windows on residential places.  And I actually went to the

19   interview with him.  And we got the contract.  So he kind of

20   made me his number two, so to speak.  And, you know, for the

21   next three, four months we installed windows and hung out

22   pretty much every day.

23   Q.    Let me ask you a question.  Prior to you-all getting

24   that contract, did he have a regular job?

25   A.    I don't believe so.  I believe he was doing general

1  construction, home maintenance, stuff like that.

2  Q.  Did you have a regular job?

3  A.  Not at that point, no, ma'am.

4  Q.  Once you got that contract, was it an every-day,

5  five-day-a-week job?

6  A.  Well, no, it was more like one or two days a week.

7  Some weeks more, some weeks less.  You know, some weeks

8  there was no work.

9  Q.  What were you-all doing when you weren't working?

10  A.  Usually just hanging out either my house or at his

11  house, mostly his house.  And, you know, being addicts, we,

12  you know, every day needed to get high.  So that's basically

13  what we were doing when we weren't working; not to say that

14  we weren't indulging while we were working, because that was

15  going on as well.

16  Q.  Did you ever -- well, tell us about what you mean

17  there, sir.

18  A.  Just when you are an addict, it is -- you know,

19  especially if you have to go work and do something that --

20  you know, manual labor or anything like that, you know, you

21  -- you definitely need something.  So, you know --

22  Q.  Again, you are saying "need something," need what?

23  A.  You definitely need, you know, your fix, your drug of

24  choice, which for us was, you know, usually Roxicodone,

25  sometimes Dilaudid.  So on the days we weren't working, it

1  was, you know, pretty much just finding, you know, a

2  Dilaudid or a Roxy, and, you know, getting our fix.  And

3  then the days we were working, we tried to make sure that we

4  had, you know, something to take with us, Roxy or Dilaudid,

5  Opana, what have you.

6  Q.  Let me ask you, where were you-all getting these pills?

7  Were you getting them from each other, from other people --

8  A.  A number of different places.  From other people.  And

9  then Chris actually had his own prescription of Roxys.  So

10  that -- that was a big help for -- you know, for him and

11  myself, actually.  But -- yeah, from a number of people

12  named in the indictment --

13  Q.  Explain to the jury real quick what he had a

14  prescription for that you know of.

15  A.  It was Roxicodone 5-milligram, which is, you know, just

16  basically a weaker version of what we preferred, which was

17  the 30-milligram Roxicodones.

18  Q.  Did you ever get any Roxy 10s from him as well?

19  A.  Yes, ma'am, I believe so.

20  Q.  Now, did he ever have a prescription for Roxy 30?

21  A.  I don't believe for 30s, no, ma'am.

22  Q.  Did you ever get any Roxy 30s from Mr. Burns?

23  A.  Absolutely.

24  Q.  Do you know where his source -- or who his source was?

25  A.  It -- he would get them from our friend Kevin Jessee;

1    he would get them through me; get them from Jennie Kirsche,

2    who is named in the indictment.  And then he had, you know,

3    people that I didn't know that he would get them from.

4    Q.   Did he ever tell you about any other people or where he

5    was going?

6    A.   He -- he mentioned, you know, a few names that I was

7    familiar with, but I hadn't quite met the individuals.

8    Scotty Andrews, just for example, would be one of them.

9    Q.   Did you ever get pills from him that he told you that

10   came from Scotty Andrews?

11   A.   Yeah.  He actually about took me to Scotty Andrews'

12   house to get Dilaudid.

13   Q.   What kind of pills -- Dilaudid?

14   A.   Yes, ma'am.

15   Q.   Do you know where Scotty had gotten them from?

16   A.   I don't.

17   Q.   Did you get the pill from Chris or from Scotty?

18   A.   Oh, I never met Scotty.  I got it from Chris.

19   Q.   You mentioned Jennifer Kirsche.  What was her

20   relationship with you and with Mr. Burns?

21   A.   Chris actually introduced me to her.  She was kind of a

22   big-time pill distributor who lived in Bedford.  And Chris

23   took me to her house and introduced me.  And we worked on

24   her car and stuff like that, that -- just kind of

25   familiarized myself with her.  And, yeah, that's -- that's

1   actually how I met her.  And I ended up spending a

2   substantial amount of time with her as well.

3   Q.  Did you ever get pills from Chris, prior to meeting

4   her, that were from her?

5   A.  Yeah.  I rode with him on several occasions to the

6   house that I -- I didn't know was hers yet, and we got

7   Dilaudids mostly.

8   Q.  When you say "we got," who got them?

9   A.  Chris.  Chris would -- we would -- you know, he would

10  go in the house.  I would stay in the vehicle.  And he would

11  come back out with the Dilaudids or the Roxys.  They both

12  came from there.

13  Q.  Why did he end up introducing you to Jennie Kirsche?

14  A.  It just kind of happened.  And, you know, like I said,

15  we were spending quite a bit of time together.  So, you

16  know, it just made sense for him to introduce me to her.

17  And, you know, at some points in time that was the only

18  place that we could get any pills.  So, you know, she was a

19  well-spoke subject between the two of us.

20  Q.  Did all of you begin working together?

21  A.  Yeah, she actually did work with us on a couple of

22  occasions.

23          THE COURT:  You say "working."  Is that in the

24  window business or --

25          THE WITNESS:  Yes, Your Honor, installing windows

1    in residential houses.

2    BY MS. NEESE:

3    Q.  Did you ever work together in the drug business?

4    A.  Yeah, we -- we -- you know, it -- when you are an

5    addict like that and you need your drug every day, it is

6    kind of hard to maintain.  So, you know, some days I would

7    be able to find something when Chris couldn't; and, you

8    know, oppositely, Chris would be able to find something on

9    days that I couldn't.  And, you know, we --

10   Q.  Who else was involved with this with you and Chris,

11   sir?

12   A.  As far as being able to find pills on other days,

13   mainly in our little group of friends is me and Chris Burns

14   and Kevin Jessee, Jennie Kirsche, Matt Giles, Samantha

15   Hogan, Scott -- a number of people -- a number of people,

16   most of them named in the indictment.

17   Q.  Did you ever see Chris distribute pills to anyone else

18   but yourself?

19   A.  Yes, ma'am.

20   Q.  Who all did you see him distribute pills to?

21   A.  Most of the individuals just mentioned:  Kevin Jessee,

22   Matt Giles, Mandy McKinney, and then myself, of course.

23   And --

24   Q.  Did he ever distribute to Jennie Kirsche as well?

25   A.  Yes, and her sister, Jessie Kirsche.  They were good

1   friends.  I think Chris and Jessie went to school

2   together -- or Chris and Jennie went to school together.  I

3   can't remember exactly how he knew them to begin with.

4       But, yeah, we all kind of helped each other out, so

5   that nobody had to go without, you know.  And, you know,

6   most days -- pretty much every day somebody within the group

7   would be able to find some type of pill.  And we would, you

8   know, go with that person for that day.

9   Q.  How many times would you estimate you got pills from

10  Chris Burns, whether it be buying or being given them?

11  A.  20, 30 times.  And that's a -- that's a low estimate,

12  because, like I said, we were together for three or four

13  months, and when you are an addict like that, you don't

14  really go a day without.  So that's -- that's a very

15  conservative estimation.

16  Q.  What-all types of pills did you say?

17  A.  That I got just from Chris?

18  Q.  Just from Mr. Burns.

19  A.  Well, I got Roxys from him, which was his prescription.

20  I actually went to the doctor with him a couple of times,

21  stayed in the parking lot.  And, you know, Dilaudid and

22  Opana.

23  Q.  When you say "Roxys," are there two different

24  milligrams that you got from him or --

25  A.  Well, his prescription for Roxys was for 5 milligrams.

1    And, you know, I got those from him, of course.  But he

2    would find other milligrams, mainly 30 milligrams, and

3    sometimes 15s.  And, oppositely, I would do the same for

4    him.  So we kind of supported each other's habit, everybody

5    in the group there.

6    Q.  Did you ever trade pills with him?

7    A.  On the occasion when I had pills for -- you know, a

8    bargaining chip, yeah, we would trade.  Sometimes if, you

9    know, he had his prescription and, you know, we did a couple

10   of days work and he, you know, would give me some pills for

11   -- instead of paying me, or pay me and give me pills.

12   Q.  When you say "paying you," he paid you in pills or he

13   paid you in cash?

14   A.  Both.  Both, yeah.

15   Q.  Okay.  What was your pill of choice, sir?

16   A.  It was probably the Roxicodone 30.

17   Q.  Were you around Chris enough to know what his pill of

18   choice was?

19   A.  Yes, ma'am.  The Roxicodone 30.

20   Q.  Did he use Dilaudid also?

21   A.  He did.

22   Q.  Did you use Dilaudid also?

23   A.  I did, yes, ma'am.

24   Q.  Did you-all shoot up together?

25   A.  Yes, ma'am.

1          THE COURT:  When you say "shoot up," what do you

2   mean?

3          THE WITNESS:  Intravenous use, Your Honor.

4          THE COURT:  Just how did you do it?

5          THE WITNESS:  You mean how did we acquire the --

6          THE COURT:  No.  How did you shoot yourself up?

7   Did you have -- I thought you had pills now.

8          THE WITNESS:  Yes, sir.  You take -- I'm ashamed to

9   say this to you, Your Honor.  You take the pill and you put

10  it in a spoon and you put water on it.  And then you put it

11  in a syringe.  And you do it that way.

12  BY MS. NEESE:

13  Q.  Do you heat it up to melt the pill down?

14  A.  It depends on which pill it is.

15         THE COURT:  Okay.

16  BY MS. NEESE:

17  Q.  Now, the pills that you got from Mr. Burns -- well, did

18  they affect you in any way?

19  A.  Did they get me high?

20  Q.  Yes.

21  A.  Yes, ma'am.

22  Q.  Now, go to December 20th of 2012.  When did you find

23  out a controlled buy had been made from you?

24  A.  When I got indicted the following January.

25  Q.  Is that January of 2013?

1    A.    Yes, ma'am.

2    Q.    And do you remember -- were you arrested?

3    A.    I was actually arrested at Jennie Kirsche's house.

4    Q.    Okay.  Did you know at that point in time who was the

5    confidential informant?

6    A.    No, ma'am, I didn't.

7    Q.    Did you ever find that out later?

8    A.    It was never, you know, verified to me or told to me.

9    But, you know, while I was sitting in Roanoke City Jail, I,

10   you know, had suspicions.  And, like I said, they were never

11   confirmed.  But it -- you know, it pointed towards Chris.

12   Q.    Have you ever been able to confirm that?

13   A.    No, ma'am.

14   Q.    Now, going back between December 20th of 2012 and the

15   time that you were arrested at the end of January, did you

16   have any dealings with Chris Burns?

17   A.    Yes, ma'am.

18   Q.    Can you tell us about any of those?

19   A.    Just that things were, you know, normal up until the

20   morning of my arrest.  So -- you know, we were hanging out.

21   And we didn't have much work in January, as far as window

22   installation, but -- yeah, we -- you know, it was pretty

23   much business as usual until --

24   Q.    What do you mean "business as usual"?

25   A.    That every day, you know, we had to find some type of

1  pill.

2  Q.  Did you know he was working as a confidential informant

3  at the time?

4  A.  I did not.  I knew that he had talked to the sheriff's

5  office and that, you know, they had asked him certain

6  things.  But he never told me that he was, you know, working

7  as a confidential informant.

8  Q.  Was he still using during this time period?

9  A.  Yes, ma'am.

10  Q.  Did you still get pills from him during this time

11  period?

12  A.  Yes, ma'am.  I didn't stop getting pills from him

13  until, you know, my arrest.

14  Q.  Do you remember January 2nd of 2013, with Mr. Burns and

15  a Samantha Hogan?

16  A.  Yes, ma'am.

17  Q.  Will you tell us about that day.

18  A.  That day Chris and myself rode to Roanoke with Samantha

19  Hogan and John Naples.  And the point of the trip was to get

20  heroin, which is sometimes used as a substitute when you

21  can't find pills.  So we rode to Roanoke and got the heroin;

22  Samantha got it.

23      And on our way back, it had just kind of occurred to me

24  that Chris was acting strange.  So I pulled out my cell

25  phone and I typed in, "Are you working with the police?"

1    And he took my cell phone and typed "Yes" and handed it back

2    to me.  And then we -- he showed me the text messages that

3    were actually coming from the investigator, asking him where

4    he was and why it was taking so long and things like that.

5        And on our way back we stopped and Chris got out of the

6    vehicle.  In hindsight, it was -- he went into the store so

7    that he could call the investigator.  It was a Food Lion.

8    But we-all used in the parking lot.  And then --

9    Q.   You used what?

10   A.   Used the heroin.

11   Q.   Who-all used?

12   A.   Everybody in the vehicle.

13   Q.   Okay.  Name them for us, sir.

14   A.   Chris Burns and myself, John Naples, and Samantha

15   Hogan.  And --

16   Q.   How did you use heroin that day?

17   A.   Intravenously.

18   Q.   Did each and every one of you-all use it?

19   A.   Yes.

20   Q.   Did you have anything -- what did you do with the

21   needles afterwards?

22   A.   Well, since I asked Chris if he was working with the

23   police and he said yes, I asked him if, you know, we should

24   throw away our needles.  And he said yes.  So we -- we got

25   rid of them before we got back to Bedford.  And then we got

1  back to Bedford and Samantha and John went their separate

2  ways.  And I actually went back to Chris's house while he

3  met the investigators and gave them what was left in the

4  bags of heroin.

5  Q.  What do you mean "gave them what was left"?

6  A.  Well, we had done a substantial amount of it.  You

7  know, we just took back enough -- because -- you know, I

8  guess Chris assumed that the investigators didn't know what

9  the bags were supposed to look like and wouldn't know the

10  difference if, you know, some of it was missing.

11  Q.  Did you-all ever talk about anything else on the trip,

12  what he had with him, once you found out he was a

13  confidential informant?

14  A.  He actually showed me -- after he typed "yes" and

15  flipped through his text messages, he pulled out what I now

16  know to be a recording device.  It is a keychain module.

17  And, yeah, he showed it to me and flipped the switch on it

18  and, you know --

19  Q.  What do you mean "flipped the switch on it"?

20  A.  I didn't know it -- what -- it was actually -- I

21  figured that he was cutting it on and off.  I guess that's

22  actually what he was doing.  But, yeah, that was -- because

23  I -- I thought maybe he was messing with me about -- about

24  working with them.  And then he pulled that out.  And, you

25  know, I realized that he was being genuine.

1   Q.  Let me ask you something.  How long were you in the

2   Roanoke City Jail?

3   A.  A little over a month.

4   Q.  Do you remember what day exactly you got out?

5   A.  I believe it was March, the beginning of March.  I

6   don't remember the exact day.

7   Q.  And when you got out, did you start cooperating with

8   law enforcement?

9   A.  I did, yes, ma'am.

10   Q.  Did you do anything for law enforcement on March 8th of

11   2013?

12   A.  I did.  I --

13   Q.  Was that with the Bedford County Sheriff's Office?

14   A.  Yes, ma'am.  Yeah.  With the investigators, I called

15   Chris and asked him to --

16   Q.  Is that Chris Burns?

17   A.  Chris Burns.

18   Q.  Okay.

19   A.  And asked him to find me something.

20   Q.  What do you mean find you something?

21   A.  Find me some -- pardon me.  Find me any kind of pill

22   or, you know, something like that.  And he -- the only thing

23   he could find at the time was Suboxone.  And he was actually

24   at home.  So he -- he arranged where I would meet a friend

25   of his at -- in the Wal-Mart parking lot in Bedford County

1   and get the Suboxone from her.

2   Q.   And who was that friend?

3   A.   Heather Overstreet.

4   Q.   Did you ever deal with her prior to that day?

5   A.   No.  I knew of her, but --

6   Q.   How did you know of her?

7   A.   I had just, you know, heard her name around.  And I had

8   went to school with her younger brother.  But, you know, I

9   wouldn't have been able to call her; I didn't know her like

10  that.

11  Q.   Did Mr. Burns know her?

12  A.   Yes, ma'am.

13  Q.   Did he ever talk to you about his dealings with Heather

14  Overstreet?

15  A.   Just that she -- she lived in Roanoke at the time and,

16  you know, she was one of the -- one of the people that could

17  find pills and other drugs in Roanoke.

18  Q.   Did you make that controlled purchase that day?

19  A.   I did.  Yes, ma'am.

20  Q.   Was it for Suboxone?

21  A.   Yes, ma'am.

22         MS. NEESE:  No further questions at this time, Your

23  Honor.

24         THE COURT:  Okay.

25                         CROSS-EXAMINATION

1    BY MR. SNOOK:

2    Q.   Mr. Goodman, do you remember when it was that you met

3    Chris?

4    A.   Yes, sir.  Like I told Ms. Neese, it was towards the

5    end of 2012, through our mutual acquaintance, Kevin Jessee.

6    Q.   About October, maybe, would that be about right?

7    A.   That sounds about right.

8    Q.   So you met him in October.  And do I understand that

9    you fairly soon thereafter started working for him, doing

10   the windows thing?

11   A.   Yeah.  It was -- it wasn't long after.  We probably

12   hung out as just friends for about a month before we

13   actually went and had the interview for the contract on the

14   windows.

15   Q.   And so the windows contract -- do you remember the name

16   of the company that he was working with?

17   A.   Owens Corning.

18   Q.   Okay.  And working for Owens Corning, was there a group

19   called Windows Direct that was actually the connection

20   between him and Owens Corning, or do you remember?

21   A.   I don't really recall.  It sounds like maybe that was

22   the warehouse where we actually picked up the merchandise.

23   Q.   And so during the fall of 2012, when the weather was

24   pretty decent, you-all were during that time pretty busy,

25   weren't you?

GOODMAN - CROSS

1  A.   Yeah.   Initially, when we got the contract, we -- we,

2  you know, had quite a few different houses, you know;

3  probably averaging two houses a week, something like that.

4  Q.   Okay.

5  A.   But the problem with those contracts is it is -- it is

6  not steady.   It -- you know, sometimes it is more and

7  sometimes it is less.

8  Q.   And certainly in January that's not exactly prime time

9  for installing windows?

10  A.   Well, you know, the customer is in charge of buying, so

11  it is really on their prerogative, you know.   If they had a

12  problem or something, you know, nobody is going to sit next

13  to a broken window when it is cold outside.

14  Q.   In terms of doing replacement work, that tends not to

15  be a cold weather kind of --

16  A.   Yeah, I would agree with you.

17  Q.   So early on in your relationship with Mr. Burns,

18  you-all were pretty busy and making pretty decent money

19  doing the windows; right?

20  A.   For the first month or two we -- yeah, we made okay

21  money.

22  Q.   Okay.   And then by about January, it had pretty much

23  slowed down; you weren't making much money doing windows?

24  A.   Yes, sir.

25  Q.   That was during the time when you were doing maybe one

1  or two days a week?

2  A.   Yeah, it -- well, when it got really slow, you know,

3  sometimes it was nothing a week.

4  Q.   Yeah.

5  A.   But, yeah, one or two windows a week sounds about right

6  -- or one or two jobs a week sounds about right.

7  Q.   So the time that you knew Chris Burns was really only

8  for about three to four months, tops:  October, November,

9  December, January -- I shouldn't say that.  Let me retract

10  that.  The time before you were arrested that you -- that

11  you knew Chris Burns was about three or four months?

12  A.   Yeah, between -- yeah, three, four, five months.  I

13  can't remember exactly.

14  Q.   Okay.  And so -- then you were arrested January 29th,

15  was it?

16  A.   That sounds correct.

17  Q.   Okay.  And at the time that you were arrested, you were

18  actually at Jennifer Kirsche's house, weren't you?

19  A.   Yes.  That's correct.

20  Q.   They basically got you out of bed?

21  A.   Yes, sir.

22  Q.   And the only person who really knew that you were up

23  there was Chris; right?

24  A.   Chris -- Chris was one of the people that knew I was

25  staying.  I had talked to him the night before my arrest.

1   Q.   And Chris was actually expecting to be picking you up

2   to go out and do a job that day; right?

3   A.   No, I don't know if that's correct.  He called me the

4   night before to ask me if I could find him anything.

5   Q.   Meaning a pill?

6   A.   Yes, sir.

7   Q.   Okay.

8   A.   But I don't recall anything about a job that day.

9   Q.   Okay.  Now, let's see, so the first time that you were

10  interviewed in September of 2012 and you were -- and

11  Ms. Neese asked you about drug activity and you mentioned

12  the various people, and you didn't mention Chris Burns, you

13  hadn't actually met Mr. Burns at that point; isn't that

14  right?

15  A.   At the time of my first interview, no, I believe we

16  were acquainted, but Chris wasn't on their radar, so to

17  speak.  They were more interested in Matt Barlow.

18  Q.   Uh-huh.  But I take it that in all of these interviews

19  one of the things that they asked you -- they are not just

20  asking you about a particular person, but they ask you, "Do

21  you know anybody else who is selling"; isn't that pretty

22  much standard?

23  A.   It eventually got to that.  Initially it was more --

24  you know, they were more interested in specific people, what

25  specific people were up to.  And then later down the road,

1   you know, they got to the general, you know, so who else is

2   up to no good.

3   Q.   Okay.  So in the first interview that you had with

4   them, you didn't mention them.  Then the second time that

5   you were interviewed -- let's see, there were -- you had

6   made a proffer to them in January -- in February, after your

7   arrest; right?

8   A.   Yes.

9   Q.   February 26th?

10  A.   That sounds correct.

11  Q.   Okay.  And at that point you mentioned some things

12  about Chris.  And then there was a grand jury appearance and

13  so on?

14  A.   That sounds correct, yes.

15  Q.   And you say that what you were getting from Chris was

16  part of his prescription for Roxy 5s?

17  A.   Yeah, I did get some of his Roxy 5s, yes, sir.

18  Q.   Okay.  And you mentioned that you had gone with him

19  when he went to the doctor; is that right?

20  A.   Yeah, on a couple of occasions, more than --

21  Q.   Do you remember when that would have been?

22  A.   No.  It would have been towards probably the last two

23  months.  You know, a prescription is a monthly thing.  So it

24  would have been the last two months of 2012; that sounds

25  correct.

1    Q.   Okay.  So how about in January of 2013?

2    A.   No, I didn't go with him to his doctor in January.

3    Q.   Okay.  But you do remember doing it in 2012 twice?

4    Once?  I don't want to put words in your mouth --

5    A.   More than once.  Twice, two or three times.

6    Q.   And it was specifically to the doctor, not to the

7    pharmacy?

8    A.   Well, to both.  But, yeah, to -- I would go with him to

9    his actual appointment, and then we would leave there and go

10   to the pharmacy.

11   Q.   Now, you had testified, if I got my notes correct, that

12   you had had perhaps 20 or 30 different transactions with

13   Chris?

14   A.   Yeah.  It is -- it is strange to put a number on it.

15   Like I said, we were, you know, pretty much best buddies at

16   the time.  So, yeah, that would be a, you know, conservative

17   estimation.

18   Q.   And some of those 20 or 30 are times when he would sell

19   to you, and some of those 20 or 30 are times when you would

20   sell to him?

21   A.   The 20 or 30 times are actually just him selling to me.

22   If you include when I sold to him, the number would

23   increase.

24   Q.   Basically double?  Was it about equal?

25   A.   Probably.  I don't know if it was quite equal, because

1    I didn't have the advantage of having my own prescription,

2    but it would definitely increase.

3    Q.   Okay.  Now, on the time on the 20th of December when

4    Chris bought stuff from you, he actually bought a couple of

5    Subutex; is that the name of the drug?

6    A.   Yes, that's correct.

7    Q.   Which is sometimes referred to as Suboxone?

8    A.   They are actually two separate drugs.

9    Q.   Okay.  Related, but not --

10   A.   Yeah, definitely related, but not in the same family.

11   One has a blocker in it.

12   Q.   A blocker?

13   A.   An opiate blocker, yes, sir.

14   Q.   Okay.  And so he bought two of those from you on the

15   20th of December; right?

16   A.   Yes, sir, I believe so.

17   Q.   And at that point you were with Matt Barlow.  And the

18   two of you-all actually asked Chris about what he had been

19   asked about at the grand jury that day, didn't you?

20   A.   That sounds correct.

21   Q.   I mean, you obviously knew he had been to the grand

22   jury at that point?

23   A.   Yeah, we were still friends.

24   Q.   And basically all you wanted was assurance that he

25   hadn't mentioned you?

1    A.   Well, actually, you know, Chris -- the whole point of

2    December 20th was -- he called me, telling me that he was

3    trying to clean up; that his wife had actually found some

4    drug-related paraphernalia and that he really needed to

5    straighten up.  And that's why they -- the Suboxone -- or

6    the Subutex, actually, was, you know, a good thing for him

7    to have, because it is actually used as a detox medication.

8    Q.   Okay.  And that -- as far as you know, is that the only

9    time that he made a controlled buy from you?

10   A.   As far as I know, yes, sir.

11   Q.   When you would do one of these things where he would

12   sell some pills to you, how many pills would he sell you at

13   a time?

14   A.   Oh, it varied, depending on if it was just my money or

15   if, you know, I had my friends' money, or, you know,

16   sometimes he would help me out and just, you know, give me

17   something until I could come up with the money.  He was a

18   good friend of mine.

19   Q.   Well -- okay.  The times that you would get stuff from

20   him, we are talking mainly just like one or two, three, four

21   pills?

22   A.   If I was just buying for myself, yeah.

23   Q.   Were there times when -- you say you were buying for

24   somebody else?

25   A.   Yes, sir.

1  Q.  Who would the somebody else be?

2  A.  It -- in our whole group of friends, you know.  It is

3  quite a few of them.  Samantha Hogan and John Naples, just

4  because I mentioned them earlier, would be good examples.

5  They weren't, you know, necessarily -- they couldn't call

6  Chris or, you know, ask Chris for anything.  So if it just

7  so happened to be one of those days of the month when Chris

8  was the only one that could get something, they would, you

9  know, give me their money and I would facilitate that.

10 Q.  Now, when you would sell drugs to Chris or Chris would

11 sell drugs to you, were any of you making money off of these

12 deals?

13 A.  It -- on certain -- certain times, you know, we would

14 be making money.  Usually between Chris and myself we -- you

15 know, we tried not to, you know, take advantage of each

16 other.

17 Q.  That wasn't really the point of your dealing with one

18 another was to make money from the other person?

19 A.  No.  You know, the making money, you know, just, for

20 example, would have been, you know, more if, you know, since

21 he got his prescription of the Roxy 5-milligrams, that's a

22 relatively low amount, so, you know, we would take his

23 5-milligram Roxys and sell them so that we could go and get

24 something stronger that we preferred to his prescription.

25 Q.  You realize that he didn't actually have a prescription

1   for Roxy 5s during this time?

2   A.   No, sir, I don't.

3   Q.   Okay.

4   A.   I don't understand how that's possible.

5   Q.   Okay.

6        Do you -- did you have a sense of how much money Chris

7   was making from the window business during the good times

8   during the fall, for example?  Was he making good money from

9   that?

10  A.   Yeah, it was actually -- the -- you know, the profit

11  margin was actually pretty wide.  He was doing quite well

12  for, you know, a month or so.

13  Q.   Okay.  And during that time, certainly, he wouldn't

14  need to be trying to make profits off of drug deals?

15  A.   Well, I don't know if you have ever had an experience

16  being an addict, but the money never seems to go as far as

17  you want it to.  But, no, I couldn't swear that he needed to

18  make drug profits during that time.

19  Q.   During the time that you were involved with Chris and

20  these other folks, you never saw any indication that there

21  was any sort of hierarchy in your group, where one person

22  would give orders to people and they would go out --

23  A.   No, sir, nothing like that.  It was more of a, you

24  know, just everybody was equal.  And, you know, we all tried

25  to help each other out.  There was no kingpin, per se.

1  Q.  But as far as when you were actually selling, you were

2  basically doing your own thing?  Nobody was telling you what

3  to do, were they?

4  A.  No, no.  Nobody would, you know, give orders or

5  anything like that.  No, sir.

6  Q.  That's all.

7        MR. SNOOK:  Thank you, Judge.

8                    REDIRECT EXAMINATION

9  BY MS. NEESE:

10  Q.  Was Chris Burns receiving a prescription?

11  A.  Yes, ma'am.

12  Q.  Could it have been for Oxy 10s?

13  A.  That is very possible.

14  Q.  Did you get the prescription yourself or did Mr. Burns?

15  A.  Mr. Burns, of course.  I wouldn't step foot in his

16  doctor's office.

17  Q.  Did you ride with him to where his doctor was?

18  A.  Yes, ma'am.

19  Q.  Do you know what town it was in?

20  A.  It was right at the end of Thomas Jefferson.  That's

21  Route 811.  So it was right there in Forest, in the little

22  plaza there.

23  Q.  Forest, Virginia?

24  A.  Yes, sir.

25  Q.  In Bedford?

1  A.  Yes, ma'am, Bedford County.

2  Q.  Which pharmacy did he go to?

3  A.  The CVS right across from -- I can't remember which

4  high school that is right there off 221, but, yeah, the CVS

5  that sits alone there on the corner was usually the one that

6  we went to.

7          MS. NEESE:  No other questions at this time.

8          THE COURT:  All right.  Is that all?  Okay.

9          Is this witness excused?

10         MS. NEESE:  He is from the government, yes.

11         MR. SNOOK:  Yes.

12         THE COURT:  Okay.  Members of the jury, we'll

13 recess now for lunch.  Come back at about 1:30.  If you

14 -- try to get back by 1:30.  And, again, report downstairs

15 where you came in this morning.

16         At lunch do not discuss the case with anyone.  Do

17 not allow anyone to discuss it with you.  Do not remain

18 within hearing of anyone discussing the case or do any

19 research or otherwise try to learn anything about the case.

20         I have to tell you that every time.

21         And leave your notes in the jury room.

22         So we'll recess now until 1:30.

23    (Jury out.)

24    (Recess at 12:27 p.m.)

25    (Proceedings were had, TESTIMONY OF HEATHER OVERSTREET

```
 1   and GRETCHEN STATON, said proceedings not being designated
 2   to be transcribed.  Proceedings were then had in the presence
 3   of the jury as follows:)
 4            THE COURT:  Thank you, you may be excused.  And
 5   call the next witness.
 6            MR. BRADYLYONS:  Micah Mabery.
 7            THE CLERK:  Ma'am, would you please raise your
 8   right hand to be sworn.
 9            Your right -- other hand.  Thank you.
10       MICAH SHANE MABERY, GOVERNMENT'S WITNESS, SWORN
11            THE CLERK:  Thank you.  Please have a seat.
12                    DIRECT EXAMINATION
13   BY MR. BRADYLYONS:
14   Q.  Good morning -- good afternoon.  Sorry.
15   A.  Good afternoon.
16   Q.  Can you please state your name for the record.
17   A.  Micah Shane Mabery.
18   Q.  Would you please spell your last name?
19   A.  M-A-B-E-R-Y.
20   Q.  And how old are you?
21   A.  23.
22   Q.  Have you met Christopher Burns?
23   A.  Yes.
24   Q.  Do you see him in the courtroom here today?
25   A.  Yes.
```

1   Q.   Can you please point him out and say what he's wearing.

2   A.   Gray tux.

3        MR. BRADYLYONS:  Your Honor, may the record reflect

4   that the witness has identified --

5        THE COURT:  It will.

6        MR. BRADYLYONS:  Thank you.

7   BY MR. BRADYLYONS:

8   Q.   When did you meet Chris Burns?

9   A.   A few years ago.

10  Q.   How did you meet him?

11  A.   Through my boyfriend, Kevin Jessee.

12  Q.   How long were you dating Kevin Jessee?

13  A.   Dating him -- I started dated him January 20th.  We

14  dated for about four years, on and off.

15  Q.   Did you and Kevin Jessee ever get prescription pills

16  from Mr. Burns?

17  A.   Yes.

18  Q.   How many times?

19  A.   Ten -- I would say a little bit more than ten times,

20  less than 20.

21  Q.   What kind of pills were those?

22  A.   Roxy 10s, we got Roxy 30s, and Dilaudids.

23  Q.   What did you do with them?

24  A.   Shot them up.

25  Q.   Did you take them any other way?

1   A.   Uh-uh.

2   Q.   Can you answer yes or no?

3   A.   No.

4   Q.   Did Burns ever inject you?

5   A.   Yes.

6   Q.   Who injected you the first time?

7   A.   Chris did.

8   Q.   And did he say anything at the time?

9   A.   Yes.

10  Q.   What did he say?

11  A.   He said that he wanted to be the first one to pop the

12  cherry, and just to be calm and relax and it would be okay.

13  Q.   What did you take that to mean?

14  A.   To be the first one to inject you.

15  Q.   How did the pills make you feel?

16  A.   I remember when I was doing it, I referred to it as

17  getting hit by a train.  It was just a big rush.

18  Q.   So they worked?  You got high?

19  A.   Yes.

20  Q.   Did Kevin Jessee ever get you prescription pills?

21  A.   Yes.

22  Q.   How often?

23  A.   A few times.

24  Q.   Okay.  How often were you using during this period?

25  A.   Every day.

MABERY - DIRECT

```
 1   Q.   Okay.   And who were you getting those pills from?
 2   A.   We got some from Chris and some off Scott and -- got
 3   them off Kevin.
 4   Q.   Did Kevin ever tell you where he was getting his pills
 5   from?
 6   A.   He would get them from Scott and some from Chris.
 7              MR. BRADYLYONS:  One moment, Your Honor.
 8        (Off-the-record discussion between government counsel.)
 9              THE COURT:  How many years ago was it that this
10   happened, the first -- the first time -- is the name Megan?
11              THE WITNESS:  Micah.
12              THE COURT:  Micah.  When did you say this first
13   happened, the first time you were shot up?
14              THE WITNESS:  I don't remember the exact date.  I
15   just remember I was driving past the rhinos in Bedford.
16              THE COURT:  Well, was it last -- was it in -- like
17   two years ago, three years ago, four years ago?
18              THE WITNESS:  Maybe a little more than two years
19   ago.  Around two years ago.
20   BY MR. BRADYLYONS:
21   Q.   Can you describe that incident?
22   A.   What, riding down the road and it happening?
23   Q.   Where were you in the car?
24   A.   I was driving my car.  And Kevin was in the backseat.
25   And Chris was in the passenger seat.  And I was driving past
```

```
1    the rhinos.  And he shot me up with an eight on the top of

2    my hand.

3    Q.   What is an eight?

4    A.   Dilaudid.

5    Q.   While you were driving?

6    A.   Yes.

7    Q.   What was Scott's last name?

8    A.   Jennings.

9    Q.   What was Chris's last name?

10   A.   Burns.

11   Q.   Okay.  You mentioned that Kevin Jessee gave you pills

12   that you said you thought were from Burns; is that right?

13   A.   Right.

14   Q.   Is that in addition to the times you went with Kevin

15   Jessee to see Burns?

16   A.   Yes.

17   Q.   Okay.  Thank you.

18        MR. BRADYLYONS:  No further questions, Your Honor.

19                        CROSS-EXAMINATION

20   BY MR. SNOOK:

21   Q.   Ms. Mabery, do I understand that you have been using

22   pills in various ways for a long time?

23   A.   Correct.

24   Q.   And this started even before you met Kevin --

25   A.   Correct.
```

1   Q.   -- your pill use.  Okay.

2       And you say you started dating Kevin January 20th,

3   2010.  But you had been using pills, and a lot of pills,

4   before that, hadn't you?

5   A.   Never shot up.

6   Q.   Right.  Okay.  But you had been using Lortabs,

7   Percocets, Roxys, Dilaudid, all of those things?

8   A.   I never used a Dilaudid.

9   Q.   Okay.  Did you tell the grand jury that you did?

10  A.   No.

11  Q.   You were -- you were getting -- certainly -- during

12  early on in your relationship with Kevin you were getting

13  your pills from Kevin; right?

14  A.   Correct.

15  Q.   And Kevin would get them from Scott Jennings, when he

16  would get Dilaudids; or he would get them from Matt Barlow,

17  when he would get the Roxys?

18  A.   Correct.

19  Q.   You don't know where they were getting the Percocets

20  and the Lortabs?

21  A.   Uh-uh.  No, sir.

22  Q.   Do you know that Kevin was sometimes getting pills from

23  Bryant Reynolds?

24  A.   Right.

25  Q.   You know that Bryant -- you actually went to Bryant's

1    one time to drop Mandy off, Mandy McKinney, up there?

2    A.    Yes.

3    Q.    And you didn't see Chris Burns there?

4    A.    No, sir.

5    Q.    Did -- when was the first time -- this time that you

6    say Chris shot you up?

7    A.    It was in -- it was me, Chris, and Kevin.  And we were

8    in Bedford.  And I was driving past the rhinos.

9    Q.    Okay.  Do you know what year it was?

10   A.    I can't remember.

11   Q.    Okay.  Do you know about in terms of -- you know, was

12   it shortly before Chris got arrested or shortly -- or a long

13   time before Chris got arrested or do you know?

14   A.    It was a while before, I think.

15   Q.    Okay.  You really don't have any idea?

16   A.    No.

17   Q.    And so over some period of time you think you got pills

18   of some sort from Chris, maybe 10 or 20 times?

19   A.    Correct.

20   Q.    But you were using daily; right?

21   A.    Okay.  Yes.

22   Q.    And most of the time you were using, you weren't

23   getting anything from Chris; you were getting it from Kevin

24   or Scott or some of these other guys?  Right?

25   A.    Okay.

1  Q.   Is that correct?

2  A.   Yeah.

3  Q.   Okay.  When you said that Chris said that he wanted to

4  be the first person to pop your cherry, we're not talking

5  about sex here, are we?

6  A.   No.

7  Q.   I'm curious about -- let's see.  You say Chris shot you

8  up one time.  Isn't it true that your boyfriend, Kevin

9  Jessee, shot you up 50 times or so?

10  A.   Correct.

11      But I said Chris Burns shot me up for the first time.

12  I didn't just say one time.

13  Q.   I understand.

14      You -- how old are you now?  You are 23 now?

15  A.   Correct.

16  Q.   And the pill that you say that he shot you up with was

17  what?

18  A.   Dilaudid.

19  Q.   Okay.  And so -- okay.  So Chris shot you up one time

20  and Kevin shot you up 50 times.  Isn't it true that you also

21  observed Kevin Jessee shooting up a juvenile three times in

22  December of 2012?

23      MS. NEESE:  Your Honor, I would object.  He just

24  misclassified her statement.  She said, "I didn't state that

25  that was the only time he shot me up."  And now he's trying

1    to go back and say that was the only time.

2           MR. SNOOK:  Okay.  I'll take that.

3    BY MR. SNOOK:

4    Q.   You told the grand jury June 6th, "Chris shot me up one

5    time"; right?

6         Let me ask you, first of all, did Chris shoot you up

7    only one time?

8    A.   He shot me up more than once.

9    Q.   Do you remember telling the grand jury on June 6th,

10   2013, that Chris shot you up one time?

11   A.   No, I said for the first time.

12   Q.   So you deny saying "one time"?  Is that correct?  I

13   want to make sure we're right.

14   A.   I deny saying -- no, I didn't say he only shot me up

15   once.

16   Q.   How many times are you saying now that he shot you up?

17   A.   I don't remember how many times.  A few times.

18   Q.   Do you remember being asked "Anybody else ever shoot

19   you up with pills?"

20        And your answer was "Yes."

21        And you were asked, "Who?"

22        And you said, "Chris did one time."

23        Do you remember giving that answer?

24   A.   Uh-uh.

25   Q.   You are saying now that the sworn testimony -- that if

1    -- well, I won't ask that.

2        So back to my initial question.  Chris shot you up at

3    least one time, maybe more.  Your testimony today is he shot

4    you up more than one time?

5    A.  Okay.

6    Q.  Is that right?

7    A.  Yes.

8    Q.  Okay.  I don't want to misstate anything.

9        You have also stated that Kevin shot you up 50 times?

10   A.  Correct.

11   Q.  And you -- is it not also true that Kevin had shot up a

12   juvenile at least three different times?

13   A.  Correct.

14           MR. SNOOK:  That's all I have, Judge.  Thank you.

15           THE COURT:  Okay.

16                    REDIRECT EXAMINATION

17   BY MR. BRADLYONS:

18   Q.  You testified that Chris shot you up with the Dilaudid;

19   is that right?

20   A.  Right.

21   Q.  Where did that Dilaudid come from; do you know?

22   A.  Someone in Bedford.  That's all I know.

23   Q.  Do you know if Chris had a prescription for Dilaudid?

24   A.  No.

25   Q.  Okay.  Who showed Kevin Jessee, your boyfriend, how to

```
 1   shoot people up?
 2   A.   I don't know.
 3           MR. BRADYLYONS:  One moment, Your Honor.
 4      (Off-the-record discussion between government counsel.)
 5           MR. BRADYLYONS:  No further questions, Your Honor.
 6           THE COURT:  Okay.  Is that all, Mr. Snook?
 7           MR. SNOOK:  Yes, Your Honor.
 8           THE COURT:  Okay.  Members of the jury, we'll take
 9   about a 15-minute recess now.  You may retire to the jury
10   room.
11           And this witness may be excused?
12           MS. NEESE:  She can be excused.
13           THE COURT:  All right.  Thank you.
14      (Jury out at 2:28 p.m.)
15      (Call to Order of the Court at 2:43 p.m.)
16           THE COURT:  If the jury is ready, they can come
17   back.
18           Have you got your witness around?
19           MS. NEESE:  Yes.
20           Leah Kelly.  Leah Kelly.
21      (Jury in.)
22           THE CLERK:  Would you please raise your right hand
23   to be sworn.
24            LEAH KELLY, GOVERNMENT'S WITNESS, SWORN
25           THE CLERK:  Please have a seat.
```

1    DIRECT EXAMINATION

2    BY MS. NEESE:

3    Q.   Good afternoon.  Please state your name for the record,

4    ma'am.

5    A.   Leah Kelly.

6    Q.   Will you scoot up to the microphone just a little bit

7    so the Court can hear you and so can the jury.

8    A.   Leah Kelly.

9    Q.   Ms. Kelly, where are you from?

10   A.   Roanoke.

11   Q.   Have you lived in Roanoke and Bedford County your whole

12   life?

13   A.   Yes.

14   Q.   Have you used pills before, ma'am?

15   A.   Yes.

16   Q.   What time period were you using pills?

17   A.   September of 2010 to June 2010.

18   Q.   June 2010?

19   A.   Or '11.

20   Q.   Okay.  So about a nine-to-ten-month period there?

21   A.   Yes, ma'am.

22   Q.   How did you start using pills?

23   A.   I started using when I got with my boyfriend at the

24   time.

25   Q.   And who was your boyfriend at the time?

1    A.    Jonathan Bohon.

2    Q.    And was he a pill user at the time?

3    A.    Yes.

4    Q.    What kind of pills were you using?

5    A.    Roxys, Oxys, Dilaudid.

6    Q.    What is the difference between Roxys and Oxys to you?

7    A.    Nothing, really; just a different name.

8    Q.    Roxy 30s?  Do you mean Oxy --

9    A.    5s, 5s and 30s.

10   Q.    Okay.  And what else?

11   A.    And Dilaudid.

12   Q.    Okay.  Now, how did you use them?

13   A.    Snorted them.

14   Q.    Just in a -- a way to use them?

15   A.    Yes.

16   Q.    Is that correct?

17   A.    Yes.

18   Q.    Do you know the defendant here today, Mr. Burns?

19   A.    Yes, ma'am.

20   Q.    And -- well, first tell the jury where he's seated and

21   what he's wearing.

22   A.    He's seated right there to my left in a tan suit, I

23   guess, tan/gray.

24          MS. NEESE:  Your Honor, please let the record

25   reflect the witness has identified the defendant.

1    THE COURT:  It will.

2  BY MS. NEESE:

3  Q.  And how do you know Mr. Burns?

4  A.  He was good friends with Jonathan and we used to

5  purchase drugs off of him.

6  Q.  Who used to?

7  A.  Jonathan.

8  Q.  Did you ever get pills from him?

9  A.  No.  I was there when it was being -- when they were

10 being purchased, though.

11 Q.  Okay.  Tell us about what happened, what the

12 arrangement was.

13 A.  We used to buy them off of him.  He said it was his

14 prescription.  They were Roxy or Oxy 5s.

15 Q.  So he told you he had a prescription?

16 A.  Yes, ma'am.

17 Q.  How many times did you get his prescription pills?

18 A.  About anywhere between five to ten times that I was

19 present, multiple times when I wasn't present that I had

20 heard of.

21    Also I know that Jonathan used to get Oxy or Roxy 30s

22 from him.  He was selling them for a guy named Bryant

23 Reynolds.

24 Q.  Did you ever hear that conversation between the two of

25 them?

1    A.   Yes, ma'am.

2    Q.   Tell us about that conversation or those conversations.

3    A.   Well, I just had heard that Bryant would go out of town

4    to pick up his prescription, and then --

5         MR. SNOOK:   Excuse me just a second, Your Honor.

6    If we could be clear about who she heard what from.  I think

7    we need a foundation.

8         THE COURT:   Yes.

9    BY MS. NEESE:

10   Q.   Okay.  You just said you had -- who were the people

11   involved in the conversation that you overheard?

12   A.   Jonathan and Chris Burns.

13   Q.   Okay.  And please tell us what they were saying.

14   A.   They would talk about when Bryant would go out of town

15   to get his prescription, what days and stuff; that they

16   would go up there to get the stuff from him and sell it for

17   him.

18   Q.   Okay.  Who was selling pills for him?

19        THE COURT:   And who is "him"?

20   BY MS. NEESE:

21   A.   Bryant --

22   Q.   Identify who they were getting their pills from.

23   A.   Bryant Reynolds.

24   Q.   Okay.  And what kind of pills were they?

25   A.   Roxy 30s or Oxy 30.

1   Q.   Did you ever hear where he was going to get his

2   prescription?

3   A.   Out of town.

4   Q.   Okay.  What did you hear -- overhear them say about

5   what they were going to get?

6   A.   They would just talk about when -- the day that he

7   would go out of town and then when they go pick them up, to

8   get rid of them for him.

9   Q.   Tell the Court and the jury who "they" is.

10  A.   Chris and Jonathan.

11  Q.   Were they both selling pills for Bryant Reynolds?

12  A.   Yes.

13  Q.   Did you hear that come out of their mouths?

14  A.   Yes.

15  Q.   Did you ever get any of those Oxy 30s?

16  A.   No, I never bought any.

17  Q.   Did you ever get them?  Did anybody ever give them to

18  you?

19  A.   Yes.

20  Q.   Did you use Oxy 30s?

21  A.   Yes.

22  Q.   Where did they come from?

23  A.   Chris Burns and Bryant Reynolds.

24  Q.   And Jonathan Bohon?

25  A.   Yes.

1  Q.   Did you get them from all three?

2  A.   Yes.

3  Q.   Did you get them directly from Bryant?

4  A.   I know Jonathan had went up there a couple of times and

5  got them directly from him.

6  Q.   Okay.  Explain to the jury, ma'am, were you getting

7  them directly from Chris sometimes?

8  A.   Yes.

9  Q.   Okay.  Where were those pills coming from?

10  A.   Bryant.

11  Q.   Okay.  Were you getting pills directly from Jonathan

12  Bohon?

13  A.   Yes.

14  Q.   Was he getting them from Chris or Bryant or both?

15  A.   Both.

16  Q.   All right.  How do you know this?  Did you ever see him

17  get pills from Chris?

18  A.   Yes.

19  Q.   How many times?

20  A.   About five to ten with me being there, like seeing it

21  personally.  But I know over -- plenty of times that I

22  wasn't there that that's -- that he had gotten them from

23  Chris.

24  Q.   Did Jonathan tell you that?

25  A.   Yes.

1    Q.   How often were they hanging out?

2    A.   Not so much when we were together, but we had broken up

3    for a month and they were together almost every day.

4    Q.   Do you remember what month that was?

5    A.   April.

6    Q.   Of 2000 --

7    A.   Of 2011, yes.

8    Q.   How did -- the pills that you got from Mr. Burns, how

9    did they make you feel?

10   A.   Drowsy.

11   Q.   Did they make you high?

12   A.   Yes.

13   Q.   Is that why you used them?

14   A.   Yes.

15            MS. NEESE:   No further questions of this witness.

16                         CROSS-EXAMINATION

17   BY MR. SNOOK:

18   Q.   Ms. Kelly, do I understand that you were using drugs in

19   this fashion between September 2010 and June of 2011?

20   A.   Yes.

21   Q.   And during that time -- I take it that was during the

22   time that you were dating Jonathan?  Yes?

23   A.   Yes.

24   Q.   I just need to have you say yes or no.

25   A.   Yes.

1  Q.  And when, out of all -- during that time period, did

2  you meet Chris Burns?

3  A.  A couple months after we had started dating.

4  Q.  Okay.  So maybe sometime around Christmastime or

5  something?

6  A.  I really don't --

7  Q.  Between Halloween and Christmas?

8  A.  Yeah.

9  Q.  Okay.  And then during the time -- you say there was a

10 month when you were -- when you and Jonathan were sort of

11 apart?

12 A.  Yes.

13 Q.  And during that time you know that Jonathan and Chris

14 were spending a lot of time together?

15 A.  Yes.

16 Q.  During the time, let's say, once Chris started hanging

17 around with you-all, whenever it was in the fall/winter of

18 2010, between then and the month that you and Jonathan broke

19 up, which would be April of 2011, during that time period do

20 you have an idea of how often you would see Chris?  Would he

21 come around frequently or once a week or what?

22 A.  However often his prescription would get filled.

23 Q.  Okay.  I mean, he -- his prescription would get filled

24 once a month, so --

25 A.  Yeah.

1    Q.   You would see him once a month?

2    A.   I mean, a couple times.

3    Q.   Okay.  When -- you said five or ten times you saw

4    Jonathan buy pills or get pills in some fashion from Chris.

5    Was it always for money, always cash?

6    A.   Yes.

7    Q.   Okay.  Did you ever see Chris get pills from Jonathan?

8    A.   Yes.

9    Q.   Okay.  And did you ever hear Jonathan talking about the

10   fact that he had given Chris some pills?

11   A.   Yes.

12   Q.   Okay.  So there was a mutual thing going on between

13   them; is that fair to say?

14   A.   Yes.

15   Q.   Okay.  When Chris would get pills -- when Chris would

16   sell or give pills to Jonathan, how many pills at a time?

17   A.   I mean, Jonathan wouldn't get that many, but there has

18   been people at the house that have bought the whole

19   prescription off of him.

20   Q.   Okay.  So my question about Jonathan was, basically,

21   just -- just a few?

22   A.   Yes.

23   Q.   Basically, to use, pretty much --

24   A.   Right.  Yes.

25   Q.   -- right away.

1    Okay.  And then you say there were other times when

2  somebody else would be at your house, and they would be

3  buying drugs from Chris?

4  A.  Yes.

5  Q.  Were there also times when other people would come to

6  your house and buy drugs from Jonathan?

7  A.  Yes.

8  Q.  Okay.  As between Jonathan and Chris, did either of

9  them ever sell to one another more than just basically a few

10  for pretty much immediate use?

11  A.  No.

12  Q.  Okay.  Did either -- do you -- I mean -- I have no

13  other questions.  Thank you.

14                    REDIRECT EXAMINATION

15  BY MS. NEESE:

16  Q.  Ms. Kelly, were you with Jonathan every time he was

17  with Mr. Burns?

18  A.  No.

19  Q.  Do you know every dealing they ever had together?

20  A.  No.

21  Q.  So do you know every time whether or not those pills

22  they had -- they sold -- how many pills they sold, I mean?

23  A.  No.

24  Q.  Now, you said people would come to the house and they

25  bought off Chris.  Who were those people?

1    A.    Josh -- I can't think of his last name.

2    Q.    So a guy named Josh?

3    A.    Yes.

4    Q.    What did you say about selling the whole script?

5    A.    Yes.

6    Q.    Why was he selling his whole script?

7            MR. SNOOK:   Objection to speculation.

8    BY MS. NEESE:

9    Q.    Did he ever say why he was selling his whole script?

10   A.    No.

11   Q.    Okay.  Do you know how big his script was?

12   A.    It was like close to 200, I think.

13   Q.    Do you know anybody that can use 200 pills in a day?

14   A.    No.

15           MS. NEESE:   No further questions.

16           THE COURT:   Okay.

17           MR. SNOOK:   Could I have just a second, Your Honor?

18   I want to check something.

19       (Pause.)

20                        RECROSS-EXAMINATION

21   BY MR. SNOOK:

22   Q.    Can I get clear, the time that you say that somebody

23   came to your house and bought prescription medication from

24   Chris Burns was when?

25   A.    I don't remember the date.

1    Q.   Do you remember when it was that this person came

2    -- this Josh person came and bought the whole prescription

3    from Chris?

4    A.   No.

5    Q.   Was it before or after the month that you and Jonathan

6    had broken up?

7    A.   After.

8    Q.   Okay.  And so it would have been perhaps May or June or

9    something?

10   A.   Between March and June.

11   Q.   Okay.  Well, you say it was after April because

12   April --

13   A.   Well, May.  That's right, May.

14          MR. SNOOK:  I have no other questions.  Thank you.

15          MS. NEESE:  No other questions.

16          THE COURT:  Thank you.  You may be excused.

17          Next witness.

18          (Thereupon, further proceedings were had, TESTIMONY

19   OF ELICIA DICKSON, said proceedings not being designated to

20   be transcribed.  Proceedings were then had in the presence

21   of the jury as follows:)

22          THE COURT:  All right.  Thank you.  You may be

23   excused.

24          Call the next witness.

25          MS. NEESE:  I call Amanda McKinney.

1          THE CLERK:  Ma'am -- ma'am, would you please raise

2    your right hand to be sworn.

3          Would you stand up, please.  Thank you.

4          AMANDA MCKINNEY, GOVERNMENT'S WITNESS, SWORN

5          THE CLERK:  Thank you.  Now please have a seat.

6                          DIRECT EXAMINATION

7    BY MS. NEESE:

8    Q.   Good afternoon.

9         Scoot up to the microphone, if you don't mind, and tell

10   us your name, please.

11   A.   Amanda McKinney.

12   Q.   Ms. McKinney, where are you from?

13   A.   Thaxton, Virginia.

14   Q.   Is that in Bedford County?

15   A.   Yes, it is.

16   Q.   Have you lived there almost your entire life?

17   A.   Since I was four.

18   Q.   How old are you now?

19   A.   22.  22.

20   Q.   Okay.  Have you ever used pills before, ma'am?

21   A.   Yes.

22   Q.   When did you start using pills?

23   A.   When I was 17.

24   Q.   So you have been using pills -- or do you still

25   use pills now?

1  A.  No.

2       THE COURT:  Just a minute.  Don't you think we

3  ought to talk -- it is legal to use pills.  When you ask

4  "Are you using pills," are you talking about just taking a

5  prescription drug the doctor gave you?

6       MS. NEESE:  No, Your Honor.  These --

7       THE COURT:  Well, let's make it clear.

8       The jury and the rest of us don't deal with this

9  every day of their lives.  And you-all use these terms

10 that -- to most of us "taking pills" is not a big deal.  We

11 have got -- you know, go to the doctor, we get them, and we

12 take them.  It is not -- and I think --

13 BY MS. NEESE:

14 Q.  Are you prescribed any pills, ma'am?

15 A.  No, ma'am, not until I was 20.

16 Q.  How did you use pills?

17 A.  When I first started doing pills, I took them.  And

18 then I gradually started snorting them.

19 Q.  When you say "take them," do you mean orally?

20 A.  Yes, ma'am.

21 Q.  Okay.  And then what did you start doing?

22 A.  Shooting up.

23 Q.  What was the next step you just mentioned?

24 You just said it.

25 A.  Snorting.

1   Q.   And then you moved to snorting the pills?

2   A.   Yes, ma'am.

3   Q.   And then you moved to shooting up?

4   A.   Yes, ma'am.

5   Q.   Is there a major difference in how it affects you?

6   A.   Yes, ma'am.

7   Q.   In all three of those?

8   A.   Yes, ma'am.

9   Q.   What kind of pills have you used?

10  A.   Roxy 30s, Roxy 10s, Roxy 5s, Lortabs, Dilaudids,

11  Opanas.  If I'm missing anything, it is my fault.  Sorry.

12  That's the only thing I can think of right now.

13  Q.   Were you prescribed any of those?

14  A.   Not until I was 20.

15  Q.   What did you get prescribed at 20?

16  A.   Roxy 15s for a very short period of time.

17  Q.   How long was that?

18  A.   A month or two.

19  Q.   When did you start abusing them?

20  A.   I don't have an exact date.  I just know that I did.

21  Q.   A while ago?

22  A.   Yes, ma'am.

23  Q.   Were you still in high school?

24  A.   Yes, ma'am.

25  Q.   Do you know the defendant here today, Chris Burns?

1   A.   Yes, ma'am.

2   Q.   Will you please tell the jury where he's sitting and

3   what he's wearing.

4   A.   Right there.   He's wearing a gray suit, a yellow tie, a

5   white shirt.

6   Q.   Thank you.

7            MS. NEESE:   Your Honor --

8            THE COURT:   It will.

9            MS. NEESE:   Thank you.

10  BY MS. NEESE:

11  Q.   How do you know Mr. Burns?

12  A.   Through a mutual friend of ours, Jonathan Bohon.

13  Q.   Did you know him before then?

14  A.   No, ma'am, not personally.

15  Q.   When did you meet Mr. Burns?

16  A.   When I was almost 19, my senior year of high school.

17  Q.   Do you remember about what time period?

18  A.   Towards the end of the year, maybe; towards the end of

19  my senior year, the beginning of the year, though.

20  Q.   Do you remember what year that was?

21  A.   Late 2010, early 2011, if I'm remembering correctly.

22  Q.   Was he hanging out with Mr. Bohon during this time

23  period?

24  A.   Yeah, they were working together.

25  Q.   Were they doing anything else together?

1    A.    Yeah, they were doing pills together, off -- I mean,

2    each of them.   He would give him pills; he would give him

3    pills.

4    Q.    Did you ever see those transactions?

5    A.    Yeah, I was there a couple times.   Yes.

6    Q.    Did either of them ever talk about it with you?

7    A.    Not really, no.   I mean, not like just to talk about

8    it; like they would -- "Yeah, I'm going over to Bohon's" or

9    "Yeah, I'm going over to Chris," no, not anything specific,

10   but, yeah, I was there a couple times.

11   Q.    Did you ever get pills from Mr. Burns?

12   A.    Yes.

13   Q.    Tell us about when you started getting pills from

14   Mr. Burns.

15   A.    The first time I ever got pills off of him, I called

16   Bohon to see if Bohon had anything.   And Chris has his

17   prescription of Roxy 5s.   And that's the first time I ever

18   met him.   And I got two that day, two to three.   And then

19   the next day I went and hung out with Chris and got two

20   more.   And later on that day we went and got Bohon and we

21   got a Dilaudid.

22   Q.    Okay.   Let's talk about that first day.   The first day

23   you ever met him, you got Roxy 5s?

24   A.    Yes, ma'am.

25   Q.    Do you remember what color they are?

1  A.   White.

2  Q.   Did you use them?

3  A.   Yeah, I snorted them.

4  Q.   You snorted them?

5  A.   Yes, ma'am.

6  Q.   Does that mean break them down?

7  A.   Yes, ma'am.

8  Q.   And then snorting them through your nose?

9  A.   Yes, ma'am.

10 Q.   Did it have an effect on you?

11 A.   Yes, ma'am.

12 Q.   You said you got some from him the next day?

13 A.   Yes, ma'am.

14 Q.   How did you have contact with him the next day?

15 A.   He called me when I got out of school.  I had given him

16 my number the day before.

17 Q.   Now, were those the only two times you ever dealt with

18 him?

19 A.   No.

20 Q.   How long did you deal with Mr. Burns?

21 A.   Off and on for a period of two years; a year and half,

22 two years.

23 Q.   During that time period, how many times would you

24 estimate you got pills from Mr. Burns?

25 A.   40 or 50.

1    Q.   What kind of pills were you getting from him?

2    A.   Dilaudids, Roxys -- Dilaudids and Roxys, mostly.

3    Q.   Was it just Roxy 5s?

4    A.   Roxy 30s, Roxy 5s, Roxy 10s.  About three months after

5    I met him, three or four months, the Roxy 5s stopped.  And

6    then Roxy 10s from then on, Roxy 30s, Dilaudids.

7    Q.   Do you know what he had his prescription for?

8    A.   No, ma'am.  I'm sure he told me, but I can't remember.

9    Q.   Okay.  Did he have a prescription for Roxy 30s?

10   A.   No, ma'am, not that he ever made me aware of.

11   Q.   Do you know where he got any Roxy 30s from?

12   A.   Bryant Reynolds.

13   Q.   How do you know this?

14   A.   I was with him.

15   Q.   Okay.  Did he ever talk to you about it?

16   A.   Yeah.

17   Q.   Did you ever go up there?

18   A.   Yes, ma'am.

19   Q.   Tell us all about what was said to you and the times

20   that you went up there.

21   A.   I went up there a few times with him.  And he got some

22   Roxys a couple of times.  I didn't go in.  And, you know, he

23   would go in and get something and just have it and then come

24   back out to the car.  I would give him a ride; he would give

25   me some.  I would give him money; he would give me some.  It

1    was always like that.  But I knew that he was going to

2    Bryant's to get them.

3    Q.   Did he tell you that?

4    A.   Yes.

5    Q.   Did you give him money ahead of time?

6    A.   Not always, no, ma'am.

7    Q.   Okay.  Did he bring you back pills from Mr. Reynolds?

8    A.   He -- I have given him money before and he has bringed

9    them back, but it wasn't -- I mean, I know he has gotten

10   them off Bryant.  I just -- you know, I don't think that I

11   have ever once given him the money and he has left and then

12   came back; no.  I've always --

13   Q.   I'm confused, then.  How do you know he got pills that

14   came from him and came from Bryant Reynolds?

15   A.   I was with him.  I gave him a ride over there the first

16   time.

17   Q.   Okay.  So is that the first time you went to

18   Mr. Reynolds' house?

19   A.   Yes, ma'am.

20   Q.   Is that how you met Mr. Reynolds?

21   A.   Yes, ma'am.

22   Q.   How many times did you get pills from Chris Burns

23   that they came from Brent Reynolds?

24   A.   Probably like three or four times; it was a couple.

25   And then him and Bryant had a falling-out.

1    Q.   Was that the only times you ever dealt with him?

2    A.   When I was at Bryant's, yes.

3    Q.   Was that the only pills that came from Bryant that you

4    ever got from him?

5    A.   That I know of, yes.  He didn't always tell me where

6    they were coming from; he did not have to.

7    Q.   Did he ever talk to you about what his arrangement was

8    with Bryant Reynolds?

9    A.   He just told me that Bryant would also deal with him

10   and a guy named Barlow.  And that if he could sell some,

11   Bryant would give him some.  If he didn't have money or he

12   was sick, he would go over there and work on a car, an

13   Eclipse.  And there was a purple Eclipse always out there.

14   If he told Bryant he needed a part for it, Bryant would pay

15   him in pills.

16   Q.   Okay.  You said about three things there.  Break it

17   down for us.  What was the first thing you said?

18   A.   He would go over there and he would, like, distribute

19   them for Bryant.  If he was sick, Bryant would give him

20   some.

21   Q.   What did he tell you about distributing pills for

22   Bryant?  Did he tell you whether Bryant fronted him pills or

23   whether he got them from Bryant and then resold them or

24   what?

25   A.    Yes, ma'am.  Like he got them from Bryant and then

1    resold them, and he would get some for doing that.

2    Q.   Okay.  Is that called "fronting"?

3    A.   Yes, ma'am.

4    Q.   Okay.  Did he bring money back?

5    A.   That he had sold -- when he had sold the pills, yes.

6    Q.   Okay.  Tell us about that arrangement, what he told you

7    that came out of his mouth.

8    A.   He would get pills from Bryant, get some that were

9    given to him for selling them, and then bring the money

10   back.

11   Q.   To Bryant?

12   A.   Yes, ma'am.

13   Q.   Do you know what pills those were?

14   A.   Roxy 30s.

15   Q.   And you never got any of those from him?

16   A.   No, I did.

17   Q.   That's what I asked you.  Were there certain times that

18   you got Roxy 30s from him that you didn't go to Bryant's

19   directly?

20   A.   Yes, ma'am, but I did not know they were coming from --

21   he never had to tell me they were coming from Bryant

22   directly.  He had numerous sources.  I never knew if they

23   were just from Bryant, you know.

24        But I went over there a couple of times and physically

25   saw him walk out of the house with Bryant's Roxy 30s.

1    Q.   Okay.  But you also know -- I guess I'm confused

2    because you also said that he has talked to you about

3    selling pills for Bryant?

4    A.   Yes, ma'am.

5    Q.   Okay.  So you know he was selling pills for Bryant.

6    Did you know he was selling pills for anyone else?

7    A.   Yes, ma'am.

8    Q.   Who else?

9    A.   Well, not -- he would get pills and then sell them.  I

10   don't know if he was doing it for them or for his own

11   benefit.  But Danny Elliott, Elisha Bryant, Matt Giles,

12   Kevin Jessee.

13   Q.   Anybody else?

14   A.   Bryant Reynolds.  I don't know if I said that.

15   Q.   Have you ever heard of Jennifer Kirsche?

16   A.   Jennifer and Jessie Kirsche, yes, ma'am, I met them

17   right before he got arrested, actually.

18   Q.   Did you meet them through who?

19   A.   Chris Burns.

20   Q.   Tell us what he told you about his arrangements with

21   Kevin Jessee.

22   A.   Him and Kevin Jessie had known each other for a while,

23   apparently.  And Kevin Jessee could get the Dilaudids.  And

24   Chris would have his 10s.  So if Chris didn't have any 10s,

25   Kevin would help him out.  And then if Kevin was sick one

1  day, they would go back and forth.

2  Q.  Did you ever see them trade pills?

3  A.  Yes, ma'am.  I was actually in the driveway one time

4  when Kevin brought him Roxy 30s one day when he didn't have

5  his prescription.  And when Chris had gotten him Dilaudids,

6  I had been with Kevin a couple times, yes.

7  Q.  When Chris had gotten him Dilaudids?

8  A.  Yes.

9  Q.  Where did Chris get Dilaudids from?

10 A.  He had numerous sources.  Danny Elliott, Jennie and

11 Jessie.

12 Q.  The Kirsches?

13 A.  Yes, ma'am.

14 Q.  Did you ever see him get pills from the Kirsches?

15 A.  Yes, ma'am, I was over there.

16 Q.  How many times did you go over there with Chris Burns?

17 A.  Two or three times, while he was working on a blue

18 Honda.

19 Q.  Did you ever get any Dilaudids that came from the

20 Kirsches through Chris Burns?

21 A.  Yes, ma'am; he did a half with me one day in my dad's

22 truck, after he worked on a blue Honda for a while.  And I

23 guess that's how she paid him.

24 Q.  Any other pills that came from Jennie and Jessie

25 Kirsche that you got from him?

1    A.    No, ma'am.

2    Q.    Did you ever get any other Dilaudids from him?

3    A.    No, ma'am.

4    Q.    Never?

5    A.    No, just from Danny Elliott.

6    Q.    That --

7    A.    No, I thought you meant like a different form of

8    Dilaudid or something.  No, it was always the same one, just

9    different people, yes.

10   Q.    From different people.  I didn't mean a different

11   prescription --

12   A.    Yeah, I thought you meant a different --

13   Q.    Let's talk about Dilaudids.  How did you use your

14   Dilaudids?

15   A.    At first I snorted them.  But then it moved to shooting

16   up.

17   Q.    All right.  Will you please tell the jury about how

18   that happened.

19   A.    The day that I met Chris for the first time, I gave him

20   my number.  The next day he called me.  And after I got out

21   of school, I went over to his house.  And he only had two of

22   his Roxy 5s.  And then he told me that we were going to meet

23   Bohon.  And when we got there, Bohon had Dilaudids.  We met

24   him at the bottom of his mom's driveway.  We went up to his

25   mom's house and nobody was there, so he went inside.  And he

1    came back out.  And it was in a spoon.  And we sat there and

2    did it right in his mom's driveway.  And apparently what I

3    had bought was already in the spoon, so I did do it.

4    Q.   What do you mean "apparently"?  Did he tell you that?

5    A.   Yes, ma'am.

6    Q.   Did you give him money to buy that pill for you?

7    A.   Yes, ma'am.

8    Q.   How did you shoot up for the first time?  Did you know

9    what you were doing?

10    A.   No, ma'am.

11    Q.   Okay.  How did it happen, then?

12    A.   He shot me up.

13    Q.   Did he say anything to you?

14    A.   He said he wanted to pop my cherry.

15    Q.   How did that make you feel once you got shot up?

16    A.   Good.  Really good.  I mean, it makes you feel really

17    good; I'm not going to lie.  But I felt ashamed of myself,

18    definitely.  I mean, I didn't want to shoot up.  I didn't

19    want any of this to happen.

20    Q.   Did you ever shoot up again after that?

21    A.   Yes, ma'am.  After that I did it a lot.

22    Q.   Do you do it yourself or did Mr. Burns ever shoot you

23    up again?

24    A.   I could never hit myself.  I could never do that.  I

25    had to have -- Chris had to do it.

1    Q.   What do you mean you could never hit yourself?

2    A.   I would never know how to do that.  I have never known

3    how to do that.  Chris would always have to do it for me.

4    Q.   But explain to the jury what you mean "hit yourself,"

5    how you shoot up.

6    A.   You basically just have to stick it in your arm.  And

7    you have to register for blood.  And I could never do that.

8    I never knew what I was looking for or what I was supposed

9    to be doing.  So Chris always did it for me.

10   Q.   Did Mr. Burns ever talk to you about if he knew how to

11   do that or not?

12   A.   Yeah.  He made me feel really comfortable about it,

13   actually.  He always had a clean needle.  He told me

14   everything would be okay.  He made sure I sat down after I

15   did it.  I mean, I felt good after I did it.  I just wish I

16   hadn't have done it.  I felt comfortable around him doing

17   it; that's why I did it.

18   Q.   Did Mr. Burns ever talk to you -- excuse me.  How many

19   times did he inject you?

20   A.   Probably about 20 out of the 40 or 50 I got some from

21   him.

22   Q.   Did he ever talk to you about anyone else he was

23   involved with?

24   A.   Yes, ma'am, but not like anything that I would

25   remember; just in passing when we would talk about all of

1    the people we know.  I'm sure we had conversations about a

2    lot of people we knew.  But I don't know if you're asking me

3    something specific or --

4    Q.   Do you know a guy named Tim Goodman?

5    A.   Yes, ma'am.

6    Q.   Did he ever talk to you about Mr. Goodman?

7    A.   Yes, ma'am.

8    Q.   Before we go there, though, do you have a girlfriend?

9    A.   Yes, ma'am.

10   Q.   Okay.  What is her name?

11   A.   Samantha Blankenship.

12   Q.   Did she use pills as well?

13   A.   Yes, ma'am.

14   Q.   Who was her pill source?

15   A.   Chris Burns.

16   Q.   Did you ever see him give her pills?

17   A.   Yes, ma'am.

18   Q.   Did you ever get pills from Chris and then give them to

19   Samantha yourself?

20   A.   No.  We would just be there together.  I didn't have

21   to.

22   Q.   Do you know Kevin Jessee?

23   A.   Yes, ma'am.

24   Q.   What was -- or did Mr. Burns and Kevin Jessee know each

25   other?

1    A.   Yes, ma'am.

2    Q.   What was their relationship like?

3    A.   Off and on friends.  I mean, they had their problems,

4    but they had been friends for a while, so everything

5    -- every time they kind of had a problem, it would just go

6    away, like in a month or two, and they would start talking

7    again.

8    Q.   Okay.  Did they have any kind of pill relationship?

9    A.   Yes, ma'am.  They -- when Kevin was sick, Chris would

10   help him out with the Roxy 10s.  And if Chris was sick,

11   without his prescription, Kevin would get him what he could.

12   Q.   Did you ever overhear this arrangement?  Did you ever

13   see it?  Or did Chris talk to you?

14   A.   Yes, ma'am, I was there one time when Kevin brought him

15   three Roxy 30s and one time when Kevin got him Dilaudids.

16   Q.   Did you ever see Chris give him pills or tell him he

17   would pay him back?

18   A.   I meant when Chris got him Dilaudids.  Sorry.  Kevin

19   got him Roxy 30s; Chris got him Dilaudids.  I meant to say

20   "Chris."

21   Q.   The entire time that you knew Mr. Burns, did he have a

22   prescription?

23   A.   Up until three or four months, maybe two to four months

24   before he got arrested, yeah -- yes, ma'am, he did.

25   Q.   Okay.  And what was the prescription for?

1    A.    Roxy 10s.

2    Q.    And then do you know why he didn't have a prescription

3    anymore?

4    A.    He never said.  He said one time that it was because of

5    Obamacare, but I took it as a joke.

6    Q.    Do -- did you have any dealings with him in those last

7    two or three months before he was arrested?

8    A.    Not really; not too much, no.  Besides when -- you

9    know, a couple of times we went to Jennie and Jessie's after

10   that.  When he lost his prescription, that's when we started

11   going to Jennie and Jessie's.  Actually I met them around

12   the same time, right before he got arrested.

13   Q.    And that's Jennie and Jessie Kirsche?

14   A.    Kirsche, yes, ma'am.

15   Q.    You took him over there?

16   A.    Yes, ma'am.

17   Q.    Was he still using during this time period?

18   A.    Yes, ma'am.

19   Q.    Was he still distributing?

20   A.    Yes, ma'am.

21   Q.    You have got to speak up.

22   A.    Yes, ma'am.

23   Q.    Okay.  Did he ever talk to you about anything during

24   this time period?

25   A.    No, not really.  I mean, he didn't talk to me about

1    every time.  He didn't tell me everything.  I just knew

2    certain stuff.  He would tell me some stuff and talk to me

3    about it.  But during those last three or four months he

4    would just, you know, get some from other people or just get

5    some for himself and give them some for getting them or

6    something like that.  I didn't really see him making a point

7    to buy, like, 20 of them and distribute them like he did

8    from Bryant.  It wasn't to that extent.

9    Q.  Well, let me ask you, did he ever talk to you about the

10   police in any way?

11   A.  Yes, ma'am.

12   Q.  Okay.  Tell us what he said.

13   A.  He told me that he was working for the cops and that I

14   didn't need to worry, that I wasn't going to be in any

15   trouble for anything, and that Tim Goodman was working with

16   him, and that everything would be okay, and that you-all

17   were a bunch of fucking idiots and you were never going to

18   catch him playing both sides.

19   Q.  That who was?

20   A.  That you-all were idiots, the cops, the investigators,

21   whoever --

22   Q.  Law enforcement?

23   A.  Yeah, whoever he was working for.  I don't know who he

24   was working for.  But whoever he was working for, that's who

25   he was calling retards.

1  Q.   And he said what now?

2  A.   That you-all were a bunch of fucking retards and you

3  will never catch him playing both sides.

4          MS. NEESE:   No further questions at this time.

5          THE COURT:   All right.

6                          CROSS-EXAMINATION

7  BY MR. SNOOK:

8  Q.   Ms. McKinney, do I understand that you actually went

9  with Chris Burns to Bryant Reynolds' place twice?

10 A.   Two to three times, yes, sir.

11 Q.   Did you go to Bryant Reynolds' place on other occasions

12 without Chris?

13 A.   Yes, sir, I did.

14 Q.   How many times?

15 A.   Not very many.  I would go over there with my

16 girlfriend's mom.  She had lived with them previously.  She

17 cleaned their house.  I went over there a couple of times to

18 clean their house.

19 Q.   And that would be Samantha Blankenship's mother --

20 A.   Dana Parker.

21 Q.   -- Dana Parker?

22 A.   Yes, sir.

23 Q.   And so Dana would go up to Bryant's, and you and

24 Amanda -- you and --

25 A.   Samantha.

1    Q.   -- Samantha would go up there sometimes just basically
2    to see her mother and to deal with Bryant?
3    A.   Yes, sir.  We never left -- we never stayed at her
4    house without her mom.  She had a little sister.  We always
5    all went up there.  Like I said, they had lived together, so
6    they were all really close.
7    Q.   They -- when you say "they" had lived together?
8    A.   Dana Parker, Samantha, Bryant Reynolds, Danielle
9    Reynolds, they had all lived together in a house at one
10   point in time.
11   Q.   Okay.  And so that was -- that was a friendship and an
12   association that really didn't have anything to do with
13   Chris?  I mean, the association with Dana and so on?
14   A.   He knew Dana Parker.
15   Q.   Okay.  But, I mean, he didn't go up there with Dana
16   Parker; right?
17   A.   They were up there at times together, but they didn't
18   ride up there together.
19   Q.   When you were up there on -- on occasions when Chris
20   didn't go up there with you, would Chris be up there?
21   A.   No, sir.  I think at that time, when I had went up
22   there with Dana, that him and Mr. Reynolds had actually had
23   a falling-out.
24   Q.   Okay.  Do you remember roughly when that falling-out
25   was?

1    A.    No, sir.

2    Q.    Would it have been in the spring of 2011?

3    A.    I couldn't even -- I couldn't give you a time.  It

4    wasn't my falling-out, so I wouldn't know.

5    Q.    Okay.  Now, you mentioned that you had actually met

6    Chris through Jonathan Bohon and that Jonathan -- Jonathan

7    worked for Chris; is that right?

8    A.    They worked together.

9    Q.    Okay.

10   A.    That's what Bohon had told me, that they were doing

11   construction that day or something.

12   Q.    Okay.  Construction work, not drug work --

13   A.    No, they were working together.

14   Q.    -- construction work --

15   A.    Yes, they were working together that day.

16   Q.    Okay.  Was that just that day or was Jonathan an

17   employee with Chris?

18   A.    I don't know who was employed where.  I just know that

19   they worked together.  And they would get off of whatever

20   job they had done together in Chris's truck.

21   Q.    Okay.  Without asking -- without asking to tell us who

22   was working for whom, the point is the two of them were

23   working together, and were working together for months,

24   weren't they?

25   A.    Yes, sir, they worked together for a while.

1  Q.  Now, you had mentioned that you knew that Chris had a

2  number of sources.  And I gather that the information you

3  had about who his sources were came from what either

4  -- either what Chris was telling you or what you actually

5  observed in terms of people meeting with him?

6  A.  Yes, sir.

7  Q.  And the people that he was receiving pills from

8  included Danny Elliott, Jennie Kirsche, Kevin Jessee -- I

9  can't remember; you probably mentioned a few others too?

10  A.  Yes, sir.

11  Q.  The times that you would see these pills being bought

12  or sold or traded or whatever, we're talking about a handful

13  of pills; right?  A few pills at a time?

14  A.  20 was the most I ever got a specific number on.

15  Q.  Okay.  And you say -- you didn't personally receive 20?

16  A.  No, sir.

17  Q.  You were aware that somebody got 20?

18  A.  I was aware that Chris was going to Bryant's.  He

19  called me after he left Bryant's and he had 20 Roxys.  And

20  he told me that he had just left there and that he had

21  gotten 20 Roxys.

22  Q.  Okay.  And Chris -- Chris was pretty addicted himself,

23  wasn't he?

24  A.  Yes, sir.

25  Q.  Okay.  Do you know how often he would use when he had

1    the drugs available?

2    A.   If he could, on a daily basis, to keep himself from

3    getting sick.

4    Q.   And that might include a bunch of pills at a time,

5    wouldn't it?

6    A.   Yes, sir.  I mean --

7    Q.   Okay.

8    A.   -- I have seen him do a couple at a time.

9    Q.   Okay.  When you used the phrase "He wanted to pop my

10   cherry," for some people that has a sexual meaning.  That

11   wasn't involved here at all, was it?

12   A.   No.  No, sir.

13        (Off-the-record discussion between the defendant and

14   defense counsel.)

15   BY MR. SNOOK:

16   Q.   Were you also friends -- I take it you were friends

17   with Micah Mabery and Kevin Jessee?

18   A.   I have known Micah Mabery since birth.

19   Q.   Okay.  And so you also know Kevin Jessee?

20   A.   Through her, yes, sir.

21   Q.   Kevin also shot you up, didn't he?

22   A.   Yes, sir.  A couple times, yes, sir.

23   Q.   Were there other people associated with all of this

24   group who would shoot you up?

25            MS. NEESE:  Your Honor, I'm going to object to this

1    at this point in time.  They are not on trial here today.

2            MR. SNOOK:  I'll withdraw the question, Judge.

3            THE COURT:  All right.  Any other questions?

4            MS. NEESE:  No other questions.

5            THE COURT:  Okay.  Thank you.  You may be excused.

6            Call the next witness.

7            MS. NEESE:  Samantha Blankenship.

8            THE CLERK:  Ma'am, before you sit down, will you

9    please raise your right hand to be sworn.

10           Thank you.

11       SAMANTHA BLANKENSHIP, GOVERNMENT'S WITNESS, SWORN

12           THE CLERK:  Thank you.  Please have a seat.

13                        DIRECT EXAMINATION

14   BY MS. NEESE:

15   Q.  Good afternoon.  How are you?

16   A.  I'm good.  How are you?

17   Q.  Please state your name for the record, ma'am.

18   A.  Samantha Blankenship.

19   Q.  Ma'am, how old are you?

20   A.  I'm 18 years old.

21   Q.  When did you turn 18?

22   A.  May 20th.

23   Q.  Of this year?

24   A.  Yes, ma'am.

25   Q.  So just a few -- a couple weeks ago?

1  A.   Yes, ma'am.

2  Q.   Have you ever used pills before?

3  A.   Yes, ma'am.

4  Q.   And when did you start using pills, ma'am?

5  A.   When I was 15 years old.

6  Q.   When you were 15?

7  A.   Yes, ma'am.

8  Q.   And when I say "used pills," how were you using pills?

9  A.   Snorting them and injecting them.

10  Q.   Did you first start off injecting them?

11  A.   No, ma'am.

12  Q.   Did you first start by snorting them?

13  A.   Yes, ma'am.

14  Q.   Do you know the defendant here today, Mr. Chris Burns?

15  A.   Yes, ma'am.

16  Q.   If you would, please, for the jury, just tell the jury

17  what he's wearing and where he's seated.

18  A.   He's right there.  And he's wearing a suit and a

19  gold-colored tie.

20        MS. NEESE:  Your Honor, please let the record

21  reflect the witness has identified the defendant.

22        THE COURT:  It will.

23  BY MS. NEESE:

24  Q.   How do you know the defendant?

25  A.   I met Chris through Amanda McKinney.

1    Q.   Ms. McKinney, is that your girlfriend?

2    A.   Yes, ma'am, it is.

3    Q.   And how long have you-all been together?

4    A.   Three and a half years next month.

5    Q.   Okay.  And if you would, please, just tell us when you

6    met Mr. Burns.

7    A.   I actually met Chris Burns on my 15th birthday.

8    Q.   Do you know what day that was?

9    A.   May 20th of 2011.

10   Q.   May 20th of 2011?

11   A.   Yes, ma'am.

12   Q.   Where did you meet him?

13   A.   At his house, I presume, at the -- over near Smith

14   Mountain Lake.

15   Q.   Okay.  And who did you go there with?

16   A.   Amanda.

17   Q.   What happened on that day?

18   A.   He did pills with us.

19   Q.   He did pills with you?

20   A.   Yes, ma'am.

21   Q.   Where did you get the pills from?

22   A.   From him.

23   Q.   Okay.  Tell us all about what happened.

24   A.   Well, he had already had them, I guess.  I didn't know

25   if he had went to get them or whatever the deal was.  But

1    when I got there, he had already had them.

2    Q.   What kind of pills were they?

3    A.   I honestly don't remember.

4    Q.   Okay.  You don't remember the first time?

5    A.   No, ma'am, I don't.

6    Q.   Did you have any other dealings with him after your

7    15th birthday?

8    A.   Yes, ma'am, I did.

9    Q.   And how often were you dealing with him?

10   A.   Hanging out with Chris was a regular basis.

11   Q.   What do you mean by that?

12   A.   A few times a week.

13   Q.   Did you ever get pills from him again?

14   A.   Yes, ma'am.

15   Q.   Okay.  And tell us about that.

16   A.   Well, sometimes Chris would call me and Amanda and ask

17   if we would want to come over with him, and he would have

18   some stuff.  He never made us pay for it, but he would

19   always hand it out.

20   Q.   What do you mean "have some stuff"?

21   A.   He'd have pills.

22   Q.   So you never paid him for a pill?

23   A.   No, ma'am.  I would give him gas money, if he asked for

24   that, but I never paid him for a pill.

25   Q.   Okay.  And then what kind of pills was he distributing

1  to you?

2  A.  I had Roxys, Opanas, and Dilaudid.

3  Q.  Do you know what milligrams were the Roxys?

4  A.  Normally 30s, or the 10s that Chris had prescribed to

5  him.

6  Q.  Did he tell you he had a prescription?

7  A.  Yes, ma'am, numerous times.

8  Q.  Did you ever go with him to get the prescription?

9  A.  Not that I can remember, no.

10 Q.  Did you ever get the prescription from him?

11 A.  Yes, ma'am.

12 Q.  Approximately how many times?

13 A.  I'd say maybe, of his own prescription, like five to

14 ten.

15 Q.  Do you know where he was getting his Roxy 30s?

16 A.  Bryant Reynolds.

17 Q.  And how do you know this?

18 A.  I have been to Bryant's with him.

19 Q.  Okay.  Did he ever talk to you about what he was doing

20 with the pills he was getting from Bryant Reynolds?

21 A.  He wouldn't talk to me about it, but I would see him

22 shooting them.

23 Q.  Okay.  Did he ever get you pills from Bryant Reynolds?

24 A.  Yes, ma'am.

25 Q.  Approximately how many times did he get you pills from

1    Bryant Reynolds?

2    A.   I would say 20 to 30 times.

3    Q.   Were those all Roxy 30s?

4    A.   Or the Opanas.

5    Q.   Who was prescribed the Opanas?

6    A.   I believe that was Danielle.

7    Q.   Who is Danielle?

8    A.   That's Bryant's wife.

9    Q.   And you said you also got Dilaudids from him?

10   A.   Yes, ma'am.

11   Q.   Did you ever know where he was getting those?

12   A.   No, ma'am, I didn't.

13   Q.   Did you know any other sources of pills that Mr. Burns

14   had?

15   A.   Well, I have heard the name Jennie and Jessie Kirsche,

16   but I have never seen him get pills from there.

17   Q.   You heard it -- you mean you heard it from his mouth?

18   A.   Yes.

19   Q.   Okay.  Tell us what he told you about Jennie and Jessie

20   Kirsche.

21   A.   Well, he had told me and Amanda that they were getting

22   pills from their father; I think he had a prescription.  And

23   they would sell them to Chris often.

24   Q.   Did you ever get any of those pills?

25   A.   Not that I know of.

1  Q.  Did he ever talk to you about Kevin Jessee?

2  A.  A few times, yes, ma'am.

3  Q.  Did you ever hang out with Kevin Jessee?

4  A.  Did I ever hang out with Kevin Jessee?

5  Q.  Yes.

6  A.  Yes, ma'am.

7  Q.  Okay.  Were him and Chris Burns buddies?

8  A.  Yes, ma'am.

9  Q.  Did they have any pill dealings together?

10 A.  Yes, ma'am.

11 Q.  Please tell us about those pill dealings that you know

12 about.

13 A.  Well, I know that he would sell his own prescription to

14 Kevin and Micah.  And -- I mean, I'm sure that they would

15 get other pills from him and sell to him, but I never

16 witnessed any of those.

17 Q.  You didn't witness any of those?

18 A.  No, ma'am.

19 Q.  Did Mr. Burns ever talk to you about it?

20 A.  Not that I can remember.

21 Q.  Now, you said at a point in time you started shooting

22 up pills?

23 A.  Yes, ma'am.

24 Q.  Does that mean injecting pills?

25 A.  Yes, ma'am.

1   Q.   Is that a difference between snorting pills?

2   A.   That's a huge difference.

3   Q.   What do you mean by that?  How does that affect you?

4   A.   Well, you are putting a needle into your arm and

5   shooting the drug right into your vein.

6   Q.   Did you ever shoot yourself up?

7   A.   No, ma'am.

8   Q.   When did you start shooting up?

9   A.   Chris Burns had called me and Amanda and said that he

10  was at his mom's house; he had just bought ponies or horses

11  from -- for his daughters, and he was building a fence and

12  asked if we would come help him.  So we went over there.

13  And then his wife, Tara, showed up.  And she got really

14  upset that me and Mandy were there.  So Amanda went inside

15  with Tara.

16      And Chris told me that he had had a pill and asked me

17  if I wanted to do it with him.  So I told him yeah.  And

18  then he told me that if I was going to do it with him, I had

19  to do it a certain way.  I asked him what was that.  And he

20  told me that would be shooting up.  And I told him that I

21  was worried about that, because I had never done it before.

22  And he told me not to worry about it, that he would take

23  care of me and it would be fun.

24  Q.   Did he make any other statements to you?

25  A.   He said that he wanted to be the one to pop my cherry.

1    Q.   Did he shoot you up that day, ma'am?

2    A.   Yes, ma'am, he did.

3    Q.   Was that the first time you ever were shot up?

4    A.   Yes, ma'am.

5    Q.   Do you know what kind of pill it was?

6    A.   I honestly don't remember.  It might have been

7    Dilaudid.  I think it would be Dilaudid.

8    Q.   Did he ever shoot you up again?

9    A.   About two or three more times, yes, ma'am.

10           MS. NEESE:  No further questions at this time.

11           THE COURT:  Okay.

12           Wait.

13                       CROSS-EXAMINATION

14   BY MR. SNOOK:

15   Q.   Samantha, when you first started using pills, you

16   actually got the pills from your mother, didn't you?

17   A.   Yes, sir, I did.

18   Q.   And so in a sense, she got you started on pills long

19   before you met Chris?

20   A.   Yes, sir.

21           MS. NEESE:  Your Honor, if we're going to go

22   through this line of questioning, I'm going to object at

23   this point in time.  Her mother is not here on trial today.

24           THE COURT:  Is what?

25           MS. NEESE:  I said if we're going to go through any

1   more line of this questioning at this point in time, I'm

2   going to object as to relevancy as her mother is not here on

3   trial today.

4            MR. SNOOK:  I had asked all the questions I was

5   planning to ask in that line, Judge.

6            THE COURT:  Her mother doesn't have to be here.  Go

7   ahead.  Okay.

8   BY MR. SNOOK:

9   Q.  During the time that you -- actually, let me ask you,

10  do you know when it was, this time that you were over at

11  Chris's house and he was building a fence and he said for

12  you to come over and so on?

13  A.  I wouldn't remember the time frame; no, sir.  That was

14  about three years ago.

15  Q.  Okay.  Well, we know that it was three years and about

16  two weeks ago that you turned 15?

17  A.  Yes, sir.

18  Q.  And that was the first time you met Chris?

19  A.  Yes, sir.

20  Q.  How long after you first met Chris do you think this

21  happened?

22  A.  I would probably say maybe three to four months after.

23  Q.  Okay.  So that would put us sometime into late summer,

24  beginning of fall?

25  A.  Yes, sir.

1   Q.   And I take it that you have been a user of pills, you

2   know, for quite a while; the last three years, anyway?

3   Right?

4   A.   Yes, sir.

5   Q.   Okay.  And I assume that Chris was not your only

6   source?

7   A.   No, sir, he wasn't.

8   Q.   Who else were you getting pills from?

9   A.   Bryant Reynolds and Danielle Reynolds and my mother.

10  Q.   And just to be clear about one thing, you would

11  sometimes talk about you would get his prescription.  You

12  never got his full prescribed amount.  You got certain pills

13  from his prescription; am I right?

14  A.   Yes, sir.

15  Q.   Okay.  And you would get, basically, just a few at a

16  time; right?

17  A.   Yes, sir.

18  Q.   And those were intended for your personal use?

19  A.   Yes, sir.

20  Q.   And you, in fact, used them personally?

21  A.   Yes, sir.

22  Q.   And when the phrase was used that "he said he wanted to

23  pop my cherry," for some people that has a sexual context.

24  That's not what was meant here at all, was it?

25  A.   No, sir.  He had meant that he wanted to be the first

1    one to stick a needle in my arm.

2    Q.   Okay.

3            MS. NEESE:   No further questions --

4            MR. SNOOK:   Just -- just a second, please.

5        (Pause.)

6    BY MR. SNOOK:

7    Q.   How many times did you go up to Bryant's with Chris?

8    A.   I'd say I actually went to Bryant's house with Chris

9    maybe about ten times.

10   Q.   Okay.  And did you go up there on other occasions

11   without Chris?

12   A.   Yes, sir.

13   Q.   When you went up there on those other occasions without

14   Chris, was Chris there?

15   A.   I seen Chris there maybe about two times that I had

16   went without him.

17   Q.   Okay.  And so how many times did you go up there

18   without him when you didn't see him?

19   A.   Actually a lot.  Bryant was an old family friend.

20   Q.   Uh-huh.  Okay.

21           MR. SNOOK:   That's all I have.  Thank you.

22           THE COURT:   Okay.

23           MS. NEESE:   No further questions of this witness.

24           THE COURT:   All right.  Thank you.  You may be

25   excused.

1          And call your next witness.

2          If you have any witnesses you need to finish today,

3     be sure to call them in time to get them out of here.

4          MS. NEESE:  You mean we have to --

5          THE COURT:  Well, like yesterday, we -- you know,

6     you had a witness you wanted to get through, but you didn't

7     call him in time to finish him.  So don't -- I don't want to

8     get in that situation again today.  If you have got a

9     witness who has to leave, we need to get him on today so

10    that he can -- or she can complete their testimony.

11         THE CLERK:  Sir, will you please raise your right

12    hand.

13             KEVIN JESSEE, GOVERNMENT'S WITNESS, SWORN

14         THE CLERK:  Thank you.  Please have a seat.

15                       DIRECT EXAMINATION

16    BY MS. NEESE:

17    Q.   Please state your name for the record.

18    A.   Kevin Jessee.

19    Q.   Mr. Jessee, are you from Bedford County?

20    A.   Yes, ma'am.

21    Q.   Are you presently charged in this court?

22    A.   Yes, ma'am.

23    Q.   Have you entered a guilty plea?

24    A.   Yes, ma'am.

25    Q.   What charge did you enter a guilty plea to?

1  A.   Conspiracy to distribute narcotics.

2  Q.   What kind of -- what kind of pills -- or, excuse me,

3  what kind of drugs?

4  A.   Oxycodone, hydromorphone, oxymorphone, Adderall, etc.

5  Q.   Have you ever been promised anything for your

6  testimony?

7  A.   No, ma'am.

8  Q.   Are you hoping for anything?

9  A.   Yes, ma'am.

10  Q.   What would that be?

11  A.   Substantial assistance.

12  Q.   Is that part of your plea agreement?

13  A.   No.

14  Q.   Is there a section in there that says you can

15  potentially receive it, depending on if you provide truthful

16  information to the United States?

17  A.   Yes, ma'am.

18  Q.   Besides the charge you pled guilty to, were you charged

19  with two distribution counts?

20  A.   Yes, ma'am.

21  Q.   One of those, were you aiding and abetting in the

22  distribution?

23  A.   Yes, ma'am.

24  Q.   What day was that; do you remember?

25  A.   I believe October -- October something.

JESSEE - DIRECT

1   Q.   Was it October 29th?

2   A.   Yeah.   Yeah.

3   Q.   2012?

4   A.   Yes.

5   Q.   Is that actually the first time you talked to us?

6   A.   Yes.

7   Q.   After you testified in grand jury?

8   A.   Yes, ma'am.

9   Q.   When was the second time?

10  A.   Before Christmas of the -- December 2012.

11  Q.   Approximately December 20th of 2012?

12  A.   Right before Christmas, yes.

13  Q.   Do you know who the confidential informant was on those

14  two buys?

15  A.   Yes, ma'am.

16  Q.   Who was it?

17  A.   Les Burns.

18  Q.   Is it Chris Burns to you?

19  A.   Yes, ma'am.

20  Q.   Is his real name Les Burns?

21  A.   Yes, ma'am.

22  Q.   When did you find out that he was the confidential

23  informant?

24  A.   I kind of had a gut feeling at the time, but I didn't

25  find out until I seen the charges.

1   Q.   And your charges weren't until when?

2   A.   August 28th, 2013.

3   Q.   So from December until August you didn't know for sure?

4   A.   No, ma'am.

5   Q.   Prior to entering your guilty plea here today, have you

6   been convicted of two felonies?

7   A.   Yes, ma'am.

8   Q.   What are those two felonies?

9   A.   Breaking and entering, and grand larceny.

10  Q.   When did you meet Mr. Burns?

11  A.   High school.

12  Q.   Okay.  Were you-all good friends?

13  A.   Yes, ma'am.

14  Q.   Did you remain friends after high school?

15  A.   Well, we lost touch for approximately ten years.

16  Q.   For approximately ten years?

17  A.   Yes.

18  Q.   When did you-all catch back up?

19  A.   Around 2011.

20  Q.   How did you-all catch back up in 2011?

21  A.   We met at a mutual friend's house.

22  Q.   Who was that?

23  A.   Jonathan Bohon.

24  Q.   Okay.  And when approximately?  Early 2011?

25  A.   Yes, early 2011.

1    Q.   Were you using pills at that time period?

2    A.   Yes.

3    Q.   And when I say "using pills," tell the jury what way

4    you were using pills at that time.

5    A.   Well, at that time it was mostly snorting them.  And I

6    was just getting into injecting.

7    Q.   You had already gotten into injecting?

8    A.   I was just getting around the crowd.

9    Q.   Okay.  So had you started injecting by the time you saw

10   Chris Burns?

11   A.   No, not at the very moment, no; not at first.

12   Q.   What kind of pills were you using then?

13   A.   Oxycodone, mainly.

14   Q.   Do you know what milligram?

15   A.   30, usually.

16   Q.   Who were your sources of supply in 2011?

17   A.   Matt Barlow, mainly.  As far as 2011, mainly Matthew

18   Barlow.

19   Q.   Okay.  Is that the only person you got pills from the

20   whole time?

21   A.   No.  There were more.  My memory is just not working

22   very well right now.

23   Q.   Were you also a distributor of pills?

24   A.   Yes.

25   Q.   Did you have your own prescription?

1   A.   No, ma'am.

2   Q.   Where were you getting your pills from to distribute?

3   A.   Friends.

4   Q.   Okay.  Name some of those for us, please, sir.

5   A.   Matt Barlow, Tony Abee, Tim Goodman.

6   Q.   Did you ever get pills from Mr. Burns?

7   A.   Eventually, after meeting up with him.  Not prior to

8   2011.

9   Q.   Okay.  But after you met up with him, did you start

10  getting pills from him?

11  A.   Yes.

12  Q.   Did you distribute some of those pills?

13  A.   Yes.

14  Q.   Okay.  Tell us what kind of pills you were getting from

15  Mr. Burns.

16  A.   Oxycodone 10-milligrams.

17  Q.   Is that the only type of pill you ever got from him?

18  A.   No.  Oxycodone 30-milligrams, Dilaudid 8-milligrams.

19  Q.   Did you ever talk to Mr. Burns about where he was

20  getting his pills from?

21  A.   Yes, ma'am.

22  Q.   Where did he get his Oxy 10s?

23  A.   His own prescription.

24  Q.   Okay.  How often was he getting those?

25  A.   Monthly.

1  Q.  Did you ever go with him to get them?

2  A.  Yes, ma'am.

3  Q.  Where was he getting them from?

4  A.  From a doctor's office in Forest.

5  Q.  Okay.  Did you ever go to the pharmacy with him?

6  A.  Yes, ma'am.

7  Q.  Which pharmacy did he use?

8  A.  CVS down the street.

9  Q.  From the doctor's office?

10  A.  Correct.

11  Q.  Did you ever get any of those Oxy 10s when he got them?

12  A.  Yes, ma'am.

13  Q.  How many were you getting at a time, usually?

14  A.  We normally split ten as soon as we got them.

15  Q.  And you used them right then?

16  A.  Yeah.

17  Q.  Did you ever sell any for him?

18  A.  Yeah.

19  Q.  Tell us about those.

20  A.  I can recall meeting up with Chastity Dooley afterwards

21  on the way to -- we were going to Roanoke to do some work.

22  We stopped at her house and sold her some.  He traded some

23  for some Klonopins.  I mean, I have seen him sell the pills,

24  but I don't know exactly all of them that I distributed.

25  Q.  Okay.  If you will, please, scoot closer to the

1  microphone, sir.

2      Did you ever get those pills, the Oxy 10s, from him and

3  then give them to your girlfriend?

4  A.  Yes.

5  Q.  Will you tell us about that?

6  A.  Micah Mabery.

7  Q.  Okay.  How often were you getting pills from him that

8  you were giving to her?

9  A.  Normally just once a month.

10  Q.  Was that just the 10s?

11  A.  Yes.

12  Q.  Did you also provide Mr. Burns with pills?

13  A.  Yes.

14  Q.  What type of pills were you providing him?

15  A.  The same:  Roxy 30s and Dilaudid.

16  Q.  Okay.  Where was he getting his Roxy 30s from?

17  A.  Jessica Kirsche.

18  Q.  Was it both Jennifer and Jessica or just one?

19  A.  Both, I'm sure.

20  Q.  Where was he getting his Dilaudids from?

21  A.  The same source.  Or me.

22  Q.  Jennifer and Jessica Kirsche?

23  A.  Yes, or me.

24      Me also.

25  Q.  You were another source for him?

1   A.   Yes, ma'am.

2   Q.   Well, what about those Dilaudids, where were yours

3   coming from?

4   A.   Scott Jennings.

5   Q.   Could Mr. Burns go to Scott Jennings to get pills?

6   A.   No, ma'am.

7   Q.   Did you help him out sometimes?

8   A.   Yes.

9   Q.   Did he help you out?

10  A.   Yes.

11  Q.   What was you-all's arrangement?

12  A.   If I could get some for him, he would split them with

13  me; if he could get some for me, I would split them with

14  him.

15  Q.   Was he going to see -- or did he know Bryant Reynolds

16  at that time?

17  A.   Yeah, prior -- prior to me meeting back up with him.

18  Q.   Did he talk to you about it?

19  A.   Yeah.

20  Q.   Did he tell you what their relationship was?

21  A.   Yes.

22  Q.   Tell us about that relationship, sir.

23  A.   He worked on his vehicles.  He worked on Bryant

24  Reynolds' vehicles.

25  Q.   Is that the only relationship they had?

1    A.   He got paid in Roxy 30s.

2    Q.   Did he ever talk about any other dealings with Bryant

3    Reynolds?

4    A.   No, not to my knowledge.

5    Q.   Did Mr. Burns have any other sources of supply?

6    A.   I'm sure he did.

7    Q.   Okay.  Did you ever know -- does he know Scotty

8    Andrews?

9    A.   I'm not sure.

10   Q.   You don't know that?

11   A.   No.

12   Q.   He never talked to you about Scotty Andrews?

13   A.   No.

14   Q.   Okay.  What about -- going back to Jennifer and Jessie

15   Kirsche.  Did you ever go over there with him?

16   A.   Yes.

17   Q.   Tell us about the arrangement, sir.

18   A.   Well, we would go over there.  He would -- one of them,

19   Jessica, would come out and sell us pills.  We would leave

20   or we would do them there.  We would split them.

21   Q.   Did you ever -- were you able to go over there

22   yourself?

23   A.   He's actually -- he has called over there and arranged

24   for me to come over there once or twice.

25   Q.   Before he called over there and arranged for you to go

1  over there, could you ever go there by yourself?

2  A.   No.

3  Q.   Could you directly buy pills from either of them?

4  A.   No.

5  Q.   Did he hook you up with them?

6  A.   Yes.

7  Q.   And then did you, after he called over there, go over

8  there to get pills?

9  A.   Yes.

10 Q.   Who-all went over there?

11 A.   Me and Brandon Turpin.

12 Q.   Okay.  And what kind of pills did you get?

13 A.   Roxy 30s.

14 Q.   Is that the only time you ever got pills directly from

15 them?

16 A.   Well, Brandon Turpin actually got her phone number

17 after that, and we went back several times.

18 Q.   Now, a few minutes ago you were talking about how you

19 abused pills.  And you said you got to a point where you

20 were injecting.  Tell us about that.

21 A.   I started dating a new girlfriend, and she was doing

22 it, and I tried it.

23 Q.   Okay.  Who was that?

24 A.   Tabitha Welch.

25 Q.   Okay.  And then --

1      MR. SNOOK:  I'm sorry.  I didn't hear the name.

2      THE WITNESS:  Tabitha Welch.

3  BY MS. NEESE:

4  Q.  And once you started trying it, did you continue

5  injecting?

6  A.  Yes, ma'am.

7  Q.  Did you date Tabitha the entire time you were hanging

8  out with Chris Burns?

9  A.  No, ma'am.

10  Q.  Who else did you date?

11  A.  Micah Mabery.

12  Q.  Was she getting pills from Mr. Burns?

13  A.  Yes, through me.

14  Q.  Through you?

15  A.  Yes, ma'am.

16  Q.  Did she ever get any pills directly from him?

17  A.  I don't believe so.

18  Q.  Did you ever witness anything between those two?

19  A.  Yeah, I do -- when I first got -- me and Micah were

20  together before me and Tabitha.  And we had broken up for

21  several months.  When I got back with Micah, I was

22  injecting.  And I wouldn't -- didn't want her doing it.  And

23  she -- she didn't really want to try it at first, for like

24  the first three or four days.  And then we ended up giving

25  Mr. Burns a ride to Bedford to meet up with Jessica Kirsche

1    and get some Dilaudids one day.  And he -- well, she

2    eventually said she wanted to try it, and he injected her

3    the first time.

4    Q.  Okay.  Where were you when he injected her?

5    A.  I was in the backseat of her car.

6    Q.  Okay.  Where was the car?

7    A.  Driving down 460.

8    Q.  Who was driving?

9    A.  Micah Mabery.

10   Q.  Where was Mr. Burns?

11   A.  In the passenger seat.

12   Q.  Where did he shoot her up?

13   A.  In her right hand -- arm.

14   Q.  Did you-all get pills from Jessica Kirsche that day?

15   A.  Yes, ma'am.

16   Q.  Did you get them or did Mr. Burns?

17   A.  Mr. Burns.

18   Q.  Did you get any from him that day?

19   A.  Yes.

20   Q.  Did you ever know of Mr. Burns to shoot anyone else up?

21   A.  Yes.

22   Q.  Tell us about that.

23   A.  I physically seen Amanda McKinney, myself, Micah

24   Mabery --

25   Q.  Wait.  He shot you up before too?

1  A.   Yes, ma'am.

2  Q.   Okay.  Tell us about that as well.

3  A.   Well, it was at the beginning, like the first time I

4  think I ever bought anything from him.  It was a morphine.

5  And I didn't -- I didn't know how to -- how to do it,

6  because they are different.  If you inject them, they are

7  done differently.

8  Q.   Explain to the jury what you mean, sir.  We don't

9  understand.

10  A.   Well, the morphines, they gel up and they get kind of,

11  like, hard.  You have got to heat them up really hot to make

12  them melt down.  And I wasn't -- I didn't know what I was

13  doing, because I had just started.  So Mr. Burns helped me.

14  Q.   Where did you get the morphine pill from?

15  A.   I got it from him.

16  Q.   From Mr. Burns?

17  A.   Yes.

18  Q.   And that's what he shot you up with that day?

19  A.   Yes, ma'am.

20  Q.   How many times did you witness him shoot up Mandy

21  McKinney?

22  A.   Two or three.

23  Q.   What about Micah?

24  A.   Just the once.

25  Q.   Did you also shoot her up too?

1   A.   Yes, ma'am.

2   Q.   So you knew how to do this after a while?

3   A.   Correct.

4   Q.   Did you-all have any other kind of dealings together

5   throughout the course of this conspiracy?

6   A.   Well, I mean, we used to work together.

7   Q.   Tell us about that, sir.

8   A.   Well, at first, we would just help his mother and

9   stepfather refurbishing their rental properties.  And then

10  he got a contract replacing windows.  And we -- we worked

11  for, like, two or three weeks.

12  Q.   You worked for two or three weeks?

13  A.   Yeah.

14  Q.   How often were you working?

15  A.   Three days a week.

16  Q.   What were you-all doing the other days of the week?

17  A.   Just hanging out, video games.

18  Q.   Anything else?

19  A.   Pills.

20  Q.   Were you addicted to pills?

21  A.   Yes, ma'am.

22  Q.   How often did you need pills?

23  A.   Daily.

24  Q.   Did Mr. Burns need pills daily?

25  A.   Yes.

1    Q.   Did you-all have any kind of agreement on what you were

2    going to do on a daily basis?

3    A.   Find money, get pills.

4    Q.   Anybody else that was working with Mr. Burns at the

5    time you were working with him?

6    A.   Yes.  Tim Goodman.

7    Q.   Can you tell us about that arrangement.

8    A.   Well, Mr. Burns didn't know Tim Goodman at first; I

9    actually knew him.  And we -- he needed someone to help him

10   -- well, one day we needed some pills, and we got them from

11   Tim.  I called Tim, and he said he could find some.  So we

12   went by his house, and I introduced him to Mr. Burns.  And

13   he said -- Mr. Burns needed help on his window business, so

14   I told him that Mr. Goodman was in the construction.  So he

15   asked him to help us.

16   Q.   Okay.  Well, did Mr. Goodman ever hook you-all up with

17   any pills?

18   A.   Yes.

19   Q.   Did you get anything out of the deal?

20   A.   Yes.

21   Q.   Did Mr. Goodman get anything out of the deal?

22   A.   Yes.

23   Q.   Who paid for the pills that day?

24   A.   Mr. Burns.

25   Q.   Do you know what kind of pills they were?

```
 1    A.    Roxy 30s.

 2    Q.    Do you know where you got them?

 3    A.    No, Mr. Goodman got them.

 4    Q.    The pills -- how many times did you deal or get pills

 5    from Mr. Burns during this time period?  Can you count that

 6    high?

 7    A.    In the hundreds.

 8    Q.    How many times did you distribute to him?

 9    A.    Hundreds.

10    Q.    How close were you-all?

11    A.    Pretty much he was my best friend.

12    Q.    Anybody else during this time period that you-all were

13    hanging out with?

14    A.    I mean, not on a daily basis.  Occasionally Matt Giles

15    would come over.

16    Q.    The pills that you got from him, how did they make you

17    feel?

18    A.    Euphoric.

19    Q.    Did they give you a high?

20    A.    Yes.

21          MS. NEESE:  No other questions at this time, Your

22    Honor.

23          THE COURT:  We'll take about a ten-minute -- just

24    about a ten-minute recess and then come back.

25          (Jury out.)
```

1      (Recess at 4:01 p.m.)

2      (Call to Order of the Court at 4:10 p.m.)

3          THE COURT:  Okay.  If the jury is ready, you can

4  call them back.

5      (Jury in.)

6          THE COURT:  All right, Mr. Snook, you may cross.

7                    CROSS-EXAMINATION

8  BY MR. SNOOK:

9  Q.  So, Mr. Jessee, you had testified to the federal grand

10  jury on September 20th, 2012; do you remember that?

11  A.  Yes, sir.

12  Q.  At that point you had been a friend, you say, of

13  Chris's for years?

14  A.  Yes.

15  Q.  You had been distributing drugs to and with him for

16  years?

17  A.  For about a year, yeah.

18  Q.  About a year.

19      And you didn't mention his name to the grand jury on

20  September 20th; is that correct?

21  A.  Yes, sir.

22  Q.  You mentioned a whole lot of other people.  You

23  mentioned Jonathan Bohon; you mentioned Elmo, in other words

24  known as Tony Abee; you mentioned Matt Barlow, Tim Goodman,

25  Bryant Reynolds, Andy Dooley, Amanda McKinney, Matt Hargis,

1    Matt Giles, Jimmy Wheat, Brandon -- I guess Brandon Turpin,

2    Chastity Dooley.  Didn't mention Mr. Burns?

3    A.   No, sir.

4    Q.   Now, the story of -- let me back up.  You say that

5    there was a time when Chris shot up -- was it Micah, as they

6    were -- as you-all were driving down the highway?

7    A.   Yes, sir.

8    Q.   Okay.  When did that supposedly happen?

9    A.   2012.

10   Q.   Okay.  Do you know when in 2012?

11   A.   Not exactly.

12   Q.   Was it summer, fall?

13   A.   It was around August.

14   Q.   Around August.  Okay.

15       Do you recall a time in November of 2011 where you were

16   up at Chris Burns' mother's house and you got into a fight

17   with Matt Giles?

18   A.   Yes, sir.

19   Q.   And as a result of that happening up at Chris Burns'

20   mother's house, you and Chris basically didn't see each

21   other for months; isn't that fair to say?

22   A.   I'm not sure if that was 2011.  I believe that was in

23   -- that was in 2012.

24   Q.   Okay.

25   A.   That was -- actually happened the day that he shot

1    Micah up.  That was the same day, because he shot her up
2    that day, and then later on that night she dropped me off
3    and wanted to go back to get more drugs.
4    Q.   So the fight that you are talking about occurred on the
5    day that you say that he shot up Micah?
6    A.   Yes.
7    Q.   Okay.  Now, as far as driving down the highway and
8    shooting her up as you go, that's a pretty dramatic story.
9    You never told that to the grand jury, did you?
10   A.   Sure didn't.
11   Q.   You didn't tell them either the time you went to the
12   grand jury on the 12th -- let's see, was that the only time
13   you -- did you just go to the grand jury one time?
14   A.   Yes.
15   Q.   You also didn't mention anything about that detail in
16   any of -- a lot of different proffer sessions you had with
17   the cops?
18   A.   No, I sure didn't.
19   Q.   You didn't mention it in June of 2013; you didn't
20   mention it in August of 2013; you didn't mention it in
21   October of 2013.  You didn't mention that very dramatic
22   story any of those times?
23   A.   No.  When I was talking to the federal prosecutors, I
24   only gave them what they asked for.  I didn't relinquish any
25   information about my dealers that I wasn't asked about.

1    Q.   So you are saying that in each of those three different

2    interviews, when you mentioned all of the different people,

3    you mentioned Chris Burns a whole bunch of different times

4    for other things, you felt that you were going to protect

5    Chris from having that detail released?  That was a favor to

6    him?

7    A.   No, sir.

8    Q.   Okay.  So it wasn't a favor to him.  You know that part

9    of the deal, when you are making one of these proffers, is

10   that the more good stuff you can tell them -- the more

11   truthful good stuff you can tell them, the better off you

12   are when it comes time to asking the judge for a reduction

13   in sentence; isn't that right?

14   A.   I would imagine so.

15   Q.   And despite that fact, you didn't tell them, either in

16   the grand jury -- of course, the grand jury was before you

17   were indicted and everything, but you didn't tell them in

18   either of the three proffer sessions after that, either the

19   June or the August or the October?

20        MS. NEESE:  Your Honor, I object.  He has asked and

21   answered this now three times.

22        THE COURT:  Right.  He told you he --

23        MR. SNOOK:  That's fine.  I'll move on, then,

24   Judge.

25   BY MR. SNOOK:

1   Q.   Now -- so back to this question of when this fight

2   happened.  You recall that, because I guess you were, you

3   say, Chris Burns' best friend, that in the fall of 2011

4   Chris had two different surgeries; do you remember that?

5   A.   Yes.

6   Q.   And -- because he had been in a pretty serious accident

7   and he had some orthopedic injuries and had to have surgery

8   to try to fix them?

9   A.   Yes, sir.

10  Q.   As a consequence of that, he had a pretty hefty pain

11  medication prescription that he was getting legitimately

12  during that time; isn't that right?

13  A.   Yes, sir.

14  Q.   But he was also essentially immobile during that time?

15  I mean, he wasn't out and about in the community?  He wasn't

16  working.  He was basically staying at home and taking his

17  pills and trying to get better, wasn't he?

18  A.   Well, I mean, he wasn't that immobile.  I mean, we were

19  still going out and doing things.

20  Q.   Okay.

21  A.   He was immobile maybe for the first two days.

22  Q.   Okay.  So during the fall of 2011, when he had these

23  two different surgeries, do you recall when it was that

24  -- wasn't the fight that you had with Chris in that time

25  frame, in, like, the fall, in November or so of 2011?

1   A.   I'm not sure.

2   Q.   And the next time you-all actually were -- you know,

3   got back to talking to one another again wasn't until the

4   following summer; isn't that right?

5   A.   No, it wasn't that long.  It was maybe three months.

6   Q.   Three months.  Okay.  And so do you have any -- that

7   would put us into late winter, perhaps, of 2012, February,

8   March, somewhere in there?

9   A.   Yeah, that sounds about right.

10  Q.   Well -- or was it later than that?

11  A.   I mean, I don't know exact dates.

12  Q.   Okay.  There was a period of time, however many months

13  it was, during which you and Chris -- after this fight that

14  took place up at his mother's house, during which you and

15  Chris weren't talking to one another?

16          MS. NEESE:  Your Honor, I would object.  He has

17  asked and answered this several times.  He says he doesn't

18  know the date.  He says that there was a period of time,

19  three months.  He's going over the same questions over and

20  over.

21          THE COURT:  All right.  Let's get your final answer

22  and then go on.

23  BY MR. SNOOK:

24  Q.   Do you have -- do you have any better recollection of

25  how many months it was?  Exactly when -- exactly when it

1    started --

2    A.    I don't know exactly.    I know it was approximately

3    three months we didn't speak.

4    Q.    Okay.    Now -- and I assume during that time you weren't

5    selling drugs to one another?

6    A.    No.

7    Q.    When you would get these drugs from Chris or he would

8    get drugs from you, you-all were both addicts at that point;

9    right?

10   A.    Yes, sir.

11   Q.    And you were both basically concerned about getting

12   whatever you needed to make sure you didn't get pill sick or

13   to get you off of being pill sick?

14   A.    Yes, sir.

15   Q.    And so the drugs that you were buying and selling

16   between the two of you, that wasn't about distributing to

17   the rest of the world.    It was just keeping the two of you

18   from being sick?

19   A.    Well, sometimes we would share with other people that

20   would help us out as well.

21   Q.    Okay.    So there might be a few other people who were in

22   the same boat, being pill sick or worried about being pill

23   sick?

24   A.    Yes, sir.

25   Q.    And so -- but as far as, you know, being somebody who

1   was going to sell a whole bunch of pills, make a whole bunch

2   of money, that wasn't what either of you-all were into;

3   right?

4   A.   No.   No, sir.

5   Q.   And I take it that neither one of you was like the boss

6   of the other in any distribution sense?  You didn't tell him

7   what to do; he didn't tell you what to do?

8   A.   No, no one told each other what to do.  But I never

9   really had the money.  I usually would find them and he

10  would buy them or vice versa.  But he was usually the one

11  with the money.

12  Q.   But as between the two of you, I mean, it wasn't a

13  situation where -- well, basically, you-all were both doing

14  your own thing and hoping to get by the best you could;

15  isn't that fair to say?

16  A.   We were helping each other out as best we could.

17  Q.   Uh-huh.  Okay.  You didn't direct him to do anything;

18  he didn't direct you to do anything?

19         MS. NEESE:  Your Honor, objection; asked and

20  answered.  He is asking the same questions over and over and

21  he has answered the question.

22         MR. SNOOK:  I did ask a similar question a moment

23  ago, I will concede.

24         THE COURT:  Okay.  Well, let's move on.

25  BY MR. SNOOK:

1  Q.  When you would sell him or give him or trade him,

2  whatever, drugs, it was just a few pills at a time, wasn't

3  it?

4  A.  Yes, sir.

5  Q.  Personal use?

6  A.  Yes, sir.

7          MR. SNOOK:  That's all I have, Judge.  Thank you.

8          THE COURT:  All right.

9                    REDIRECT EXAMINATION

10  BY MS. NEESE:

11  Q.  Do you know what Mr. Burns did with every pill you gave

12  or sold him?

13  A.  Yes, ma'am.

14  Q.  Every pill?

15  A.  No, not every single pill.

16  Q.  Well, you just testified to that.

17  A.  I know that, well, normally you use them.

18  Q.  Did he ever sell pills?

19  A.  Yes, ma'am.

20  Q.  Did you see him?

21  A.  Yes, ma'am.

22  Q.  Did you-all sell pills in order to get other pills that

23  you liked?

24  A.  Yes, ma'am.

25  Q.  Do you know whether he sold any pills that he got from

1  you?

2  A.  Yes, ma'am, I'm sure he has.

3  Q.  Well, you just told --

4       MR. SNOOK:  Objection.  That's obviously a

5  speculative answer.

6  BY MS. NEESE:

7  Q.  Did he ever tell you he sold any of the pills he got

8  from you?

9  A.  No.

10  Q.  Did you ever see him sell any of the pills he got from

11  you?

12  A.  From me?  No.

13  Q.  Do you know -- when you said you had this group that

14  you were sharing pills with, didn't you just testify that

15  you also sold some of the pills that he gave you?

16  A.  I'm talking about his prescription.

17  Q.  That's what I'm asking you, though, sir.  Did you get

18  pills from him and sell some of them?

19  A.  Yes, ma'am.

20  Q.  Okay.

21  A.  Normally we would sell the Roxy 10s and try to get

22  Dilaudids.

23  Q.  So you two were working in concert together, doing

24  that?

25  A.  Yes.

1    Q.    Were you trying to do it together?

2    A.    Well, I mean, it just worked out like that, kind of.    I

3    mean, if we were together and he couldn't find anybody to

4    buy his prescription, I would call --

5    Q.    I don't mean you had to be together, sir.    But did

6    you-all have any kind of agreement amongst each other that

7    you were selling his Roxy 10s to get Dilaudids?

8    A.    No -- well, we didn't have an actual agreement.    It was

9    unspoken, I mean, unwritten.

10   Q.    Do all agreements have to be signed?

11   A.    Oh, no, ma'am.

12            MR. SNOOK:    Objection.    Calls for a legal

13   conclusion.

14            THE COURT:    Sustained.

15   BY MS. NEESE:

16   Q.    What do you mean an "unspoken"?

17   A.    I mean we both wanted Dilaudids.    And we would do -- we

18   would sell whatever we could get to get the Dilaudids.

19   Q.    Did you talk about that?

20   A.    Yes.

21   Q.    Was that unspoken?

22   A.    No, I guess not.

23   Q.    Okay.    Well, tell the jury what you-all talked about.

24   A.    Whoever could find the Dilaudid, we would -- whoever

25   -- we would get rid of whatever we could get rid of to get

1   Dilaudids.

2   Q.   So were you doing it together?

3   A.   Yes, ma'am.

4            MS. NEESE:  No further questions.

5            THE COURT:  All right.

6            Anything else?

7            MR. SNOOK:  No, Your Honor.

8            THE COURT:  Thank you.  This witness may be

9   excused.

10           Next?

11           MR. BRADYLYONS:  Danny Elliott, Your Honor.

12           Danny Elliott.

13           THE CLERK:  Will you please raise your right hand.

14           DANNY ELLIOTT, GOVERNMENT'S WITNESS, SWORN

15           THE CLERK:  Thank you.  Please have a seat.

16                     DIRECT EXAMINATION

17  BY MR. BRADYLYONS:

18  Q.   Good afternoon, sir.

19  A.   Good afternoon.

20  Q.   Could you please lean a little closer to the

21  microphone.

22  A.   Yes.

23  Q.   Could you please state your name for the record.

24  A.   Danny Elliott.

25  Q.   Have you ever used prescription pills?

1  A.   Yes.

2  Q.   Have you had a prescription for all of those

3  prescription pills?

4  A.   No.

5  Q.   Can you explain how you used them.

6  A.   Either I swallow them or I crush them up and snort

7  them.

8  Q.   When did you start using prescription pills in that

9  way?

10  A.   I believe it was around 2011.

11  Q.   Have you ever met Christopher Burns?

12  A.   Yes.

13  Q.   Do you see him in the courtroom here today?

14  A.   Yes.

15  Q.   Can you please point him out and describe what he's

16  wearing.

17  A.   He's wearing a tan-colored suit and tie.

18          MR. BRADYLYONS:  Your Honor, may the record reflect

19  that the witness has identified the defendant?

20          THE COURT:  It will.

21  BY MR. BRADYLYONS:

22  Q.   When did you meet Chris Burns?

23  A.   I have known him since high school.

24  Q.   Have you ever received pills from him?

25  A.   Yes.

1   Q.   When was the first time?

2   A.   I believe that was 2012.

3   Q.   What types of pills were you getting from him?

4   A.   They were Roxy 10-milligrams.

5   Q.   Do you know where he was getting them from?  Did he

6   tell you?

7   A.   He had a prescription for them.

8   Q.   Did you get any other type of prescription pill from

9   him?

10   A.   No.

11   Q.   On how many occasions did you receive those Roxy 10s

12   from Mr. Burns?

13   A.   About ten.

14   Q.   And on each time, approximately, how many pills did you

15   get?

16   A.   It was different every time.  Sometimes it would be 10.

17   Sometimes -- between 10 and 20 each time.

18   Q.   And what did you do with those pills?

19   A.   I sold them to supply my own habit.

20   Q.   What is "fronting"?

21   A.   It is kind of like a loan; when somebody gives you

22   something, and you pay them back later.

23   Q.   Okay.  Were you fronted those pills from Mr. Burns?

24   A.   Yes.

25   Q.   So can you explain what that means?

1    A.   He came over -- when he had the pills, he fronted me

2    the pills, which gave -- which means he gave them to me.

3    And later on he would come back and pick up the money, like

4    a day or two a later.

5    Q.   And what did you get out of this transaction?

6    A.   Either I got a discount on the pills or just pills or

7    money to keep for myself.

8    Q.   Did you ever take those pills?

9    A.   Yes.

10   Q.   How did they make you feel?

11   A.   They give you a nice buzz.

12   Q.   They worked?

13   A.   Yeah.  They eased the pain and everything.

14   Q.   And where were these transactions happening

15   geographically?

16   A.   Like where at?

17   Q.   What county?

18   A.   Oh.  Bedford County.

19   Q.   And that's in Virginia?

20   A.   Yes.

21   Q.   Who else did you see Mr. Burns associate with?

22   A.   I know he hung out with Elicia, and --

23   Q.   What is her last name?

24   A.   Dickerson, I believe.

25        I know he knew Jennie and Jessie Kirsche.  And that's

1    all I know of.

2    Q.   Did you ever get anything from any of those people?

3    A.   No.

4    Q.   Did you ever give any pills to Mr. Burns?

5    A.   No.

6             MR. BRADYLYONS:  One moment, Your Honor.

7        (Off-the-record discussion between government counsel.)

8    BY MR. BRADYLYONS:

9    Q.   Do you know where Elicia was getting her pills?

10   A.   I'm not sure of that.

11   Q.   Do you know whether Mr. Burns ever got pills from the

12   Kirsches?

13   A.   Yes, he -- he mentioned a few times.

14   Q.   What did he say about it?

15   A.   He said he could get Dilaudids -- Dilaudids there and

16   some Roxys.

17   Q.   Did he mention anyone else that he was getting pills

18   from?

19   A.   No.

20   Q.   Did you see him get pills from anyone else?

21   A.   No.

22             MR. BRADYLYONS:  No further questions at this time.

23                      CROSS-EXAMINATION

24   BY MR. SNOOK:

25   Q.   Mr. Elliott, so I guess you had been using drugs

1   -- using these pills before you kind of met up with Chris in

2   2012?

3   A.   Yes.

4   Q.   Okay.  And I realize you had been friends since high

5   school, so you had known each other ten or so years ago?

6   A.   Yes.

7   Q.   And then the passage of ten years go by, you wound up

8   getting addicted -- would you say you got addicted in 2011

9   or you simply started using occasionally?

10  A.   I started using occasionally before then.  I say in

11  2012 is when my addiction got, you know, pretty bad.

12  Q.   And you mentioned that there were maybe ten times that

13  you got some pills.  Primarily -- was it primarily Roxy 10s?

14  A.   Yes.

15  Q.   Okay.  You got those from Chris.  Roughly when was

16  that; do you know?

17  A.   I can't remember exactly.

18  Q.   Okay.  Was it early 2012, late 2012?

19  A.   I believe it was maybe in the middle of 2012.

20  Q.   Okay.  Were you aware of the fact that Chris had -- had

21  had some surgeries for some orthopedic problems?

22  A.   Yes, that's -- yes.

23  Q.   Was that around the time that you first started meeting

24  Chris, shortly after the surgeries?

25  A.   I believe so, yes.

1   Q.   Okay.  And if -- if we were to determine that those

2   surgeries had happened in the fall to early -- you know,

3   like September to November of 2011, does that help you place

4   in time when it was you met back up with Chris?

5   A.   Yes.

6   Q.   Okay.  So when do you think it was you met back up with

7   Chris?

8   A.   If it -- the surgeries happened around that time, it

9   was probably -- that's probably around the same time:  2011,

10  2012.

11  Q.   Okay.  And during that time was he -- was he pretty

12  much laid up?  Was he able to get around town much?

13  A.   Yes.

14  Q.   Okay.  Was he working at that point?

15  A.   Not that I am aware of.

16  Q.   Okay.  During that time, was that when he was having

17  some pills that he gave to you, or did that come later?

18  A.   It was around that same time.

19  Q.   Okay.  The pills that he would give to you you say

20  might be ten, might be as many as 20 at a time?

21  A.   Yes.

22  Q.   Would you then go use those pills?

23  A.   Some of them, yes.

24  Q.   Okay.  Some you would use; some you would sell?

25  A.   Yes.

1  Q.  Did you and he ever discuss the fact that you were

2  going to go out and sell them or just that you were going to

3  be using them?

4  A.  He wanted me to get rid of them, so, yes, he wanted me

5  to sell them.

6  Q.  Okay.  And so the amount of money that you wound up

7  giving to him, basically, was enough to cover the ones that

8  you were using for yourself?

9  A.  Sometimes.  Sometimes I would have to put in my own

10  money to make up for it.

11  Q.  Okay.  So this wasn't a situation where you were

12  profiting financially as a result?

13  A.  Not always, no.

14  Q.  Okay.

15        MR. SNOOK:  I have nothing else, Judge.  Thank you.

16        THE COURT:  All right.  Any other questions?

17                    REDIRECT EXAMINATION

18  BY MR. BRADLYLYONS:

19  Q.  Do you know if Burns was profiting from your sales?

20  A.  I'm not sure how much he paid for the prescription, but

21  I'm sure he was.

22        MR. BRADLYLYONS:  Okay.  No further questions, Your

23  Honor.

24        THE COURT:  All right.  Thank you.  You may step

25  down.

1          Call your next witness.

2      (Thereupon, further proceedings were had, TESTIMONY OF

3  DAVID CYRLIN, said proceedings not being designated to be

4  transcribed.)

5

6                    EXAMINATION INDEX

7

BRYANT REYNOLDS, GOVERNMENT'S WITNESS
8      CROSS BY MR. SNOOK                                2
       REDIRECT BY MS. NEESE                            18
9      RECROSS BY MR. SNOOK                             24

10 SCOTT MICHAEL ANDREWS, GOVERNMENT'S WITNESS
       DIRECT BY MR. BRADYLYONS                         25
11     CROSS BY MR. SNOOK                               34
       REDIRECT BY MR. BRADYLYONS                       49
12     RECROSS BY MR. SNOOK                             52
       REDIRECT BY MR. BRADYLYONS                       53
13
   JESSICA KIRSCHE, GOVERNMENT'S WITNESS
14     DIRECT BY MR. BRADYLYONS                         54
       CROSS BY MR. SNOOK                               59
15     REDIRECT BY MR. BRADYLYONS                       64

16 TIMOTHY GOODMAN, GOVERNMENT'S WITNESS
       DIRECT BY MS. NEESE                              66
17     CROSS BY MR. SNOOK                               86
       REDIRECT BY MS. NEESE                            97
18
   HEATHER OVERSTREET, GOVERNMENT'S WITNESS
19     not transcribed                                 98

20 GRETCHEN STATON, GOVERNMENT'S WITNESS
       not transcribed                                 98
21
   MICAH SHANE MABERY, GOVERNMENT'S WITNESS
22     DIRECT BY MR. BRADYLYONS                         99
       CROSS BY MR. SNOOK                              103
23     REDIRECT BY MR. BRADYLYONS                      108

24

25

195

LEAH KELLY GOVERNMENT'S WITNESS - CROSS
    DIRECT BY MS. NEESE               110
    CROSS BY MR. SNOOK               116
    REDIRECT BY MS. NEESE            119
    RECROSS BY MR. SNOOK            120

ELICIA DICKSON, GOVERNMENT'S WITNESS
    not transcribed                 121

AMANDA McKINNEY, GOVERNMENT'S WITNESS
    DIRECT BY MS. NEESE               122
    CROSS BY MR. SNOOK               141

SAMANTHA BLANKENSHIP, GOVERNMENT'S WITNESS
    DIRECT BY MS. NEESE               146
    CROSS BY MR. SNOOK               154

KEVIN JESSEE, GOVERNMENT'S WITNESS
    DIRECT BY MS. NEESE               158
    CROSS BY MR. SNOOK               175
    REDIRECT BY MS. NEESE            183

DANNY ELLIOTT, GOVERNMENT'S WITNESS
    DIRECT BY MR. BRADYLYONS       186
    CROSS BY MR. SNOOK               190
    REDIRECT BY MR. BRADYLYONS     193

DAVID CYRLIN, GOVERNMENT'S WITNESS
    not transcribed                 194

    I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

      _____/s/ Carol Jacobs_____      September 25, 2014
      Official Court Reporter          Date