```
 1                UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF VIRGINIA
 2                    Lynchburg Division

 3   UNITED STATES OF AMERICA          Criminal 6:13cr00022

 4
                    Plaintiff,
 5
             vs.                      Lynchburg, Virginia
 6
     LES CHRISTOPHER BURNS
 7
                    Defendant.         June 30, 2016
 8

 9              TRANSCRIPT OF EVIDENTIARY HEARING
              BEFORE THE HONORABLE NORMAN K. MOON
10                 UNITED STATES DISTRICT JUDGE

11   APPEARANCES:

12   For the United States:      RICK A. MOUNTCASTLE
                                 U.S. Attorneys Office
13                               BB&T Building
                                 310 First St., S.W. Room 906
14                               Roanoke, VA 24008

15   For the Defendant:         PAUL G. BEERS
                                 Glenn Feldmann Darby &
16                               Goodlatte
                                 P.O. Box 2887
17                               Roanoke, VA 24011

18   Court Reporter:            Sonia Ferris, RPR, OCR
                                 U.S. Court Reporter
19                               116 N. Main St.  Room 314
                                 Harrisonburg, VA 22802
20                               540.434.3181.  Ext. 7

21

22

23

24

25   Proceedings recorded by mechanical stenography; transcript
     produced by computer.
```

1          THE COURT:  Good morning.

2          Call the case, please.

3          THE CLERK:  This is the case of the United States of

4   America vs. Les Christopher Burns, Case #6:13cr22, defendant

5   number ten.

6          THE COURT:  Government ready?

7          MR. MOUNTCASTLE:  Yes, Your Honor.

8          MR. BEERS:  Yes, Your Honor.

9          THE COURT:  Mr. Beers, you may.

10          MR. BEERS:  May it please the Court, Your Honor, Paul

11   Beers appointed to represent Mr. Burns.

12          I know the Court is familiar with the procedural

13   posture of this case.  At the request of the government after

14   I raised some Brady and Giglio issues on appeal, the Fourth

15   Circuit granted the government's request for a remand for

16   evidentiary development.  That's what we're here today for,

17   Judge.

18          I think my position is laid out as clearly as I could

19   lay it out in the briefs. I'd like to call some witnesses

20   today in support of our request, either for dismissal of the

21   indictment for prosecutorial misconduct or, in the

22   alternative, for a new trial.

23          THE COURT:  Would you like to make a statement?

24          MR. MOUNTCASTLE:  No, Your Honor.  I believe our

25   position is laid out in our briefing papers.

1          THE COURT:  Ready to call a witness?

2          MR. BEERS:  Yes, Your Honor.

3          Defendants would like to call FBI Agent Bryan

4     Emmerson.

5          And I'd also like to make a motion to exclude

6     witnesses who aren't testifying.

7          THE COURT:  If there are witnesses in the courtroom

8     that aren't testifying, I'll ask them to step outside.

9          MR. BEERS:  Judge, I've talked to Mr. Mountcastle

10    about this.

11         THE COURT:  Go ahead and swear the witness.

12       BRYAN EMMERSON, CALLED AS A WITNESS BY DEFENSE, SWORN

13         MR. BEERS:  We have a number of exhibits we presented

14    attached to the briefs.  To move this along, Judge, the

15    parties, if it please the Court, would like to move in en

16    masse their exhibits.  There's no objection on either side to

17    the exhibits that are attached to the filings.

18         THE COURT:  Okay.

19         MR. MOUNTCASTLE:  That's right, Your Honor.

20    BY MR. BEERS:

21    Q.   Would you tell the judge your full name, please?

22    A.   My name is Bryan Emmerson.

23    Q.   What do you do for a living, sir?

24    A.   I'm a special agent with the FBI out of Roanoke

25    Virginia, Richmond division.

1    Q.   Are you here because I subpoenaed you?

2    A.   Yes, sir.

3    Q.   Have you had a chance to talk to Mr. Mountcastle today

4    in anticipation and preparation for your testimony?

5    A.   A few days ago, yes.

6    Q.   And Ashley Neese, Ms. Neese?

7    A.   Haven't spoken to her about this.

8    Q.   Were you involved directly in this Pain Train

9    investigation Judge Moon is very familiar with?

10   A.   No, sir.

11   Q.   How did you get involved with Investigator Chris Cook

12   with the Bedford County Sheriff's Department?  How were you

13   involved at all?

14   A.   I came back from lunch at the wrong time.  I came back

15   from lunch and my boss called me in the office and said, hey,

16   we've got something that's come up.  I need you to go down to

17   the ATF and do an intake.  There's been concern about some

18   public corruption.  So I headed downstairs with my pad and

19   that's where it started for me.

20   Q.   In Roanoke.

21   A.   In Roanoke.

22   Q.   Was the FBI asked by the U.S. Attorney's office to

23   participate in this interview of this woman we'll call EC?

24   A.   I believe so.  I was asked by my boss.  That's what I

25   know.

1   Q.   Was that on or about April 16, 2013?

2   A.   Yes, it was.

3   Q.   Did you -- so you attended an interview.  Can you tell

4   us who was at the this interview at the ATF office?

5   A.   An individual referred to as EC.

6   Q.   A female; right?

7   A.   Correct, and her attorney, Scott Weber; AUSA Neese;

8   Russell Davidson with the ATF, who I had not met before; and

9   an agent from my office went along with us because we

10  understood there might be a phone with some significant info

11  on it and he was electronically certified to download phones.

12  So he came as well.

13  Q.   All right.  This interview, you took notes during the

14  interview?

15  A.   I did.

16  Q.   Did you prepare a written report?

17  A.   I prepared what we call an intake or 71.

18  Q.   Okay.  And you have that in front of you?

19  A.   I do.

20       MR. BEERS:  Would Your Honor like a copy? It's

21  already in evidence.  I'll ask a number of questions about

22  it.

23       THE COURT:  Is this --

24       MR. BEERS:  It's the FBI's typed up --

25       THE COURT:  I may have that.

1          MR. BEERS:  It says "complaint" at the top.

2          THE COURT:  Is this the same?

3          MR. BEERS:  Yes, sir.  Thank you, Judge.

4    BY MR. BEERS:

5    Q.   Now, this is the typed up -- you took some handwritten

6    notes while you were there, I take it?

7    A.   Correct.

8    Q.   How long after this interview did you type up your notes

9    into this report?

10   A.   I started it that afternoon. I actually went back to my

11   calendar when I got these questions prior to this hearing and

12   determined I finished it April 18, two days later, because I

13   had a different obligation the next day.

14   Q.   Did you send a copy to people within the FBI?

15   A.   I put it in my boss' in tray, yes.

16   Q.   Did you send it to the U.S. Attorney's office?

17   A.   No.

18   Q.   Did anyone request it?

19   A.   No.

20        To explain, this is an intake form so like if we had

21   somebody walk in off the street to make a complaint, we do an

22   intake where we put a basic summary of what they're saying.

23   It's kind of a triage mechanism for my boss to determine

24   whether we open a case, put it to a zero file.  It's not

25   something typically that's disseminated.

1  Q.   Ms. Neese was aware you were taking notes? She was

2  taking notes and you were taking notes; right?

3  A.   She was, and I was across the table from her, yes.

4  Q.   She was aware that typically, the FBI when they do

5  interviews, types up a report shortly thereafter.  Is that

6  fair? Like a 302?

7  A.   I don't know what her awareness is on intakes. I really

8  don't. I do know a couple years later, she asked if we had

9  done a report.  I said, well, we did an intake.

10 Q.   Now, turning to page two of your report, you say that

11 you learned that EC, this female, was a federal grand jury

12 witness on or about February 1, 2012?

13 A.   Yes, sir.

14 Q.   And that she started receiving some text messages from

15 Investigator Cook?

16 A.   Correct.

17 Q.   And moving us along, on December 8, 2012, did she meet

18 Investigator Cook at his request in the Montvale area?

19 A.   Yes.

20 Q.   Did she tell you that he was holding a six-pack of beer?

21 A.   Yes, she did.

22 Q.   She told you he was driving his Bedford County sheriff's

23 vehicle or another vehicle?

24 A.   He was sitting in the van with a six-pack, and that made

25 her uncomfortable.

1    Q.    This was a Bedford County Sheriff's Office vehicle that

2    he was driving around in; right?

3    A.    Yes.

4    Q.    And so, eventually, she allowed him to get into his car?

5    A.    Her car.

6    Q.    Her car.

7          He had already been dealing with her because she was a

8    grand jury witness; right?

9    A.    Apparently they had spoken a couple times, yes.

10   Q.    He's a vice agent, with the vice division of the

11   sheriff's office?

12   A.    I honestly don't know.  I know he was working with the

13   task force at the time.

14   Q.    All right.  And he made a sexual advance upon her?  Is

15   that fair?

16   A.    Yeah, I'd say that's fair.

17   Q.    Did he ask her -- this is on the top of page three.  Did

18   she ask him, aware that he had children?

19   A.    Yes.

20   Q.    Whether he was married?

21   A.    Yes.

22   Q.    And he said?

23   A.    No.

24   Q.    And you learned that was a false statement by

25   Investigator Cook subsequently?

1   A.   I didn't learn it from him.  I've heard it since, yeah.

2   Q.   To your knowledge, he's married; right? He was married

3   at the time? You don't know?

4   A.   Just rumor, yes.  No one formally told me that.

5   Q.   The bottom of page two, did he tell her, according to

6   EC, did he tell her that she had no exposure in this Pain

7   Train investigation, she was just a victim of circumstances?

8   A.   In the December 8th meeting, yes.

9   Q.   Yes.

10  A.   Uh-huh.

11  Q.   So he told her that she wasn't a likely target.  She had

12  no exposure, just a witness; is that fair?

13  A.   Correct, yes, in this first meeting.

14  Q.   Then he tries to kiss her; is that right?

15  A.   Yes.

16  Q.   Did he -- did she also tell you -- she's in the driver's

17  seat of her car; right?

18  A.   Correct.

19  Q.   There's a console in the middle?

20  A.   Uh-huh.

21  Q.   Yes?

22  A.   Yes.

23  Q.   So he's in the passenger seat.

24  A.   Correct.

25  Q.   He's drinking.

1    A.    Yes.

2    Q.    Did she tell you that he grabbed her and tried to pull

3    her over the console into his lap?

4    A.    Yes.

5    Q.    Did she tell you she sustained a large bruise on her

6    thigh and knee because of that?

7    A.    I remember the knee, yes. She sustained a bruise.

8    Q.    Bruising?

9    A.    Yes.

10   Q.    Did she say that he asked her to sit on his erect penis?

11   A.    I think she said he asked "did you feel that?"

12   Q.    Referring to his privates; is that right?

13   A.    Yes.

14   Q.    Did she then get away from him and get back into her

15   driver's seat?

16   A.    She did.

17   Q.    She asked him some questions about -- you don't know,

18   but she asked him some questions.

19   A.    She said they continued to talk.

20   Q.    At one point -- what does she tell you next that she

21   noticed?

22   A.    While she was continuing to talk, looking straight

23   ahead, she looked towards him and saw that he had unbuttoned

24   himself and pulled out his genitalia.

25   Q.    All right.  So your report, I think said he unzipped his

1   pants and he had unbuttoned his pants; right?

2   A.   Let's see. That he had unbuttoned and unzipped his

3   pants, yes.

4   Q.   And he was playing with himself, I think, your

5   expression?

6   A.   Playing with his penis.

7   Q.   So here's this officer masturbating in front of this

8   witness; right?

9   A.   That's what she told us.

10  Q.   That's what playing with his penis means; right?

11  Masturbating?

12  A.   Yeah, semantics.

13  Q.   Is it your impression the officer was asking her to

14  perform either oral or vaginal sex? Is that the impression

15  you got from her?

16  A.   Yes.

17  Q.   Did she comply?

18  A.   No, not according to her statement.

19  Q.   At any point -- at any point in this interview, and I've

20  read your report, did she tell you that she flirted with him

21  or he was just flirting with her? I don't see the word

22  flirtation or flirt in your report.

23  A.   I don't recall her saying she flirted with him, no.

24  Q.   The word flirtatious or flirt is nowhere in your report.

25  A.   No.

1    Q.   Then two days later, he asked her to meet her again?

2    Cook asked EC to meet him again?

3    A.   I think I said a few days later, so I don't think she

4    was specific.

5    Q.   All right.  But it was in December.

6    A.   Yes, a few days after December 8th.

7    Q.   Did she tell you -- you can review the report, but did

8    she tell you she considered recording this second meeting?

9    A.   She did.

10   Q.   Did she actually record the second meeting?

11   A.   No.  She said she was afraid to do it.  She was afraid

12   he'd notice.

13   Q.   At the second meeting, there was no sexual contact;

14   correct?

15   A.   Say that again? There was no sexual act?

16   Q.   He didn't take his pants off during the second meeting.

17   A.   No.

18   Q.   Did he ask her for a kiss?

19   A.   When she was departing the van, yes.

20   Q.   And she just ignored that?

21   A.   She pretended she didn't hear it.

22   Q.   So there's no physical contact of any kind at the second

23   meeting; correct?

24   A.   Correct.

25   Q.   Now, we talked, Agent, a little earlier how at the

1    beginning he told her you're just a victim of circumstances,

2    you're not a likely target, you're just a witness.  Did he

3    tell her that again at the second meeting two or three days

4    later?

5    A.    No.

6    Q.    What did he tell her?

7    A.    He said she might be involved or that she was

8    involved -- yes; that she was involved, in quotes.

9    Q.    And did he tell her there was a reasonable likelihood

10   now she was going to be arrested, words to that effect?

11   A.    He did.

12   Q.    Did he tell her he would be involved in this supposed

13   arrest?

14   A.    He said he would come and arrest her and he'd be the one

15   to strip search her.

16   Q.    Be the one to strip search her.

17         Now, that's false, right, just the strip search

18   statement?  There's no way that the federal government, ATF

19   task force, is going to let a male go in someone's house and

20   strip search her, is it?  No way.

21   A.    It would not be protocol for that.  You would check to

22   make sure there was no weapons or anything of that sort,

23   that's right.

24   Q.    So he lied to her; is that fair?

25   A.    Am I allowed to comment?

1    Q.   Yes.

2          MR. MOUNTCASTLE:   I'm going to object to that; asking

3    for speculation.

4          MR. BEERS:   What's the speculation?   He knows it's

5    preposterous.   He's familiar with local law enforcement.   The

6    federal government won't let a male strip search a female.

7          THE COURT:   He was a Bedford County officer.   I don't

8    know -- I mean, obviously, it's not going to happen.   I mean,

9    it's not permissible.

10         MR. BEERS:   That's obvious to us, Judge.

11         THE COURT:   I mean --

12         MR. BEERS:   Thank you, Judge.

13   BY MR. BEERS:

14   Q.   Now, you looked into that comment?   Not the strip

15   search.   As the judge said, that's obviously not going to

16   happen.   But did you then go to Ms. Neese and others in the

17   U.S. Attorney's office and say is she a likely target now?

18   Did you ask them that?

19   A.   Did I ask at the end of the interview?

20   Q.   Yes.   Page five; right?

21   A.   Correct.   I asked was she a likely target because I was

22   interested in the initial comment from the December 8th

23   meeting of whether or not, you know, she was a victim of

24   circumstance or if she was truly a target at the beginning.

25   They told me that she was not, on either occasion.

1   Q.   She was not a likely target then.  She was not a likely

2   target at any point; correct?

3   A.   Correct.

4   Q.   So he, by telling her that, was trying to deceive and

5   mislead her.  Is that fair?

6   A.   It's what it sounds like.  That's why I reported it as

7   she told us.

8   Q.   Yes, sir.

9        Now, did you have any further involvement in the case?

10  A.   No.

11  Q.   Did Ms. Neese come to you -- you said a couple years

12  later.  Did she ever come to you and say she needs your

13  report?

14  A.   No.

15  Q.   Did she ever come to you and say she needs your

16  handwritten report, the notes you took that day?

17  A.   No, until a couple years later I got a call from her

18  asking if I had a report and if I had notes. I said yes, I

19  did.

20       This is, like I said before, an intake. It's a

21  complaint.

22  Q.   Right.

23  A.   Actually, a lot of times, you write your report and the

24  notes go away on an intake.  On this one, I kept them because

25  it was an unusual scenario to be in, you know. So I kept them

1   and I had them and provided them to her at that point.

2   Q.   When you say a couple years -- we've just been talking

3   about April 16, 2013.  Do you mean 2014 or 2015 that she

4   requested it?

5   A.   I think it was 2015 because I got another call in I

6   think it was August of 2015 when these proceedings were going

7   on and I did note that date and I know it was prior to that.

8   I don't have an exact date when it was, but it was well after

9   this. She had to remind me what she was talking about.

10  Q.   I used the term 302 before.

11  A.   This is not a 302.

12  Q.   What's an FBI 302?  That's the one I'm most familiar

13  with, having done criminal law.

14  A.   So, this is an electronic communication in the form of

15  an FD71, which is an intake form.  It's an internal document

16  that's intended to speak to the file, speak to the

17  supervisor, speak to within house.  An FD302 is a formal

18  report you do when you conduct a formal interview in an open

19  investigation. This was not an investigation that was open.

20  This is what I would say is akin to triage.  I'm the medic

21  walking up and down the line of the soldiers laying there

22  trying to determine what do we have here, what do I need to

23  tell the surgeon, my boss.  I put it in a report.  He looks

24  at it.  He makes a determination whether, one, it's a

25  violation that we can work, we have the resources to work it,

1    we are going to work it; or two, if it needs to be put in a

2    file just to denote that it happened.

3    Q.   All right.

4    A.   So it's not a 302.

5    Q.   But a 302 is an interview when the FBI is involved with

6    U.S. Attorney's office, the FBI interviews suspects,

7    witnesses cooperating parties?

8    A.   In an open case, yes.

9    Q.   That's a typical 302.

10   A.   In an open case, this is the typical form in an intake.

11   Q.   U.S. Attorneys are very familiar with those forms;

12   right?

13   A.   Yes, those are the bricks you build a case with.

14   Q.   They know that typically the FBI -- and in fact, there

15   are time limits. You need to type those up pretty quickly,

16   don't you, after you interview the witnesses.

17   A.   Yes.

18   Q.   So they know you have those and they have access to

19   those; right?

20   A.   Correct, yes.

21        This is not a 302.  I want to make that clear.

22   Q.   Right.  Let's put that down.

23        Since you were asked by the Attorney's office to get

24   involved, conduct this interview, did you get back to the

25   U.S. Attorney's office or talk to them about your findings?

1          MR. MOUNTCASTLE:  I'll object.  A couple issues here.

2          Number one, I don't believe he was asked by the U.S.

3     Attorney's office to do anything.  He said he was asked by

4     his boss.

5          Number two, agent Emmerson is testifying pursuant to

6     a Touhy request, so the question about any further

7     discussions outside of this interview are beyond the scope of

8     the requested information in the Touhy request and the

9     information he's authorized to provide. So under law, he

10    cannot answer any questions that go beyond the scope of what

11    he had been authorized to provide based on the request made

12    by the FBI.

13         THE COURT:  What's the question?

14         MR. BEERS:  The question is did he get back to anyone

15    in the U.S. Attorney's office besides Ms. Neese about this

16    interview.

17         THE COURT:  He can answer that.

18         THE WITNESS:  I believe your question was, and

19    correct me if I'm wrong, did I --

20    BY MR. BEERS:

21    Q.   That's my question. I rephrased it.

22    A.   Did I get back to them because I was asked by the United

23    States office to be there?  I was not asked by the United

24    States Attorney's office to be there. I was asked by my boss,

25    who I imagine had a conversation with the U.S. Attorney's

1    office.  I went there.  I took the report and I returned it

2    to my boss, which is protocol for a 71 intake.

3    Q.   What's his name?

4    A.   Jeffrey Taylor.

5        And I had no involvement after that.  Just worker bee.

6    Q.   You found -- as a law enforcement agent, you found this

7    Investigator Cook's conduct grossly inappropriate.  Is that

8    fair?

9            MR. MOUNTCASTLE:  I'm going to object.

10           THE COURT: Sustained.

11           MR. BEERS:  No further questions, Your Honor.

12           MR. MOUNTCASTLE:  I have no questions, Your Honor.

13           THE COURT:  Thank you, sir.  You may step down.

14           MR. BEERS:  Can he leave, Judge?

15           THE COURT:  It's fine with me.

16           THE WITNESS: Can I stay in the courtroom?

17           MR. BEERS:  He's going to stay, Judge.

18           THE COURT:  That's all right.

19           MR. BEERS:  Defense calls Ashley Neese.

20       ASHLEY NEESE, CALLED AS A WITNESS BY DEFENSE, SWORN

21                      DIRECT EXAMINATION

22   BY MR. BEERS:

23   Q.   Tell the judge your full name for the record, please.

24   A.   Ashley Brook Neese.

25   Q.   What do you do for a living?

1    A.    I didn't hear you sir.

2    Q.    What do you do for a living?

3    A.    I'm an Assistant United States Attorney in the Western

4    District of Virginia, with the U.S. Attorney's office.

5    Q.    How long have you been practicing law?

6    A.    Practicing law; over eight years, about eight-and-a-half

7    to closer -- I think I was sworn in October of 2007.

8    Q.    Investigator Cook that we've been talking about today

9    that is at issue in this case, what was his role in the

10   so-called Pain Train conspiracy investigation?

11   A.    He was an investigator with the Bedford County Sheriff's

12   Office during the time period.  She was just one of the

13   investigators.

14   Q.    What was his involvement with Mr. Burns.

15   A.    His involvement with Mr. Burns? He was one of the

16   investigators that was looking into the entire investigation

17   and into Mr. Burns.

18   Q.    Wasn't he working with Mr. Burns when Mr. Burns was a

19   confidential informant?

20   A.    Yes.  I think beginning in October of 2012 after Mr.

21   Burns wanted to become a confidential informant, he had

22   signed up with the Bedford County Sheriff's Office and not

23   the Bedford Police Department.

24   Q.    How long was Cook involved with the Pain Train

25   investigation?

1   A.   I don't know prior to my involvement or the U.S.

2   Attorney's office involvement.   I think I became involved

3   somewhere around August of 2012.   There were approximately

4   five to six, either investigators or special agents on the

5   case or investigation, and he was one of those.

6   Q.   So, did you and your office basically terminate his

7   involvement, tell the sheriff's department he was not to work

8   on the case anymore? Did there come a time that you did that?

9   A.   August 16, 2013, I was directed, my supervision, to take

10  information to Captain Mike Miller of the Bedford County

11  Sheriff's Office and ask that he no longer be a part of the

12  Pain Train investigation, sir.

13  Q.   You said August? Did you mean April?

14  A.   I'm sorry, April of '13.   April 16th of 2013.   I'm

15  sorry.

16  Q.   So as soon as you sat down with Agent Emmerson and

17  interviewed EC on April 15 and 16, the decision was

18  immediately made to fire him from the investigation, to

19  terminate him from the investigation.

20  A.   I did not sit down with Agent Emmerson until April 16,

21  2013.   I had sat down on April 15th of 2013 to conduct an

22  attorney proffer at the direction of my supervision, and

23  following that, I took the information to my supervision and

24  they made that call, yes, sir.

25  Q.   Why?   Why did you not want him on the investigation

1   anymore?

2   A.   Well, I didn't choose that, but my supervision informed

3   me we were choosing that, basically.  I didn't have a say in

4   it.  I would have followed what my supervision said.  It was

5   because of the alleged conduct at the time.

6   Q.   So, this officer who had been working with you and

7   working on this investigation, because of what he did to EC,

8   was terminated, correct, from the investigation?

9   A.   Based on her allegations, yes, sir; yes, sir.

10  Q.   Do you have any doubt about the veracity of her

11  allegations?

12  A.   No, sir.

13  Q.   You keep saying her allegations, but he admitted them,

14  didn't he?

15  A.   I was not part of that interview.  That was an internal

16  interview, but based on what I received in May of 2013, yes,

17  sir -- excuse me, December of 2013, with the overview from

18  Elizabeth Wright, and then in May of 2014, it's my

19  understanding that he was truthful when he was interviewed

20  about the conduct.

21  Q.   Right.  So there's no doubt in your mind based on his

22  admissions and her statements that he pulled out his penis in

23  front of her in that car that night and started playing with

24  himself; right?

25  A.   That's correct.

1    Q.   Do you have your -- I've got a copy if you need it.  Do

2    you have some notes, I think you made? Do you want a copy

3    there?

4    A.   If you don't mind, sir.

5         (Document handed to the witness).

6         Thank you.

7         MR. BEERS:  Judge, these are some handwritten notes.

8    Does the Court need a copy?

9         THE COURT:  I don't have it before me.

10   BY MR. BEERS:

11   Q.   Did you make these notes?

12   A.   Yes, sir.

13   Q.   At the top, are they covering one date or two dates?

14   A.   They covered two dates, sir.

15   Q.   So, let me ask.  If I understand, Scott Webber is a

16   lawyer that was representing EC?

17   A.   Yes, he contacted me on April 15th of 2013 to advise me

18   that.

19   Q.   You first went and talked to Mr. Webber on April 15,

20   2013?

21   A.   Yes, sir, at the direction of my supervision.

22   Q.   Was -- when you went there to Mr. Webber's office, this

23   is in Roanoke?

24   A.   Yes, sir.

25   Q.   EC, his client, this female we've been talking about,

1    she was there, too.

2    A.    She did come later.

3    Q.    She was in the room at least for the part of the time.

4    A.    Yes, sir.

5    Q.    So these notes are from the April 15 meeting?

6    A.    That's correct.

7    Q.    Are some of these notes also from the next day when you

8    were at the ATF office when you interviewed her again with

9    Emmerson?

10   A.    Yes, sir.

11         And just to clarify for the record, it was Mr. Webber

12   that was providing most of the information on April 15th.

13   Q.    She was just there.

14   A.    She was providing him with information that was being

15   relayed to me is how I was under the -- is what he was

16   informing me.

17   Q.    But the three of you were there.

18   A.    That is correct.

19   Q.    Then the next day, you invited -- someone invited the

20   FBI and you met at the ATF office and interviewed her

21   directly; correct?

22   A.    Yes.  My supervision contacted the FBI.

23   Q.    Do your notes state anywhere, ma'am, and I've read them

24   as carefully as I can, that EC said or admitted that she was

25   flirtatious with Investigator Cook? Is that word "flirt" or

1   "flirtatious" in these notes anywhere?

2   A.   It is not, sir.

3   Q.   Now, you took the interview and then what did you do

4   next? After this interview on April 16, 2013, what did you do

5   with this information?

6   A.   I contacted my supervision, First Assistant United

7   States Attorney Tony Giorno, and Deputy Criminal Chief Thomas

8   Cullen, and asked them to talk with us about the information

9   and described it to them.   Thomas Cullen came down to meet

10  with us. I provided him with my notes and he went to discuss

11  with management.   I was advised later that ATF Special Agent

12  Russell Davidson and I, we were directed to take this

13  information, on that same date, April 16, 2013, to

14  supervision at the Bedford County Sheriff's Office.

15  Q.   So now, did Agent Emmerson also, he was right there next

16  to you.  He was taking his own notes; correct?

17  A.   He was across the table from me in the room.

18  Q.   Taking notes.

19  A.   To the best of my understanding or to the best of my

20  recollection, I think so.

21  Q.   You said in the affidavit that was allowed into evidence

22  that he was taking notes; right?

23  A.   That's to the best of my recollection.   Jesse Sebelius

24  was also there from the FBI and he was working on extracting

25  information from the cell phone.

1    Q.    You understood or assumed, didn't you, because you've

2    been practicing, been a prosecutor for a number of years,

3    that the FBI would shortly thereafter type up Agent

4    Emmerson's notes into a typed report; right?

5    A.    I actually do not know what they do on a case that is --

6    not a case, but whether or not it was going to be an

7    investigation, I did not know if he was going to type it up

8    or not.  I knew he was going to talk to his supervision.

9    Q.    Typically when you work with the FBI, they type up their

10   interview notes; right?

11   A.    In cases with our office, yes, sir.

12   Q.    Is Pain Train a case with your office?

13   A.    Yes, sir.

14   Q.    Okay. So now, did you go talk to the Bedford County

15   Sheriff's department, Investigator Cook's employer?

16   A.    Special Agent Russell Davidson and I proceeded that day

17   to Captain Mike Miller's house, in Bedford County.

18   Q.    The sheriff's department in Bedford County, they're part

19   of the ATF task force, involved in the Pain Train

20   investigation?

21   A.    They had involvement.  I'm not sure what you mean by

22   whether or not they were on the task force, I mean, actually

23   sworn in as task force officers. They were part of the case.

24   Q.    They were part of the case.

25   A.    Yes, sir.

1    Q.   The task force, just for the record, is that cooperation

2    between federal and local authorities?

3    A.   It can be, yes, sir.  Essentially, typically places

4    place task force officers, law enforcement offices place task

5    force offices on ATF, FBI or DEA, whatever, but it doesn't

6    mean the whole office is actually in the task force.

7    Q.   Getting away from task force or not task force, the

8    Bedford County Sheriff's department was intimately involved

9    in the Pain Train investigation.

10   A.   They did have investigators involved in that, yes, sir.

11   Q.   Including Investigator Cook.

12   A.   He was one of them; right.

13   Q.   You go over there to this captain's house; right?

14   A.   Yes, sir.

15   Q.   Did you tell the captain that his Investigator Cook

16   grabbed this woman, pulled her over the console of the car

17   and bruised her knee?  Did you tell him all that?

18   A.   Yes, sir.  I provided my handwritten notes to him.

19   Q.   Okay.  You gave him the notes?

20   A.   I gave him a copy of my notes, yes.

21   Q.   My next series of questions are, did you tell him

22   Investigator Cook grabbed the woman and tried to pull her

23   over the console of the car and bruised her knee?

24   A.   I actually don't recall the amount of detail we told

25   him.  We told him an overview of what happened.  I cannot

1   remember each and everything we told him.  I'm sorry about

2   that.

3   Q.   Here's one thing I want to ask you.  Did he tell him his

4   investigator pulled out his penis and started playing with

5   himself in front of that woman? Did you tell him that?

6   A.   Sir, I don't remember.

7   Q.   You don't remember?

8   A.   I remember I provided him with our notes, my handwritten

9   notes.  I don't recall anything or every detail of what was

10  told to him, besides the fact that we gave him the notes.  We

11  gave him the extraction report. We sat on his front porch and

12  we discussed the fact that we had a cooperating witness come

13  in and provide us with this information.

14  Q.   Extraction report is just taking the text messages off

15  his phone; right? That's extraction report.

16  A.   That's what the FBI calls it, yes.

17  Q.   I'm not asking about that, okay?  I'm asking when you

18  went over there to Captain Miller's house, did you tell him

19  anything about Investigator Cook exposing himself to this

20  poor woman?

21  A.   I don't recall if I said that specifically.  I do recall

22  telling him that there was misconduct.

23  Q.   Right.  Because you were protecting Investigator Cook

24  so, you never told him how bad it was?

25  A.   Sir, I gave him my notes and it's stated in my notes.

 1    Q.   Where is it stated in the notes?

 2    A.   It's stated on the first page, over on the right side:

 3    "He pulls it out and plays with himself. It's distinct,

 4    penis, small."  It's written.

 5    Q.   You handed it to him and said here you go; is that

 6    right?

 7    A.   I did give it to him.

 8    Q.   Okay, all right.

 9         Now, at that point, did you disclose any of this to any

10    of the defense counsel in this Pain Train conspiracy?

11    A.   In April of 2013?

12    Q.   Yes, ma'am.

13    A.   No, sir.

14    Q.   Were there internal discussions that maybe that was

15    going to need to be disclosed?

16    A.   Sir, I had multiple discussions. I contacted every

17    criminal supervisor in the Roanoke office about this and two

18    Giglio officers, with the exception of the United States

19    Attorney.

20    Q.   There are two Giglio officers in the Western District of

21    Virginia; is that true?

22    A.   At that time point, yes, sir.

23    Q.   Who are they?

24    A.   At that time, the ones that -- were Jennifer Bockhorst

25    and Elizabeth Wright.

1    Q.    And Jennifer Bockhorst was down in Abingdon.  Works

2    across the street from the courthouse in Abingdon.  She's

3    with the U.S. Attorney's office in Abingdon.

4    A.    That's right.

5    Q.    And Ms. Wright worked in the U.S. Attorney's office in

6    Harrisonburg.

7    A.    That is correct.

8    Q.    And they're both Giglio officers.

9    A.    That is correct.

10   Q.    So they're experts in Giglio procedures; right?

11   A.    I don't know if I can classify them as experts, but it's

12   my understanding they receive specialized training in the

13   handling of Giglio matters.  We do not, as line U.S.

14   Attorneys, receive that training.

15   Q.    So you looked to them.

16   A.    Yes, sir.

17   Q.    Let me ask you about an email chain.

18         Judge, I'd like to give you a copy.  It's in the

19   documents behind Ms. Neese's affidavit.

20         (Document handed to the Court).

21         Really, I'm just going to -- we don't have to go through

22   all of them.  I'll ask you real briefly about the last two in

23   the chain.

24   A.    Sir, this only says page three through six.  I don't

25   know that I have the complete document.

1   Q.   I'm just asking about these e-mails.  I'll be specific.

2   An e-mail from you to Elizabeth Wright and Jennifer

3   Bockhorst, the Giglio officers, on December 6, 2013; right?

4   And Jennifer Bockhorst's response the same day?

5   A.   Yes, sir.

6   Q.   Now, at this time in November, December, were you

7   working with -- and prior to that in 2013, were you working

8   with Ms. Bockhorst as a Giglio officer?

9   A.   Yes, sir.

10  Q.   Had she given you any advice about whether you had to

11  disclose things or not up to this point, if you remember?

12  A.   Sir, there's a March of 2013 e-mail where I had learned

13  of an issue in a Giglio questionnaire and I had raised it

14  with her and brought it to her attention. She advised me at

15  that point that Investigator Cook could still work on the

16  Pain Train matter and that she was going to reach out to get

17  documentation from the Botetourt County Sheriff's Office

18  because that's how our policies with the Department of

19  Justice and the United States Attorney's office was, that the

20  Giglio officer had to do those inquiries.

21  Q.   Right.  So let me back up and see if I understand this.

22  When you say there was another matter, I think you said

23  Investigator Cook.  There's a whole 'nother set of issues

24  that was investigated by your officer concerning Investigator

25  Cook and that happened in Botetourt County; right?

1    A.   It did.

2         I want to make sure I'm explaining this correctly.  In

3    March of 2013, I completed a Giglio questionnaire.

4    Q.   With Investigator Cook.

5    A.   That is correct.

6         He had responded to one of the questions.  The

7    information that was provided to me by Investigator Cook I

8    provided to my Giglio officer on or about the same day, and

9    that was a matter with the Botetourt County Sheriff's Office

10   prior to his employment -- it's my understanding, at least,

11   prior to his employment with the Bedford County Sheriff's

12   Office.

13   Q.   So Ms. Bockhorst had had some involvement from March

14   forward advising you and she said she was going to write

15   Bedford County to get more information.

16   A.   Botetourt County Sheriff's Office.

17   Q.   Then in April, 16, you learn that he exposed himself,

18   Investigator Cook, to EC, and you terminated this guy, Cook,

19   from the investigation team.

20   A.   The United States Attorney's office did, yes, sir.

21   Q.   All right. So then, you're still talking though --

22   apparently it comes up again late in 2013.  Were you getting

23   ready for trial in early '14 in one of the Pain Train cases?

24   A.   Yes.  There was a potential that a jury trial would go

25   between January 8th and January 10th, 2014.  I think I had

1    brought it up with my supervisor, who had changed at that

2    point in time because Thomas Cullen had left.  So I brought

3    it up with Deputy Criminal Chief Craig Jacobsen, who was my

4    direct supervisor.

5    Q.   So back to our e-mail here, December 6, 2013.  You lay

6    out these timeline of events and I want to ask you real

7    quickly.  You talk about what happened on April 16, 2013, on

8    the interviews.  Then you say that EC testified before the

9    grand jury, April 18th. Then you say "within a week, I

10   received word Investigator Cook had been demoted by Bedford

11   County, removed from vice."

12        Now, I want to ask you about Jennifer Bockhorst.  She's

13   the Giglio officer; right? She says -- or you ask for a

14   conference call; is that right?

15   A.   I think Elizabeth Wright asked for the conference call

16   previously.  If you look back at the sixth page --

17   Q.   Yes.

18   A.   -- Elizabeth Wright asked Jennifer if she could be

19   available for a conference call.

20   Q.   Now, Ms. Bockhorst says "forgive me for sounding grumpy,

21   but we don't need a conference call on this. If the guy has

22   been demoted, we need the documents from Bedford County and I

23   think that needs to be turned over if they say that's why

24   they demoted him.  If they did it without a finding of

25   misconduct, then collect the documents and lay out the facts

1   in writing and submit an ex parte motion with the judge.   I

2   don't see what else there is to talk about."

3        That's your Giglio officer talking to you; right?

4   A.   That was one of them, yes, sir.

5   Q.   You knew at that time he had been demoted and you knew

6   the facts and she said "what's so complicated, turn over the

7   documents to the defense counsel;" right?

8   A.   That's what the e-mail says, yes, sir, and it goes on to

9   say lay out in ex parte.

10  Q.   We're six months before we get to the ex parte motion

11  where you're about to talk to Judge Moon and your Giglio

12  officer told you to turn over the documents.

13  A.   She was one of our Giglio officers. About this time, I

14  was assigned to work with Elizabeth Wright.

15  Q.   Right.

16       Once you got that clear direction from Elizabeth

17  Bockhorst (sic), the Giglio officer, you changed Giglio

18  officers.

19  A.   That is incorrect, sir.  If you could read the e-mails,

20  I did not choose any of the Giglio officers.  My supervision

21  did.  Jennifer Bockhorst advised us she was too busy on a

22  case load and I was directed to work with Elizabeth Wright.

23  Q.   So then you work with Elizabeth Wright and she's a

24  different Giglio officer and she gave you different advice?

25  A.   Sir, I followed the advice and direction of all my

1    supervision and the Giglio officer in this case.

2    Q.   Let's just move ahead to May.  Now we're May 14th;

3    right?

4    A.   Yes, sir.

5    Q.   That's when you approach Judge Moon ex parte; right?

6    A.   Yes, sir.

7    Q.   So you've been sitting on this information since April

8    of 2013. You haven't told Mr. Snook, defense counsel; right?

9    You haven't told anybody.

10   A.   I told a lot of people.

11   Q.   You haven't told anybody outside the government, have

12   you?

13   A.   Outside of the U.S. Attorney's office?

14   Q.   You haven't told any defense counsel about this

15   misconduct by your Investigator Cook, former investigator.

16   A.   That's correct.  If you look at our e-mails in December

17   of 2013, I had asked my deputy criminal chief, Craig

18   Jacobsen, if I should release this information for anyone who

19   had pled guilty and both Jennifer Bockhorst and Elizabeth

20   Wright advised me that I didn't need to release that

21   information.

22   Q.   You're letting people plead guilty not know about this

23   information; right?

24   A.   I was advised I could do that.  I inquired about it.

25   Q.   Here we are in May of 2014 and you still don't want to

1    tell the guy's lawyer who's not pleading guilty, this guy's

2    lawyer, Mr. Burns' lawyer, you don't want to tell Mr. Snook,

3    here's the evidence. You don't want to do what Ms. Wright

4    said and just turn over the documents; right?

5    A.   First off, Ms. Wright did not say that, sir.  That's

6    incorrect.  Second off, that's not correct. We did not

7    anticipate calling Christopher Cook to the stand.  We thought

8    we could prove our case well besides that and if you read the

9    e-mails, it lays that out.

10   Q.   Well, now at some point, you told the judge, Cook is

11   going to be a witness, he's going to read in a confession.

12   A.   Yes.  As my Declaration indicates, it's because Mr.

13   Snook filed a motion to suppress alleging Investigator Cook

14   and I had threatened Mr. Burns' then wife.

15   Q.   You knew at some point, in April or May, you're going to

16   trial.  Cook's just not going to take a plea -- Burns, not

17   Cook -- and Cook was going to be a witness at the trial

18   against Burns in June, right, '14?

19   A.   On May 5, 2014, a motion to suppress was filed. I

20   contacted my direct supervisor on May 6, 2014, to discuss

21   whether or not Deputy Cook would be a witness at the

22   suppression hearing.  At that point in time, we decided he

23   would be and that's when I was advised to follow the

24   direction of Elizabeth Wright, the Giglio officer working on

25   that matter.

1    Q.    Where is Ms. Bockhorst? She's gone. She's out of the

2    case.

3    A.    As the e-mails set forth in December, our supervision in

4    the U.S. Attorney's office in Roanoke, directed Ms. Wright to

5    be the Giglio officer over this matter, sir.  I don't know

6    what they discussed.  I just know that I was directed to work

7    with Elizabeth Wright.

8    Q.    Why did you and Ms. Wright -- forget Ms. Bockhorst.

9    She's off the case.  Why did you and Ms. Wright then just not

10   give the documents to Burns' lawyer?

11   A.    I was advised and informed that I needed to make a

12   disclosure that was sufficient to provide a summary of the

13   nature of the conduct and that I also had to -- and that

14   would be sufficient to comply with my discovery obligations,

15   sir, and that I would also need to comply with the Department

16   of Justice's policy and procedures and also the United States

17   Attorney's office policy and procedures to take into

18   consideration the Privacy Act, sir.  As I said, that's what I

19   was advised.

20   Q.    So, you go in front of Judge Moon and you do this

21   without telling Snook; right? You never told Snook you were

22   going to talk to Judge Moon.

23   A.    It was an ex parte proceeding.

24   Q.    Secret.

25   A.    Yes, sir. I think after the fact we had advised him we

1    did do that.

2    Q.   Correct.

3         So, you then provided a summary to Judge Moon; is that

4    right?  A summary of this agent's misconduct?

5    A.   I had received draft examples and was advised on how to

6    work on drafting this, yes, sir.

7    Q.   And your summary is in the record.  We don't need to

8    belabor it, but you certainly didn't tell Judge Moon anything

9    about this Investigator Cook taking his penis out.

10   A.   That detail was not included.

11   Q.   Did you tell Judge Moon that the guy had lied about

12   being married?

13   A.   No, sir.

14        May I explain?

15   Q.   Let me ask you this -- yes, you can explain.

16        He told EC he wasn't married; right?

17   A.   That is included in my notes, yes, sir.

18   Q.   That was a lie.

19   A.   Yes, sir, to the best of my knowledge of what I've been

20   informed, yes, sir.

21   Q.   It's in the record already.  The sheriff's department

22   said you're married.

23   A.   That's correct.

24   Q.   He lied to the woman and said "I'm not married."

25   A.   That's correct.

1   Q.   Did you tell Judge Moon about that lie?

2   A.   That was not included, and if I could explain. As I

3   stated in my Declaration, I was getting advice from my

4   supervision and from my Giglio officers.  That part of the

5   conduct was never described or highlighted and we considered

6   that part of the conduct, sir.

7   Q.   Did you tell Judge Moon that the guy, Cook, on the

8   second occasion after telling her "you're not a witness,

9   you're a victim of circumstances, likely to be arrested," did

10  you tell Judge Moon on the second occasion, Cook went to this

11  lady and said you're likely to be arrested and I'm going to

12  be the one to strip search you if you are?  Did you tell him

13  that? We just heard about all that from Agent Emmerson.

14  A.   I think at least from my notes, he said you could be

15  arrested and that he would be the one to come potentially do

16  the thorough strip search and he advised her that she was

17  involved.

18  Q.   Right.  And none of that was true.

19  A.   I think that's partially inaccurate.  She was involved.

20  She had already been a grand jury witness and had been

21  notified.  But the second part or the part about she could be

22  arrested at that point in time, sir, she was not a target of

23  our investigation.

24  Q.   Didn't Emmerson come to you and say, wait a minute, why

25  is he flip-flopping within two days?  Once he tells you

1    you're purely a witness -- we all know what that means.

2    Purely a witness.  No exposure.  Two or three days later, he

3    says, now you're involved, you're likely to be arrested.

4    A.   Are you asking me if Emmerson asked us that?

5    Q.   Yes. Didn't Emmerson come to you and ask you that?

6    A.   To the best of my recollection, at the end of the

7    interview, Special Agent Emmerson asked me if she was likely

8    to be arrested or if she had been a target and I advised him

9    that she was not a target.

10   Q.   And of course, this idea that a male, that you would

11   allow a male to go arrest a female subject and strip search

12   her, that's not true, is it?  You would never allow that.

13   A.   No, sir.  Not that I have control over how they do their

14   arrests, but if it was my call, no, sir.

15   Q.   It is your call. You're the prosecutor on the Pain Train

16   investigation.

17   A.   Sir, I don't supervise individuals when they go out to

18   make arrests.

19   Q.   Do you think a Bedford County sheriff would let him go

20   strip search a female in her house? What do you think?

21   A.   I would hope not.

22   Q.   So that's another false statement.

23   A.   It was false, from my recollection, that she could be

24   arrested because she was not a target.

25   Q.   So your understanding -- and you were there, you saw the

1    demeanor of this lady.  This guy, Cook, he was just trying to

2    intimidate her? What was he trying to do? Sexual favors? What

3    was he trying to do?

4    A.    Sir, I do not know.

5    Q.    So, you didn't tell Judge Moon all these things.  What

6    you did tell Judge Moon is that she admitted being

7    flirtatious and he admitted being flirtatious and they even

8    kissed.  Right? That's what you told Judge Moon.  Brief

9    summary; right?

10   A.    That's part of the summary, yes, sir.

11   Q.    A couple days later, the judge, His Honor, enters an ex

12   parte order; correct?

13   A.    I'm pretty sure it's the same day.

14   Q.    Because the trial is coming up.

15   A.    We were worried about the suppression hearing and that

16   was on May 20th.

17   Q.    Were you worried about defense counsel having all the

18   facts and the exculpatory information he needed to represent

19   this gentleman?

20   A.    First of all, I was not advised this was any type of

21   exculpatory information at all.  Second of all, I was advised

22   this was potential Giglio information and I was worried about

23   following the direction of my supervision and what Ms. Wright

24   was informing me in that we had to both file our discovery

25   obligations by providing a sufficient summary of the nature

1    of the conduct while also complying with the Department of

2    Justice's policy and procedures with the Privacy Act.

3        Sir, as I stated before, I did not have specialized

4    training in that nor do I know each and every detail of the

5    Privacy Act.  So, I was being informed of this information

6    and trying to follow the direction that was given to me.

7    Q.   Are you finished?

8    A.   I'm sorry?

9    Q.   Are you finished with your answer?

10   A.   Yes, sir.

11   Q.   I'll go on with the judge's order.  Let's just go to the

12   last page.  Page three.  Do you have that?

13   A.   Yes, sir.

14   Q.   There's a copy.  Have you reviewed this before your

15   testimony today?

16   A.   I did.  I have reviewed this.

17   Q.   I can show it to you, let me just read you the key part.

18   It's at the end.  Pretty short and straightforward, I think.

19   The judge says, you know, he says Cook's behavior while he's

20   involved with Botetourt County Sheriff's Office need not be

21   disclosed.  That's the Botetourt County's, Investigator

22   Cook's conduct or misconduct over there, does not need to be

23   disclosed; right?  Botetourt County?

24   A.   That's correct.

25   Q.   But Judge Moon said, Investigator Cook's December 2012

1   behavior while he was an employee of the Bedford County

2   Sheriff's Office and an investigator working on the Pain

3   Train investigation does need to be disclosed as soon as

4   possible to defendant pursuant to Giglio versus the United

5   States. Then in a footnote, the judge says "I note while I

6   determined this information must be disclosed to the

7   defendants so defendant may take part in argument about its

8   probative value and admissibility, I at this time take no

9   position on the question of whether Investigator Cook's

10  behavior will ultimately be deemed admissible."

11      So you understood this order, which is straightforward,

12  I think we can agree, and well written, to mean that you need

13  to provide evidence of this guy's behavior with respect to

14  EC, in December, 2012; right?

15  A.   Of the behavior, yes, sir.

16  Q.   Yeah.  Did you provide any evidence of his behavior?  I

17  think we can all agree it was misbehavior.

18  A.   Yes, sir, I did provide a disclosure letter to Mr. Snook

19  at that time pursuant to what I was being advised by Ms.

20  Wright.

21  Q.   I understand, and you've said enough times, I think --

22  if you want to keep saying it you can -- but I understand you

23  telling us Ms. Wright is advising you and right in there with

24  you the whole time; right?

25  A.    Sir, I have to do that in compliance with my office

1   policy.

2   Q.   But do you think -- do you think that that letter was

3   evidence? Your letter to him, was that evidence?

4   A.   Sir, we noted it was part of the discovery in the case.

5   I'm not sure what you're asking.

6   Q.   That letter is signed by you.  You're not a witness;

7   right? That's not evidence from you.  You're not a witness.

8   Snook can't call you to the stand. You just gave a summary.

9   You didn't give any primary evidence, did you?

10  A.   Sir, I think he could if he wanted to try to conflict me

11  out of the case.  Once I signed that letter, he could have

12  done that.

13  Q.   What about the other evidence? What about Agent

14  Emmerson's typed FBI report specifying Cook's false

15  statements to this woman, specifying what he did to her? Did

16  you give that to Mr. Snook?

17  A.   No, sir, and I need to explain why.

18       First, I did not have communication with the FBI about

19  that.  My supervision did.  I did not receive a copy --

20       THE COURT:  Just a minute. Why, once I enter an

21  order, why did you have to go back to the FBI to see if you

22  can comply with my order? That's what I don't quite

23  understand.

24       THE WITNESS:  Sir, I didn't go back to the FBI. I

25  went to Elizabeth Wright.

1           THE COURT:  Well, Elizabeth Wright.  Once I enter the

2   order, unless you appeal it, unless the order makes no sense,

3   I don't know why you would go to anybody but to supply the

4   information.

5           THE WITNESS:  Sir, I understand that. What I was

6   trying to do was comply with my office's policy.

7           THE COURT:  Your policy can't trump the Constitution

8   and it can't trump the rules of evidence and it can't trump

9   my order.

10          THE WITNESS:  I understand that, sir.  What I was

11  doing was complying with what my supervision had advised me

12  and what my Giglio officer had advised me, sir.

13          THE COURT:  Okay.

14  BY MR. BEERS:

15  Q.  So your testimony is that the United States Attorney's

16  office, including its Giglio office told you to disobey this

17  order.

18  A.  No, sir, that's not my testimony.  My testimony is that

19  I provided this order to Elizabeth Wright and then later to

20  Craig Jacobsen and I was instructed on how to follow this

21  order in a sense that I was given sample disclosure letter

22  language.  I was also advised, because I had never had a

23  hearing like this or a matter regarding potential Giglio

24  information like this, I was advised to include the same

25  information because the summary of the nature of the conduct

1   was sufficient to comply with my discovery obligations and

2   also to comply with DOJ policy involving the Privacy Act.  So

3   I submitted my disclosure letter that I drafted for Mr. Snook

4   to Ms. Wright.  Once it was approved and there were no

5   substantive changes, just like the ex parte motion, I

6   submitted it because I thought I was doing the right thing.

7   Q.   You did.  You thought you were doing the right thing.

8   A.   I did.  In good faith, I truly thought I was doing the

9   right thing.

10  Q.   Well, before you testified, did you y'all just didn't

11  think this was Giglio material so you just didn't discharge

12  your ethical obligations.  You went in front of the judge and

13  said ask the judge and it's all in the record.  You argued

14  hard this wasn't Giglio material, it didn't matter.

15  A.   Sir, I said previously in my testimony it was potential

16  Giglio information and I was advised throughout my --

17  Q.   You signed a pleading arguing that we shouldn't have to

18  turn it over, ma'am.

19  A.   That's correct.

20  Q.   Yeah, that's correct, okay.

21       So now then you have a hearing.  You get to have a

22  hearing, extraordinary hearing, where this guy, who was

23  charged with very serious offenses, isn't even invited.  His

24  lawyer is not there.  You have a private chat with the judge.

25  He looks at the situation. He tells you to disclose the

1  behavior to defense counsel; correct?

2  A.   He ordered that, yes.

3  Q.   And did you give any evidence besides your summary,

4  which I don't think is evidence, but if you think it's

5  evidence, fine.  Did you give any of the primary evidence

6  like the FBI report? No.

7  A.   I didn't have it, sir.

8  Q.   Did you give any of the Bedford County documents that

9  are in evidence to Mr. Snook?

10  A.   We did not.

11  Q.   Did you give these things to Ms. Wright, the woman you

12  say is telling you what to do?

13  A.   Sir, Ms. Wright received the documents from Bedford

14  County.  I did not.  I was not in a position in the U.S.

15  Attorney's office to either request or receive potential

16  Giglio information as set forth in my Declaration.

17  Q.   Do you or anyone else give Elizabeth Wright, the FBI

18  report typed up that we've just been talking about? Was that

19  given to Ms. Wright?

20  A.   Sir, I do not know. You'll have to ask her.  I did not

21  have that report until May of 2015 because I was not the one

22  communicating with the FBI.

23  Q.   I'm not asking right now what Elizabeth Wright told you

24  to do or Mr. Giorno or anybody else. I'm asking you in your

25  mind as a prosecutor, do you think you gave any evidence to

 1    Mr. Snook as you were ordered to do?

 2    A.   Sir, I was advised and had been advised multiple times

 3    to comply with my discovery obligations I could also submit

 4    e-mails giving an overview of testimony or giving an overview

 5    of conduct.  I submitted this disclosure letter and it was my

 6    understanding that I was complying with my discovery

 7    obligations and also with the Department of Justice's

 8    policies and procedures.

 9    Q.   Let's depart from Judge Moon's ex parte order of May and

10    go back for a minute to his standing order in January.

11    There's a discovery order, right, joint discovery inspection

12    order.  You sign these all the time, don't you?

13    A.   Yes, sir.

14    Q.   You don't check with Ms. Wright.  She doesn't tell you

15    what to do.  You sign them; correct? You endorse these. I'm

16    going to show it to you in a minute.

17         Is that right?

18    A.   Yes, sir.

19    Q.   You endorsed this order and you agreed that the United

20    States shall provide -- in fact it's further ordered that the

21    United States will provide to the defendant any evidence of

22    an exculpatory nature as defined in Brady v. Maryland and

23    those cases interpreting that opinion. You endorsed that,

24    Ashley Neese.  You agreed to do that.  You promised to do

25    that, didn't you?

1    A.    Yes, sir.

2    Q.    Do you want to see your signature?  Is that your

3    signature? Seen and agreed; right?

4    A.    Yes, sir.

5    Q.    So before we even talk about the ex parte order, you're

6    already under a duty not to provide a summary, right, but to

7    provide the evidence that's exculpatory; correct?

8    A.    Sir, the form in which we provide information I think is

9    not -- as long as the substance is there.

10   Q.    Is that what that says to you? When you endorsed this

11   order, "provide any evidence of an exculpatory nature" you

12   think you can get away with just writing some summary?

13   A.    First off, I was advised this was not exculpatory

14   information, that this was potential impeachment information.

15   Second, we've been trained we have to make the information

16   known as part of discovery.

17          MR. BEERS:  Judge, just for the record, I was just

18   showing her Document 172, which is a joint inspection order,

19   dated January 22, 2014.

20   BY MR. BEERS:

21   Q.    Didn't Judge Moon tell you, end any debate, when he went

22   back and considered your summary that you gave him?  Didn't

23   he end any debate? He said this information needs to be

24   disclosed because it tends to impeach.  He cited a Fourth

25   Circuit case to you, Sterling. He said this information about

1    his behavior concerning EC needs to be disclosed.

2         There's no more debate; right?

3    A.   He did cite a Fourth Circuit case and that's correct.

4    Q.   Right.  So he told you exculpatory.  He's told you

5    before when there's exculpatory information, you provide it.

6    A.   He did not say exculpatory, sir.

7    Q.   What did he say?

8    A.   He said impeach, which is different than exculpatory.

9    Q.   You think so?

10   A.   Yes, sir.

11   Q.   So you went to trial and just to sum up, Mr. Snook,

12   prior Court-appointed counsel, didn't know anything about

13   what happened that day during those occasions between EC and

14   Investigator Cook; right?

15   A.   That's not correct.

16   Q.   What did he know, based on your summary? Tell me what he

17   knew.

18   A.   Exactly what my summary said.

19   Q.   Right.  What did it say?

20   A.   I don't have the letter before me, but I think it's

21   essentially the same thing that I wrote in the ex parte

22   motion that I'd received.

23   Q.   May 16, 2014, letter; right?

24   A.   I'm actually reading from the motion because I don't

25   have the letter.  If you have the letter --

1   Q.   Let's look at the letter.  You say you disagree with me

2   and you think you fairly informed his defense lawyer.

3   A.   You asked me if I presented any evidence and yes, sir, I

4   did present some evidence.

5   Q.   Some evidence.  That's not what the order of January

6   told you and that's not what the order of May 14th, the ex

7   parte order, said when Judge Moon said give him the evidence

8   and you didn't do it.  Is that right?

9   A.   In the May 2014 order, he did say the behavior, yes,

10  sir.

11  Q.   What you told Mr. Snook was that Ms. EC admitted -- let

12  me see if I can get this right.  The witness, EC, admitted

13  that during encounters with Cook, she and Cook had been

14  flirtatious and even engaged in kissing.  The witness said

15  Cook admitted to her he had consumed alcoholic beverages

16  prior to meeting with her on each indication and was driving

17  his undercover vehicle at the time he met with her on both

18  occasions.

19      Now, we've already gone over, I think with you and the

20  FBI agent, and nowhere in your notes or report is the word

21  flirtation or flirtatious even there; correct?

22  A.   That is correct.

23  Q.   Ma'am, you're not going to tell me when a guy grabs a

24  woman -- not a guy.  An investigator grabs a female grand

25  jury witness, obviously trying to get some treatment from

1   her, that he grabs her, pulls her across the console of her

2   car, bruises her knee and then starts playing with himself in

3   front of her, that's not flirtation.  Is that flirtation?

4   It's a very simple question.  I don't want to hear about Ms.

5   Wright.  I want to hear from you.

6   A.   I think that's more than flirtation.

7   Q.   That's right.  Thank you.

8        And you didn't tell Mr. Snook that, did you?

9   A.   I advised him of what was in the documentation, as we

10  advised him it was a summary of the nature of the conduct.

11  Q.   And that was misleading.  You misled Snook, didn't you?

12  A.   I was not trying to mislead anyone.

13  Q.   Really?

14  A.   I was trying to comply with my discovery obligation,

15  sir, while also complying with the Department of Justice

16  policy.

17  Q.   Let's get away from Investigator Cook's penis. Let's

18  talk about lying.

19       Did you tell Snook the guy lied to EC when she asked him

20  point blank "aren't you married" and he said "I'm single"?

21  Did you tell Snook that?

22  A.   Again, we did not consider that separate conduct.  At

23  the time, we were focused on the other conduct, the physical

24  conduct in trying to comply with that information.  Plus, it

25  had never been brought up in my discussions with my

1  supervision or my discussions with my <u>Giglio</u> officers.

2  Q.   Judge Moon, again, told you all behavior, all evidence,

3  and this is exculpatory, impeachment, needs to be disclosed

4  immediately; right?

5  A.   He used the word behavior.

6  Q.   And you didn't do that.

7  A.   Not that specific statement.

8  Q.   Let's go to one of the other misleading statements.   One

9  of the many misleading statements, among many, is that all of

10  a sudden, she is likely going to be arrested now. She's no

11  longer just a witness.   Likely to be arrested and if so,

12  he'll be the one to do it and he'll be sure to strip search

13  her at her house.

14       Did you tell Snook about that false statement?

15  A.   She advised she was involved -- excuse me.   She advised

16  he told her she was involved and could be arrested.   At that

17  point in time, we determined that she was involved in the

18  investigation, so it was not separate from the conduct as

19  well.   And no, sir, we did not turn that specific statement

20  over.

21  Q.   Right.   She was involved as a witness, but you told

22  Emmerson when he investigated, the agent, that she was never

23  going to be a target.

24  A.   I said she was not a target.

25  Q.   Right.   Did you tell Snook that, that Cook tried to put

1   it in her head she would all of a sudden become a target?

2   A.   Not that specific detail.

3   Q.   That's fine.

4        Now, you did say in that sentence that he admitted to

5   consuming alcoholic beverages.

6   A.   Yes, sir.

7   Q.   Did you though say when you found out that you and Ms.

8   Wright and all the Army of people looking at this in your

9   office -- let me get this straight -- that he admitted he was

10  under the influence of alcohol when meeting with her and had

11  -- Cook admitted being under the influence of alcohol,

12  driving around in a sheriff's vehicle, and that he had

13  consumed approximately six beers prior to driving his county

14  vehicle to meet her?  You didn't tell Snook that, did you?

15  A.   I did not include the number. I did include he had

16  consumed alcoholic beverages prior to the meeting with her.

17  Q.   According to --

18  A.   And sir, if I could please finish.

19       I also advised Mr. Snook and the Court that he had

20  violated policy while consuming alcohol while operating his

21  police vehicle.

22  Q.   But there's a difference, isn't there, between a cop --

23  you may or may not agree -- having a beer or two, but to

24  drive around in a vehicle, police vehicle, intoxicated,

25  intoxicated, is different than just telling someone that he

1    had had a beer; right?

2    A.   I didn't say he had a beer, sir.  I said he had consumed

3    alcohol and --

4    Q.   But according --

5    A.   Alcoholic beverages.

6    Q.   And there was another deputy that I guess Investigator

7    Cook also drunk-dialed as a witness. Do you remember that?

8    There was another deputy that had to come and take Cook home

9    because he was so drunk?

10   A.   I think she said she did not know if they met or not.

11   Q.   In any event, according to the documents you had in your

12   possession that you decided not to give to Burns' lawyer, he

13   admitted to not only being under the influence and

14   intoxicated, he had six beers prior to going to see the lady;

15   correct?

16   A.   I didn't state the number of the alcoholic beverage.  I

17   thought I was conveying the information that he had been

18   drinking and driving.

19   Q.   And also, when he got to EC and started coming on to

20   her, he was drinking more.  We don't know how many beers he

21   had, but it was more than six; correct?

22   A.   Sir, I do not know.

23   Q.   But you didn't think that that was important for Snook

24   to know, not only was the guy drinking but he was

25   intoxicated.  That wasn't important.

1    A.   Sir, I'm sorry.  I thought I did convey that with the

2    information in which I said he had consumed alcoholic

3    beverages and he had been drinking while driving his

4    undercover vehicle.

5    Q.   And nowhere, ma'am, in this summary that you think was

6    okay, did you state to Mr. Snook, by the way, we have not

7    just a summary, we have actual evidence, we have documents,

8    we have an FBI report, we have Bedford County sheriff's

9    department investigation reports.  We have evidence.

10   A.   Sir, if I could please have a copy of the letter?  If I

11   remember, it's similar in nature to what the ex parte motion

12   stated, that there was an interview that was conducted and

13   that there were text messaged that were attained.

14   Q.   First of all, ma'am, that's not the question. The

15   question I'm on now -- we'll talk further about the ex part

16   motion in a minute, but the question now, just stick with the

17   letter to Snook, okay?

18       You didn't tell Snook, by the way, there are some

19   documents, evidence, that we have that you don't have.  Did

20   you say that? Did you give him, for example, a privilege log

21   or a list of documents that you had concerning Investigator

22   Cook?

23   A.   No, sir.  What I stated was the witness was interviewed

24   about the alleged encounters and the witness provided law

25   enforcement with numerous text messages.  So we thought it

1   was sufficient to inform him that we had additional

2   documentation.

3   Q.   You told him you had text messages. Did you tell him you

4   had reports?

5   A.   Sir, when -- the fact that she was interviewed, I

6   figured he would have known there would have been at least

7   documentation, whether it be handwritten notes or a

8   recording.  It was not a recording in this case, but that's

9   typically how things are.

10  Q.   Right.  Just like you knew Agent Emmerson when he went

11  back to his office was going to type up his notes into a

12  report.

13  A.   Sir, I didn't have communication with the FBI as to how

14  they were going to handle the matter.

15  Q.   Uh-huh.

16      By the way, do you see anywhere in your ex parte motion

17  that you wanted to talk about -- and I'm about done, ma'am --

18  to Judge Moon, did you ever tell him about any of these

19  reports, that they were available?

20  A.   I said -- I want to make sure I state all this, if

21  you'll give me some time.

22  Q.   Sure.

23  A.   My understanding was to provide a summary of the facts

24  surrounding the incidents in Botetourt County and Bedford

25  County.  I was also informed how to do that and I received

1    different examples of how to do it.  I also provided this

2    documentation where I stated that she had been interviewed

3    and there were numerous text messages.  And then I also

4    stated in the eighth paragraph, as I thought I was supposed

5    to do based on my communications, that I would make myself

6    and the United States available and Cook available for

7    further questions and the United States will make further

8    documentation available to the Court, if requested.

9        It was my understanding that that was how I was supposed

10   to handle this.  Again, sir, this was my first time handling

11   any potential Giglio matter like this.

12   Q.   In your ex parte motion to the judge -- do you have that

13   in front of you?

14   A.   Yes, sir.

15   Q.   Can I see that for a second?

16       In footnote three on page seven, this is the ex parte

17   sealed motion for in camera review of potential Giglio

18   material.  "The United States will provide the Court with all

19   the information received from the Botetourt County Sheriff's

20   Office and the Office of Campbell County Commonwealth

21   Attorney if it is requested."

22       Now, the reason Campbell County is involved is because

23   there was a special prosecutor from Campbell County that

24   tried to get an indictment against Cook in Botetourt County;

25   right?

1   A.   That's what I was informed.

2   Q.   But there's nothing in here about any documents you have

3   or that you could provide concerning Bedford County; correct?

4   A.   That is not correct.

5   Q.   You show us where it says Bedford County, ma'am, in your

6   motion to Judge Moon, and I'll be done.

7   A.   Sir, under the Bedford County Sheriff's Office

8   information, we did not include paragraph eight as a

9   footnote.  We included that as part of the information, to

10  ensure that we were trying to notify the Court that there was

11  further documentation available.  I brought that

12  documentation to the hearing on that day.  I conducted the

13  hearing the way that I thought I was supposed to based on my

14  communications and what I was advised and I had it available.

15  I was also informed that if it was requested that it could

16  not be made part of the record because there had been an

17  issue in another case in this jurisdiction whereby an ex

18  parte designation was removed and the documents had the

19  potential of being -- becoming unsealed.  So, I was advised

20  that I was complying with my discovery obligations, but also

21  to comply with the Privacy Act or I would be in violation of

22  the Privacy Act, sir.

23  Q.   No further questions.

24  A.   I was trying to do everything correct and definitely in

25  good faith.

1          MR. BEERS:  No further questions, Your Honor.

2          THE COURT:  Let's take about a five-minute recess.

3          (Recess at 11:20 a.m. to 11:25 a.m.)

4          You may continue.

5          MR. MOUNTCASTLE:  May I proceed, Your Honor?

6          THE COURT:  Yes.

7          MR. MOUNTCASTLE:  Thank you.

8                        CROSS-EXAMINATION

9    BY MR. MOUNTCASTLE:

10   Q.   Ms. Neese, I want to first clarify or ask you questions

11   about the Court's order that Mr. Beers asked you about.  Do

12   you have that in front of you?

13   A.   The order from May of 2014?

14   Q.   Yes, ma'am, entered May 14th of 2014.

15   A.   Yes, sir.

16   Q.   Mr. Beers asked you some questions about the Court's

17   order that Investigator Cook's December 2012 behavior while

18   he was an employee of the Bedford County Sheriff's Office and

19   an investigator on the Pain Train investigation does need to

20   be disclosed.  Do you recall those questions?

21   A.   Yes, sir.

22   Q.   What was your understanding of what information the

23   Court was directing you to provide?

24   A.   My understanding was both based on all my communications

25   I had up to that point and based on my communications with

1    Ms. Wright following this order that I needed to provide the

2    same summary of the nature of the conduct that we had

3    provided to the Court.

4    Q.   In May of 2014, May 14, 2014, after you received this

5    order, did you have the understanding that the Court was

6    directing you to provide any source documents or evidence, as

7    Mr. Beers refers to it, to defendants' counsel?

8    A.   I did not.  I thought I was supposed to provide the same

9    information that I had provided in the ex parte hearing, sir.

10   That was my understanding.

11   Q.   If you had understood the Court to direct you to provide

12   the actual source documents, what would you have done?

13   A.   I would have provided the source documents.

14   Q.   Ms. Neese, when did you become an Assistant U.S.

15   Attorney?

16   A.   In the middle of October of 2008.

17   Q.   Before that, had you had any experience as a prosecutor?

18   A.   No, sir.

19   Q.   So in May of 2014 when you were dealing with this issue,

20   how long had you been an AUSA?

21   A.   In May of 2014?

22   Q.   Yes, ma'am.

23   A.   Approximately five to five-and-a-half years.

24   Q.   In terms of seniority in the U.S. Attorney's office at

25   that time, where did you rank?

1    A.    I was a junior level line AUSA.

2    Q.    Were there many AUSA's who had less seniority than you

3    at that time?

4    A.    Sir, I was the youngest AUSA in the district and

5    probably one of the most least experienced.  I can't say the

6    least experienced because people that were hired after me had

7    been in practice longer than me.

8    Q.    Prior to May 2014, what experience did you have in

9    dealing with Giglio issues?

10   A.    Virtually none. I had completed Giglio questionnaires,

11   but nothing to the matter of this issue.

12   Q.    Prior to May of 2014, what was your experience handling

13   Giglio issues involving law enforcement officer witnesses?

14   A.    This was the first matter that had anything to do with

15   potential Giglio information that I was involved with

16   directly.

17   Q.    In May of 2014, what was your understanding about the

18   manner in which you were required to handle potential Giglio

19   information about a potential law enforcement witness?

20   A.    My understanding -- and I want to make sure I'm

21   understanding your question correctly.  My understanding was

22   that I needed to discuss with my Giglio officer and my

23   supervision on how to handle matters. I was a line AUSA. I

24   was not entitled to the underlying potential Giglio

25   information that would have been received from law

1    enforcement agencies if requested from our officers for

2    supervision in our office until or unless a determination was

3    made that we needed to have an ex parte motion to file and a

4    potential in camera hearing that was supposed to be ex parte.

5    That would allow me to comply with, my understanding, with

6    both my obligations under the discovery obligations and also

7    my U.S. Attorney office policy and the Department of Justice

8    policy, sir.

9    Q.   What was your understanding about your authority

10   individually as an Assistant U.S. Attorney regarding the

11   manner in which potential Giglio information about a law

12   enforcement officer was handled?

13   A.   My understanding was that I would be directed by my

14   supervision and/or Giglio officers on how to handle these

15   matters.  As I stated, I was not entitled to that information

16   until a later time, and I still had to work directly with

17   supervision and/or my Giglio officers, depending on how they

18   directed me.

19        MR. MOUNTCASTLE:  Your Honor, for the record, I've

20   provided the clerk with the government's exhibits which have

21   been marked as 1 through 39.  Those are the exhibits that

22   were attached to the government's response to the motion, the

23   defendant's motion, and I'm asking that those be entered as

24   part of the record for this hearing.

25        THE COURT:  Okay.

1          MR. BEERS:  No objection. I thought both sides'

2   exhibits had already been entered.

3          MR. MOUNTCASTLE:  I just provided mine in a separate

4   format.  I just wanted to make sure.

5          MR. BEERS:  No objection.

6          MR. MOUNTCASTLE:  Thank you.

7          (Government Exhibits #1-39, previously submitted,

8   were admitted into evidence).

9   BY MR. MOUNTCASTLE:

10  Q.   Ms. Neese, do you have a copy of your Declaration?

11  A.   Yes, sir, I do.

12  Q.   With respect to paragraph four, how did you first learn

13  of any potential Giglio information pertaining to Officer

14  Cook?

15  A.   In my employment position, I followed United States

16  Attorney's office policy in March of 2011 and completed the

17  Giglio questionnaire with Deputy Cook of the Bedford County

18  Sheriff's Office.

19  Q.   You said March of 2011.  Did you mean March of 2013?

20  A.   March 11, 2013, on or about.  Excuse me.

21  Q.   So you uncovered that potential, initially the first

22  potential Giglio information pertaining to Officer Cook; is

23  that correct?

24  A.   Yes, sir, and I almost immediately notified our Giglio

25  officer.

1    Q.    Why did you contact Ms. Bockhorst and Mr. Cullen about

2    that information?

3    A.    I contacted them because Ms. Bockhorst is one of the

4    Giglio officers and it's policy and procedure to do that and

5    Thomas Cullen was my direct supervisor who supervises my

6    cases and I am supposed to notify him of anything that came

7    up and this was an issue that had come up.

8    Q.    During the March 2013 discussion with Officer Cook, did

9    he disclose anything to you about his December 2012

10   encounters with the witness that you were questioned about by

11   Mr. Beers?

12   A.    No, sir.

13   Q.    With respect to paragraph eight of your Declaration, how

14   did you first become aware of Officer Cook's potential Giglio

15   information regarding his sexual misconducts with the Pain

16   Train investigation witness?

17   A.    On or about April 15th of 2013, Attorney Scott Webber

18   contacted me and advised me that he was representing a

19   witness in the overall Pain Train investigation and he

20   provided me with an overview of information regarding Cook's

21   contact with this witness.

22   Q.    With regard to paragraph nine of your Declaration, why

23   did you advise Mr. Cullen about that information?

24   A.    I advised him almost immediately after I received this

25   information because he was my direct supervisor at the time

1    at the United States Attorney's office.  Again, as per

2    policy, I need to keep my supervision informed of anything

3    that comes up in a case.

4    Q.   With respect to paragraph ten of your Declaration, you

5    make reference to a First Assistant United States Attorney,

6    Tony Giorno.  What was your purpose in including him on an

7    e-mail regarding the scheduling of the proffer and interview

8    of the grand jury witness?

9    A.   It was my understanding once I advised Thomas Cullen of

10   this matter, he also advised the First Assistant United

11   States Attorney to keep upper level management apprised as to

12   what was going on. After the meeting, I contacted both Thomas

13   Cullen and First Assistant United States Attorney Tony Giorno

14   at the time to make sure I was complying with the obligations

15   I have as an Assistant United States Attorney to inform

16   management in my office.

17   Q.   Can you explain the level of supervision that a First

18   Assistant United States Attorney has in a U.S. Attorney's

19   office?

20   A.   He basically is the overseer for the United States

21   Attorney's office for the Western District of Virginia,

22   besides the United States Attorney.  So he oversees both the

23   civil and criminal divisions.

24   Q.   Is he second in command to the U.S. Attorney?

25   A.   Yes, sir, he is.

1    Q.   Is that two or three levels of supervision above you?

2    A.   At least two, if not three.

3    Q.   What was your role in arranging for the grand jury

4    witness that we've talked about in this proceeding?

5    A.   I was advised -- well, it was my understanding to go

6    ahead and schedule an interview, but I had scheduled it with

7    ATF Special Agent Russell Davidson and myself.  Management in

8    my office notified the FBI and had them get involved in the

9    interview the next day, on April 16, 2013.

10   Q.   So did you have any role other than being present and

11   having discussions with Agent Emmerson?  In conjunction with

12   that interview on April 16th, did you have any other role

13   with the FBI's involvement in this matter?

14   A.   No, sir, I did not.

15   Q.   Was the FBI part of the Pain Train investigation?

16   A.   No, sir, they were not.

17   Q.   And following that interview, why did you e-mail both

18   Mr. Cullen and Mr. Giorno to schedule a discussion about the

19   results?

20   A.   It was my understanding that I needed to inform them of

21   what was said and provide them with the documentation, both

22   my notes and the extraction report that I had received

23   because they were the ones making determinations in our

24   office.

25   Q.   Now, when you -- you were asked questions by Mr. Beers

1  regarding your conversation with Bedford County Sheriff's

2  Office's Captain Miller, on April 16th of 2013.  Do you

3  recall those questions?

4  A.   Yes, sir.

5  Q.   And do you know why Mr. Cullen directed you to provide

6  Captain Miller with the information about this potential

7  Giglio information about Officer Cook, the misconduct he had

8  with the witness, to include your notes?

9  A.   Sir, we did not have a copy of Agent Emmerson's notes or

10 an FBI report on that day.  We had my notes, which covered

11 essentially everything that was said.  I was advised that I

12 needed to take this, with Special Agent Davidson, to Captain

13 Miller to make Bedford County Sheriff's Office fully apprised

14 as to what the witness had informed us and the information

15 that we had gotten from the extraction report, which was

16 based from her phone.

17 Q.   And did you understand your notes to have the essential

18 details of Officer Cook's misconduct with the witness?

19 A.   Yes, sir.

20 Q.   And were your notes -- aren't they attorney work

21 product?

22 A.   They are, yes, sir.

23 Q.   But you still provided those to Captain Miller; is that

24 right?

25 A.   Yes, sir.

1    Q.   In paragraph 14 of your Declaration, can you tell us why

2    you advised Captain Miller to contact Mr. Cullen if he had

3    any questions about the information that you provided to him

4    regarding Officer Cook's misconduct with the witness?

5    A.   Because I'm a line AUSA and I do not have any

6    decision-making authority in the United States Attorney's

7    office.  Deputy Chief Thomas Cullen did and he advised me I

8    needed to notify the Bedford County Sheriff's Office and

9    Captain Miller, that he was the contact for any further

10   information about Deputy Cook.

11   Q.   With regard to paragraph 15 of your Declaration, which

12   is Exhibit 1 in this proceeding, why did you schedule a

13   discussion with your new supervisor, Mr. Jacobsen, regarding

14   the potential Giglio information about Officer Cook?

15   A.   I recognized the need that we needed to make a potential

16   or have a potential discussion about the potential Giglio

17   matters and I recognized that I needed to figure out how to

18   handle the matter and I had to go through supervision and a

19   Giglio officer for that, sir.

20   Q.   So was it your intent to seek supervisory guidance to

21   ensure you handled it correctly?

22   A.   Yes, sir, that was my intent.

23   Q.   With respect to paragraph 17 of your Declaration,

24   Exhibit 1 in this proceeding, what was your understanding

25   about the roles of Ms. Wright and Ms. Bockhorst in the

1    handling of the potential <u>Giglio</u> information pertaining to

2    Officer Cook?

3    A.   My understanding is that they were both <u>Giglio</u> officers

4    in our office and at that point in time, I do not know if Mr.

5    Jacobsen had advised me to go through Ms. Wright or if it was

6    both Ms. Wright and Ms. Bockhorst.  But they were the ones to

7    reach out to Botetourt County and Bedford County to obtain

8    any potential personnel file information.  They would obtain

9    that information as they're required to do under the

10   Department of Justice's policy and also the U.S. Attorney's

11   policy.  Since I'm a line AUSA, I'm not entitled to that

12   information until or unless I'm notified I can receive a

13   copy.

14   Q.   Ms. Neese, do you still have a copy of the e-mail from

15   December of 2013 that Mr. Beers was asking you about, the

16   e-mail from Ms. Bockhorst where she talks about sounding

17   grumpy?

18   A.   It says page three of six, so I don't have the complete

19   e-mail chain, but yes, sir, I do have that one.

20   Q.   I'm going to show you a copy of it.  It's in evidence

21   now as Exhibit 9 for purposes of this proceeding.

22        Would you please turn to the December 6, 2013, e-mail

23   from Ms. Bockhorst to yourself, Ms. Wright, and a copy to Mr.

24   Jacobsen where she starts off "forgive me for sounding

25   grumpy."

1        Do you have that?

2   A.   Yes, sir, I do.

3   Q.   In this e-mail, you were asked a number of questions and

4   I want to make sure it's clear here.

5        When you look at this e-mail, did Ms. Bockhorst say that

6   whatever that information was, referring to Officer Cook's

7   Bedford County potential Giglio information, that that needed

8   to be turned over right then?

9   A.   No, sir, it does not.

10  Q.   Does she, in fact, say that it depends on what the

11  information is from Bedford County and what their findings

12  are?

13  A.   Yes, sir.

14  Q.   To your knowledge, as of December 6, 2013, had you or

15  anyone else in the U.S. Attorney's office received any of the

16  information in Bedford County regarding Officer Cook's

17  misconduct with the witness?

18  A.   I had not received the information, any documentation,

19  and it was my understanding from the e-mails I received that

20  no one else had as well.

21  Q.   Based on your understanding of the policies provided by

22  the U.S. Attorney's office and Department of Justice, would

23  you have been allowed to ask for or receive that information

24  from Bedford County?

25  A.   I would not have been allowed to receive that

1    information.

2    Q.   Under the department's policy and guidelines and U.S.

3    Attorney's policies and procedures, who could request and

4    receive that information from Bedford County?

5    A.   I know the Giglio officers in our office can do that. I

6    don't know this for sure, but supervision is also allowed to

7    look at that information.  I don't know if they're allowed to

8    receive it.  This e-mail says either Jake or Elizabeth could

9    reach out to the sheriff to get things started.

10   Q.   As of December 6, 2013, based on Ms. Bockhorst's e-mail

11   to you, does it indicate that no one had yet reached out to

12   those agents, to the Bedford County Sheriff's Office?

13   A.   Botetourt or Bedford.  No one had reached out to them,

14   it was my understanding, sir.

15   Q.   Referring you to your Declaration at paragraph 17.  So,

16   what did you understand the roles of either Ms. Wright or Ms.

17   Bockhorst in terms of handling the potential Giglio

18   information pertaining to Officer Cook?

19   A.   My understanding was that either Elizabeth Wright or

20   Jennifer Bockhorst as Giglio officers, they would request the

21   information from both Botetourt County and Bedford County.

22   They would receive that information and retain that

23   information in a private manner, in compliance with the

24   Privacy Act because of the information containing personnel

25   file information.

1    Q.   In the e-mail Exhibit 9, Ms. Bockhorst talks about

2    collect the documents, lay out the facts in writing and

3    submit an ex parte motion to the judge.  Do you recall seeing

4    that?

5    A.   That is in the e-mail, yes, sir.

6    Q.   Based on your understanding of the policy and guidance

7    in effect at that time, who had the authority to decide

8    whether to turn that information over or whether you first

9    had to go to the Court with some sort of ex parte motion and

10   go through his other procedure?

11   A.   I had received information that my supervision and the

12   Giglio officers would make that determination.  There were

13   multiple e-mails that informed me that at some point in time

14   I may have to file an ex parte motion, but I was just

15   following what my supervision or what my understanding from

16   my supervision and Giglio officers was, sir.

17   Q.   At paragraphs 19 and 21 of your Declaration, do you see

18   where you discuss or talk about having discussions or

19   arranging for discussions about the potential Giglio

20   information pertaining to Officer Cook with the First

21   Assistant U.S. Attorney?

22   A.   Paragraph 19, yes, sir.

23   Q.   What was the reason that you wanted to schedule a

24   discussion with a first assistant U.S. Attorney regarding

25   Officer Cook's potential Giglio information?

1    A.   Sir, we had originally had Tony Giorno involved back in

2    April of 2013 and I wanted to ensure I was keeping all my

3    supervision apprised of what was going on to ensure I was

4    both complying with the discovery obligations that I had and

5    also with the Privacy Act, sir.

6    Q.   With respect to paragraph 22 of your Declaration, what

7    was your understanding about the reason that Ms. Wright told

8    you the potential Giglio information received from Botetourt

9    County, "should be treated entirely conflictually for now"?

10   A.   As a line AUSA, I'm not actually allowed to know all of

11   that information until or unless there's a potential it could

12   be turned over in an ex parte motion and she advised me to

13   treat it confidentially to ensure I was complying with the

14   Department of Justice policies and procedures.

15   Q.   And the Department of Justice policies and procedures

16   with respect to what?

17   A.   The Privacy Act, sir.

18   Q.   With respect to paragraph 24 of your Declaration, what

19   was your understanding about the reason that Ms. Wright

20   summarized information received from the sheriff's office

21   pertaining to truthfulness and bias?

22   A.   She summarized that information to just give me an

23   overview of the information and she informed me that it did

24   not pertain to truthfulness or bias as the Bedford County

25   attorney and the county sheriff's office had made that

1    determination.  Additionally, she advised me that Deputy Cook

2    had been truthful in his responses in whatever interview had

3    been conducted by the Bedford County Sheriff's Office.

4    Q.   At that time, what was your understanding about the

5    admissibility of the potential Giglio information received

6    from the Bedford County Sheriff's Office?

7    A.   Based on the summary e-mail from December 24, 2013, and

8    then following, as listed in paragraph 25 of my Declaration,

9    the statement by Anthony Giorno on December 30, 2013, that

10   there was no evidence to support a claim that Cook was

11   untruthful or dishonest, it was my understanding based on the

12   guidance that I had been provided that this was likely not to

13   be admissible for cross-examination purposes.

14   Q.   And did that information have any impact or effect on

15   your view of the extent to which you were required to

16   consider Officer Cook's privacy interests in those matters?

17   A.   Yes, sir.  We had previously informed me, as I stated on

18   direct, that there had been an issue in another matter I was

19   not involved in and I relied on the information I received in

20   the e-mail in my communications that there had been an ex

21   parte designation removed and the potential for documentation

22   to be unsealed and thus it could have been a violation of the

23   Privacy Act, which would have been a violation for the AUSA

24   in the case and the United States Attorney's office in

25   general.  We were trying not to violate either the discovery

1    obligations we had or the Privacy Act, sir.

2    Q.   Explain why there was this concern about privacy

3    interests of the officer in the context of potential <u>Giglio</u>

4    information.

5    A.   It was my understanding that was what was provided to

6    me, that that was our obligation, as well.  As Assistant

7    United States Attorneys, that we have to comply with the

8    Privacy Act if the information received was personnel file

9    information.

10   Q.   What was your understanding -- did you have any

11   understanding about whether there might be any consequences

12   should yourself or another employee of the U.S. Attorney's

13   office not consider the privacy interests of Officer Cook in

14   his personnel file information?

15   A.   Yes.  My understanding was, based on all my

16   communications with everyone, was essentially that I could

17   get in trouble for a violation under DOJ policy and

18   procedures and that I could also potentially be open and

19   subject to being sued.

20   Q.   In May of 2014, had you begun preparing for the trial of

21   the defendant in this case, Mr. Burns?

22   A.   I had two trials back-to-back.  I had United States vs.

23   Sheek Trice, May 27th through May 29th, in Roanoke, before

24   Judge Conrad, and then United States vs. Les Christopher

25   Burns June 2nd through June 6th, with Judge Moon, here in

1    Lynchburg.  So we were trying to prepare for trial

2    preparation, but it was starting to ramp up with both cases.

3    Q.   At paragraph 29 of your Declaration, you mention Ms.

4    Wright's suggestion that you should take a position with

5    regard to the potential Giglio information pertaining to

6    Officer Cook?

7    A.   Yes, sir.

8    Q.   What was the position that she suggested you should

9    take?

10   A.   She suggested that I take the position that even if the

11   Court decided the information should be disclosed, it should

12   not be allowed for the use of cross-examination and I could

13   argue why a disclosure of the information was not necessary,

14   based on that information.  That's what I was advised, sir.

15   Q.   During this time frame, did you continue to have

16   discussions about this potential Giglio information with your

17   supervisor?

18   A.   Yes, sir.  I spoke with him on both May 6, 2014, and

19   May 7, 2014, and then again, as indicated in the ex parte

20   hearing transcript, I spoke with him the night before the ex

21   parte hearing.

22   Q.   What advice, if any, did he give you on how you should

23   handle the potential Giglio information pertaining to Officer

24   Cook?

25   A.   He advised me that I needed to comply with our Giglio

1   officer, Elizabeth Wright's suggestions and guidance in this

2   case.

3   Q.   Did you have an understanding in the preparation of the

4   ex parte motion, and I think I'm referring to your

5   Declaration, Exhibit 1, at paragraph 34, did you have an

6   understanding of what you could or should include in the

7   summary of the conduct in question?  And we're talking about

8   the Bedford County Giglio, potential Giglio information.

9   A.   Sir, it was my understanding if there was the potential

10  of it not being admissible that I would need to provide a

11  summary of the nature of the conduct based on my

12  communications with supervision, the e-mails and also with my

13  communications with the Giglio officer.

14  Q.   So what was the basis for your understanding that you

15  should, was preferable, to provide a summary of the conduct

16  to the Court?

17  A.   To ensure that I didn't release Privacy Act or potential

18  Privacy Act information.  I didn't want an unwarranted

19  disclosure of that information, but I also wanted to ensure

20  that I was complying with my discovery obligation, sir.

21  Q.   Where did you get that understanding from?

22  A.   My supervision and Giglio officer.

23        THE COURT:  What came first, the privacy of Cook or

24  the constitutional obligation to the defendant?

25        THE WITNESS:  Sir, it was my understanding I was

1    complying with my discovery obligations by providing this

2    summary information.

3         THE COURT:  Was there any discussion about the fact

4    that he may have told her that she would be arrested and he

5    would come and do a strip search at her home?

6         THE WITNESS:  With my supervision and with my Giglio

7    officer, that was not discussed, sir.

8         THE COURT:  To me, that's the dead horse in the

9    living room.  That's the biggest thing about this case.  I

10   don't know why that didn't jump out as being something really

11   bad.

12        THE WITNESS:  I'm not sure.  Again, this was my first

13   time handling this matter and I was relying upon them and we

14   did not discuss that statement.  It was included in my notes,

15   sir.

16        THE COURT:  It was what?

17        THE WITNESS:  It was included in my notes that we

18   provided to Bedford County Sheriff's Office and it was

19   included in the information that Ms. Wright received from the

20   Bedford County Sheriff's Office.

21        THE COURT:  But it wasn't told to me at the hearing,

22   ex parte hearing, and it wasn't told to Mr. Snook.

23        THE WITNESS:  That is correct, sir.

24        Again, as I stated in my Declaration, we thought that

25   was part of the conduct overall and it was not highlighted in

1    my communications.

2    BY MR. MOUNTCASTLE:

3    Q.   Did you just plain forget about it?

4         MR. BEERS:  Objection to leading.  He's been leading

5    and leading and leading, but now he's really leading.

6         THE COURT:  Sustained.

7         MR. MOUNTCASTLE:  Thank you, Your Honor.

8    BY MR. MOUNTCASTLE:

9    Q.   So at paragraph 37 where it discusses the summary

10   contained in the ex parte submission to the Court -- do you

11   have that in front of you with regard to your Declaration?

12   A.   Yes, sir.

13   Q.   I've got two more exhibits that I need to offer to the

14   Court.

15        Ms. Neese, I'm going to hand you what has been marked

16   for identification as Government's Exhibit 30A.  Would you

17   tell the Court what that document is?

18   A.   This is a track-changing document that I received back

19   from my Giglio officer, Elizabeth Wright, on May 12, 2014.

20        MR. MOUNTCASTLE:  I'd move for the admission of

21   Government Exhibit 30A.  The document submitted as Exhibit 30

22   was printed as a final and doesn't have the track changes.

23   For completeness of record, I ask the Court to admit this

24   document.

25        MR. BEERS:  No objection, Judge.  I just don't know

1   why it matters.  They're drafts.  But no objection, Judge.

2   All right.

3          MR. MOUNTCASTLE:  If we want to argue that, I can.

4   I'll leave it to the Court.

5          (Government Exhibit #30A was marked for

6   identification and admitted into evidence).

7   BY MR. MOUNTCASTLE:

8   Q.   So, you provided, you drafted an ex parte motion to

9   submit to the Court; correct?

10  A.   Yes, sir, I did.

11  Q.   Why did you do that?

12  A.   Based on my communications, it was my understanding that

13  I needed to provide the Court with a summary of this

14  information in order for the Court to make a determination if

15  we needed to disclose the summary.

16  Q.   Did you have anybody else in the office review it?

17  A.   Drew Bradylyons and Elizabeth Wright.

18  Q.   Did you receive any response from Ms. Wright after she

19  reviewed your motion?

20  A.   Yes, she sent back a revision.

21  Q.   Is that 30A that's just been submitted into evidence?

22  A.   Yes, sir.

23  Q.   Did Ms. Wright propose any changes to the substance of

24  the summary of Officer Cook's misconduct with the witness?

25  A.   Not to the substance, just a few minor changes.

1    Q.   What effect, if any, did that have on your understanding

2    about the sufficiency of the submission of the ex parte

3    motion?

4    A.   It was my understanding at that point in time after

5    making her proposed edit that it was sufficient to comply

6    with my obligations, sir, and sufficient also to follow the

7    direction of my supervision as they had informed me to work

8    with Ms. Wright.

9    Q.   With respect to the ex parte hearing with the judge

10   that's described in paragraphs 38 and 39 of your Declaration,

11   why did you not provide the Court with a copy of the source

12   documents relating to the Bedford County potential Giglio

13   information?

14   A.   Sir, it was my understanding from my communications with

15   Ms. Wright and supervision that I could only provide those

16   upon request from the Court and further documentation --

17          THE COURT:  How was I supposed to know what you had?

18          THE WITNESS:  I understand that, sir.

19          We thought that we had laid it out in the document

20   that there was additional documentation and then when it was

21   requested for the Botetourt information --

22          THE COURT:  My recollection of that hearing was like

23   -- was the word "flirtatious" used there?

24          THE WITNESS:  Not at the hearing.  It was used in the

25   ex parte motion, sir.

1          THE COURT:  That this was something, sort of an

2     innocuous sort of thing, something unseemly, but no big deal.

3          THE WITNESS:  I'm sorry, sir.

4          THE COURT:  It didn't seem it was something you all

5     took as a very serious matter.

6          THE WITNESS:  Again, sir, I was advised I needed to

7     provide a summary of the information and we thought we were

8     conveying the nature of the conduct.

9          THE COURT:  Well, you were asked this by Mr. Beers,

10    but where did the word "flirtatious" come from?

11         THE WITNESS:  It was in order to try to relay the

12    nature of the conduct.

13         THE COURT:  It could be said to deceive the nature of

14    the conduct.  This was not friendly conduct on both persons'

15    part, was it?

16         THE WITNESS:  On either of them?

17         THE COURT:  On one of them.

18         I don't know whether it was friendly or not on his

19    part, but apparently EC didn't take it as friendly.

20         THE WITNESS:  As what she described, sir.  I can only

21    go off of what she described, sir, yes, sir.

22         THE COURT:  She had been interviewed.

23         THE WITNESS:  That is correct.

24         THE COURT:  I mean, she thought it was bad enough she

25    even considered recording it.

1         THE WITNESS:  The second time around, she advised us

2    at the second meeting she considered recording it in case

3    anyone ever questioned her about it.

4         THE COURT:  Go ahead.

5    BY MR. MOUNTCASTLE:

6    Q.   Ms. Neese, I guess the Court wants to know who came up

7    with the word "flirtatious"?

8    A.   I used that in the draft motion because I was advised I

9    needed to describe the nature of the conduct, but not use

10   necessarily -- or it was my understanding not to use

11   embarrassing language in case the ex parte designation was

12   removed and the documentation was unsealed, sir.

13   Q.   So you came up with the word "flirtatious"?

14   A.   That is correct.

15   Q.   Why did you think that was sufficient to convey the

16   nature of the conduct?

17   A.   It was regarding their -- I was trying to convey that it

18   was sexual in nature conduct.  I didn't use the word

19   "sexual."  I just used flirtatious because I thought that

20   would convey it and once it was reviewed by others and not

21   changed, I thought we were conveying what the nature of the

22   conduct was, sir.

23   Q.   At the ex parte hearing, can you state -- you said, I

24   think, in your Declaration, you had Officer Cook available to

25   provide the Court with additional information.  Why did you

1    not offer him to the Court at ex parte hearing?

2    A.    It was my understanding that I needed to make him

3    available if additional questions were asked.  I'm a line

4    AUSA who did not interview him about this.  Nor did any

5    federal agent that I'm aware of interview him about it and

6    essentially, my understanding was that it would make him

7    available and we would answer any questions of the Court.

8    Q.    So you didn't believe that you had an obligation to

9    actually offer -- affirmatively put Officer Cook on the stand

10   to explain or describe that conduct?

11   A.    I didn't believe I had the authority to do that and I

12   didn't believe I had the right to do it without the Court

13   requesting it, sir.

14   Q.    What was the basis of that belief?

15   A.    My communications, sir, with my Giglio officer and the

16   way things had been handled in other cases I was not a part

17   of in this jurisdiction.

18   Q.    Paragraph 43 of your Declaration where you describe the

19   drafting of the letter to defendant's counsel in response to

20   the Court's May 2014 order, again, I'm going to show you a

21   document which I marked as Government 36A.

22         Can you identify it?

23   A.    Yes, sir.  It is the track-change version of a revision

24   of the disclosure letter that I had drafted for Mr. Snook

25   that I received back from Elizabeth Wright.  She made the

1    track changes.

2    Q.   Did you do the original draft of the description of the

3    summary of Officer Cook's misconduct with the witness?

4    A.   Yes, sir.

5    Q.   How did you go about drafting that?

6    A.   From my conversations and understanding, I would use the

7    same summary that I had provided to the Court in the ex parte

8    motion.

9    Q.   And did you understand the Court had ordered the

10   disclosure of the behavior?

11   A.   That's what the order said, yes, sir.

12   Q.   What was the basis for your belief that providing the

13   same information or the same description you had provided to

14   the Court was sufficient for the disclosure to the

15   defendants' counsel?

16   A.   My understanding from my communications with my Giglio

17   officer was that that was -- the summary was essentially like

18   what she had seen in the past happen and that I was supposed

19   to make that disclosure to Mr. Snook as well.

20   Q.   Did you provide the draft to Ms. Wright?

21   A.   Yes, sir, I did.

22   Q.   Did she review it and provide you with some proposed

23   changes or edits?

24   A.   Yes, sir, and that's Exhibit 36A we're discussing.

25   Those were her edits.

1    Q.   Did she propose any substantive changes to the

2    description of the potential Giglio information pertaining to

3    Officer Cook from Bedford County?

4    A.   No substantive changes were proposed, sir.

5    Q.   What effect, if anything, did that have on your

6    understanding of the letters and summary of the letter's

7    insufficiency?

8    A.   My understanding was the discovery letter was sufficient

9    to comply with my discovery obligations as well as comply

10   with the Privacy Act.

11        I was not trying to mislead Mr. Snook or the Court in

12   any way.  I was trying to comply with both my discovery

13   obligations and the Privacy Act obligations as it had been

14   relayed to me.

15   Q.   Ms. Neese, at any time during your handling of this

16   potential Giglio information, Officer Cook's misconduct with

17   the witness, was it your intention to minimize or deceive the

18   Court or to conceal that information?

19   A.   No, sir, it was not.  I was trying to, as I've stated

20   multiple times, I was trying to comply with my discovery

21   obligations, but also with what I was being informed about

22   the Privacy Act.  I did not want to violate the Privacy Act

23   because I'm an Assistant United States Attorney employed by

24   the Department of Justice.

25        MR. MOUNTCASTLE:  Your Honor, that's all the

1    questions I have.

2        MR. BEERS:  Your Honor, I'm going to be brief, Judge.

3    The Court, can I do that? Thank you, Your Honor.

4                    REDIRECT EXAMINATION

5    BY MR. BEERS:

6    Q.   Ms. Neese, you mentioned these obligations under the

7    Privacy Act and the manual.  Can we agree that whatever it

8    says in this manual, when Judge Moon enters an order telling

9    you to disclose Giglio information, impeachment information,

10   that trumps any manual you think you're relying upon?  Is

11   that true?

12   A.   Sir, my understanding at the time is what I think is

13   important here --

14   Q.   What's important is my question and you answering it.

15   My question is, can we agree whatever it said in some manual,

16   doesn't Judge Moon's order trump, supersede the manual?

17   A.   I understand that now, but I did not understand that at

18   that time because I was advised I needed to comply with both

19   my discovery obligations and the Privacy Act, sir.  I had not

20   been involved in any other Giglio matters of this sort and I

21   was advised by the people who had had those experiences

22   previously.

23   Q.   Had you read the briefs filed in this case?  There are

24   three briefs.

25   A.   I did read them.  Not recently.  I read them previously.

1   Q.   You mentioned the Privacy Act many, many times.  Let me

2   just read you though, just pretty clear text.

3        Privacy Act does say, assuming it even applies, in B, 5

4   U.S.C. 552(a):  No agency shall disclose any record which is

5   contained in a system of records by any means of

6   communication to any person or to another agency except

7   pursuant to a written request by or the prior written consent

8   of the individual to whom the record pertains unless

9   disclosure of the record would be -- and we turn to 11 --

10  pursuant to the order of a Court of competent jurisdiction.

11  Pursuant to an order of a Court of competent jurisdiction.

12       Can we agree this is a Court of competent jurisdiction?

13  A.   Yes, sir, we can, and I was not aware of that at the

14  time.

15  Q.   Yeah.

16       So the Privacy Act has nothing to do with this case,

17  once Judge Moon entered his ex parte order telling you people

18  to give this information about his behavior, the evidence of

19  Cook's behavior with respect to EC to Mr. Snook; right?  The

20  Privacy Act has nothing to do with it anymore.  It's an order

21  of a Court of competent jurisdiction; correct?

22  A.   Sir, I have not read that document.  Based on what

23  you're saying, yes, sir, but I did not know that at the time

24  because I was not aware of that.  I was only aware of what I

25  was being --

1   Q.   You're just up here testifying about statutes you've

2   never read; right?

3   A.   Sir, I'm testifying about what my understanding was and

4   what was informed to me.

5   Q.   Now, you keep saying, ma'am, gee, you had never been

6   involved with Giglio issues or Brady issues before.

7   A.   I had limited experience, virtually none, as of May of

8   2014.

9   Q.   Haven't you had many, many cases, drug cases, in your

10  eight years or whatever it was you'd been practicing?

11  A.   Up to this point, I'm a little over seven-and-a-half

12  years, and I have had.

13  Q.   You've been trained on Brady material, right, Brady

14  doctrine; correct?

15  A.   Sir, I have received a two-hour Department of Justice

16  training per year.

17  Q.   You were out signing orders.  We already went through

18  this, document 172.  You agreed to comply with your

19  obligations under Brady and those obligations, you agreed,

20  entail providing any evidence of an exculpatory nature.

21  A.   Sir, again, I was never informed that this was

22  exculpatory evidence.  Nor did I believe it was exculpatory

23  evidence.  We believed it was potential impeachment evidence

24  under Giglio, which is not the Brady decision.

25  Q.   So, have you not turned over exculpatory material or

1   impeachment material in prior cases?

2   A.   We're talking about law enforcement officers.

3   Q.   My question is, have you turned over exculpatory

4   material to defense counsel in other cases?

5   A.   Yes, sir.

6   Q.   Right.  And you don't turn over some little summary that

7   talks about flirtation. You turn over the real deal, right?

8   You turn over the real evidence that's exculpatory:  FBI

9   reports, interview reports; right?

10  A.   Sir, those aren't real evidence.  Those are also just

11  documentations of what the agents say, just like the

12  documentation we would write down, yes, sir.

13  Q.   Those are underlying source materials; correct?

14  A.   Correct.

15  Q.   This is the first time you tried to comply with Brady

16  obligations or Giglio obligations by sending just a letter.

17  Isn't that true?

18  A.   Sir, I've submitted e-mails before as well to defense

19  counsel when there was -- when we did not have either a

20  report from a law enforcement officer based on the conduct,

21  so I've submitted it other ways as well, sir.

22  Q.   Here, you did have reports from law enforcement

23  officers.  That's the point. Let's go through it real

24  quickly.  You had the FBI reports or notes, which were

25  available to you. Secondly, you had the Bedford County

1  documents, which were available to you and your Giglio

2  officers; correct? You had those?

3  A.   Sir, if I could please explain.

4       The FBI report, I did not have that available to me.

5  That was my supervision who was communicating with the FBI

6  and it's my understanding that neither the Giglio officers

7  nor my supervision obtained either Mr. Emmerson's notes or

8  his report, and I'm not allowed to ask for that information.

9       Regarding the Bedford County documentation, I did

10 receive the personnel file information on May 8, 2014, from

11 Elizabeth Wright.

12 Q.   Right.  And unlike your normal course, you decided not

13 to give that to Burns' lawyer, not to give that information;

14 right?

15 A.   Sir, as I've previously explained, I followed what my

16 understanding was from the information that was provided to

17 me and the guidance that was provided to me.

18 Q.   You were asked over and over again about your

19 Declaration and you went through most of the paragraphs, I

20 think.  I'm going to ask you about one section, ma'am, that I

21 think was skipped.  I'm not sure, but it's paragraph 40,

22 which is your understanding of Judge Moon's order; okay?

23      You said, paragraph 40, page 13 of your Declaration, on

24 May 14, 2014:  After the ex parte hearing, the Court issued

25 an order finding that Cook's behavior while employed with the

1    Bedford County Sheriff's Office did tend to impeach and must

2    be disclosed to defense counsel.

3        Right?  Did you at any time go back to Judge Moon and

4    say, hey, can we just send him a letter, send Snook a letter?

5    Did you ever ask permission from the judge on that?

6    A.   No, sir. I submitted it to my Giglio officer, Elizabeth

7    Wright, and followed her advice.

8    Q.   Did she tell you to "cc" or to send a copy to the Court

9    so the Court could see it?

10   A.   No, sir.

11   Q.   The Court thought you had done what you were supposed to

12   do; provide the evidence, the exculpatory impeachment

13   evidence, didn't he?

14   A.   Sir, again, we did not classify this as exculpatory

15   evidence because it had nothing to do with Mr. Burns or Mr.

16   Burns' conduct during the Pain Train investigation.

17        Regarding impeachment evidence, sir, I did not go back

18   to the Court because I followed what I was guided to do, sir.

19        MR. BEERS:  Thank you, Your Honor.

20        THE COURT:  Anything else?

21        MR. MOUNTCASTLE:  No, Your Honor.

22        THE COURT:  Thank you.

23        Will there be any other evidence?

24        MR. BEERS:  Can I talk to him for a second, Judge?

25        (Counsel conferred with the defendant).

1            Call Ms. Wright, Elizabeth Wright.

2            THE CLERK:  Did you move for the admission of 36A?

3            MR. MOUNTCASTLE:  I meant to, Your Honor.

4            Do you have any objection to that, Paul?

5            MR. BEERS:  No.

6            (Government's Exhibit 36A was marked for

7    identification and admitted into evidence).

8       ELIZABETH WRIGHT, CALLED AS A WITNESS BY DEFENSE, SWORN

9                       DIRECT EXAMINATION

10   BY MR. BEERS:

11   Q.   Tell the judge your full name, please.

12   A.   Elizabeth Wright, W-R-I-G-H-T.

13   Q.   What do you do for a living, ma'am?

14   A.   I'm currently a trial attorney with the U.S. Department

15   of Justice in Washington, DC.

16   Q.   Where did you go to law school?

17   A.   I went to Yale law school.

18   Q.   What did you do after going to Yale law school?

19   A.   I clerked for two years and then worked at a law firm in

20   DC and San Diego for three-and-a-half years.  Then after

21   that, I was a Special Assistant U.S. Attorney in Roanoke at

22   the U.S. Attorney's office for one year and then an Assistant

23   U.S. Attorney in the Harrisonburg office.

24   Q.   So did you clerk for a circuit court or District Court?

25   A.   One year of each.

1    Q.    What circuit?

2    A.    The Ninth Circuit in Pasadena, California.  Before that,

3    I was with the district court in Los Angeles.

4    Q.    Can we agree -- you are the Giglio officer; is that

5    right?

6    A.    One of them, yes.

7    Q.    Were you the Giglio officer come 2014, who was in charge

8    of this case?

9    A.    I was assisting the AUSAs on it, yes.

10   Q.    Did you tell Ashley Neese she needed to make an ex parte

11   motion regarding Investigator Cook?

12   A.    When the inquiry first came to me, it was already

13   presented that AUSA Neese did need to make an ex parte

14   disclosure, so my task was to gather information from two

15   different offices in support of that analysis and go-bys,

16   sort of general filings for AUSA Neese to follow and present

17   the information and continue to work with her as she was

18   working on the disclosures.

19   Q.    I thought it was -- maybe I misunderstood.  I thought it

20   was your idea, it was your advice, it was your counsel not to

21   just give this information to defense counsel, but to go to

22   the judge with an ex parte motion.  Wasn't it your idea?

23   A.    No. Initially, AUSA Jacobsen had sent me an e-mail in

24   December, 2013, looping me in and saying AUSA Neese needed to

25   file an ex parte motion, could we get that rolling. We did

1    additional follow-up gathering the information.  Once the

2    information came in, we were providing it to supervisors and

3    it remained clear that an ex parte filing was appropriate.

4    So we worked along on that process.

5    Q.    Did you identify this as <u>Giglio</u> material?

6    A.    Potential, yes.

7    Q.    Did you see the FBI typed report? Did anyone get that to

8    you?

9    A.    No.

10   Q.    Did you know the FBI interviewed this woman -- we'll

11   call her EC -- about Investigator Cook's sexual misconduct?

12   A.    I knew that there had been a session with AUSA Neese and

13   I believe I recall there were agents involved in that, but

14   did not know of any other report at all about that until the

15   appeal was pending.

16   Q.    Did you ask for the FBI's reports of their notes of that

17   interview?

18   A.    I asked if there were any other reports and was told

19   there weren't any.

20   Q.    Who told you there were no other reports when you asked

21   if there were any other reports? Was that Ms. Neese?

22   A.    I don't remember specifically. It was a combination of

23   --

24   Q.    Come on.  You don't remember who told you there were no

25   other reports?

1    A.   At that point, we were -- I was talking to AUSA Neese

2    and a bunch of supervisors. So it was some combination of

3    AUSA Neese and Thomas Cullen.

4    Q.   They all told you there were no FBI reports.

5    A.   Part of that conversation, yes.

6    Q.   Did you call the FBI yourself and verify whether there

7    were any FBI reports?

8    A.   No, I did not.

9    Q.   Did they tell you the FBI was sitting there taking notes

10   during the interview?

11   A.   Not that I recall.

12   Q.   Wasn't it your understanding the reason the FBI was

13   there taking notes at the interview was because the U.S.

14   Attorney asked them to?

15   A.   I don't remember having any specific understanding of

16   that.  I knew the U.S. Attorney's office through AUSA Cullen

17   and AUSA Neese had proceeded to have an interview and had

18   given that information to Bedford County.

19   Q.   How did the FBI get to the table? This was an ATF

20   investigation.  Wasn't it the U.S. Attorney's idea to bring

21   in the FBI?

22   A.   I don't actually know. I wasn't involved in the case at

23   that time.

24   Q.   Did anyone tell you that this guy, Investigator Cook,

25   grabbed this lady, EC, pulled her across the console of her

1   car and bruised her knee? Did anybody tell you that?

2   A.   I was not aware -- no, I didn't know any sort of

3   aggressiveness in the contact between the two of them.

4   Q.   I'm sorry.  You didn't know about any aggressiveness

5   between the two of them?

6   A.   In terms of pulling over to bruise the knee.

7   Q.   Yeah.

8   A.   I knew what was in AUSA Neese's notes.

9   Q.   You just said you didn't know of any aggressiveness by

10  Investigator Cook to that grand jury witness.  Is that what

11  you said?

12  A.   Yes.

13  Q.   Did you know he pulled out his penis and started

14  masturbating in front of her?

15  A.   I knew from AUSA Neese's notes that his penis was

16  displayed, yes.

17  Q.   She told you that.

18  A.   I don't remember speaking to her about it, but I saw it

19  in one of the responses from the sheriff's office.

20  Q.   So Neese never told you that the guy pulled out his

21  penis and started playing with himself. She never told you

22  that.

23  A.   I don't remember having any conversation with her about

24  it, but it was reflected in her notes that his penis was

25  displayed.

1    Q.    I will tell you it's not reflected in any sheriff's

2    department notes.  So, where did you get that information?

3    You're saying from her notes?

4    A.    Yes, that were sent to me from the sheriff's department

5    files.

6    Q.    Now, did you know that she -- that Investigator Cook

7    lied to EC and said he was not married.  Did you know that?

8    A.    That was on the notes.  The conversation where EC said

9    that she had asked Investigator Cook if he was married and he

10   said no was on the notes as well.

11   Q.    You knew that was a false statement, didn't you?

12   A.    Through the investigative file, that was apparent, yes.

13   Q.    Did you think that was Giglio material, the fact he

14   would lie to a grand jury witness?

15   A.    I believe that was in the information that I summarized

16   as part of the potential Giglio material. I mentioned that

17   part in there.  We were also throughout the process needing

18   to be sensitive to Privacy Act, the fact it was personnel

19   file information, and we were thinking about what could be

20   admissible at trial.

21        In the course of the process, that wasn't something I

22   focused on.

23   Q.    Is that a yes or no, when a officer lied to a grand jury

24   witness?

25   A.    It's a potential.

1    Q.   What about the fact when he lied and said to her all of

2    a sudden, you're likely to be arrested and not only that,

3    when you're arrested, I'm going to be the guy to come there

4    and strip search you in your house.

5         Did you think that was Giglio material?

6    A.   I don't remember thinking anything about that at the

7    time.  My understanding was EC was involved in the

8    investigation and was a witness, so at the time nothing

9    struck me particularly about whether he was telling her the

10   truth or not about what could happen to her in that

11   investigation.

12   Q.   But it's your understanding that she was never likely to

13   be arrested.  She was never a target.  That was a lie on his

14   part; right?  She was a witness.

15   A.   I actually don't have a specific understanding of that.

16   I don't know what the substance of the investigation was as

17   to her.

18   Q.   So Ms. Neese or her colleagues, Mr. Jacobsen -- I don't

19   know.  It's dizzying, all these people.  Nobody told you

20   about that.

21   A.   A conversation about the strip search and arrest was in

22   the notes, so I had seen something about that at the time.

23   But my understanding was she was a witness in this

24   investigation.  She had testified in grand jury, but I didn't

25   have occasion to get involved in the specific facts about the

1    likelihood of her being a witness or what her otherwise

2    status in the investigation was.

3    Q.   I'm not asking you whether she was a witness.  She's

4    obviously a witness.  That's how this whole thing started;

5    right? She testified in front of the grand jury; right?

6    A.   Yes, that's my understanding.

7    Q.   I'm asking, are you aware that he tried to mislead her

8    on the second occasion?  Cook tried to mislead this lady on

9    the second occasion by saying, guess what?  Now you're likely

10   to be arrested.

11   A.   I don't know anything about whether that was misleading

12   or not.

13   Q.   Then you advised Ms. Neese and her colleagues to write

14   up some ex parte motion and you participated in the drafting,

15   in fact; right?

16   A.   Well, the decision to write up the ex parte motion was

17   decided sort of as the group with the supervisors on that as

18   well.  But yes, I looked at a draft when she sent that back

19   and was generally advising on the process.

20   Q.   This is what's filed and shown to the Court, to Judge

21   Moon; right?

22   A.   Yes.

23   Q.   The ex parte motion says the witness admitted that

24   during the encounters with Cook, she and Cook had been

25   flirtatious and had even engaged in kissing.

1      You wrote that; right?

2    A.   No.

3    Q.   That's not true though, is it? The witness admitted that

4    during the encounters with Cook, she and Cook had been

5    flirtatious.  We've been over this this morning.  I know you

6    were excluded, but isn't it true that none of the reports

7    you've seen did she admit she and Cook were flirtatious?  Did

8    you see an admission by her that they were flirtatious?

9    A.   The only information I had seen that came from EC was

10   what was reflected in AUSA Neese's notes. She initiated

11   contact with the U.S. Attorney's office through her attorney

12   and they had run through these incidents. So it is my

13   understanding that she did admit to them there had been these

14   two incidents in December and described them as reflected in

15   the notes.

16   Q.   Is that your answer?

17        Here's my question. Did you see the word "flirtatious"

18   in these notes that you received from Ms. Neese?

19   A.   No, I don't recall that note being in there.

20   Q.   Trust me.  It's not in there.

21        So, why did you write here the witness admitted during

22   the encounters she was flirtatious?  Why did you do that?

23   A.   I didn't write that, sir.  I reviewed what was written

24   and submitted to me by AUSA Neese as a summary of the

25   information.

1    Q.   You could have told the judge the whole story; right?

2    That's generally what you're supposed to do if you're going

3    to go in and ask for a ex parte proceeding, correct, be

4    forthcoming with the Court; right?

5    A.   Yes, and we made clear in the filing that all the

6    information and back-up filings would be available for the

7    Court to review if the Court so desired.

8    Q.   I'll tell you there's nowhere in this ex parte motion

9    where any documents are described concerning Bedford County

10   or there's any invitation to review Bedford County documents.

11        MR. MOUNTCASTLE:   Objection.   I think it's not a

12   question, number one, and I think it's patently wrong.

13        MR. BEERS:   It's not patently wrong, but I'll go on,

14   Judge.

15   BY MR. BEERS:

16   Q.   Now, you were concerned with the Privacy Act?   I read

17   your Declaration. You were concerned about the Privacy Act

18   implications?

19   A.   Yes.   The privacy and confidentiality of sensitive

20   Giglio information as to law enforcement and other witnesses

21   is something we are directed by DOJ policy to consider in the

22   Giglio analyses.

23   Q.   Judge Moon had the ex parte proceeding at your request.

24   Did you show up?

25   A.   No.

1    Q.   So, they had their ex parte proceeding.  He considered

2    it. He weighed what he was told, right, and he issued an ex

3    parte order; correct?

4    A.   Yes.

5    Q.   We can agree this is a Court of competent jurisdiction;

6    right?

7    A.   Yes.

8    Q.   We can agree the Privacy Act says in B11 that there's no

9    bar, certainly, under the Privacy Act to disclosing

10   information pursuant to an order of a Court of competent

11   jurisdiction; correct?

12   A.   Yes, that's correct.

13   Q.   So at that point, did you advise Ms. Neese to give the

14   evidence, not a summary now, but the actual source documents,

15   the ones that you and she had been looking at, the ones you

16   had the chance to evaluate, did you tell her you need to give

17   that to Mr. Snook so he can have a chance to evaluate its

18   probative value and admissibility?

19   A.   Our understanding was -- the standard practice of --

20   Q.   Is the answer no?  You can explain, but is the answer,

21   just for the record, no?

22   A.   No, we did not give that to him.

23   Q.   You didn't advise her to, did you?

24   A.   No.  We understood -- the information was disclosed.

25   Our practice was it would generally track what had generally

1    been disclosed to the Court as a summary of the information.

2    What had happened in other cases and what we anticipated was

3    that if he had any interest in seeing the background

4    documents, which it was clear there were some, and doing

5    anything with the information at trial, that he would request

6    them.

7    Q.    So, you told the judge half the truth.  So then you get

8    by with that.  So, now you're going to tell the lawyer the

9    half the truth; right?

10   A.    The intent was to disclose everything we could that was

11   appropriate and then have the other information available

12   upon request in other to be sensitive to not violating the

13   Privacy Act.

14   Q.    As a good Giglio expert, you know there's no duty upon

15   Judge Moon to ask for any documents; correct?

16   A.    That's correct.

17   Q.    There's no duty on the part of defense counsel to ask

18   for any particular documents.  You're supposed to disclose

19   the behavior.

20   A.    Right, and we believed we did that through the summary.

21   Q.    By telling Mr. Snook that she had admitted to being

22   flirtatious and they had even kissed; right?

23   A.    And that he was disciplined, and all the other

24   information that was in that summary.

25   Q.    You didn't tell them anything about his penis being

1   waved around the car or being grabbed and being thrown

2   against the console.

3   A.   Any grabbing or throwing against the console, I didn't

4   know anything about, but no, there was nothing in the

5   specific summary talking about these.

6   Q.   So he didn't have the benefit of evaluating Cook's lies;

7   right?  Do you remember about the lies?  "Are you married,

8   sir? No, I'm not married."

9   A.   That was not in the summary, no.

10  Q.   And the thing about you're now a target, likely

11  arrested, going to be arrested, probably I'm going to be the

12  one doing the strip search.  That wasn't in it; right?  You

13  didn't tell Cook that?

14  A.   No.

15  Q.   And that was on your advise. Is that true?  It wasn't

16  Ms. Neese's decision. It was your decision not to tell Snook

17  all that.

18  A.   The Giglio responsibilities are the AUSA's ultimate

19  responsibility, but we advise. I told her about the specific

20  practice and we had recently had experiences where items were

21  incorrectly submitted without being under seal and not ex

22  parte.  So we were trying specifically to be protective of

23  the information in order not to run afoul of the protections

24  we needed to accord it.

25  Q.   Did you advise her to go and ask Judge Moon for

1   permission just to write a summary and not give the defense

2   counsel the actual documents, the ones you all had the

3   benefit of evaluating?  Did you advise her to go back and

4   clear that with Judge Moon?

5   A.   No.  We understood that based on the district's

6   practice, having summarized the information, that would be

7   sufficient to disclose that information to the defense as

8   well and the defense attorneys would inquire if they had any

9   interest in making additional requests.

10  Q.   So someone told you that's the practice in this

11  district, not to provide the evidence, but just to provide a

12  summary?  Someone told you that in this district? Who told

13  you that?

14  A.   If there had been exculpatory evidence, that would have

15  been provided.  Here, there was arguable potential Giglio

16  material and we were providing the gist of that material and

17  enough substance to convey the sexual nature, the discipline

18  and other aspects of that conduct to enable the

19  determination.

20  Q.   Two questions. First of all, I thought you said it was

21  your understanding this district practices not to give the

22  defense counsel the actual documents, the ones that you have,

23  the ones you get to look at and Ms. Neese gets to look at,

24  evidence, but to do a summary.  Did someone tell you that was

25  the practice in this district?

1    A.   It depends on the type of case.  In a variety of cases,

2    we would fully disclose the information.  In this case, we

3    were sensitive to the need to protect personnel files, partly

4    to keep lines of communication open and to disclose

5    information only legally required to do so. When we had done

6    this ex parte type procedure, it was standard practice to

7    disclose to the Court and then defense attorney the same

8    thing in order to give them the understanding of what the

9    circumstances were.

10   Q.   You keep saying potentially Giglio, potentially

11   impeachment, potentially discoverable.  But wasn't that all

12   over when Judge Moon said, citing Fourth Circuit law, this

13   tends to impeach, it must be disclosed, it's Giglio? Why are

14   you saying it's potential anymore when the judge told you it

15   was Giglio material, impeachment material and needs to be

16   disclosed?  Why are you saying potential anymore?  He ordered

17   you to do it.

18   A.   He ordered disclosure of the behavior and my

19   understanding is we had summarized the behavior and given

20   necessary information from that and there isn't a right to

21   review sort of full employment files of any law enforcement

22   witnesses.  So we were disclosing the substance of the

23   material that could potentially be used at trial, is what we

24   were believing we were doing.

25   Q.   Even though he told you to disclose it, you decided not

1    to disclose all of it, but just to disclose a little bit of

2    it.  Is that fair?

3    A.  We were trying to comply with the order and disclose

4    what the substance of the behavior had been.

5    Q.  Can we agree, ma'am, this letter you wrote for Mr. Cook

6    (sic) that says she admitted to being flirtatious and they

7    even kissed or something and that he had been consuming

8    alcohol, that's not evidence in that letter.  That's not

9    evidence. That's just a summary; right?

10   A.  I didn't write that summary.  I reviewed it later, but

11   yes, that's a summary.  But the obligation was to disclose

12   the Giglio information --

13   Q.  Is that evidence --

14   A.   -- that could potentially be used against him and

15   additional information could be provided if the defense

16   attorney had requested it.

17   Q.  That's not evidence, the letter.

18   A.  No, the summary was not evidence.

19   Q.  Did you take a look at Judge Moon's order that your

20   colleague, Ashley Neese, endorsed and agreed?  This is the

21   joint inspection and discovery order from January. Let me

22   just read this to you. Does this not refresh your

23   recollection?

24   A.  I don't think I ever saw that in this case, but there

25   were standard filings in that regard across the district.

1    Q.   You've seen this before, haven't you?

2    A.   Not the specific one in this case, but the general --

3    Q.   It is further ordered that the United States provide to

4    the defendant any evidence of an exculpatory nature as

5    defined in Brady v. Maryland and those cases interpreting

6    that opinion. Right? That's an order of the Court.

7    A.   Yes.

8    Q.   And you didn't do that.

9    A.   I believe we did.  Also, there are Giglio and Brady --

10   for the Giglio information, this is impeachment rather than

11   -- there was nothing exculpatory I was aware of throughout

12   this case. This was impeachment information on a specific

13   witness.

14        THE COURT:  Did you think that I didn't want you to

15   reveal impeachment evidence?

16        THE WITNESS:  We certainly did, Your Honor, but

17   during -- we were also trying to be sensitive --

18        THE COURT:  Wasn't there a dance going on here to

19   really deceive the Court and have the Court not appreciate

20   what was going on with Officer Cook?

21        THE WITNESS:  There was no advantage.  The full

22   intent was to have you understand what was going on.

23        The practice --

24        THE COURT:  How was I to know? Is there any place in

25   there in what you revealed to me that he had told her she

1   would be arrested, which was a false statement, and that he

2   would come and do a strip search?

3          THE WITNESS:  I didn't know anything whether it was

4   false or not -- anything about the background of her being --

5   the likelihood of being arrested in the case. But the reason

6   that the initial full file of documents wasn't filed was that

7   we were concerned about the Privacy Act and --

8          THE COURT:  Aren't you more concerned about the

9   Constitution than the Privacy Act?

10         THE WITNESS:  We certainly are more concerned about

11  the Constitution, Your Honor, but we thought that we were

12  protecting all relevant interests in providing the summary

13  and making the background documents available.  Any statement

14  about the arrests or likelihood, I didn't focus on at the

15  time.  I didn't really know enough about the facts of the

16  case to appraise whether she was a likely target or not.

17         THE COURT:  Isn't one of the big things whether the

18  witness has lied? Wasn't the lies a big problem here?

19         THE WITNESS:  In the Giglio inquiries, we're

20  traditionally focused on -- and in the Giglio questions,

21  we're focused on sustained findings of misconduct and

22  findings pertaining to truthfulness and bias. Something that

23  was significant to me in clear response to this case --

24         THE COURT:  Just a little hugging and kissing is not

25  nearly as bad as a witness saying you're going to be arrested

1    and I'll come to your house and do a strip search.

2          Take on the one hand, a little hugging and kissing

3    and on the other hand, the witness saying I'll come -- you'll

4    be arrested and I'll come to your house and do a strip

5    search, which is the most important?

6          THE WITNESS:  The credibility issues are what we were

7    primarily focused on.  What had struck me in part about this

8    case, and we did include as well, is that Investigator Cook

9    was fully open and the people who investigated it from the

10   sheriff's office and looked into it thought he was completely

11   open and forthcoming with them and that there was no issue as

12   to credibility as to Investigator Cook.

13         What we are traditionally asking for through the

14   Giglio inquiry is filings of misconduct, which we identified

15   and disclosed, but then implications for truthfulness or bias

16   and here, the investigators and the folks who had actually

17   looked at that were very clear and adamant in their response,

18   and we quoted some of that, too, that Investigator Cook had

19   been open and honest with them about what had happened.

20         THE COURT:  He was open and honest with the sheriff,

21   but the question is, did he tell a lie to the witness.

22         THE WITNESS:  The question that we focus on is the

23   official findings and not looking -- the information that we

24   got in this case was vastly more than we typically have

25   access to for law enforcement officers. Typically, we're

1    limited to learning about sustained findings.  That's what

2    our --

3            THE COURT:  This matter came up at trial.  Mrs. Neese

4    said, Judge, you know all there is to know. Did I know? Is

5    there any way I would have known -- maybe I could have known.

6    Maybe I should have taken over the ex parte hearing and gone

7    deeper into it, but I didn't do it.  She knew I didn't do it.

8    She knew I accepted her presentation.  So when it came to the

9    time they wanted to cross-examine the witness, I did not know

10   and I don't know how anyone could think that I knew that he

11   had told the witness "you will be arrested and I'll come to

12   your house and strip search you."

13           THE WITNESS:  The statements about her likelihood of

14   being arrested or not were not anything I focused on.  I

15   didn't know the facts of the case in terms of that, but our

16   intent was to provide the information that was Giglio

17   information, while still trying to protect the privacy, as we

18   were required to do, of witnesses. That was why we hadn't

19   immediately filed, basically, all of the background

20   documents, because we also are trying to encourage local law

21   enforcement officers to share this information with us, which

22   they aren't required to do so.  Part of that is only

23   disclosing the information and going through the ex parte

24   process to only disclose what we're legally required to

25   disclose.

1          THE COURT:  You had the information from the lawyer

2   of EC.

3          THE WITNESS:  I had -- the only part of that I --

4          THE COURT:  You didn't need the Bedford County

5   report, sheriff's report, to know what the attorney for EC

6   had already turned over to your office.

7          THE WITNESS:  That's correct, Your Honor.  I don't

8   remember if I had seen the notes before they had came back in

9   the Giglio request response, but yes, the office did have the

10  notes from EC.

11         I'm sorry, Your Honor.  I may not have understood your

12  question.

13         THE COURT:  Okay.  Go ahead, Mr. Beers.

14  BY MR. BEERS:

15  Q.   Just briefly.

16       So, you keep saying Ms. Neese never told you, nobody

17  ever told you that the guy tried to mislead this woman for

18  his own designs, his own purposes, by telling her all of a

19  sudden "you're likely to be arrested and I'm the one that's

20  going to arrest you and strip search you."

21       That's news to you. That's your testimony.

22  A.   I had seen the discussion of that in the briefing of

23  this case, but at the time, I don't remember having any

24  focus on the status of any investigation or on that statement

25  to her.

1  Q.   If you had known that, if they had told you that, ma'am,

2  as the Giglio officer, would you have told them "you tell

3  that to Judge Moon"?

4  A.   We still would have had to go through, in order to

5  comply with DOJ policy, to appraise -- it came from a

6  personnel file, so something additional to verify --

7  Q.   It didn't come from a personnel file.

8         THE COURT:  Don't y'all have ex parte hearings with

9  judges and disclose secret information, things that have been

10 classified secret?

11        THE WITNESS:  I haven't personally been involved in

12 any of those, Your Honor.  I had been personally involved in a

13 previous ex parte Giglio hearing where we submitted a variety

14 of information and then it was not going to stay under seal.

15 That was part of what was informing our treatment of the

16 documents here because the court in that case had not wanted

17 to have the Giglio proceeding, either ex parte or under seal,

18 and was taking steps to make the entire proceeding public

19 initially when we had submitted this information for

20 consideration by the Court.  So we were concerned and trying

21 to protect against that so we weren't inappropriately

22 disclosing information.

23        THE COURT:  You're in a situation, it seems, Mr. Cook

24 becomes -- everyone is trying to protect Mr. Cook and losing

25 sight of the fact that he's going to testify in a trial and

1    this information is important as to his credibility.

2         THE WITNESS:  We weren't trying to protect Mr. Cook.

3    We were trying to follow DOJ procedures that were requiring

4    this balancing of potential impeachment.

5         THE COURT:  Is there any place in the Department of

6    Justice where someone stops and says, hey, the Constitution

7    overrides our rules?

8         THE WITNESS:  The Department of Justice policy is to

9    provide even broader discovery procedures than the

10   Constitution requires, but we also are tasked with balancing

11   that against other issues, such as the Privacy Act.

12        THE COURT:  Once you get a Court order, doesn't the

13   balancing act end, if the judge makes a decision? How do you

14   go back and balance some statute or some policy with your

15   requirement to obey the Court's order?

16        THE WITNESS:  At that time, Your Honor, we didn't

17   understand the order to be more expansive than the behavior

18   as it had been summarized to the Court.  And the way we

19   typically had done that in our cases was to provide the same

20   summary to the Court, conveying the substance of the

21   information, and that would naturally be provided to the

22   defense attorney.  So there wasn't a separate balancing at

23   that time after the Court's order.

24        MR. BEERS:  Two or three more questions, Judge.

25        Thank you.

1          THE COURT:  Any other questions?

2          MR. BEERS:  Just three more, yes, Your Honor, a

3   couple more?

4          THE COURT: Of this witness.

5          MR. BEERS:  Yes, sir, just a couple.

6   BY MR. BEERS:

7   Q.   You said something about a personnel file.  We can agree

8   the interviews on April 15 and 16 with Ms. Neese and then the

9   FBI and the ATF, okay, of EC, those interviews, that's not

10  personnel files.  That's FBI work and ATF work and U.S.

11  Attorney investigation; right?

12  A.   What I had seen was just from the personnel file and

13  that contained the notes. I wasn't aware of any other reports

14  about that, but yes, the AUSA's notes themselves were in the

15  possession of the U.S. Attorney's office rather than wholly

16  in the personnel file.

17  Q.   You mean, you saw Ms. Neese's notes when you got them

18  from the Bedford County Sheriff's Department; right?

19  A.   Yes.

20  Q.   Obviously, Ms. Neese doesn't work for the Bedford County

21  Sheriff's Department.  That's not a personnel document, is

22  it? That's your document.

23  A.   It's a U.S. Attorney office document, yes.

24  Q.   Isn't it black letter _Giglio_, _Brady_, juris prudence,

25  that impeachment material must be turned over and it's

1   considered exculpatory?

2   A.   There's a materiality standard on that and we were

3   attempting to balance that with the need to respect the

4   witness's privacy.

5   Q.   You thought you were free to do that, needed to do that

6   even after Judge Moon entered his ex parte order. You still

7   needed to engage in balancing; right?

8   A.   Right, not disclose items that weren't required to be

9   disclosed, yes.

10       THE COURT:  I take it you wouldn't have disclosed it

11  to me.  You didn't -- after I ordered what should have been

12  -- what was included in the order, I gather you would have

13  taken the position before me that I wasn't entitled to it.

14       THE WITNESS:  No, Your Honor. We offered up all the

15  back-up documentation to you in the ex parte submission.

16       THE COURT:  That FBI document?

17       THE WITNESS:  We did not have that FBI document.  I

18  didn't see the FBI document or know that it existed until

19  2015 when the appeal was filed.

20       THE COURT:  Ms. Neese would have known, wouldn't she?

21       THE WITNESS:  My understanding was that she didn't

22  and she had also -- we're always trying to get a document

23  from the agency rather than relying on the attorney's notes.

24  So we had had discussion, including with other supervisors,

25  whether there was an FBI report or document or anything else

1    to submit, describing that and my understanding was there was

2    nothing else we had any access to.

3    BY MR. BEERS:

4    Q.   The testimony in this case, the author of the report

5    that Judge Moon just asked you about, says it was done

6    April 18, 2013; okay?

7    A.   Okay. I wasn't in the courtroom for that.

8    Q.   Fine.

9         Did anyone from your office, the U.S. Attorney's office

10   in Harrisonburg or Roanoke, ask the FBI for either the

11   underlying notes Ms. Neese saw the FBI agent take or his

12   typed up report?

13   A.   My understanding was yes, we had, either through AUSA

14   Cullen or AUSA Neese and there had not been a report.

15   Q.   Had not been a report.  That's what Ms. Neese told you.

16   The FBI said there's no report.

17   A.   I don't remember the specific conversation about what

18   she or someone else may have told me about that, but my

19   understanding was all we had was the notes.

20   Q.   You didn't have the FBI agent's notes?

21   A.   No.

22   Q.   Black letter question on <u>Giglio</u> and <u>Brady</u> doctrine.

23        You're responsible, are you not, you, Ms. Neese, your

24   colleagues, U.S. Attorney's office are responsible for

25   searching for and making sure that all reports that are in

1  the hands of the FBI or other federal agencies are produced,

2  collected and produced, either exculpatory or Giglio; right?

3  A.   Yes, and we always try to do that.

4  Q.   You always try to do that, sort of a collective

5  knowledge doctrine; right?

6  A.   Yes, what's known to the officers is imputed to the

7  prosecutors, yes.

8  Q.   Very good, what's known to the officers.  But what

9  you're telling us is that Ms. Neese told you there's just

10  nothing over at the FBI.

11  A.   I don't remember if it was specifically AUSA Neese.  It

12  was in the early conversations about the Giglio disclosures.

13  Q.   Last question, ma'am.

14      Did you have any discussions with anyone at the U.S.

15  Attorney's office about contacting Staunton River High School

16  or the school authorities about this Investigator Cook who

17  they found a job for him -- did you know that -- as the DARE

18  officer, school resource officer at the high school after he

19  got removed from the team and the investigation?

20  A.   There was no discussions, no.

21  Q.   Did you have any duty at all to alert the school

22  authorities, this guy, the DARE officer was intoxicated in

23  the car and getting his penis out and is the DARE officer,

24  did you have any duty to do that?

25  A.   I'm not aware of a specific duty.  I wasn't aware until

1    your filing he was a DARE officer or any other capacity, but

2    the U.S. Attorney's office had disclosed all information it

3    had to the Bedford County Sheriff's Office and they handled

4    it in their disciplinary process.

5    Q.   Right.  They found a job for him over at the school.

6    A.   They suspended him and took other actions.

7         MR. BEERS:  Thank you, Your Honor.

8                   CROSS-EXAMINATION

9    BY MR. MOUNTCASTLE:

10   Q.   Ms. Wright, approximately when you were you assigned to

11   serve as one of the Giglio officers in the U.S. Attorney's

12   office for the Western District of Virginia?

13   A.   In approximately October of 2012.

14   Q.   So during December, 2013 through May of 2014, the period

15   relevant to this matter, how long had you been a full time

16   AUSA at that time?

17   A.   I became a full-time AUSA in September 2012, so about

18   15 months.

19   Q.   How long had you been assigned to serve as a Giglio

20   officer?

21   A.   About one month fewer than that.

22   Q.   What was the training, the specialized training, if any,

23   you received to be a Giglio officer?

24   A.   It was just on-the-job training and repeated

25   conversations with my supervisors and AUSA Bockhorst, who had

1    been the Giglio officer for some time before then. I also

2    attended some discovery trainings that were generally

3    available to AUSAs.

4    Q.   Did you have any guidance you relied on in performing

5    your duties as a Giglio officer?

6    A.   The guidance included the U.S. Attorney's manual and

7    then there were documents received in the course of the

8    trainings on Giglio and Brady.

9    Q.   So during the period of time of December 2013 through

10   May of 2014, how would you describe your level of experience

11   as an AUSA and as a Giglio officer?

12   A.   I was still relatively new to both and learning the

13   procedures.

14   Q.   What do you understand your role to be as a Giglio

15   officer during that period of time, December 2013, through

16   May of 2014?

17   A.   We were there to assist AUSAs in receiving and basically

18   to be a conduit for potential Giglio information on law

19   enforcement witnesses and to help, along with the

20   supervisors, to advise on the handling of Giglio inquiries.

21   Q.   What did you understand your role to be with respect to

22   pleadings that were prepared for filing with the Court such

23   as the ex parte motion in this case, the disclosure letter to

24   the defendant's counsel and even the subsequent motion in

25   limine that was filed with the Court?

1    A.    There was no specific role. I would review them when

2    AUSAs sent them to me and would offer whatever advice struck

3    me. Primarily, I was helping to circulate go-by examples to

4    assist the AUSAs.

5    Q.    Again, during the same period of time we've been talking

6    about, what did you understand the role of the supervisors at

7    the U.S. Attorney's office to be in deciding how to handle

8    complex Giglio matters such as those pertaining to Officer

9    Cook?

10   A.    They were to be fully involved in the discussion and we

11   were running all of the materials by them.  Then they would

12   be doing whatever review they would typically do for fillings

13   for their supervisees.

14   Q.    In your testimony just now and in your Declaration, you

15   make reference to the need to consider Privacy Act concerns

16   or issues related to Officer Cook.  Can you tell the Court

17   the basis for that concern or that requirement to have that

18   concern?

19   A.    The basic concern came from the U.S. Attorney's manual

20   which directed the AUSAs are required to consider the privacy

21   and reputation interests of the individuals.  I also had the

22   experience where I think we were instructed to be keeping

23   this information, using the ex parte and under seal process

24   when necessary when there were privacy interests and it

25   wasn't obvious a disclosure had to be made.  We had had a

1    recent incident in the district where the items had not been

2    going to be kept under seal.  So we had been trying to be

3    especially careful of that in order not to run afoul of

4    either DOJ policy or the Privacy Act in making these

5    disclosures.

6    Q.   Based on the guidance you had in your on-the-job

7    training, do you understand there to be any difference in

8    terms of handling Giglio information for a federal law

9    enforcement officer as compared to a state or local law

10   enforcement officer?

11   A.   The main difference is that for the federal law

12   enforcement officers, they have agreements with the

13   Department of Justice that basically obligate them to provide

14   information to assist in Giglio inquiries to the U.S.

15   Attorney's office.  There is no such agreement with the state

16   and local law enforcement officers.  So when we would request

17   Giglio information, there's actually no obligation for them

18   to respond or give us any information at all.  So we were

19   trying to be especially sensitive to respecting the personnel

20   files and trying to protect the privacy interests and whatnot

21   of the officers when dealing with the state law enforcement

22   officers.

23   Q.   Did you have any understanding of whether there would be

24   any consequences if you as a Giglio officer or an AUSA in the

25   U.S. Attorney's office failed to give proper regard to the

1   privacy concerns of a law enforcement officer, in this

2   particular case, a state or local law enforcement officer?

3   A.   My understanding was there could be potential liability

4   under state or federal Privacy Act considerations or

5   violations of the U.S. Attorney's office policies.

6   Q.   And did you have discussions with AUSA Neese regarding

7   that concern?

8   A.   I was telling individuals and spoke with AUSA Neese, per

9   the training we received, they needed to treat these

10  documents confidentially.  We kept them secured in the U.S.

11  Attorney's office so they were fully accessible to the AUSAs

12  on a case-related need-to-know basis, and I remember passing

13  along the information about the difficulties we had or the

14  issue we had had in following the procedure of having these

15  proceedings be ex parte and under seal previously.

16  Q.   With respect to the disclosure made to this Court

17  through the ex parte motion and the hearing with respect to

18  the information, the ex parte hearing, do you recall whether

19  you had any discussions any AUSA Neese about how to proceed

20  with respect to the motion and the hearing?

21  A.   To my knowledge, this is the first hearing of this type

22  that we had, but we talked about the desire to have the

23  documents available, not to file them ahead because of the

24  concern that it wouldn't be filed properly.  But she was

25  going to have herself and the officer available to testify

1    and the documents also available for review if that would

2    assist the Court.

3    Q.   So in your discussion with her, are you saying you did

4    not discuss actually just presenting the documents

5    affirmative to the Court in that ex parte hearing?

6    A.   I don't recall specifically discussing that, no.

7    Q.   Would you have advised her with regard to whether that

8    should be done or not? What's your position on that?

9    A.   I would have certainly advised making them available --

10   having them available and providing it if the Court had

11   requested it, but otherwise, generally, to be cautious

12   because of the need to not be publically disclosing or

13   disclosing more broadly than required some of this

14   potentially protected information.

15   Q.   But if it's an ex parte hearing, why would that be a

16   concern?

17   A.   In the ex parte hearing available to the Court, there

18   would not be a concern with that.  The Court would have been

19   able to review the documents upon request, at least if we had

20   potentially had to go back and verify or confirm and inform

21   the local agency that this would be happening.

22   Q.   Did you express to Ms. Neese that a preference for

23   providing the Court with a summary of the information in the

24   ex parte information as opposed to providing the Court with

25   the actual source documents?

A. Yes.

Q. And what was that? What did you tell her?

A. I don't recall the specific conversation other than this was the approach of the district in order to focus on the issues and not have the Court need to slog through various documents. So for efficiency and also to be as deferential as we could appropriately be to the privacy considerations.

Q. And it was your understanding at that time that that was the preferred practice in the district?

A. Yes.

Q. When you reviewed the filings, the draft ex parte motion and the draft of the disclosure letter to the defendant's counsel, what did you understand the purpose for your review of those documents to be?

A. The review wasn't required, but my role when I was sent these documents was generally to look them over and ensure they were consistent with the general procedural practices of the office, reflected the ex parte and under seal aspect for purposes of the Court's disclosure, and I was generally looking for sort of typos or any other thoughts that struck me as I was reading through.

Q. To what extent did you review the description or the summary of the potential Giglio information that was described in those documents?

A. I looked over it. I don't remember having any specific

1    discussion of it at that time.  It was several months after

2    we gathered the information, but I read over it and just sort

3    of looked at the overall content and aspects of the filing.

4    Q.    So was it your belief that the summary was sufficient,

5    based on the facts as you knew them?

6    A.    That was my understanding, yes.

7    Q.    And what was the basis for your -- what were the factors

8    you considered in coming to that understanding?

9    A.    I had reviewed the information we had received from the

10   various offices back in December.  I knew that AUSA Neese had

11   been having extensive conversations with supervisors and the

12   supervisors who had been looped in were not particularly

13   concerned about this information.  It remained influential to

14   me when we were disclosing the fact of the discipline, which

15   is part of the information we try to gather and also the fact

16   that the individuals who had engaged in the investigation had

17   considered Investigator Cook to be open and forthcoming with

18   them in that investigation and didn't think there were any

19   credibility issues as to Investigator Cook.

20   Q.    You mentioned the supervisors didn't appear to be

21   concerned about that information. Which supervisors are you

22   referring to?

23   A.    I remember an e-mail from the First Assistant U.S.

24   Attorney Giorno, who had reviewed information in the files

25   and said it didn't seem to reflect any concern about

1    truthfulness or bias. And from the conversations about AUSA

2    Neese repeatedly looping in supervisors and talking about the

3    generalized information, some folks didn't think there was

4    any need for any disclosure, even ex parte, or certainly

5    thought the ex parte process was sufficient and appropriate

6    to outline the sexual nature of the conduct and the

7    discipline and whatnot that we needed to disclose.

8    Q.   The e-mail you're referring to from the first assistant,

9    was that also copied to other supervisors, including the

10   criminal chief and the deputy criminal chief?

11   A.   That sounds right.  I don't remember the specific copy,

12   but it was a full loop of supervisors and I was looped into

13   that afterward as well.

14   Q.   For clarification, you talked about when you got into

15   the matter, the decision had already been made that an ex

16   parte motion needed to be filed rather than a straight out

17   disclosure to defense counsel. Am I recalling your testimony

18   correctly?

19   A.   Yes.

20   Q.   Do you know who made that decision?

21   A.   I received the information from just the initial e-mail

22   from AUSA Jacobsen asking me to send examples for these

23   filings and I knew from talking to AUSA Neese she had

24   previously talked in detail with AUSA Bockhorst and AUSA

25   Cullen and others involved in reaching that determination.

1    Q.   Did you have any disagreement with that determination

2    once you got into the case?

3    A.   No, it made sense.

4    Q.   Did you have -- what was your intent in the way that the

5    conduct was summarized in the ex parte motion and the

6    disclosure to defense counsel? What was the intent when you

7    reviewed that and you felt that that was sufficient?

8    A.   The goal was to provide information giving the gravamen

9    of the conduct to the Court and sufficient information in

10   order to enable the Court to make a ruling on potential

11   disclosure and admissibility.

12   Q.   Did you have any intent to minimize or hide or fail to

13   disclose any relevant material to the Court or to the defense

14   counsel in this particular case?

15   A.   No, not at all.

16            MR. MOUNTCASTLE:  That's all I have, Your Honor.

17            MR. BEERS:  Nothing further, Your Honor.

18            THE COURT:  Thank you.  You may step down.

19            MR. BEERS:  Defense rests.

20            THE COURT:  It's five after one. Would you all like

21   to take a lunch break then?

22            MR. MOUNTCASTLE:  We can.  I'm just thinking a

23   minute. I don't think I have any other witnesses, so the

24   government is going to rest as well.

25            THE COURT:  I take it y'all would like to argue the

1    case.

2         MR. BEERS:  Just briefly, Judge.  We briefed it.

3    Brief argument on my part.

4         MR. MOUNTCASTLE:  I just have a small argument.  I'm

5    not going to go into all the details. It's been briefed

6    extensively.  I just have a couple points I'd like to make.

7         THE COURT:  We'll take about a five-minute recess and

8    then come back.

9         (Recess at 1:10 p.m. until 1:15 p.m.)

10        MR. BEERS:  May it please the Court.

11        Your Honor, thank you for affording us so much time.

12   I also thank you for appointing me to represent the

13   defendant, Mr. Burns, in such an interesting case, I think a

14   very important and disturbing case.

15        Judge, both sides are briefed this issue thoroughly.

16   I'll just say one addition. In March of this year, the

17   Supreme Court, in a case called Wearry, W-E-A-R-R-Y, v. Cane,

18   136 Supreme Court 1002, reversed summarily, without even

19   affording argument, reversed a Court of Appeals refusal to

20   award a new trial in a Brady and I think a Giglio case, at

21   least Brady and I think it was a Giglio case. In any event,

22   Judge, the Court in that case, and I'm not saying it's

23   factually similar, but the principles, they went over the

24   principles.  Said to prevail on his Brady claim -- and

25   despite some of the testimony, Judge, Brady and Giglio, the

1   Supreme Court said 30 years ago, two sides of the same coin,

2   same standard.  To prevail on the Brady claim, Wearry, the

3   defendant need not show the "more likely than not would have

4   been acquitted had the new evidence been admitted."  They

5   said given this legal standard, Wearry can prevail even if

6   the undisclosed information may not have affected the jury's

7   verdict. In other words, I think the Supreme Court was

8   reemphasizing this is not Strickland versus -- the Strickland

9   ineffective assistance of counsel standard.  It's not a new

10  trial standard.  It's a lower standard.  Ultimately, the

11  Court needs to look at a number of factors.

12       The Fourth Circuit went over some of those factors in

13  2013. This is the case the Court cited in its ex parte order,

14  Sterling, from 2013. "In fashioning a remedy for a Giglio

15  violation, the district court must consider several factors:

16  The reason for the government's delay; whether the government

17  acted intentionally or in bad faith; degree of prejudice;

18  whether any less severe sanction or remedy will prejudice the

19  defendant and deter future wrongdoing by the government.

20       That clarified a couple points, Judge, in the Fourth

21  Circuit.  Before that, the cases were in conflict whether bad

22  faith or intentional violations should be considered in

23  considering remedy and also deterrence. We know from 2013 in

24  that opinion that both deterrence and intentional wrongs

25  should be considered in fashioning a remedy.

1    Judge, the remedy we're asking for, if not dismissal

2    of the indictment, which concededly is rare, is a new trial

3    for this judge.

4    First of all, there's no question there was a <u>Giglio</u>

5    violation here. We can talk all day long about the U.S.

6    Attorney's manual, which they never addressed.  I addressed

7    it in the brief.  It says on its face the policy they

8    supplied, and it's attached to my brief.  It doesn't even

9    apply.  They never addressed that.  It just doesn't apply.

10   It says that on its face. A, it says it doesn't have the

11   force of law and secondly, says it doesn't apply to our

12   situation.  That policy or guidance for what you tell local

13   authorities and federal agencies what they have to produce to

14   the U.S. Attorney's office has nothing to do with what we're

15   talking about in this case which is what do they need to tell

16   the defense counsel. That's not in that policy they're

17   relying upon.

18   The Privacy Act is another red herring. It's obvious

19   it's a red herring because we could talk about privacy

20   concerns all day long for Mr. Cook.  I don't know why they're

21   so worried about this cop.  I think he's waived any privacy

22   interests he may have had in his private parts a long time

23   ago when he got in the car with that lady and pulled her

24   across that console and asked her to perform sex acts on him

25   and said "are you going to leave me hanging, are you going to

1   leave me hanging?"  I think any Privacy Act rights were over.

2        The bottom line is, they got their ex parte hearing,

3   which is an extraordinary hearing.  They came in and they did

4   it.  That's controlled by Pennsylvania vs. Richey.

5   Pennsylvania vs. Richey makes clear that even though Burns

6   and his lawyer, Mr. Snook, from Charlottesville, appointed

7   counsel at that time, didn't know about it, Burns was, at a

8   minimum, entitled under due process principles of the Fifth

9   and Sixth Amendment, he was entitled to a thorough ex parte

10  review of the information.  They misled the Court.  They told

11  the Court half the story -- not even half the story. They

12  just told the Court in two sentences, she admitted to being

13  flirtatious and even kissing. That's misleading.  Not just

14  misleading.  It's just a lie.  They came in here and lied to

15  this federal judge.  She didn't admit to being flirtatious.

16  I asked her, where does it say she admitted to being

17  flirtatious?  It's not in Ms. Neese's notes. It's not in the

18  FBI notes.  Then to even kissing.  Well, that's misleading.

19  Nothing about him trying to expose himself and committing

20  several state court crimes, nothing about him trying to force

21  himself upon her and bruising her knee. Then going in and

22  telling a judge there was nothing in here that called into

23  question his veracity or credibility and they cite all these

24  cases. But he did.

25        There were a number of things. First of all, we

haven't talked about this, but he was deceptive when he got

the job and he failed the lie detector test. They didn't

turn that over. They didn't tell the Court that. They didn't

tell Mr. Snook that. They didn't tell the Court or Mr. Snook

he failed to report to Botetourt County officers on the job,

I guess, smoking marijuana. Didn't tell him any of that.

Then more importantly, they didn't tell the Court that he

point blank looked at this grand jury witness when he was

trying to get sexual satisfaction from her and said, oh, I'm

not married, I'm single, I wouldn't be here if I were

married, which is a lie. The jury could have understood that

was a lie. That's not hard. The man disavowed his wife in

the interest of gratifying himself in that car with a federal

grand jury witness. He abused his office. Then on the next

occasion, he abused it further more significantly in my mind

by lying to her and saying you're now a likely target. I

told you two or three days ago you were just a witness.

Everything's changed now and now you're going to be arrested.

He tried to scare the living daylights out of her. Beyond

that, when you get arrested, honey, I'm coming over and I'm

going to be the one to strip search you. He's trying to

intimidate her and he's doing a lot of sick things. But the

point is, none of that was disclosed to this Court. That's a

violation of <u>Pennsylvania vs. Ritchey</u>. This Court was not

able to conduct an ex parte review of the facts because they

1    didn't want His Honor to know the facts.

2          Beyond that, Judge, the Court said even on that PG

3    sanitized version, misleading version they told the Court,

4    the Court said in no uncertain terms his behavior concerning

5    this witness must be disclosed as soon as possible.  Of

6    course all that needs to be read together with the Court's

7    standing order, which, of course, Ms. Neese agreed to.  She

8    said she doesn't know anything about <u>Brady</u> or <u>Giglio</u>; she's

9    inexperienced.  She's signing these orders every day of the

10   week.  Provide the defendant any evidence of an exculpatory

11   nature.  Once the Court had that hearing, once the Court

12   entered its order, the Court decided this it was exculpatory.

13   It was impeachment material that needed to be turned over.

14   All balancings was over. There's no more Privacy Act because

15   the Privacy Act doesn't apply because this is a Court of

16   competent jurisdiction and that's all ridiculous. The U.S.

17   Attorney's manual doesn't apply.  What applies is this

18   Court's order and the Constitution.

19         Instead of providing the evidence the Court told them

20   in two orders to provide and which they promised -- they

21   promised to Mr. Snook at the beginning of this case when he

22   got appointed that they would provide, because they now know

23   it's exculpatory, so they promised to do it, they sent him

24   this mamby-pamby letter that doesn't say anything.  It does

25   have a privilege log attached, but it doesn't say there are

documents that she could look up. They just mislead him,
just like they misled the Court. Mr. Snook -- poor Mr. Snook
believed them. I don't believe them, but he did. We
shouldn't blame Mr. Snook. Mr. Snook's under no duty to
think that they were misleading him. He's under no duty to
think they would have the temerity to come in and mislead a
federal judge. They misled Mr. Snook. He accepted that. He
thought that's all there was and he's under no duty to look
behind their representations. Why would he, Judge? They
promised him they would give him any evidence of an
exculpatory nature.

So, they continued to talk about balancing and
Privacy Act, and all that's out the window. This Court's
order and the Constitution trumps all that. They didn't give
him any of the information. So there's no question we have a
Giglio violation. The Court's already decided it has to be
turned over. The Court's already decided it's favorable to
the accused because it tends to impeached. The Court's
already decided it's material and has to be produced. The
Court has already decided it's Brady and Giglio material and
needs to be shared. They didn't want to share it. That's
what they have not wanted to do from the beginning of this
case, share it with the defense. Why? Because it's more
important to protect this dirty cop. That's why they didn't
want to share it. They never wanted to share it. They wanted

1    to protect him.

2         The jury should have been able to hear all that,

3    Judge.  The jury should have been able to hear the antics

4    they've gone to, to protect this guy, this charade that he

5    could be a DARE officer at Staunton River High School.  He

6    was gone the day our brief was filed and it became public

7    because he was never qualified to be a DARE officer. The jury

8    should have heard that that guy, when he's testifying about a

9    confession that he says Burns made, that Burns disputed, that

10   he owes one to the sheriff.  He owes one to the task force.

11   He owes one to the U.S. Attorney's office for keeping quiet.

12   They should be able to hear that.  That's not governed by

13   Rule 608(b).  That's bias information. He owes them one.

14   That guy should have been fired. He should not have been

15   shuttled over to that high school.  So he owed them and the

16   jury didn't know that.  So, he's up there testifying like

17   he's this school resource officer and the jury was not

18   allowed to know what he owes these people for protecting him.

19        Ms. Neese never told even the sheriff, I guess, the

20   facts about him pulling out his penis and all that. She

21   doesn't remember.  She said it's in my notes.  What do the

22   notes said? They don't come out and say it.  They say he

23   pulled something out and played with it? She said I included

24   it, it was in my notes.  She was protecting her friend, the

25   officer.  They were protecting their friend, the officer,

1    from the beginning and the jury should have known all that.

2         Turning to these factors, Judge, I don't think

3    there's any question it's a Giglio violation. I think it's a

4    question of remedy.  Judge, if they had come into this court

5    or a long time ago instead of causing all this brief writing

6    and hearings and just said, you know what, we made a mistake,

7    we missed the boat, got bad advice from Ms. Wright or

8    somebody, or I don't know.  Did something.  But it doesn't

9    matter and this and that.  That's not what they've done. What

10   they've done is prolong this by coming in and defending what

11   they've done by citing a U.S. Attorney's manual that doesn't

12   apply on its face, by citing the Privacy Act which can't

13   possibly apply once this Court's entered an order and

14   defending things instead of just admitting that they made a

15   mistake.  So they acted intentionally. They acted

16   intentionally at the time, Judge.  They acted in bad faith at

17   the time and by submitting a brief like they've submitted,

18   they're continuing -- they're continuing their intentional

19   conduct in coming up here and just giving all this

20   bureaucratic talk about divisions and I have to listen to

21   this person. This is a very simple case.  The first Giglio

22   officer involved before she was mysteriously assigned off the

23   case said, "I don't mean to be grumpy. I don't know what

24   we're talking about in that e-mail.  If the guy was demoted

25   for that conduct, we need to turn over the documents." For

```
 1    this, Ms. Bockhorst was reassigned. She was off the case.

 2    Then they brought in Ms. Wright, their Giglio genius from

 3    Harrisonburg, to say, no, no, no, we don't have to do all

 4    that.

 5           How are we going to deter that from happening again?

 6    The Fourth Circuit says that is the relevant factor, in

 7    addition to the prejudice.  It's highly prejudicial when an

 8    officer gets to take the stand and read in a confession. It's

 9    highly prejudicial when a U.S. Attorney multiples times in

10    his argument says the guy confessed.  What's the problem?

11    The guy confessed.  But the guy, Investigator Cook, was never

12    subject to proper cross-examination because they violated

13    their ethical responsibilities and their constitutional

14    responsibilities.

15           How are we going to deter that from happening again?

16    The only way the Court can defer that from happening again is

17    to make them retry him, to give him a fair trial.  Otherwise,

18    it will happen again. Otherwise, they will continue to

19    cynically say things, you know, it's in our manual, we can do

20    this and we can do that, dah, dah, dah, we need to worry

21    about these officers that go out and drink on the job and

22    assault women. They'll continue to make these cynical

23    arguments unless the Court causes them to do some work and

24    retry this gentleman.

25           Thank you, Your Honor.
```

1          MR. MOUNTCASTLE:  Your Honor, one of the issues here

2     for the Court is the materiality aspect of it.  Mr. Beers was

3     correct that the Wearry case he cited to is very much

4     different factually.  In that case, the Supreme Court found

5     the government's evidence was built on the jury crediting a

6     single witness and of course the impeachment material in that

7     case went to that witness.

8          Here, you don't have that.  Officer Cook was one of

9     many witnesses, as set forth in our brief.  So we think that

10    the testimony, the evidence that would have -- the additional

11    evidence the jury would have heard would have been questions

12    about sexual misconduct and statements made to EC.  That's

13    what they would have heard.  That would not have touched any

14    of the other evidence that was presented to the Court,

15    including the testimony of Officer Dryden, who also took

16    admissions and confession from the defendant about his

17    involvement in the drug conspiracy.  So you have -- even

18    assuming that Mr. Snook would have been allowed under Rule

19    608 -- and that's the rule that applies.  Those documents

20    show nothing about bias because it has to do with a witness

21    who was not part of this case.  There's nothing about bias in

22    those documents. If those documents had been disclosed, Mr.

23    Snook would have asked questions.  Did you attempt to have

24    sex with the witness? Did you tell her you were married when

25    you were not? Did you tell her that she would be arrested and

1  in fact, she wasn't a target and you knew that was a lie? He

2  would have been asked those questions, but there's nothing in

3  that information that has anything to do with bias.

4       I think what the Court needs to determine is whether,

5  given what we've done now, the U.S. Attorney's office has

6  done now, contrary to Mr. Beers' cynical arguments we're

7  trying to cover up things, we have, I think, gone to

8  extraordinary lengths to open up our files in this case to

9  include waiving attorney work product privilege with respect

10  to internal e-mails, to make it clear to the Court and

11  whoever else wants to review this matter what happened in

12  this case.

13       So we would submit to you, Your Honor, that your

14  decision here is, in part, had you known the full scope of

15  the impeachment material and applied Rule 608, would you have

16  allowed cross-examination and if you had allowed

17  cross-examination, given the full scope of the evidence

18  presented at trial, the dozen or so witnesses that talked

19  about this defendant's involvement in the drug conspiracy,

20  the testimony of Officer Dryden about his confession to him

21  about being involved in some scam to steal pills from a drug

22  store using two of his co-conspirators, whether Officer

23  Cook's testimony would have made a difference in the grand

24  scheme of things even if he had been asked about five

25  questions regarding his sexual misconduct with a witness, I

think that's what you have in front of you for decision at

this point.

Of course, the government has laid out everything

that we know about this matter, every piece of paper that we

have on this matter, every e-mail that's relevant that has

any substance to it about this matter, for you to see and for

you to make a fully informed decision.

The only other thing I want to talk about is the

accusation which Mr. Beers has made from day one, from the

very first document he filed in this case, in which he

accuses AUSA Neese, AUSA Wright, perhaps even AUSA Bradlyons

of bad faith. I think if Your Honor looks at the full scope

of the evidence, including the e-mails, it's not a picture of

bad faith. It might be a picture of things not being done to

perfection and maybe even some fumbles, but it's not bad

faith.

With respect to AUSA Neese, you see repeatedly in the

documents that she is continuously herself raising the issue

of this Giglio information with Officer Cook. She's

initiating discussions with her supervisors. She's seeking

guidance from her supervisors and the Giglio officer how to

handle this. What's the proper way to handle this? What do

I need to do? She's the one that initiates the information

that uncovers in the first instance the potential Giglio

information pertaining to Officer Cook. She is the one who

1    is discussing this --

2          THE COURT:  The witness, whatever her initials are,

3    didn't her lawyer contact justice first?

4          MR. MOUNTCASTLE:  Her lawyer contacted justice first,

5    but AUSA Neese found out first about the Botetourt

6    information. It's her questioning that first uncovered the

7    Botetourt information.

8          Yes, with respect to the Bedford County information,

9    it was the lawyer that contacted her and she immediately

10   contacted her supervisors, received instructions from her

11   supervisors to -- I think even the very same day that that

12   contact was made, she was in the attorney's office receiving

13   the attorney proffer.  The very next day, there was the

14   interview with the witness herself.  So that information, the

15   minute that was provided to her, she acted upon it.  The very

16   same day of the interview with the witness, the entire file,

17   everything that they had at that time, and they didn't have

18   Agent Emmerson's form.  He didn't complete that until the

19   18th.  But on the 16th, they took all that information that

20   was in the possession of the U.S. Attorney's office, Ms.

21   Neese did, to the Bedford County Sheriff's Office. She even

22   provided her attorney work product privilege notes, which

23   contain all of the essential information that ended up in

24   Emmerson's report later anyway.

25          All that, Your Honor, paints a picture not of bad

faith, but a good faith attempt.  Perhaps, as the Court has

questioned it, maybe perhaps insufficient and perhaps

deficient in terms of whether it was perfect or not, but it

all indicates a good faith attempt to comply with the Giglio

requirements.  The issue of the Privacy Act, the government

is not here saying the Privacy Act trumps the constitutional

right.  We're not saying that at all.  For whatever reason,

the DOJ guidance spends a lot of time talking about the

Privacy Act in this context. That's just a fact.  And the DOJ

training talks about the Privacy Act ad nauseam, maybe

overkill.  I would say overkill on the Privacy Act because

what matters here is the defendant's constitutional rights.

But the reason that was brought out in this proceeding and

has been brought out in the pleadings is to address the bad

faith claim.  The fact of the matter is that DOJ policy has

been telling these AUSAs, AUSA Neese and AUSA Wright, that

you have to consider the Privacy Act.  There are privacy

right implications.  AUSAs has been sued because there was an

unwarranted invasion of privacy.  You need to avoid that.

I'm not saying that's the proper way to look at it.  I'm

saying that's what was in their minds the whole time this

whole matter was being dealt with.

        So, Your Honor, I would ask the Court to take a look

at the totality of the presentation, the evidence before it,

including the internal e-mails and the discussion, as well as

1    the testimony.  I think it would be -- we would ask the Court

2    to find that there was no bad faith in this particular

3    instance.  There are questions about whether the information

4    was adequately handled, but if it was inadequately handled,

5    it was not done in bad faith.  That's the whole point of the

6    presentation of the e-mails, of the discussion in-house, to

7    show what was in the minds of these AUSAs as they dealt with

8    this fairly complex and relatively novel issue.  Giglio in

9    itself is not novel, but Giglio information about a law

10   enforcement officer is not something that these two AUSAs had

11   handled before.  So part of the way it was handled --

12        THE COURT:  Can the government get off that easily?

13   You've got people going all the way up to the Attorney

14   General.  You have people who are inexperienced handling

15   something -- the defendant is not allowed to suffer because

16   the law enforcement people aren't doing their job.

17        MR. MOUNTCASTLE:  And I'm not asking you to let the

18   government off easy, Your Honor. We've laid open what we

19   have, all the information we have. I am talking about the

20   AUSAs that were on the line and what they knew.

21        My suggestion to you is that those two AUSAs, based

22   on all the evidence, were not acting in bad faith.  They may

23   have acted erroneously.  They may have reacted, overreacted

24   to information being provided by the Department of Justice

25   and supervisors about how things should be handled and the

1   extent to which Privacy Act concerns should be considered,

2   but that's not bad faith.  That's my point here, Your Honor.

3          In terms of the outcome of the case, I leave -- we

4   leave it to Your Honor, based on all the facts, to decide

5   what should happen in this case.  But I'm here to suggest to

6   the Court and to strongly argue to the Court that whatever

7   happened with the handling or mishandling of information was

8   not a product of bad faith or ill intent on the part of the

9   AUSAs who were on the line handling it.

10         That's all I have.  I'll be happy to answer any

11  questions you may have.

12         THE COURT:  Thank you.

13         Anything else?

14         MR. BEERS:  No, Your Honor.

15         THE COURT:  I'll try to let you have an answer in a

16  few days.

17         Thank you.

18

19

20

21

22

23

24

25

                              **INDEX**

| **WITNESS FOR DEFT.** | **Direct** | **Cross** | **Redirect** |
|---|---|---|---|
| Bryan Emmerson | 3 | | |
| Ashley Neese | 19 | 60 | 88 |
| Elizabeth Wright | 94 | 121 | |

| **EXHIBIT NO.** | **Marked** | **Admitted** |
|---|---|---|
| Govt. 1-39 | 64 | 64 |
| Govt. 30A | 81 | 81 |
| Govt. 36A | 94 | 94 |

"I certify that the foregoing is a correct transcript from

the record of proceedings in the above-entitled matter.


/s/ Sonia Ferris                    July 20, 2016"